UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
KADIAN MCBEAN, et al., individually and
on behalf of a class of all others similarly
situated,                                           :

                              Plaintiffs,           :

                                                    :          02 Civ. 5426 (GEL)

        -against-                                   :

                                                    :
THE CITY OF NEW YORK et al.,                        :

                              Defendants.           :
------------------------------------------------------------x
DAVID CENCE, et al., individually and on
behalf of a class of all others similarly
situated,                                           :

                              Plaintiffs,           :

                                                    :          03 Civ. 4114 (GEL)

        -against-                                   :

                                                    :
THE CITY OF NEW YORK, et al.,                       :

                              Defendants.           :
------------------------------------------------------------x
JOEL RAMOS, et al., individually and on
behalf of all others similarly situated,            :

                                                    :          **OPINION AND ORDER**

                      Intervenor-Plaintiffs,        :
                     _____
                                                    :

        -against-                                   :

                                                    :
THE CITY OF NEW YORK, et al.,                       :

                              Defendants.           :
------------------------------------------------------------x

Richard J. Cardinale, Cardinale, Hueston & Marinelli,
Brooklyn, New York, Robert N. Isskes, Esq.,
Middletown, New York, for Plaintiffs.

Richard D. Emery, Matthew D. Brinckerhoff, Marian
Meier Wang, Emery, Celli, Brinckerhoff & Abady
LLP, New York, New York, for Intervenor-Plaintiffs.

Michael A. Cardozo, Corporation Counsel of the City
of New York (by Genevieve Nelson and Muriel
Goode-Trufant, Assistant Corporation Counsel),

New York, New York, <u>for Defendants</u>.

GERARD E. LYNCH, <u>District Judge</u>:

A settlement agreement between plaintiffs and defendants in the above-captioned class action was preliminarily approved by this Court on June 21, 2005. Plaintiffs now move for final approval of the settlement pursuant to Fed. R. Civ. P. 23(e)(1)(A). Intervenor-plaintiffs object to the proposed settlement and request that it be rejected. For the reasons below, plaintiffs' motion for approval will be granted and intervenors' objections will be overruled.

## BACKGROUND

This case has a long history, much of which is laid out in this Court's opinion certifying the plaintiff class, <u>McBean v. City of New York</u> (<u>McBean I</u>), 228 F.R.D. 487 (S.D.N.Y. 2005). In that opinion, this Court defined the plaintiff class as "pre-trial detainees who, during the class period [July 15, 1999 through July 22, 2002], were arraigned on certain misdemeanors, violations, and misdemeanor charges of civil contempt, and non-felony warrants regarding same, and who, after arraignment, were strip-searched in DOC jails pursuant to the standard new admission strip search procedure." <u>Id</u>. at 496 (emphasis omitted). Plaintiffs claim that because the searches were conducted without individualized reasonable suspicion, the defendants violated their federal civil rights.

On May 13, 2005, after several settlement conferences under the close supervision of Magistrate Judge Theodore E. Katz, plaintiffs and defendants entered into a stipulation of settlement. The proposed settlement incorporates this Court's definition of the class, and explicitly excludes "pre-trial detainees who, at the time they were admitted . . . , were charged with [various specified drug-related or weapon-related crimes]." (Settlement ¶¶ 1, 2.) Under the

proposed settlement, class members are eligible to receive $750 if they were subjected to one qualifying strip search, and $1000 if they were subjected to two or more qualifying strip searches. (Id. ¶¶ 28, 29, 30.)  In exchange for this payment eligibility, class members agree to release all claims arising from defendants' "new admission" strip search policy, including claims made in this action, and agree not to pursue any new action against defendants arising from the policy. (Id. ¶¶ 18, 20.)  To receive a payment under the settlement, class members must have completed and returned a claim form before the court-ordered deadline.  (Id. ¶ 32.)  However, even if a class member did not return a claim form, he is still bound by the provisions of the settlement releasing claims against the defendants unless the class member filed an opt-out form excluding himself from the class.  (Id. ¶¶ 33, 41, 42.)  Individuals who opt out of the class will receive no payments under the proposed settlement, but are free to pursue individual claims against the defendants.  (Id. ¶ 22.)

The proposed settlement also provides for "bonus or incentive" awards of $25,000 to the class representatives in this action, with additional awards of $5,000 or $10,000 to the female class representatives.  (Id. ¶ 46.)  The parties stipulate that the Court can approve the proposed settlement while at the same time adjusting these awards.  See McBean I, 228 F.R.D. at 495.

Harkening back to the origins of this litigation, the proposed settlement includes various terms relating to defendants' policy of offering gynecological examinations to female pre-trial detainees.  Under the proposed settlement, defendants pledge to continue offering "gynecological services" to female pre-trial detainees for the next three years.  (Settlement ¶¶ 49, 53.) Defendants will inform female detainees of the purposes and benefits of the services, that they have the right to refuse the services, and that no retaliatory actions will be taken against them if

they refuse.  (Id. ¶ 50.)  Of course, in connection with this promise to refrain from retaliation, defendants are required *not* to retaliate if a female detainee refuses the gynecological services. (Id. ¶ 51.)  The proposed settlement explicitly allows for future claims by class members against defendants based on alleged non-consensual gynecological examinations, with the exception that female class representatives receiving bonus awards under the proposed settlement release such claims for themselves alone.  (Id. ¶ 52.)

Finally, the proposed settlement sets out an agreed upon payment of attorneys' fees and costs for class counsel in the amount of $500,000.  (Id. ¶ 43.)  Defendants agree to pay this amount in fees and costs, and also agree to pay for the prior and ongoing administration of the proposed settlement, including mailing and publishing the class notice, distributing the awards to class members, and paying class counsel ongoing administration fees.  (Id. ¶¶ 44, 45.)

On June 21, 2005, this Court preliminarily approved the settlement, ordered notices to be mailed to potential class members, set deadlines for the filing of claims, opt-outs, and objections, and scheduled a fairness hearing to determine, after all claims, opt-outs, and objections had been received, whether the settlement was "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(1)(c).  Between the preliminary approval on June 21, 2005, and the fairness hearing on December 2, 2005, plaintiffs and defendants administered the proposed settlement.  A search of defendants' records determined that 40,352 individuals were members of the class.  (Letter from Genevieve Nelson, Assistant Corporation Counsel, Dec. 1, 2005, at 1.)  Notices were mailed to 33,756 class members – those for whom address information was available – and efforts were made to contact the remaining class members by publishing notices in newspapers, posting notices in prison facilities, and contacting the Department of Homeless Services.  (Id. at 2-3.)

These 40,352 class members were determined to have been subjected to qualifying strip searches on 63,575 separate occasions, the difference in number resulting from the fact that some members of the class were subjected to the strip searches multiple times. (Id. at 1.) As of November 23, 2005, class members had returned 4,319 claim forms, 3,402 of which were determined to qualify for payment under the proposed settlement.[1] (Id. at 3-4.) Of those 3,402 claimants who qualified for payment, 2,392 will receive the $750 payment while the remaining 1,010 will receive the $1000 payment, for a total payout to the class of $2,804,000. (Id. at 4.) This amount does not include, and is not limited by, attorneys fees, administration costs, or payments to class representatives. Thirty-six class members requested to be excluded from the class, and therefore will receive no payment under the settlement and will not be bound by the terms of the settlement. (Id. at 3.) In addition to the objection to the proposed settlement filed by intervenor-plaintiffs, only one objection to the settlement has been received, that of Timothy Dean Best, which was the subject of this Court's order dated November 21, 2005.[2]

## DISCUSSION

"A class action cannot be settled without the approval of the District Court. The District Court must carefully scrutinize the settlement to ensure fairness, adequacy, and reasonableness."

---

[1] On December 1, when defendants submitted the letter detailing the administration of the settlement, there were 46 claim forms that had been received but not yet reviewed (Nelson Letter, Dec. 1, 2005, at 1), and it is likely that additional claim forms have been received since that time. Therefore, the statistics regarding the number of payments and the total payment amount are not likely to be final, but given that the deadline for the submission of claim forms was November 21, 2005, the data at hand are accurate enough for the present purposes.

[2] Best requested that the Court enter judgment in his favor in the amount of $100,000. The Court declined Best's request to enter judgment, but interpreted his request as an objection that the amount he would receive under the settlement was too low.

D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001). Rule 23 requires the Court to hold a hearing and to make a determination that a settlement is "fair, reasonable, and adequate" before approving the settlement. Fed. R. Civ. P. 23(e)(1)(C). This scrutiny is necessary because in the context of class action settlement negotiations there are factors that can cause parties, even parties with the best motives and intentions, to "give insufficient weight to the interest of at least some class members." Manual for Complex Litigation, Third § 30.42 (1995). In this regard, the Court must serve as a "fiduciary" to protect the interests of absent class members affected by the settlement. Grant v. Bethlehem Steel Corp., 823 F.2d 20, 22 (2d Cir. 1987). However, in this fiduciary role, it is not the Court's prerogative to pick and choose terms of the settlement, redact portions of the agreement, or substitute terms more to the Court's liking. Rather, the Court's duty is to evaluate the settlement as a whole, and determine if the settlement as a whole is fair, reasonable, and adequate. Manual for Complex Litigation, Fourth § 21.61 (2004).

In a case such as the instant action, where the settlement was negotiated between the parties prior to class certification, "it is subject to a higher degree of scrutiny in assessing its fairness." D'Amato, 236 F.3d at 85. Indeed, because the settlement agreement existed at the time of certification, and because the intervenor-plaintiffs argued against certification based in part on the terms of the settlement, this Court discussed the settlement terms in the opinion certifying the class. See McBean I, 228 F.R.D. at 493-96. However, as was stated in McBean I, the Court's comments at that time were provisional, and were made solely in so far as necessary to decide the issue of class certification. At the present time, the Court must and will undertake an independent "full examination of the fairness of the settlement." Id. at 494.

In evaluating the fairness of the settlement, this Court must examine both the procedural

aspects of the settlement – that is, the process of negotiation that produced the settlement – and

the substantive aspects of the settlement – that is, the terms themselves. D'Amato, 236 F.3d at

85.

I. Procedural Fairness

"A court reviewing a proposed settlement must pay close attention to the negotiating

process, to ensure that the settlement resulted from arm's-length negotiations and that plaintiffs'

counsel have possessed the experience and ability, and have engaged in the discovery, necessary

to effective representation of the class's interests." Id. (quotation marks omitted). Of course, this

Court was not present while settlement negotiations were taking place, and neither were

intervenors, so information regarding the process that led to the settlement is not as plentiful as

information regarding the substance of the settlement itself. However, after reviewing the

available information relating to the negotiating process, the Court finds that the process was fair.

As an initial matter, this settlement was the product of actual and honest negotiations

under the supervision of Magistrate Judge Theodore H. Katz. See McBean I, 228 F.R.D. at 494.

"All settlement negotiations were done in front of . . . Judge Katz" (Fairness Hearing Tr. 62-63),

and this supervision goes a long way toward assuring that the process was "free of collusion or

undue pressure." County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1323 (2d Cir.

1990).

In spite of this assurance that the settlement was the result of arm's-length negotiations,

objections have been raised to procedural aspects of the settlement. First, intervenors question

the role of the named plaintiffs in the negotiations. (Intervenor-Pl. Supplemental Mem. Supp.

Obj. 3-4.) Over the course of this litigation, individual named plaintiffs have come and gone

from the caption, with little explanation. Now, at the case's conclusion, particular plaintiffs remain as named plaintiffs seeking to represent the class as a whole, and are therefore entitled to a bonus award of at least $25,000 under the settlement, pending the approval of the Court. This raises two separate procedural issues. First, it is important to the integrity of the settlement that those individual named plaintiffs who approved the settlement were actually involved in its negotiation. The shuffling of named plaintiffs raises doubts about that process. Second, even if the named plaintiffs negotiated the settlement, it is important that the incentives of the named plaintiffs were aligned with those of the rest of the class to ensure that the process was fair to absent class members. The named plaintiffs were approving a settlement under which they believed they would receive $25,000 or more, while other class members would receive $750 or $1000. Therefore, those incentives appear to be misaligned. This is so regardless of whether the Court can now lower those amounts. What matters, from a process perspective, is not the award to named plaintiffs that this Court might now approve, but rather the incentives of the named plaintiffs *at the time of the negotiation* and how, if at all, those incentives diverged from the class as a whole.

Concerns about the about the role of the named plaintiffs in the process of negotiating the settlement were assuaged at the fairness hearing. With respect to the question of which named plaintiffs participated in the settlement negotiations, class counsel represented to the Court that "[f]rom the beginning, the people who remain named plaintiffs now have been with the case since the beginning of the case." (Fairness Hearing Tr. 61-62.) Additionally, in their response to intervenors' objections, plaintiffs asserted that various former named plaintiffs, who have since been excluded from the class, did not control the settlement process, and that in fact "[n]o single

8

named plaintiff or group of named plaintiffs drove this litigation or controlled the settlement process." (Pl. Mem. Opp. Obj. 12-13.) Intervenors respond that this statement amounts to an admission that the current named plaintiffs *did not* control the settlement process, because it shows that previous named plaintiffs were involved to some degree. (Intervenor-Pl. Supplemental Mem. Supp. Obj. 4.) However, procedural fairness does not require that only the named plaintiffs, to the exclusion of all others, have any role in the settlement process. It is enough that the named plaintiffs were involved with the negotiations from their inception, thereby making their approval of the settlement an approval of the process from the beginning.

With respect to the $25,000 awards to named plaintiffs, class counsel allayed fears of divergent incentives by explaining the process by which the settlement was approved by the parties. First, the parties negotiated the main awards for the class – the awards of $750 and $1000 – and then discussed those awards with the representative plaintiffs and obtained their approval. (Fairness Hearing Tr. 62-63.) Then, and only then, after the base awards had been agreed upon, did the parties negotiate the individual awards for the named plaintiffs, with the entire process conducted under the supervision of Judge Katz. (Id. 63.) Intervenors are indeed wise to raise a red flag in response to these individual awards, because when named plaintiffs receive "special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of class members whose interests they are appointed to guard." (Intervenor-Pl. Mem. Supp. Obj. 22, quoting Sheppard v. Consolidated Edison Co., No. 94 Civ. 403, 2000 WL 33313540 (E.D.N.Y. Dec. 21, 2000).) However, that temptation was eliminated here by a careful structuring of negotiations. Because the general awards to the class were negotiated and agreed upon before the individual awards to named plaintiffs, the incentives

of the class and the named plaintiffs were in line throughout the negotiation process.

Additionally, this is not a case where payments to the class come from a limited fund, such that

every dollar awarded to the named plaintiffs is a dollar taken away from the class as a whole.

Compare Crawford v. Equifax Payment Servs., Inc., 201 F.3d 877 (7th Cir. 2000) (rejecting

settlement where named plaintiff received $2000, all other class members received nothing, and

there was a statutory cap on damages).  Therefore, the negotiation of payments to named

plaintiffs did not affect the amount of money available to the rest of the class, and no conflicting

incentives infected the process in that regard.

Intervenors further object that class counsel, as part of the settlement negotiations,

excluded from the class individuals who were arraigned on offenses related to drugs or weapons,

and assert that this evinces "an inadequate adversarial relationship in this proceeding."  (Fairness

Hearing Tr. 25; Intervenor-Pl. Mem. Supp. Obj. 27-28.)  However, for the reasons explained in

McBean I, this Court rejects that argument.  See 228 F.R.D. at 496-98.  The decision of

plaintiffs' counsel to narrow the class definition does, in some sense, show that class counsel

were not absolutely antagonistic to defendants, in that it was not plaintiffs' counsel's goal to

bring the largest possible case or seek the largest possible recovery as a general matter.

However, a desire by lawyers to extract the greatest amount of money from defendants is not the

sort of adversarial motivation that fairness requires.  Rather, fairness requires that class counsel

act in the best interests of their clients, the class.  It was perfectly reasonable – and not at all

unfair or un-adversarial – for class counsel to define the class in a way that, in their opinion,

would lead to the best recovery *for the class*.  Fairness does not require class counsel to act on

behalf of individuals not in the class, even if at one time those individuals were included in a

pretrial class definition.  See In re Holocaust Victim Assets Litig., 225 F.3d 191, 202 (2d Cir.

2000).

Lastly, intervenors object that "[t]here appears to have been little discovery actually

pursued by class counsel."  (Intervenor-Pl. Mem. Supp. Obj. 5.)  In evaluating the procedural

fairness of the settlement, this Court must ensure that "plaintiffs' counsel . . . have engaged in the

discovery[] necessary to effective representation of the class's interests."  D'Amato, 236 F.3d at

85.  However, the question that this Court must answer is not how much or how little discovery

was completed by the parties before they agreed to the settlement, but rather whether the

discovery that was completed was sufficient for "effective representation."  At the request of the

parties, this Court stayed discovery pending the outcome of settlement negotiations on August

25, 2003.  See McBean I, 228 F.R.D. at 490.  Intervenors, while objecting to the amount of

discovery that took place before settlement, have not explained how additional discovery would

have been in the interest of the class.  Discovery has costs, and further discovery would have

taken additional time and resulted in the expenditure of additional funds on both sides, neither of

which is in the plaintiffs' interest.  On the benefit side, it is difficult to see what new information

beneficial to the class would have been obtained through a prolonged discovery process.  All

parties, including intervenors, seem to agree upon the basic facts as they relate to the plaintiff

class – members of the class were subjected to unconstitutional strip searches pursuant to an

established policy of the Department of Corrections.  (Fairness Hearing Tr. 9.)  Given that

common understanding, class counsel's decision to forgo additional discovery in the hopes of

minimizing costs and achieving a quick recovery for their clients appears to be both fair and

reasonable, and falls within the bounds of "effective representation."

II.  <u>Substantive Fairness</u>

In evaluating the substantive fairness, adequacy, and reasonableness of a settlement, this

Court is required to consider the following nine factors, often referred to as the <u>Grinnell</u> factors:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the risks of establishing liability;
> (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater judgment;
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery;
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

<u>Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.</u>, 396 F.3d 96, 117 (2d Cir. 2005), <u>citing</u> <u>City of Detroit</u>

<u>v. Grinnell Corp.</u>, 495 F.2d 448 (2d Cir. 1974).

A.  <u>Complexity, Expense, and Likely Duration of the Litigation</u>

The possible complexity of this litigation going forward is difficult to evaluate, since, to

the extent that any party has discussed this factor, the parties have taken somewhat

counterproductive positions.   As a general matter, the more complex, expensive, and time

consuming the future litigation, the more beneficial settlement becomes as a matter of efficiency

to the parties and to the Court.  <u>See</u>, <u>e.g.</u>, <u>In re Indep. Energy Holdings PLC Secs. Litig.</u>, No. 00

Civ. 6689, 2003 WL 22244676, at *3 (S.D.N.Y. Sept. 9, 2003) (stating the possibility of

continued litigation involving expert discovery, summary judgment motions, pre-trial orders, and

a long trial "weighs heavily in favor of . . . [s]ettlement").  However, neither the plaintiffs nor the

defendants have argued that taking this case to trial would be an extremely burdensome affair.

As mentioned above, the parties seem to agree that the main issue of liability is a simple one, and that it is in the area of damages that the litigation could become complicated. However, the necessity of awarding damages to individual plaintiffs exists in both the settlement context and the trial context, and in either instance the parties and the Court have the options of individuation, which requires more process, or uniform payments, which require less process and which the parties have opted for in the settlement. Throughout this litigation, it has been the intervenors who have argued for more complexity, more expense, and more time. (See, e.g., Intervenor-Pl. Mem. Supp. Obj. 25-26, Fairness Hearing Tr. 26 (stating that the settlement should be rejected and there "should be depositions, there should be motions, there should be arguments, and there should be a determination of what is and what is not right, ultimately, if it has to go that way").) Under this factor, however, the prospect of complexity, expense, and duration counsels *for* the settlement, not against it.

In any event, it appears that this first Grinnell factor weighs in favor of the settlement. Taking this case to trial would not be as complicated as a large securities class action. See, e.g., In re WorldCom, Inc. Secs. Litig., 388 F. Supp. 2d 319, 337 (S.D.N.Y. 2005) (noting the "extraordinarily" complex and expensive nature of the litigation). However, the defendants have denied liability (Settlement pmbl., at 2), and continuing the case on the march toward trial would no doubt result in summary judgment motions, pre-trial motions, additional discovery (which, as previously mentioned, would be of dubious value), and additional delays before a final judgment could be obtained. While those processes would not be terribly complex, they are much more complex than the simple and efficient settlement currently before the Court.

B.  The Reaction of the Class to the Settlement

"If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." Wal-Mart, 396 F.3d at 118, quoting 4 Newberg on Class Actions § 11:41 (4th ed. 2005).  Of the 40,352 members of the class, only four have objected: the three intervenor class members and Timothy Best.  That percentage is slightly higher than the eighteen objections out of five million in Wal-Mart, which was evidence of "overwhelming[]" approval, id., but it is lower than the eighteen objections out of 27,883 in D'Amato, where the district court "properly concluded that this small number of objections weighed in favor of the settlement," 236 F.3d at 87.  The small number of objections, together with the fact that only thirty-six class members have opted-out of the settlement, indicates the overall approval of the settlement by the class, and favors the approval of the settlement by this Court.

C.  Stage of Proceedings and Amount of Discovery Completed

As discussed above, discovery in this case was stayed at a somewhat early stage in the litigation.  However, in accord with this Court's analysis of the discovery necessary for procedural fairness, the inquiry into the amount of discovery necessary for substantive fairness is not a matter of attaining some rigid number of pages or depositions.  Rather, what is important is whether the parties have "a thorough understanding of their case" and the extent to which there are remaining factual "unknowns" prior to trial.  Wal-Mart, 396 F.3d at 118.  Discovery must be completed so that class members "have sufficient information to make an informed judgment on the reasonableness of the settlement proposal." In re Elan Secs. Litig., 385 F. Supp. 2d 363, 370 (S.D.N.Y. 2005).

The class members in this case possessed the information necessary to evaluate the settlement, and therefore this factor also favors approval. "Blanket policies mandating the strip search of every post-arraignment misdemeanor detainee upon admission, regardless of the existence of individualized reasonable suspicion that the detainee is concealing weapons or other contraband, are thus clearly unconstitutional under the law of this Circuit." McBean I, 228 F.R.D. at 489. There is little doubt that the class members were subjected to such a policy. The issue then becomes one of damages, but information regarding damages awarded to different individual plaintiffs or classes of plaintiffs in various strip-search cases is publicly available. By knowing what happened to them, and knowing the possible worth of their claims, members of the class had "sufficient information to make an informed judgment" regarding the proposed settlement.

D. The Risks of Establishing Liability, Establishing Damages, and Maintaining the Class Action Through Trial

The next three Grinnell factors – the risks of establishing liability, the risks of establishing damages, and the risks of maintaining the class action through trial – are usefully discussed together as a general analysis of the obstacles plaintiffs would face should the case go to trial. See Wal-Mart, 396 F.3d at 118-19. As discussed above, under the law of this Circuit a blanket strip-search policy such as the one to which plaintiffs were subjected is clearly unconstitutional. Therefore, the risks of establishing liability at this time are minimal, if not non-existent. However, the duty of this Court is not merely to determine the risks of establishing liability *at this time*. Rather, the Court must determine the risks of establishing liability should the settlement be rejected and the case go to trial at some future date. As discussed in McBean I,

the case law in this area is far from stable.  228 F.R.D. at 498.  Shain v. Ellison, the case invalidating a policy similar to the one at issue here, was decided by a divided panel of our Court of Appeals, compare 273 F.3d 56 (2d Cir. 2001), with id. at 70 (Cabranes, J., dissenting), with id. at 69-70 (Katzmann, J., concurring), and it may well be in the interests of the class to obtain "a quick resolution[] while the law is in their favor."  McBean I, 228 F.R.D. at 498.  The question of whether an en banc Court of Appeals, or, for that matter, the Supreme Court, will upset the holding of Shain takes this Court into the realm of speculation.  It is enough to observe, however, that there are no guaranties in life, and while it appears likely that plaintiffs would be able to establish liability at trial, things change.

In any event, "it is certainly fair to conclude that even if the plaintiffs . . . prevail[] in establishing their . . . claim, they would . . . face[] significant challenges in proving damages." Wal-Mart, 396 F.3d at 119.  The parties have provided the Court with numerous examples of individual plaintiffs who have, at trial, proven liability on a strip-search claim, only to be awarded nominal damages.  See, e.g., Shain, 273 F.3d at 67 (no compensatory or punitive damages, one dollar in nominal damages); Sorensen v. City of New York, No. 98 Civ. 3356, 2000 WL 1528282, at *13 (S.D.N.Y. Oct. 16, 2000) (one dollar in nominal damages to two plaintiffs); Kaufman v. Rivera, 95 Civ. 5667, 1998 WL 314744, at *1 (S.D.N.Y. June 12, 1998) (nominal damages).  The difficulty of proving damages in the instant matter is all the greater because the strip searches at issue here occurred after arraignment.  Regardless of the defendants' strip-search policy, class members would have been required to disrobe and be examined for legitimate medical reasons after arraignment but before entering the jail.  (Fairness Hr'g Tr. 55-56.)  Intervenors concede that class members being subjected to a post-arraignment strip search

can "view it as kind of legal . . . and standard operating procedure." (Id. 23.)

Not surprisingly, intervenors point to individual strip-search cases where plaintiffs have received tens of thousands of dollars after trial. See, e.g., Ciarolo v. City of New York, 216 F.3d 236 (2d Cir. 2000) ($19,645 in compensatory damages); Kelleher v. Fearon, 90 F. Supp. 2d 354 (S.D.N.Y. 2000) ($125,000, remitted to $25,000). However, in both cases cited by intervenors, specific factors existed that do not exist generally with respect to this class. In Ciarolo, plaintiff offered proof at trial that the strip search resulted in post-traumatic stress disorder, which required therapy and medication. 216 F.3d at 237. In Kelleher, plaintiff was the passenger in a car pulled over for a traffic stop. Plaintiff was then placed in handcuffs, taken to a police station, and strip searched by an officer in the police station bathroom before being released without any charges being filed. 90 F. Supp. 2d at 356-57. These examples, with their aggravating circumstances not present in the instant matter, are of little comfort to a class hoping to receive more than a nominal award.

Finally, with respect to maintaining the class action through trial, there is nothing to suggest that the class would be decertified at some point in the future. However, apart from maintaining certification, maintaining the class itself is a more difficult matter. Since the beginning of this action class counsel estimates that seven to ten percent of the class has passed away. (Fairness Hr'g Tr. 58.) This class is "truly transient," and class counsel asserts that as each day passes "[p]eople are disappearing." (Id.) The transience of the class is confirmed by the fact that 6,596 of the 40,352 class members identified from defendants' records had no address, and of those for whom addresses did exist, 12,438 notices were returned to sender. (Nelson Letter, Dec. 1, 2005, at 2.) If this case were to go to trial, it is likely that the class would

continue to be maintained under Fed. R. Civ. P. 23; however, if class members continue to leave the class or become unavailable as time passes, the class may not be maintained in a more important sense.

Taken together, the risks of establishing liability, establishing damages, and maintaining the class through trial strongly favor settlement in this case. While there appears to be little risk in the way of proving liability, damages are a much more tenuous matter. The prospect of a trial in this case, with the risk of receiving only nominal damages, and the risk that during protracted litigation class members or become unreachable to collect even a nominal amount, strongly favors settlement.

E.  The Ability of the Defendants to Withstand a Greater Judgment

There is no doubt that defendant, the City of New York, could withstand a judgment greater than the nearly three million dollars in damages it will pay to the class under the settlement. However, fairness does not require that the City of New York empty its coffers before this Court will approve a settlement. Where there is a risk that an insolvent defendant could not withstand a greater judgment, this factor will strongly favor settlement. That is not the case here. However, the ability of defendants to pay more, on its own, does not render the settlement unfair, especially where the other Grinnell factors favor approval. D'Amato, 236 F.3d at 86.

F.  The Range of Reasonableness of the Settlement Fund

"There is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in . . . any litigation." Wal-Mart, 396 F.3d at 96, quoting Newman v.

Stein, 464 F.2d 689, 693 (2d Cir. 1972). The final two Grinnell factors require that this Court determine whether the instant settlement falls within this "range of reasonableness." The various uncertainties, risks, and costs associated with this litigation have been discussed at length above. However, simply discussing these uncertainties, risks, and costs does little to determine whether the terms of the settlement itself are reasonable in light of those factors. Of course uncertainty exists, but from the mere existence of uncertainty it does not follow that $750 or $1000 per class member is a reasonable settlement amount. Instead, reasonableness is best gauged by taking a broader view, examining the settlement as a whole, and comparing it to other settlements negotiated and approved in similar circumstances.

All parties have provided the Court with examples of various awards in individual strip-search cases – with plaintiffs and defendants providing examples of nominal awards, and intervenors providing examples of awards of tens of thousands of dollars. In light of this variance, the settlement's terms appear quite reasonable. Individual class members can decide on their own where on the scale of damages they fall, from nominal to substantial. If on the nominal side, the settlement's award of $750 or $1000 is quite attractive; if on the substantial side, the settlement allows individuals to opt out and pursue their own claims, as thirty-six former class members have.

Intervenors object that the ability to opt out is not valuable to the class, because "[i]ndividual strip search claims, alone, are rarely pursued, even when a powerful claim exists." (Intervenor-Pl. Mem. Supp. Obj. 27; see also Fairness Hr'g Tr. 21-23.) If true, however, this assertion supports approval of the settlement. If future individual claims barred by the settlement are claims that never would have been bought, and that therefore would have cost defendants

19

nothing, then whatever payment defendants offer to extinguish those claims is a bonus.  The

three million dollars defendants stand to pay pursuant to the settlement may not seem like a large

sum of money when compared to the over forty thousand members of the class who were

subjected to strip searches.  However, if virtually none of those individuals would have obtained

any money from defendants *if not for* the settlement, defendants' total payout appears much more

reasonable.  From the perspective of the class, individuals with strip-search claims that no

attorney would take (Intervenor-Pl. Mem. Supp. Obj. 27), or that were too traumatizing to pursue

in court (Fairness Hr'g 21-23), now have the opportunity to receive $750 or $1000 without

needing to obtain an attorney or suffer through a difficult legal proceeding.

The reasonableness of the settlement is further supported when compared to other

settlements approved in similar cases.  Intervenors point to the settlement in <u>Tyson v. City of

New York</u>, No. 97 Civ. 3762 (JSM), where a class of pre-arraignment detainees received

individual awards ranging from $250 to $22,500, depending on whether the class member agreed

to submit to an examination of his individual claim, and the results of that examination.[3]  <u>See

McBean I</u>, 228 F.R.D. at 494.  Under the <u>Tyson</u> settlement, class members who submitted claim

forms and who were determined to be eligible for payment received an average of approximately

---

[3] At the fairness hearing, the Court was advised that approximately 500 members of the <u>Tyson</u> class received no money, because outstanding debts to the city were deducted from their payment under the settlement.  (Fairness Hr'g Tr. 53-54.)  Of course, in exchange for receiving no money, debts owed to the city were extinguished, so those individuals did receive a benefit from the <u>Tyson</u> settlement.  This settlement, however, contains no such provision, which is a significant practical advantage to class members, many of whom are otherwise judgment proof and are unlikely to have to pay their debts from sources other than the settlement award.

$3,800 per person.[4]  Under the settlement before this Court, approved claimants are scheduled to receive an average of approximately $825 per person.[5]  Intervenors point to this discrepancy of $3000 per person as evidence of the settlement's unfairness.

To the extent that the Tyson settlement, with its different procedures and different class definition, is a useful comparison, it is one which supports approval of the instant settlement. First, the particularized awards based on individual examinations in Tyson created different incentives for class members to opt out, thus creating a difference in the composition of class members submitting claims under the two settlements.  Under Tyson, an individual with a high-value claim was unlikely to opt-out, because his individual examination was likely to lead to a high payout, possibly near $20,000.  Under the proposed settlement here, individuals with high-value claims should have opted out of the settlement, and therefore whatever individual award they may receive in separate litigation is not included in the total payout under the settlement, and does not raise the average payment.[6]  This addition of high-value claims to the top end of the Tyson class accounts for some of the discrepancy between the average awards.

This difference in structure, however, only partially explains the difference between the payments in Tyson and the payments under the settlement here.  The class members themselves

---

[4] This number is based on a total payout in Tyson of approximately $22 million divided among 5,784 approved claimants.  (Fairness Hr'g Tr. 30-31.)

[5] This number is based on a total payout of $2,804,000 divided among 3,402 approved claimants.

[6] For the sake of illustration, assume that the thirty-six individuals who opted out of the settlement had high-value individual claims, pursued those to trial, and were awarded $25,000 each.  If those awards, totaling $900,000, are added to the settlement fund, the average payout increases from $825 to almost $1100.

were different in Tyson, and were bringing a different claim.  In Tyson, the strip searches at issue

occurred *before* individuals were arraigned, which means at the time of the strip search it had yet

to be determined whether the individuals were going to be released, or whether bail was going to

be set and they were going to be remanded.  Here, the strip searches occurred *after* arraignment,

which means the individuals had already been remanded and were about to enter a city jail, since

individuals released after arraignment were not subjected to such processing.  Therefore, as

discussed above, because class members in this case were entering the jail, they were required to

disrobe and be examined for *legitimate reasons*, regardless of defendant's strip-search policy.

The same cannot be said for the Tyson class.  Prior to arraignment, the only reason Tyson class

members were required to disrobe and be examined was the strip-search policy itself, and

therefore the claimed dignitary harm in Tyson flowed directly from defendant's unconstitutional

conduct, making proof of damages much easier for the Tyson class.

Furthermore, the fact that one search occurred before arraignment, and the other after,

means that the individuals who were subjected to the different searches are themselves

necessarily different, and different in important ways that affect settlement value.  Because Tyson

involved pre-arraignment searches, many members of the Tyson class were released after

arraignment, without bail being set, based a judge's determination that those individuals were

responsible enough to return to court.  The class at issue here, however, is composed completely

of people who were remanded, meaning that a judge determined bail was necessary to assure

future court attendance.  In making this decision, the individual's character, employment status,

community ties, and criminal record were all considered.  See N.Y. Crim. Proc. Law §

510.30(2)(a).  As a whole, therefore, members of the Tyson class faired better on this evaluation

than members of the class here, making the Tyson class more sympathetic plaintiffs, and more likely to be responsible enough to bring an action to trial. (See Fairness Hr'g Tr. 56-57.) Both of those factors increase the settlement value of Tyson.

The comparison with Tyson, and its $3800 average award, while on the surface appearing to make the settlement look somewhat unfair and unreasonable, actually favors approval of the settlement when all the relevant factors are considered. After factoring in the additional high-value claims that were a part of the Tyson settlement, the more direct connection between conduct and damages that existed in Tyson, and the different composition of the Tyson class, the variance between the average award in this settlement and that in Tyson appears quite reasonable. If Tyson was a reasonable settlement – and all parties agree that it was at a minimum reasonable – then a settlement that awarded less money to a class of individuals whose claims had a settlement value less than those in Tyson would also be reasonable.

It is, of course, impossible to determine exactly how much of the difference between Tyson's $3800 average award this settlement's $825 average award is due to the factors discussed above, and how much could be due to Tyson's settlement being "more fair" to the class, as intervenors argue. However, to the extent that Tyson's settlement was more beneficial to the Tyson class, the benefits did not come without a price. Attorneys' fees in Tyson were over $3.5 million. (Fairness Hr'g Tr. 30.) Administration fees were over $10.5 million. (Id.) By way of comparison, the parties estimate that the total attorneys' and administration fees associated with this settlement will be $750,000. (Letter from Genevieve Nelson, Assistant Corporation Counsel, Dec. 7, 2005, at 2.) The Tyson settlement, therefore, while awarding average payments approximately 4.6 times higher than the settlement at issue here, achieved that result only by

23

expending administration and attorneys' fees at a rate 11 times higher per claimant.[7]  It is not surprising then, given this relative inefficiency, that plaintiffs and defendants both sought to achieve a settlement unlike that in Tyson.  See McBean I, 228 F.R.D. at 495 (noting that Tyson had "significant administrative expenses" and that defendants "would not agree to a similar settlement in this case").

The reasonableness and fairness of this settlement is made all the more evident when it is compared to the settlement approved in Maneely v. City of Newbrugh, 01 Civ. 2600 (CLB).  The Maneely class consisted of "non-felony arrestees who . . . were arrested on charges unrelated to the use or possession of drugs or weapons, and were strip searched prior to being placed in a holding cell."  (Maneely Fairness Hr'g Tr. 11, July 21, 2005.)  Each class member who submitted a valid claim form received $1000.  (Id.)  The Maneely award is only slightly higher than the award here at issue, and yet the class members in Maneely were subjected to a pre-arraignment strip search similar to the class in Tyson.

The settlement here at issue does indeed fall within the range of reasonableness.  The terms of the settlement are fair and reasonable when considered in isolation, and they appear even more so when compared to other reasonable settlements approved by other courts in similar situations.  The final two Grinnell factors strongly favor the settlement.

---

[7] The average award in Tyson was $3800, compared with an average of $825 here, leading to a difference of approximately 4.6 times.  The total attorneys' fees and administration fees in Tyson was approximately $14 million, and 5,784 individuals received awards pursuant to the Tyson settlement.  That averages to $2420 in fees per claimant.  In this settlement, it is estimated that the total fees will be $750,000, and approximately 3,400 individuals will receive settlement awards.  That averages to $220 in fees per claimant. The $2420 in fees per claimant in Tyson is 11 times greater than the $220 in fees per claimant here.

G.  The Settlement is Substantively Fair

Each of the Grinnell factors, with the exception of the defendants' ability to withstand greater judgment, favors the settlement.  Prolonged litigation is not in the interests of the class, as evidenced by the fact that the class strongly favors the settlement.  There would be great risk and uncertainty of recovery should the case go to trial, and when evaluated and compared to other settlements in similar cases, the settlement negotiated here is eminently reasonable.  For all these reasons, the settlement is substantively fair.

III.  Awards to Named Plaintiffs

The settlement provides "bonus or incentive" awards to class representatives in the following amounts: David Cence, $25,000; Wanda Harvey, $35,000; Margarita Plyassounova, $30,000; Marcel Sarfati, $25,000; and Federico Tenorio, $25,000.[8]  (Settlement ¶ 46.)  This Court can, it its discretion, adjust the settlement's incentive awards to named plaintiffs while approving the remaining terms of the settlement.  McBean I, 228 F.R.D. at 494-95.  Intervenors claim that the incentive awards are too high, with the gravamen of this argument being that the high awards for named plaintiffs shed doubt on the fairness of the settlement to absent class members.  (See Intervenor-Pl. Mem. Supp. Obj. 20-24.)  However, this Court has already rejected that argument, and determined that by negotiating the general terms of the settlement before negotiating the awards to the named plaintiffs, the incentives of the named plaintiffs were never counter to those of the class as a whole.  In any event, lowering the awards *now* would not alter the incentives that existed at the time the settlement was negotiated.  Therefore, intervenors

---

[8] The settlement also provides for an award of $35,000 to Toby Cohen, but Ms. Cohen was removed as a class representative by this Court's order of August 10, 2005, and therefore will receive no bonus award under the settlement.

present no argument for lowering the incentive awards at this time, after it has already been determined that the settlement is both procedurally and substantively fair.

Despite the settlement's fairness, class counsel has done little to justify the compensation to named plaintiffs under the settlement. While counsel themselves assert that "named plaintiffs . . . are genuinely interested in remedying the harm that has been inflicted on others . . . [and that they] assumed this responsibility even after being told that serving as class representative would delay resolution of their individual claims" (Pl. Mem. Opp. Obj. 12), counsel has provided nothing to establish exactly what these representatives have done in furtherance of the settlement. The complete lack of evidence in the record to support these awards, such as affidavits or time sheets, could justify a reduction of the amounts set forth in the settlement. However, for the reasons stated below, the awards will be approved.

First, the awards, along with the rest of the settlement, were negotiated under the supervision of Judge Katz, and so there is a presumption that they are the reasonable result of arm's-length negotiations. Second, the amount of the awards – ranging from $25,000 to $35,000 – appears to be in line with the amount of damages awarded in high-value strip-search claims, based on the examples provided by intervenors. Third, when compared to incentive awards given generally to named plaintiffs across a variety of class actions, the awards given to the class representatives under the settlement here fall solidly in the middle of the range. See Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911, 2005 WL 1041134, at *3 (S.D.N.Y. May 5, 2005) (collecting cases illustrating a range of incentive awards and approving an award of $25,000). Finally, to the extent that class counsel should have provided this Court with affidavits or time sheets supporting the awards to class representatives, the class representatives themselves

26

should not be held responsible for their attorneys' dereliction.  Class counsel will not receive any

percentage of the awards given to the class representatives under the settlement (Nelson Letter,

Dec. 7, 2005, at 2), and therefore a reduction of the awards would penalize only the named

plaintiffs.  Therefore, this Court finds no reason to lower the awards to named plaintiffs that were

negotiated under the supervision of Judge Katz, and the awards will be approved.

IV.  Attorneys' Fees

The settlement provides for class counsel to receive $500,000 in attorneys' fees for work

performed to this point in the litigation, and additional fees for the ongoing administration of the

settlement.  The attorneys' fees provision of the settlement will be approved.

The attorneys' fees received by class counsel in this case will not be awarded from a

"common fund" created for the class as a whole.  Regardless of the amount class counsel

receives, every class member who submitted a valid claim form will receive either $750 or

$1000.  This case is therefore different from other class action settlements, where the incentives

of the class members and the attorneys diverge on the issue of attorneys' fees.  If money paid to

the attorneys comes from a common fund, and is therefore money taken from the class, then the

Court must carefully review the award to protect the interests of the absent class members.  See,

e.g., Wal-Mart, 396 F.3d at 123-24 (stating that in setting the amount of attorneys' fees,

"settlement payments to approximately five million absent class members are at stake");

Goldberger v. Integrated Resources, Inc., 209 F.3d 43 (2d Cir. 2000) (articulating factors to

examine when determining "reasonable" attorneys' fees in "common fund cases").  If, however,

money paid to the attorneys is entirely independent of money awarded to the class, the Court's

fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest

between attorneys and class members.[9]

In any event, the attorneys' fees agreed to under the settlement are reasonable. While the Court is not bound by the agreement between the parties, the fact that the award was the product of arm's-length negotiations under the supervision of Judge Katz weighs strongly in favor of approval. Furthermore, while the fee award was set before either party knew the total number of hours that would eventually be worked by class counsel, or the total amount of money that would eventually be paid to the class, a second look at the fee award, with knowledge of both the hours worked and money paid, supports its reasonableness.

Class counsel performed over 1400 hours of work on behalf of the class as of November 1, 2005 (Cardinale Decl. Ex. 1), and have no doubt worked numerous additional hours since.[10] Using an hourly rate of $300 per hour, the total hours worked support an award of approximately $420,000, a figure that is reasonably related to the $500,000 in the settlement, especially considering that two months of additional work has been done that is not included in that figure.[11]

---

[9] One could imagine a situation where exorbitant attorneys' fees awarded as part of a settlement, even if separate from money paid to the class, would give rise to a suspicion that the attorneys had persuaded named plaintiffs to agree to a settlement that was not in the class's interests, because it was in the *attorneys'* interests that the settlement, and therefore the fee award, be approved. That is not the case here, however, because the Court has already determined that the settlement itself is fair and reasonable.

[10] After November 1, 2005, class counsel prepared for the fairness hearing on December 2, 2005, and submitted a supplemental "Plaintiffs' Memorandum of Law" after the hearing on December 19, 2005.

[11] This is not an attempted to rigorously calculate a lodestar figure. The attorneys' fees will be awarded pursuant to the settlement, not an independent lodestar calculated by the Court. However, this rough calculation is useful to illustrate the reasonableness of the fee award negotiated in the settlement.

The total payout to the class will be approximately $2,800,000. Attorneys' fees of $500,000 represent an award of approximately 18% of the "fund" awarded to class members. In common fund cases, awards in the range of 25% are common, see Goldberger, 209 F.3 at 51-52 (rejecting a 25% "benchmark" but acknowledging that "district courts across the nation have apparently eased into the practice of 'systematically' awarding fees in the 25% range"), and while this is not a common fund case, the fact that the award here is lower than many awards actually taken from a common fund, at the expense of absent class members, is further evidence of its reasonableness.

## CONCLUSION

The settlement negotiated between the parties is fair, reasonable, and adequate. Therefore, plaintiffs' motion to approve the settlement and award attorneys' fees (Doc. #71) is granted. The Court approves the settlement, the payments to class representatives, and the attorneys' fees.

SO ORDERED.

Dated:  New York, New York
      February 7, 2006

GERARD E. LYNCH
United States District Judge

---

negotiated in the settlement.