UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
KADIAN MCBEAN, et al.,

                          Plaintiffs,                    02 Civ. 05426 (GEL)(THK)

       -against-

THE CITY OF NEW YORK, et al.

                          Defendants.
-----------------------------------------------------------------------x
JOEL RAMOS, et al.,

                          Intervenor-Plaintiffs,

       -against-

THE CITY OF NEW YORK, et al.,

                          Defendants.
-----------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND CLASS CERTIFICATION

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

***Attorneys for Plaintiffs***

## <u>TABLE OF CONTENTS</u>

<u>PAGE NO(s)</u>:

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-ix

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Prior Strip Search Admission Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Housing and Exit Strip Search Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    DOC Policies <u>Not</u> Being Challenged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    The Relevant DOC Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        1.    Directive 4508 and Its Revisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        2.    Prior Admission Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3.    Current Admission Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        4.    Exit Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        5.    Housing Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    Facts Concerning Named Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.    Kenneth Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.    Chareama Bolds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        3.    Foster Thomas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        4.    Julio Phitts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        5.    Arthur Wallace . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        6.    Daniel Velazquez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT ................................................... 19

I.   PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT
     SHOULD BE GRANTED ................................... 19

     A.   The Standard for Summary Judgment ..................... 19

     B.   The Fourth Amendment Forbids Strip Searches Of Pretrial
          Detainees Arraigned on Misdemeanors Without Reasonable
          Suspicion ......................................... 20

     C.   Plaintiffs Are Entitled To Partial Summary Judgment On The Issue
          Of Liability With Respect to the Prior Admission Policy ........... 24

          1.   The Prior Admission Policy is unconstitutional ............. 24

          2.   Defendants cannot escape liability by attempting to
               show *post hoc* that correctional officers *could have*
               formed the reasonable suspicion needed to justify
               a strip search ................................... 26

     D.   Defendants' Current Blanket Policies of Strip Searching
          Misdemeanor Pretrial Detainees In Their Housing Areas
          And Before Transporting Them Are Unconstitutional; Those
          Policies Should Be Permanently Enjoined ...................... 30

II.  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
     SHOULD BE GRANTED ................................... 37

     A.   The Proposed Classes Satisfy Rule 23(a) ..................... 40

          1.   Numerosity - Rule 23(a)(1) ........................... 40

          2.   Common Questions of Law or Fact - Rule 23(a)(2) .......... 40

          3.   Typicality - Rule 23(a)(3) ........................... 41

          4.   Adequacy of Representation - Rule 23(a)(4) .............. 43

          5.   Ascertainability ................................... 44

     B.   The Housing And Exit Class Satisfies Rule 23(b)(2) .............. 45

C.      The 1999-2002 Admission Class Satisfies Rule 23(b)(3) . . . . . . . . . . . 46

      1.      Common Legal and Factual Issues Predominate . . . . . . . . . . . . 47

      2.      A Class Action Is Superior to Other Methods of Adjudication . . 51

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## TABLE OF AUTHORITIES

**PAGE NO(s):**

### FEDERAL CASES

*Alexander A. ex rel. Barr v. Novello,*
    210 F.R.D. 27 (E.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Amchem Prods, Inc. v. Windsor,*
    521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 45

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Arruda v. Fair,*
    710 F.2d 886 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
    222 F.3d 52 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Bell v. Wolfish,*
    441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Block v. Rutherford,*
    468 U.S. 576 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Boucher v. Syracuse Univ.,*
    164 F.3d 113 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Bresson v. Thomson McKinnon Sec.,*
    118 F.R.D. 339 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Brinegar v. United States,*
    338 U.S. 160 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Bynum v. Dist. of Columbia,*
    214 F.R.D. 27 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 48

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Caridad v. Metro-North Commuter R.R.*,
    191 F.3d 283 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Covino v. Patrissi*,
    967 F.2d 73 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 34

*Cromer Finance Ltd. v. Berger*,
    205 F.R.D. 113 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Cutler v. Perales*,
    128 F.R.D. 39 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*D'alauro v. GC Servs. Ltd. P'ship*,
    168 F.R.D. 451 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Daniels v. City of New York*,
    198 F.R.D. 409 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 46

*Davidson v. Kyle*,
    No. 01-706S, 2004 WL 941458 (W.D.N.Y. March 30, 2004) . . . . . . . . . . . . . . . . . . . . 34

*Davis v. City of Camden*,
    657 F. Supp. 396 (D.N.J. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Deary v. Guardian Loan Co.*,
    534 F. Supp. 1178 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Doe v. Calumet City*,
    128 F.R.D. 93 (N.D. Ill. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Doe v. Calumet City*,
    754 F. Supp. 1211 (N.D.Ill. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Doe v. Renfrow*,
    631 F.2d 91 (7th Cir.1980) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ewh v. Monarch Wine Co.*,
    73 F.R.D. 131 (E.D.N.Y. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Fann v. City of Cleveland*,
   616 F. Supp. 305 (D.C.Ohio 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Hartline v. Gallo*,
   No. 03-1974, 2006 WL 2850609 (E.D.N.Y. Sept. 30, 2006) . . . . . . . . . . . . . . . . . . . . . 30

*Hirschfeld v. Stone*,
   193 F.R.D. 175 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Hodges v. Stanley*,
   712 F.2d 34 (2d Cir. 1983) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 23, 31

*Hudson v. Palmer*,
   468 U.S. 517 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Nassau County Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27, 35, 48

*In Re Visa Check/Mastermoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 50, 52

*Iqbal v. Hasty*,
   _F.3d._, No. 05-6388, 2007 WL 1717803 (2d Cir. June 14, 2007) . . . . . . . . . . . . . . . . . 34

*Kanter v. Casey*,
   43 F.3d 48 (3rd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Langley v. Coughlin*,
   715 F. Supp. 522 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Latino Officers Assoc. Of New York v. City of New York*,
   209 F.R.D. 79 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Lee v. Perez*,
   175 F.Supp.2d 673 (S.D.N.Y 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Lopez v. City of New York*,
   901 F. Supp. 684 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Mack v. Suffolk County*,
   191 F.R.D. 16 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*MacWade v. Kelly,*
     460 F.3d 260 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Marisol A. v. Guiliani,*
     126 F.3d 372 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 41, 45

*Marriott v. County of Montgomery,*
     227 F.R.D. 159 (N.D.N.Y. 2005), *aff'd,*
     No. 05-1590, 2005 WL 3117194 (2d Cir. Nov. 22, 2005) . . . . . . . . . . . . . . . . . . . . . . . 37

*Marriott v. County of Montgomery,*
     426 F.Supp.2d 1 (N.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 36, 37, 39

*Martin v. New York City Dep't of Soc. Svs.,*
     117 F.R.D. 64 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Maryland v. Garrison,*
     480 U.S. 79 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
     475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Michenfelder v. Sumner,*
     860 F.2d 328 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Morales v. United States,*
     961 F. Supp. 633 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*N.G. v. Connecticut,*
     382 F.3d 225 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

*Nicholson v. Williams,*
     205 F.R.D. 92 (E.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Nilsen v. York County,*
     219 F.R.D. 19 (D. Me. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Nowasad v. English,*
     903 F. Supp. 377 (E.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Phaneuf v. Fraikin,*
     448 F.3d 591 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Prod. Liab. Litig.,*
    241 F.R.D. 435 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Robinson v. Metro-North Commuter R.R.,*
    267 F.3d 147 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 46

*Sarnicola v. County of Westchester,*
    229 F. Supp.2d 259 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Shain v. Ellison,*
    273 F.3d 56 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Sharif v. New York State Bd. of Educ. Dep't.,*
    127 F.R.D. 84 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Tardiff v. Knox County,*
    218 F.R.D. 332 (D. Me. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Tardiff v. Knox County,*
    365 F.3d 1 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Terry v. Ohio,*
    392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Turner v. Safley,*
    482 U.S. 78 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 35

*United States v. Colon,*
    250 F.3d 130 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Edwards,*
    885 F.2d 377 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Woods,*
    544 F.2d 242 (6th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Ventura v. New York City Health & Hosp. Corp.,*
    125 F.R.D. 595 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Wachtler v. County of Herkimer,*
    35 F.3d 77 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 20

*Walsh v. Franco,*
     849 F.2d 66 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 20

*Way v. County of Ventura,*
     445 F.3d 1157 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Weber v. Dell,*
     804 F.2d 796 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 20, 33, 34, 37

## STATE CASES

*Salter v. State,*
     163 Ind. App. 35, 321 N.E.2d 760 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## FEDERAL RULES

Fed. R. Civ. P. 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Foster Thomas, Daniel Velazquez, Kenneth Williams, Arthur Wallace, Julio Phitts, and Chareama Bolds ("plaintiffs"),  submit this memorandum of law in support of intervenor-plaintiffs' ("plaintiffs") motions for partial summary judgment and class certification.

## INTRODUCTION

In *Shain v. Ellison*, 273 F.3d 56 (2d Cir. 2001), the Second Circuit held that it has been "clearly established" since at least 1995 that the Fourth Amendment prohibits correctional officers in jails from performing strip searches of pretrial detainees arraigned on misdemeanors or lesser offenses, unless an officer has a reasonable suspicion that a particular detainee is concealing contraband based on that individual's specific circumstances.  *Id*. at 65, 62-65 (relying on *Wachtler v. County of Herkimer*, 35 F.3d 77 (2d Cir. 1994), *Walsh v. Franco*, 849 F.2d 66 (2d Cir. 1988), and *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986)).  Consistent with that principle, it has also been long established that repeated strip searches of pretrial detainees who are under continuous custody are *per se* unreasonable and unnecessary, and thus violate the Fourth Amendment.  *N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004); *Hodges v. Stanley*, 712 F.2d 34 (2d Cir. 1983) (per curiam).  Plaintiffs seek class certification and summary judgment with respect to three undisputed strip search policies.

### *Prior Strip Search Admission Policy*

Although defendants claim to have reformed (a factual contention that will be proved wrong in an evidentiary hearing), they do not dispute that prior to July 22, 2002, defendants had a policy and practice mandating the strip search of *all* detainees, including those charged with misdemeanors, during the process of admission into a New York City Department of Corrections ("DOC") facility (the "Prior Admission Policy").  That policy required that each

pretrial detainee fully disrobe and stand naked for DOC officers to visually inspect his or her armpits, oral cavity, ears, nose, and navel.  The detainee also had to stand with his or her legs spread and body bent forward at the waist so that an officer could visually examine the detainee's genitalia and anal cavity, and women were sometimes required to lift their breasts.  This humiliating process was, at times, conducted in groups of several inmates at a time.[1]

DOC's Prior Admission Policy is no different from the one found unconstitutional in *Shain*.  Indeed, precisely for that reason, DOC actively participated in the briefing before the Second Circuit in *Shain* as an *amicus,* presenting arguments which the Second Circuit expressly rejected in a published decision on October 19, 2001.  273 F.3d at 62.  Notwithstanding the clear command of *Shain*, DOC's Prior Admission Policy has never been enjoined or declared unconstitutional by any court.

Instead, this action was brought by plaintiffs on July 15, 2002 challenging the policy, and thereafter a Stipulation and Order of Class Action Settlement ("Stipulation") was entered in which DOC agreed to make payments only to individuals who had been charged with non-drug and non-weapon related misdemeanor or lesser offenses prior to July 15, 2002.[2]  (Ex. 119.)  DOC explicitly denied any liability in the Stipulation, but recognized in a "Whereas" clause that it had changed its admissions policy.  (Ex. 119 at 2.)  And indeed, it is undisputed that on or about July 22, 2002, DOC issued a new, written operations order requiring that pretrial detainees charged with a misdemeanor or lesser offense – regardless of the type or nature of that

---

[1]  While defendants admit that these strip searches were sometimes done in groups, plaintiffs' experience has been that they are routinely done in groups.  For purposes of this motion, however, this is not a material fact.

[2]  As the Court knows, Foster Thomas, Daniel Velazquez, and  Kenneth Williams were granted intervenor status at the time the settlement was being considered and challenged the settlement, in part because it did not address claims relating to strip searches of those charged with weapon- and drug-related misdemeanors.

offense – be given a disposable medical gown so that they are never naked during an admission search (the "Current Admission Policy").[3]  DOC, in other words, nominally changed its written policy to prohibit the admission strip search of *even those pretrial detainees charged with drug- or weapon-related misdemeanor offenses.*

Despite the controlling precedent of *Shain* (which involved a pretrial detainee who had been arrested on a misdemeanor crime of violence and who himself admitted to having a pocket-knife on his person at the time of his arrest); despite the Supreme Court and Second Circuit's repeated admonitions that officials may not create *post-hoc* bases for reasonable suspicion; despite the fact that DOC officers strip searched pretrial detainees pursuant to a *uniform* policy which did not require nor allow any inquiry into the nature of charges against the detainee; and despite defendants' current self-proclaimed willingness to forego strip searching individuals charged with drug- or weapon-related misdemeanor offenses upon admission – defendants continue to maintain that their Prior Admission Policy was constitutional insofar as it was applied to those charged with minor offenses involving drugs or weapons.  Defendants' position has no merit.  This Court should grant partial summary judgment finding that defendants' Prior Admission Policy was unconstitutional, and should certify a damages class pursuant to Fed. R. Civ. P. 23(b)(3) of all pretrial detainees who were charged with non-felony offenses that were excluded from the *McBean* settlement.

---

[3]  In fact, even though they issued a few-page operations order on this topic in 2002, defendants have *continued* to strip search *all* detainees, including those charged with misdemeanors and violations, during the initial entry into a DOC facility.  Defendants dispute this fact.  Defendants' *de facto* policy of continuing to strip search those charged with non-felony offenses will be addressed at the factual hearing scheduled for September 24, 2007.

### Housing and Exit Strip Search Policies

It is undisputed that defendants *currently* maintain a mandatory and indiscriminate policy of strip searching *all* pretrial detainees after they are admitted to DOC facilities and have been continuously under DOC supervision and custody: (a) whenever the detainee is leaving the confines of a DOC facility (the "Exit Policy"), and (b) whenever the detainee's living quarters is searched (the "Housing Policy").

As with the Prior Admission Policy, DOC strip searches conducted pursuant to defendants' Exit and Housing Policies are undertaken without any inquiry into individualized reasonable suspicion, or indeed suspicion of any sort. Nor do these policies distinguish between individuals charged with felonies and those charged with misdemeanors or other non-felony crimes. And, as with the Prior Admission Policy, DOC strip searches conducted pursuant to the uniform Housing and Exit Policies require that each pretrial detainee fully disrobe and stand naked to be inspected by correctional officers, so that an officer can visually inspect the detainee's armpits, oral cavity, ears, nose, navel, and feet; often detainees must also perform a deep knee bend so that their anal or vaginal cavity is opened. This degrading process may be done in groups of several inmates at a time: in the case of Housing Policy strip searches, defendants admit that ten detainees may be forced to strip naked at the same time in a dormitory in the presence of up to 40 other detainees and at least another ten correctional officers; in the case of Exit Policy strip searches, defendants have admitted that up to 20 detainees may be stripped naked at once in the gymnasium of a facility, prior to their leaving for court.

While defendants' Current Admission Policy implicitly recognizes that it is unconstitutional to strip search *at intake* pretrial detainees arraigned for non-felony offenses without individualized reasonable suspicion, defendants' policies continue to mandate the

-4-

repeated strip search *after intake* of these same pretrial detainees pursuant to mandatory

procedures without any determination of reasonable suspicion.  Current DOC policy thus forbids

the strip search of a pretrial detainee admitted on a non-felony offense during the admission

process, but requires that the same detainee be strip searched during a housing search – even if

that housing search is being conducted just moments after the detainee was admitted.  This

makes no sense.  It violates clearly established Second Circuit law.  *Shain v. Ellison*, 273 F.3d 56

(2d Cir. 2001)*; N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004); *Hodges v. Stanley*, 712 F.2d 34

(2d Cir. 1983) (per curiam).  Plaintiffs seek certification of an injunctive class of all persons who

have or will be effected by the Housing and Exit Policies, summary judgment declaring the

policies unconstitutional, and a permanent injunction prohibiting future enforcement.

### DOC Policies <u>Not</u> Being Challenged

It is important to stress what plaintiffs are *not* challenging in this motion, or for

that matter, this lawsuit.[4]  DOC's blanket search policies and practices are nearly too numerous

to count; searches are mandated under governing policy in numerous ways, at numerous times,

throughout DOC, everyday – *all without individualized, reasonable suspicion*.

DOC searches detainees' mail, their lockers, their cells, their books, their toiletries

– everything in their possession.  And DOC constantly undertakes bodily searches of detainees.

DOC mandates pat frisks which require an officer to pat down the body of a detainee while she

or he remains clothed, and to search the detainee's clothing, including by requiring a detainee to

remove outer clothing, turn out her or his pockets and remove shoes and socks.  DOC mandates

that detainees walk through magnometers and that their bodies be scanned by a hand-held

transfrisker, and/or that they sit on an electronic search chair (called the "BOSS Chair," short for

_____

[4]  Plaintiffs do not concede that the following policies and practices are constitutional, but
are not challenging them in this case.

the Body Orifice Screening System), all to determine if metallic contraband is being hidden on their bodies. (*See generally*, Directive 4508R-B, Ex. 9.)

DOC constantly undertakes *strip searches* of detainees in myriad ways that are not challenged here. DOC conducts blanket strip searches of convicted inmates – who are housed separately and apart from pretrial detainees. DOC strip searches pretrial detainees charged with felonies upon admission, and repeatedly after being admitted. DOC strip searches all pretrial detainees, regardless of the nature of offense charged, *when they return* to a DOC facility from attending court, a hospital or outside medical appointment, a work release program, or a funeral, burial, wake, or visit to a critically ill relative. (Directive 4508R-B, Ex. 9 at NYC1199-1200.) DOC strip searches all pretrial detainees, irrespective of offenses charged, upon returning from interviews by members of the Board of Parole, visits, and counsel room visits. (Directive 4508R-B, Ex. 9 at 1200.) Plaintiffs do not challenge these policies and practices – nor do they even challenge the three Policies (Prior Admission, Housing and Exit) insofar as they have been or are applied to pretrial detainees charged with felonies. All of these unchallenged strip searches are permitted, under DOC policy, to be done in groups, so that as a routine matter, men and separately, women, are forced to remove all clothes until naked in groups for visual inspection by DOC officers. (*See* Directive 4508R-B, Ex. 9 at NYC1199-1200.)

It should come as no surprise, then, that individual DOC officials have observed *tens of thousands* of human beings stripped naked and inspected. Former DOC Chief Steven Conry has personally conducted or witnessed between approximately 20,000 and 30,000 searches of DOC detainees (and possibly as many as 50,000), *sixty percent* of which he estimates were strip searches – meaning that Steven Conry alone has observed between 12,000 and 30,000 detainees naked and humiliated. (Conry Dep. 285:10-287:3.)

This case is focused solely on practices that have been expressly and repeatedly forbidden by the Second Circuit for violating the Fourth Amendment.  Plaintiffs seek *only* to uphold the established rights recognized for non-felony pretrial detainees under *Weber v. Dell* and its progeny; the right to bodily privacy free from invasion without adequate cause, and to be protected from searches conducted in an unreasonably invasive manner.  In fact, DOC has demonstrated by its own policies and practices that it has the capacity to achieve respect for the Second Circuit's clear command.  Searches can and are effected based on a modicum of individualized cause.  Just as importantly, DOC already, at least on paper, appropriately attempts to limit the invasive and humiliating nature of strip searches by using less intrusive means – from using gowns, foregoing *group* strip searches, and employing appropriate technological devices as a substitute for visual cavity inspection.  All these methods assist in advancing security, while still respecting the special Fourth Amendment rights of pretrial detainees charged with misdemeanors.  Plaintiffs ask for no less and no more than that.

## FACTS

The material facts set forth below are based on plaintiffs' Statement Pursuant to Local Rule 56.1 ("Pls. 56.1 Stat.") and the sworn statements, deposition testimony and documentary evidence referenced in the Rule 56.1 Statement.  The facts in the Rule 56.1 Statement will not be repeated in full here; only pertinent facts are set forth below.

**A.      The Relevant DOC Policies**

**1.      Directive 4508 and Its Revisions**

Since at least June 1991, an approximately 40-page Directive concerning the "Control of and Search for Contraband" has been in effect at DOC facilities.  (Pls. 56.1 Stat. ¶ 8.) The Directive concerning the "Control of and Search for Contraband" sets forth in one lengthy

policy document, the manner, means, and requirements for conducting searches at DOC.

(*Id.* ¶ 10.)   While there have been changes to the text of the Directive concerning the "Control of

and Search for Contraband" over the years, the specific provisions concerning the three Policies

being challenged herein have not materially changed, as set forth below.  (*Id.* ¶ 11.)

###    2.    Prior Admission Policy

It is undisputed that until July 22, 2002, defendants had a policy and practice

requiring the systematic strip search of *all* post-arraignment, pretrial detainees during the new

admission processing into a Department of Corrections ("DOC") facility ("Prior Admission

Policy").  (*Id.* ¶¶ 12-15.)   The strip search conducted pursuant to the Prior Admission Policy

mandated that all pretrial detainees being newly admitted into DOC remove all of his or her

clothing so that a DOC officer could visually inspect the detainee's mouth, armpits, oral cavity,

ears, nose, knees, toes, and navel while the inmate was undressed; a correctional officer was also

required to make a thorough visual inspection of the detainee's anus and genital cavities while

the inmate was standing with his/her legs spread and body bent forward at the waist to ensure

that no contraband is being secreted in the area of the buttocks, and women could be required to

lift their breasts.  (*Id.* ¶¶ 16, 17; *see also id.* ¶ 5.)  Defendants have admitted that, under certain

circumstances, several detainees were strip searched at the same time under the Prior Admission

Policy (*id.* ¶ 32), while Plaintiffs have uniformly experienced admission strip searches as being

done in groups, (*id.* ¶¶ 118-208).

Every new admission detainee was processed in the same manner until at least

July 22, 2002.  (*Id.* ¶¶ 15, 18.)  This was a blanket policy of strip searching all new admission

detainees, including detainees who had been arraigned on misdemeanors and lesser offenses.

(*Id.* ¶ 19.)  Neither the nature of the crime, the circumstances of the particular arrest, nor the

characteristics of the particular detainee were relevant to enforcement of the Prior Admission

Policy.  (*Id.* ¶ 20.)  As such, the Prior Admission Policy did *not* require that searches conducted pursuant to the policy be conducted only after a particularized inquiry has yielded reasonable suspicion for an officer to believe that the pretrial detainee was concealing a weapon or other contraband. (*Id.* ¶ 21, 22.)  Pursuant to the Prior Admission Policy, it was the policy and practice for DOC officers performing strip searches of pretrial detainees during the new admission procedure *not* to inquire whether the detainee was arraigned on a charge under the New York Penal Code that related to possession or use of a drug and/or weapon.  (*Id.* ¶ *23.*)

3.      **Current Admission Policy**

On July 22, 2002, defendants did issue a new policy document, Operations Order 08/02, which purports to set forth a new search policy and procedure for newly admitted misdemeanor and violation detainees, which does not involve a strip search ("Current Admission Procedure").  (*Id.* ¶¶ 34, 36.)   Directive 4508 in each of its revisions since 1991 has never been changed to reflect the Current Admission Procedure memorialized in Operations Order 08/02, even though Chief Conry, DOC's Fed. R. Civ. P. 30(b)(6) deponent on strip search policies, thinks such a revision would be a good idea.  (*Id.* ¶ 35.)

Operation Order 08/02 states: "Post arraignment detainee inmates incarcerated for Misdemeanor and/or Violation Offenses shall *not* be made the subject of a strip search during the new admission process unless there is reasonable suspicion that the inmate is in possession of contraband." (*Id.* ¶ 36.)  The Current Admission Policy, as set out in Operations Order 08/02, requires that upon initial entry into a DOC facility a designated officer shall review the detainee's Securing Order(s) entitled "Major Arraignment Charge" to determine if a detainee has been charged with either a felony, misdemeanor or violation.  (*Id.* ¶ 38.)  The Current Admissions Policy applies equally to all misdemeanors or violations regardless of the nature of the offense,

and thus applies to pretrial detainees who are arraigned for misdemeanor and/or violation
offenses related to drug or weapon charges.  (*Id.* ¶ 40.)

     **4.**     **Exit Policy**

     Defendants have a policy and practice requiring the systematic strip search of *all*
pretrial detainees whenever a detainee is leaving the confines of a DOC facility, unless the
detainee is being released from custody, except when insufficient staff, room, or time is available
to conduct the searches ("Exit Policy").  (*Id.* ¶ 56.)

     At a minimum, the strip searches conducted pursuant to the Exit Policy require
that detainees strip naked and allow a DOC officer visually to inspect the detainees' armpits, oral
cavities, ears, noses, navels, and feet while the detainees are undressed.  (*Id.* ¶ 57.)  At times,
detainees may also be required to perform a deep knee bend so that their anus or vagina is
opened.  (*Id.*)  Strip searches conducted pursuant to the Exit Policy may be conducted in groups
and are sometimes conducted in groups.  (*Id.* ¶¶ 80, 81.)  As of at least August 31, 2006, a sign in
the intake area of one DOC facility on Rikers Island informs the detainees of the policy.  The
sign states, "EVERY INMATE WILL BE SUBJECT TO A GROUP STRIP SEARCH PRIOR
TO DEPARTING OR RETURNING TO THE FACILITY. . . PER DIRECTIVE 4508/91." (*Id.*
¶ 83.)  Defendants have admitted that up to 20 detainees may be stripped naked at once in the
gymnasium of a facility, prior to their leaving for court, (*id.* ¶ 82), and plaintiffs have uniformly
experienced Exit Policy strip searches as being done in groups, (*id.* ¶¶118-208.)

     DOC's Exit Policy has been set out without change from 1991 to the present in
Directive 4508 and its revisions.  (*Id.* ¶ 58.)  In particular, Directive 4508R-B, currently in effect,
states: "A strip frisk without a visual body search *may* be conducted at the *discretion* of the
facility whenever an inmate is leaving the confines of the facility." (*Id.* ¶ 60.)  There are no

written guidelines delineating how officers should exercise their "discretion" when deciding whether to conduct a strip search before a detainee is transported out of a facility.  (*Id.* ¶ 61.)  At some point prior to 2002, an instruction was issued to DOC staff stating that they should increase the number of inmates being strip searched on their way to court.  (*Id.* ¶ 62.) That instruction is still in effect, (*id.* ¶ 62), despite the fact that it does not appear to have had any impact on the number of incidents involving contraband at court, (*id.* ¶ 63).

Pursuant to this Exit Policy, defendants have a practice and custom of strip searching *all* pretrial detainees before they are transported to court, to a hospital or outside medical appointment, to a funeral, burial or wake, to visit to a critically ill relative, or to an outside work detail, except when insufficient staff, room, or time is available to conduct the searches.  (*Id.* ¶ 64.)  At most DOC facilities, defendants ensure that there is sufficient staff, time, and room to strip search *all* pretrial detainees whenever a detainee is leaving the confines of a DOC facility, unless the detainee is being released from custody.  (*Id.* ¶ 68.)  The Exit Policy mandates strip searches regardless of the particular circumstances of the detainees being transported.  (*Id.* ¶¶ 69-70.)  Pretrial detainees may be strip searched even if they have remained in continual DOC custody and under continual DOC supervision since the last time they were strip searched.  (*Id.*  ¶ 71.)

### 5.   Housing Policy

Defendants have a policy and practice providing for the routine and periodic strip search of *all* pretrial detainees when a detainee's living quarters is searched ("Housing Policy"), a policy that has been in effect from before July 15, 1999 until the present.  (*Id.* ¶¶ 84-85.) Directive 4508R-B, which is currently in effect, states: "A strip frisk without a visual body cavity search must be conducted when . . . an individual area of a facility or living quarters is being

searched." (*Id.* ¶ 88.)   Detainee's living quarters are searched "on a regular and frequent basis", according to a pre-set schedule developed a month at a time by supervisory DOC officials. (These are sometimes called "scheduled institutional searches".)  (*Id.* ¶¶ 89-91.)  DOC's Housing Policy also mandates that at least seven completely random searches (called "random searches") be conducted each day in every facility.  (*Id.* ¶ 92.)  Random searches are "just random" – they are not done in response to any reason, incident, or intelligence.  (*Id.* ¶ 92.)

Strip Searches conducted pursuant to the Housing Policy require that detainees get naked prior to their living quarters being searched.  (*Id.* ¶ 93.)  At a minimum, the strip searches conducted pursuant to the Housing Policy require that detainees strip naked and allow a DOC officer visually to inspect the detainee's armpits, oral cavity, ears, nose, navel, and feet while the detainee is undressed.  (*Id.* ¶ 93; *see also id.* ¶¶ 4, 94.)   At times, detainees may also be required to perform a deep knee bend so that their anus or vagina is opened.  (*Id.*)  These strip searches may be conducted in groups.  (*Id.* ¶¶ 95, 98.)  In dormitory settings, often five or more detainees are getting naked at the same time next to each other, with seven or more officers immediately in front of them observing; these take place either in the bathroom area or in the bed area of the dormitory.  (*Id.* ¶ 97.)  Sometimes as many as 50 detainees are in the bed area while a group of approximately 10 detainees strip search at the same time, pursuant to the Housing Policy. (*Id.* ¶ 98.)

DOC's Housing Policy provides that a pretrial detainee *must* be strip searched whenever the detainee's living quarters is searched, regardless of the detainee's particular circumstances.  (*Id.* ¶ 102.)   DOC officers have a policy and practice of strip searching detainees without undertaking any individualized determination as to whether a detainee might be concealing weapons or contraband.  (*Id.* ¶ 104.)  The strip searches conducted pursuant to the

Housing Policy are undertaken without any prior or intervening event or circumstance that would give rise to individualized reasonable suspicion, or indeed suspicion of any sort. (*Id.* ¶¶ 104-112.)   Pursuant to DOC's Housing Policy, pretrial detainees may be strip searched even if they have remained in continual DOC custody and are under continual DOC supervision since the last time they were strip searched.  (*Id.* ¶ 113.)

**B.    Facts Concerning Named Plaintiffs**

**1.    Kenneth Williams**

Kenneth Williams is 32 years old and resides in New York City.  (*Id.* ¶ 118.)  He works for the New York City Parks and Recreation Department and the YMCA.  (*Id.*)  On or about January 19, 2002, Mr. Williams was arrested.  (*Id.* ¶ 119.)  After being arraigned for criminal contempt in the second degree (a class A misdemeanor) and for criminal marijuana possession (a misdemeanor), Mr. Williams was brought to the Manhattan Detention Center ("MDC"), where he was strip searched with several other detainees pursuant to the Prior Admission Policy.  (*Id.* ¶ 120.)  During the process, Mr. Williams asked correctional officers if the strip search was necessary, and they responded that it was standard procedure for all detainees.  (*Id.* ¶ 121.)

A few days later, Mr. Williams was brought from MDC to Rikers Island, where he was strip searched three more times, pursuant to the Housing Policy.  (*Id.* ¶ 122.)  During these housing searches, Mr. Williams was forced along with other detainees to remove all clothing, bend over, spread his butt cheeks, and cough while his anal cavity was exposed.  (*Id.* ¶ 123.)  All these strip searches were conducted in the presence of at least five other detainees, and between two and four correctional officers.  (*Id.* ¶ 124.)  During at least one of these searches, correctional officers taunted the prisoners and video taped the strip searches.  (*Id.* ¶ 125.)

2.      **Chareama Bolds**

Chareama Sharett Bolds is 31 years old and resided in Brooklyn at the time she

joined this case.  (*Id.* ¶ 126.)  Ms. Bolds was incarcerated at Rikers Island between November 14

and 21, 2006, after being arraigned on charges of assault in the third degree (a misdemeanor),

resisting arrest (a misdemeanor), endangering the welfare of a child (a misdemeanor), menacing

(a misdemeanor), and harassment in the second degree (a violation).  (*Id.* ¶ 127.)  After being

strip searched upon admission to DOC, despite the written Current Admission Policy, Ms. Bolds

was subjected to several additional strip searches pursuant to the Housing and Exit Policies.

(*Id.* ¶¶ 128-34.)  Ms. Bolds underwent two strip searches while in her dormitory housing area,

pursuant to the blanket Housing Policy.  (*Id.* ¶ 130.)  As with the admission strip search, here Ms.

Bolds was again required to remove all clothing, squat, turn around, bend over, open her mouth,

run her hands through her hair, lift her arms up, lift her breasts up, spread her butt cheeks, and

cough while bent over.  (*Id.* ¶ 131.)  Both of these strip searches were in the presence of four

other detainees and four correctional officers.  (*Id.* ¶ 132.)  At least one of these searches was

conducted in the presence of male correctional officer.  (*Id.* ¶ 133.)

Ms. Bolds was also strip searched pursuant to the Exit Policy, before each of the

approximately two trips she made to court.  (*Id.* ¶ 134.)  Correction officers would wake her up at

4:00 a.m., and before it was light outside, she would be taken along with approximately sixty

other detainees into the gymnasium of Rose M. Singer Correctional Facility ("RSMC"), where

they were strip searched, six detainees at a time.  (*Id.* ¶ 135.)  The group strip searches were

conducted in an open area, albeit slightly partitioned off from the rest of the gym. (*Id.* ¶ 136.)

During these group strip searches, six correction officers would instruct six detainees to remove

-14-

all clothing, bounce up and down, run their hands through their hair, lift their tongues, lift their breasts, squat, spread their butt cheeks, and cough.  (*Id.*)

When menstruating, Ms. Bolds was never given a private search or exempted from the full strip search.  (*Id.* ¶ 138.)  In her experience, Ms. Bolds observed that all women were required to strip search together, regardless of whether they were menstruating, and that menstruating women had to remove their feminine pads, along with their clothing. (*See id.* ¶ 139.)  The only special provision that Ms. Bolds observed for menstruating women was that they were given a new pad after the search was over.  (*Id.* ¶ 140.)

### 3.    Foster Thomas

Foster Lee Thomas is 55 years old and resides in Monroe County.  (*Id.* ¶ 141.)  He works and lives at The Boys' School, an all boys' Jewish academy.  (*Id.*)  On numerous occasions between 1999 and the present, including without limitation on June 2, 2000, December 16, 2001, February 17, 2002, April 6, 2002, November 20, 2002, February 29, 2004, and October 3, 2004, Mr. Thomas has been arraigned on misdemeanor charges (related to gambling and/or criminal trespass) and held as a pretrial detainee at a number of DOC facilities, including the Vernon C. Bain Center ("VCBC"), MDC, and several other Rikers Island facilities.  (*Id.* ¶ 142.) Upon each admission – either pursuant to the Prior Admission Policy or pursuant to the *de facto* continuation of that policy – Mr. Thomas was strip searched along with between one to five other detainees.  (*Id.* ¶ 143.)

Mr. Thomas was also strip searched repeatedly pursuant to the blanket Exit Policy, each time before he traveled to court from a DOC facility, which may have been as many as a dozen times.  (*Id.* ¶ 145.)  These searches were conducted by approximately three or four corrections officers, and in the presence of at least three to four other detainees who were also

being required to strip naked. (*Id.* ¶ 146.)  At Rikers Island, these Exit Policy strip searches were often conducted in an open hallway with up to six other detainees.  (*Id.* ¶ 147.)  Mr. Thomas was also subjected to weekly housing group strip searches pursuant to the Housing Policy. (*Id.* ¶ 148. )

All of the group strip searches Mr. Foster experienced were conducted with a similar procedure: detainees were instructed to remove all their clothing, open their mouths, turn around, bend over and spread their butt cheeks.  (*Id.* ¶ 149.)  Mr. Thomas underwent at least 27 strip searches during the detentions described above, and in not a single one of these searches did correctional officers find a prohibited item on Mr. Thomas or any other detainee.  (*Id.* ¶ 150.)

### 4.    Julio Phitts

Julio Phitts is 39 years old and is a resident of Fitchburg, Massachusetts. (*Id.* ¶ 158.)  Mr. Phitts works in shipping for Starlite, a company in Townsing, Massachusetts, but he visits New York City frequently because his nine-year old son lives in New York. (*Id.* ¶ 159.)  In October 2006, Mr. Phitts was arrested and arraigned on charges of assault (a misdemeanor).  (*Id.* ¶ 162.)  After his arraignment, Mr. Phitts was strip searched along with other inmates, upon admission, despite DOC's claim to have changed the policy in 2002. (*Id.* ¶ 163.) During the approximately nine days that he was held at Anna M. Kross Correctional Facility ("AMKC") in October 2006 as a pretrial detainee, Mr. Phitts was strip searched pursuant to both the Housing and Exit Policies, once in his housing area, and once going to court.  (*Id.* ¶ 166.) Each of those strip searches were conducted in the same manner: he had to take off all his clothes, bend over, spread his buttocks, squat, lift his genitals, run his hands through his hair and fingers through his mouth, lift his arms, and show the soles of his feet.  (*Id.* ¶ 167.)

5.    **Arthur Wallace**

Arthur Wallace is a resident of the Bronx.  (*Id.* ¶ 169.)  Mr. Wallace was arrested and arraigned on May 21, 2002 for criminal possession of a controlled substance (a misdemeanor), resisting arrest (a misdemeanor), criminal contempt (a misdemeanor) and harassment (a violation).  (*Id.* ¶ 187.)  After being strip searched pursuant to the Prior Admission Policy, Mr. Wallace was held at VCBC for four days where he was also strip searched pursuant the Housing and Exit Policies.  (*Id.* ¶¶ 188-91.)

On April 29, 2005, Mr. Wallace was arrested for a misdemeanor and was held at VCBC for four days as a pretrial detainee.  (*Id.* ¶ 184.)  Upon admission, he was strip searched in a group, despite DOC's assertion that such strip searches have stopped.  (*Id.* ¶ 185.)  Approximately four days later, Mr. Wallace was strip searched on his way to court pursuant to the Exit Policy.  (*Id.* ¶ 186.)  The procedure was conducted in a similar manner to the intake strip search, and was also conducted in a groups with five other detainees.  (*Id.*)

On July 14, 2006, Mr. Wallace was arrested and arraigned on trespassing and criminal possession of a controlled substance and taken to AMKC as a pretrial detainee.  (*Id.* ¶ 181.)  Mr. Wallace spent two weeks at AMKC, and was strip searched twice when going to court pursuant to the Exit Policy.  (*Id.* ¶ 182.)  As with previous strip searches, these two strip searches were conducted in a group of five detainees, and Mr. Wallace was instructed to remove all clothing, bend over and squat.  (*Id.* ¶ 183.)

On or about October 30, 2006, Mr. Wallace had also been brought to VCBC, after being arrested and arraigned on charges of petit larceny (a misdemeanor) and criminal possession of stolen property in the fifth degree (a misdemeanor).  (*Id.* ¶ 174.)  Mr. Wallace was accused of shoplifting $34.80 worth of gum from a Rite Aid Pharmacy.  (*Id.* ¶ 175.)  He spent approximately

five days incarcerated at VCBC as a pretrial detainee.  (*Id.* ¶ 176.)  Upon admission to VCBC,

Mr. Wallace was strip searched, in violation of DOC's purported written policy.  (*Id.* ¶¶ 177-78.)

During this period of detention, Mr. Wallace was also strip searched pursuant to the Exit Policy

before going to court from the facility.  (*Id.* ¶ 179.)

On December 2, 2006, Mr. Wallace was arrested and arraigned on a misdemeanor

and taken to VCBC.  (*Id.* ¶ 170.)  He was incarcerated at VCBC as a pretrial detainee for

approximately five days.  (*Id.* ¶ 171.)  Upon being admitted, Mr. Wallace was strip searched

along with four other detainees, despite DOC's assertion that this practice has stopped.  (*Id.* ¶

172.)  During his five-days at Rikers, Mr. Wallace was also strip searched pursuant to the Exit

Policy on his way to court.  (*Id.* ¶ 173.)

In addition to the arrests described above, Mr. Wallace has been admitted to other

DOC facilities approximately 15 more times, many of these as a pretrial misdemeanor detainee,

since July 1999.  (*Id.* ¶ 193.)  Mr. Wallace was strip searched every time during the new

admission process, and approximately ten times pursuant to the Exit Policy, and was sometimes

subject to a weekly housing strip search pursuant to the Housing Policy.  (*Id.* ¶ 194.)

**6.   Daniel Velazquez**

Daniel Velazquez is 29 years old and lived on Staten Island at the time he joined

this lawsuit.  (*Id.* ¶ 199.)  On January 4, 2002, Mr. Velazquez was arrested for the possession and

sale of marijuana, a misdemeanor, and taken to the 13th precinct.  (*Id.* ¶ 201.)  At the precinct,

Mr. Velazquez was required to undergo a strip search conducted by two police officers.  (*Id.* ¶

202.)  After arraignment on misdemeanor charges of the criminal sale of marijuana and unlawful

possession of marijuana, Mr. Velazquez was taken to MDC.  (*Id.* ¶ 203.)  At MDC, Mr.

Velazquez was subjected to a strip search pursuant to the blanket Prior Admission Policy.  (*Id.* ¶

204, 205.)  After the admission search, Mr. Velazquez walked to his housing area and stumbled

into an ongoing housing search.  (*Id.* ¶ 207.)  Only a few minutes after his intake search, Mr.

Velazquez was pat frisked and then instructed to  remove all his clothing, squat and cough all

over again, pursuant to the Housing Policy. (*Id.*)

## ARGUMENT

### I.   PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT SHOULD BE GRANTED

#### A.   The Standard for Summary Judgment

Summary judgment may not be granted unless the submissions of the parties,

taken together, "show that there is no genuine issue as to any material fact."  Fed. R. Civ. P.

56(c).  A fact is "material" only when it may affect the outcome of the case under the governing

substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a

material fact is "genuine" if the evidence is such that a reasonable jury could return a jury verdict

for the non-moving party.  *Id*.  In deciding summary judgment, the Court must view all facts in

the light most favorable to the non-moving party, here the defendants.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To

defeat the motion, defendants must establish the existence of a factual issue requiring a trial,

through the production of admissible evidence.  *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574 (1986).  The issue must be real and not feigned, as sham, frivolous issues

are insufficient to defeat a summary judgment motion.  That is, the defendant "must do more

than simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 586

(1986).  As set forth more fully below, that standard applied to this record requires the granting

of summary judgment for the plaintiffs in the manner set forth below.

**B.      The Fourth Amendment Forbids Strip Searches Of Pretrial Detainees Arraigned on Misdemeanors Without Reasonable Suspicion**

As this Court has stated already in this case: "Blanket policies mandating the strip search of *every* post-arraignment misdemeanor detainee upon admission, regardless of the existence of individualized reasonable suspicion that the detainee is concealing weapons or other contraband, are . . . clearly unconstitutional under the law of this Circuit." *McBean v. City of New York*, 228 F.R.D. 487, 489 (S.D.N.Y. 2005) ("*McBean I*") (emphasis in original); *see also McBean v. City of New York*, 233 F.R.D. 377, 386-87 (S.D.N.Y. 2006) ("*McBean II*") ("[U]nder the law of this Circuit a blanket strip search policy such as the one to which plaintiffs were subjected is clearly unconstitutional."); *see also Shain v. Ellison*, 273 F.3d 56, 66 (2d Cir. 2001); *Wachtler v. County of Herkimer*, 35 F.3d 77 (2d Cir. 1994); *Walsh v. Franco*, 849 F.2d 66 (2d Cir. 1988); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986).  Because plaintiffs and members of the proposed class they seek to represent were strip searched pursuant to mandatory and indiscriminate policies, defendants, by definition, lacked the requisite individualized reasonable suspicion to believe that any detainee was concealing a weapon or other contraband.

The strength of this law is not surprising, given the humiliating nature of the strip searches at issue.  Strip searching entails one of the most humiliating and degrading practices available to law enforcement.  As Judge Sotomayor summarized in her partial concurrence and partial dissent in *N.G.*:

> As the majority observes, strip searches – as compared to other kinds of searches – "instinctively give us the most pause."  We have called a strip search "a highly intrusive invasion," "an extreme intrusion upon personal privacy," and "an offense to the dignity of the individual."  We hardly have been alone in this assessment.  The Eleventh Circuit has accepted as "axiomatic that a strip search

-20-

> represents a serious intrusion upon personal rights." The Seventh Circuit has
> referred to strip searches as "demeaning, dehumanizing, undignified, humiliating,
> terrifying, unpleasant, embarrassing, repulsive, signifying degradation and
> submission." Other courts have reached similar conclusions.

*N.G. v. Connecticut*, 382 F.3d 225, 238-39 (2d Cir. 2004) (numerous citations omitted); *see also*

*Doe v. Renfrow*, 631 F.2d 91, 93 (7th Cir.1980) (per curiam) (strip search absent reasonable

cause violates "any known principle of human decency" and "exceed[s] the 'bounds of reason'

by two and a half country miles.").

All three Policies at issue here mandate methodical, extensive and highly intrusive

strip searches – and defendants have confirmed that all three types of strip searches have been

conducted in groups, with Housing Policy strip searches sometimes done in groups of ten

detainees at a time in the presence of an additional 40 detainees and at least ten correctional

officers.  (Pls. 56.1 Stat. ¶¶ 98,  32, 82, 83, 97.)  Plaintiffs certainly consistently experienced all

these strip searches as being done in groups.  Pursuant to all three Policies – the Past Admission

Policy and the Housing and Exit Policies – plaintiffs have been required to fully disrobe

revealing all the intimate parts of their body, and then stand naked while correctional officers

visually inspect each person's armpits, oral cavity, ears, nose, navel, and feet.  (*Id.* ¶¶ 123, 131,

136, 149, 167, 186, 207.)  At times, detainees may also be required to perform a deep knee bend

so that their anus or vagina is opened.  (*Id.*)  Pursuant to the Past Admission Policy, detainees

were also required to allow correctional officers to make a thorough visual inspection of the

detainee's anus and genital cavities while the inmate was standing with his/her legs spread and

body bent forward at the waist, and women could be required to lift their breasts. (*Id.* ¶¶ 16, 17,

5.)

In *Shain*, the Second Circuit held that the mere fact that a detainee charged with a

misdemeanor offense is remanded to jail does not justify a strip search and cannot be used as

evidence of the detainee's danger because, according to New York State law, a misdemeanor

arrestee "must be released on his own recognizance or granted bail."  273 F.3d 56, 65.  The court

explained:

> Although a New York felony defendant's post-arraignment detention may well be
> an indicator of an increased security risk, a person charged with a misdemeanor
> who remains in jail in New York after arraignment probably does so because (a)
> he cannot afford the bail set; (b) he refuses to post bail; or (c) he was arraigned on
> a family court matter.  None of these scenarios creates a reasonable suspicion that
> the alleged offender has secreted contraband or a weapon.

*Id*. at 65 (internal citations omitted).  Furthermore, the Second Circuit found that Mr. Shain had

standing to challenge this blanket strip search policy even though he was arrested for a crime

involving violence because defendants cannot rely *post hoc* on facts unknown to the officer at the

time of the strip search.  *Id*. at 66.  Since it is undisputed that DOC officers did not know, and did

not take into account, the nature of the crimes proposed class members were charged with (Pls.

56.1 Stat. ¶¶ 22-26) defendants similarly cannot avoid liability simply because the proposed class

members were arraigned on offenses under the New York Penal Code or New York City

Administrative Code that relate to possession or use of a drug or weapon.  *See infra*, Part I.C.

Moreover, defendants cannot escape liability for their Housing and Exit Policies

by arguing that *Shain* applies only to strip searches conducted during the initial admission

process.  The Second Circuit in *Shain* drew a sharp line between cases involving local *jails*, such

as those at issue here, and those involving state *prisons* – holding that those detained at jails

cannot be strip searched "absent reasonable suspicion that they are carrying contraband or

weapons."  *Shain*, 273 F.3d at 66.  In doing so, the court confined its prior holding in *Covino v.*

*Patrissi*, 967 F.2d 73 (2d Cir. 1992) – which had upheld the strip search of a pretrial detainee

held in a *prison* during a random housing search – to its facts.  *Shain*, 273 F.3d at 66.  The court

further held that *Turner v. Safley*, 482 U.S. 78 (1987) and its progeny which hold that "a

reasonable relation to a legitimate penological interest suffices to establish the constitutionality of a *prison* regulation" apply only to prisons – not to jails, such as those operated by DOC.  *See Shain*, 273 F.3d at 65-66 (emphasis in original).[5]

In fact, the Second Circuit has held that strip searches of pretrial detainees who are under continuous custody are even less justified than strip searches during the initial intake process.  *See N.G. v. Connecticut*, 382 F.3d 225, 233-234 (2d Cir. 2004); *see also Hodges v. Stanley*, 712 F.2d 34 (2d Cir. 1983)(per curiam).  Individualized suspicion therefore is clearly required for post-intake searches, as well as intake searches, of pretrial detainees held in jails.  *See N.G.*, 382 F.3d at *232 (discussing both initial intake searches and post-intake searches and stating that "in several decisions, we have ruled that strip searches may not be performed upon adults confined after arrest for misdemeanors, in the absence of reasonable suspicion concerning possession of contraband" (citations omitted)).  Moreover, it is nonsensical that a strip search would be permitted at intake but permitted during a housing search that might be conducted an hour later.  Defendants therefore cannot defend their Housing and Exit Policies by asserting that general security interests necessitate them.  Since it is uncontested that DOC officers conducting strip searches pursuant to the Housing and Exit Policies are required to conduct strip searches even if they have no reason to believe the detainees are concealing contraband, these policies are plainly unconstitutional and must be enjoined.

---

[5]  In an *amicus* brief to the Supreme Court seeking reversal of the decision in *Shain*, the City of New York stated: "The Circuit Court's decision turns on an artificial distinction, jail versus prison, that bears little relation to reality of running a penal system in a city the size of New York.  The myriad safety and security issues of a penal system the size of New York City's is and would continue to be seriously compromised by a decision that takes little account of its inherent dangers."  Brief for City of New York as *Amicus Curiae* Supporting Defendants-Appellants-Cross-Appellees' Petition for a Writ of Certiorari, Oct. 24, 2002 in *Nassau County v. Shain*, 537 U.S. 1083 (2002) (No. 02-541), attached as Ex. 117.  The Supreme Court denied *cert.*

**C.** **Plaintiffs Are Entitled To Partial Summary Judgment On The Issue Of Liability With Respect to the Prior Admission Policy**

 **1.** **The Prior Admission Policy is unconstitutional**

  It is undisputed that until at least July 22, 2002, defendants had a policy and practice of strip searching *all* pretrial detainees during their initial entry admission processing into a DOC facility, regardless of the existence of individualized reasonable suspicion that the detainees were concealing weapons or other contraband.  ("Prior Admission Policy") (Pls. 56.1 Stat. ¶¶ 15, 20, 21.)  The Prior Admission Policy is nearly identical to the admission policy struck down in *Shain* and is plainly unconstitutional, as this Court has already repeatedly observed in *dicta*.  *McBean I*, 228 F.R.D. at 489; *McBean II*, 233 F.R.D. at 386-87.  In fact, DOC submitted an *amicus* brief in *Shain* because it knew that a decision for plaintiff in that case would invalidate its Prior Admission Policy.  *See* Brief for City of New York as *Amicus Curiae* Supporting Defendants-Appellants-Cross-Appellees, 2000 WL 33977258, June 1, 2000 in *Shain v. Ellison*, 273 F.3d 56 (2nd Cir. 2001) (No. 00-7061), attached as Ex. 116.  The Second Circuit considered DOC's arguments – describing DOC's strip search policy as "similar" to the one at issue in *Shain* – and rejected them.  *Shain*, 273 F.3d at 62.

  Despite having submitted an *amicus* brief in *Shain*, and thus presumably having read the *Shain* decision when it was published on October 19, 2001, DOC did not bother changing its written policy concerning new admission strip searches until it was sued in this case. On July 22, 2002, apparently in order to avoid the imposition of a preliminary injunction, defendants issued a four-page written policy in the from of an operations order which states:

> Post arraignment detainee inmates incarcerated for Misdemeanor and/or Violation Offenses shall *not* be made the subject of a strip search during the new admission process unless there is reasonable suspicion that the inmate is in possession of contraband.

DOC Operations Order 08/02, New Admission Search Procedures For Detainee Inmates

Incarcerated For Misdemeanor and/or Violation Offenses, July 22, 2002, at NYC000026.

Pursuant to this Current Admission Policy, pretrial detainees arraigned and remanded on

misdemeanor or lesser offenses are not subjected to strip searches during the new admission

process, regardless of the nature of the crime for which they were arraigned.  (Pls. 56.1 Stat. ¶¶

36, 39, 40.)  In short, those arraigned on offenses explicitly excluded from the *McBean*

Settlement Class – namely, those charged with misdemeanor or noncriminal offenses that *might*

somehow involve a small amount of drugs or a minor weapon[6] – cannot *now* be strip searched

according to the Current Admission Policy.  (*Id.*)

     Despite settled law and their own policy change, defendants nevertheless continue

to argue that they did not violate the constitution by strip searching detainees arraigned on drug-

---

[6] The *McBean* Settlement Class did not include pretrial detainees "who, at the time they were admitted to DOC facilities, were charged with the following Penal Law Sections: (a) § 220.03, Criminal Possession of a Controlled Substance in the Seventh Degree, a class A misdemeanor; (b) § 220.45, Criminal Possession of a Hypodermic Instrument, a class A misdemeanor;(c) § 220.50, Criminal Possession of Drug Paraphernalia in the Second Degree, a class A misdemeanor; (d) § 221.05, Unlawful Possession of Marijuana, a violation; (e) § 221.10, Criminal Possession of Marijuana in the Fifth Degree, a class B misdemeanor; (f) § 221.15, Criminal Possession of Marijuana in the Fourth Degree, a class A misdemeanor; (g) § 221.35, Criminal Sale of Marijuana in the Fifth Degree, a class B misdemeanor; (h) § 221.40, Criminal Sale of Marijuana in the Fourth Degree, a class A misdemeanor; (i) § 265.01, Criminal Possession of a Weapon in the Fourth Degree, a class A misdemeanor; and (j) § 265.06, Unlawful Possession of a Weapon upon School Grounds, a violation; or were charged pursuant to the following New York City Administrative Code Sections: (a) § 10-131, Firearms; (b) § 10-133, Possession of Knives or Instruments; and (c) § 10-134, Prohibition on Sale of Certain Knives; or were charged pursuant to Vehicle and Traffic Law 21 1192(4), Operating a Motor Vehicle while impaired by the use of a drug."  (Stipulation and Order of Class Settlement, June 21, 2005, attached as Ex. 119.)

or weapon-related misdemeanor or lessor offenses pursuant to the Prior Admission Policy.

Apparently, despite believing that the practice of strip searching such individuals upon admission

*is* constitutional, DOC nevertheless believes that it is either unnecessary to undertake to strip

search such individuals upon admission – or perhaps, that it is simply too difficult actually to

ascertain precisely which individuals are being charged with drug- or weapon-related

misdemeanor or violation offenses.

> ### 2. Defendants cannot escape liability by attempting to show *post hoc* that correctional officers *could have* formed the reasonable suspicion needed to justify a strip search

Defendants here seek to defend the strip searches conducted pursuant to the Prior

Admission Policy using precisely the same arguments advanced unsuccessfully by the defendants

in *Shain* – by proffering *post hoc* reasons that they contend might have formed the necessary

reasonable suspicion.  (*See* Reply Brief for Defendants-Appellants-Cross-Appellees in Shain

("Shain Def's Reply Br."), 2000 WL 33977769, July 31, 2000, attached as Ex. 115).  In *Shain*,

defendants asserted that they "had reasonable suspicion that Mr. Shain might be concealing a

weapon and thus Mr. Shain lacked standing to challenge [Nassau County's] general policy" of

strip searching all pretrial detainees who were admitted to the jail following arraignment.  *Shain*,

273 F.3d at 62.  They stressed that Mr. Shain had threatened to rape his victim, had previously

thrown furniture at her, and until recently was subject to an order of protection.  273 F.3d at 60.

He also "acted in an agitated manner" when he was arrested and failed to "turn over a pocket

knife when he was asked to empty his pockets."  *Id*.  (*See also* Shain Def's Reply Br., 2000 WL

33977769, at *5 n.3, *12 Ex. 115 (arguing that Mr. Shain lacks standing to challenge the blanket

policy because he was "arrested for a crime associated with violence" and was remanded by the

court "for the sake of safety")).

The Second Circuit rejected these *post hoc* arguments, holding that even if there were facts or circumstances that *would have* provided reasonable suspicion as a basis for Mr. Shain's strip search, those facts were of no moment because Mr. Shain was strip searched based *solely* on the fact that he had been remanded, and thus was subject to the mandatory policy. *Shain*, 273 F.3d at 66. This holding was recently reaffirmed by the Second Circuit in *In re Nassau County Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006). In that case, the Second Circuit held that where officials indiscriminately strip search pretrial detainees pursuant to an unlawful policy, they cannot escape liability (or class certification) by showing *post hoc* that they could have formed the reasonable suspicion needed to justify a strip search. *In re Nassau County Strip Search Cases*, 461 F.3d at 224 (holding that "reasonable suspicion must be possessed by some law enforcement officer at the time of the search and may not be retroactively imputed" to justify strip searches conducted under a blanket policy) (citations omitted); *see also N.G.*, 382 F.3d at 244-245 (Sotomayor, J., concurring, dissenting in part) ("If information causing reasonable suspicion was unknown or irrelevant to the person performing the search, it is not part of our determination of 'reasonableness' under the Fourth Amendment.") (collecting cases); *Lee v. Perez*, 175 F.Supp.2d 673, 679-681 (S.D.N.Y 2001) (reversing jury verdict for correctional officer and stating that strip search was unconstitutional because the officer admitted "that he would neither have had nor considered information about the circumstances of the arrest or Lee's prior record at the time he made the determination to strip search); *Doe v. Calumet City*, 754 F. Supp. 1211, 1221 n.23 (N.D.Ill. 1990) ("Even if [defendants] were to offer evidence that in retrospect might have given an officer some basis for conducting a particular strip search, it cannot justify *post-hoc* an unreasonable intrusion without showing that *each officer involved* had such a reasonable basis at the time of the search.") (citation omitted) (emphasis added).

Indeed, it is well-established under the Fourth Amendment that if a reasonable suspicion analysis is not conducted *prior* to the search, that search is constitutionally impermissible and that such constitutional defect cannot be undone by a retrospective reasonable suspicion analysis. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 21-22 (1968) ("reasonable suspicion" requires assessment of whether "the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief that the action taken was appropriate'"); *Maryland v. Garrison*, 480 U.S. 79, 85 (1987) (because "we must judge the constitutionality of [officials'] conduct in light of the information available to them at the time they acted," evidence acquired by officers after search cannot validate or invalidate warrant); *Brinegar v. United States*, 338 U.S. 160, 175, (1949) ("Probable cause exists where 'the facts and circumstances within (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed") (citation omitted).

Searches conducted without a contemporaneous reasonable suspicion analysis are unconstitutional even where other officers in the same department or organization had the information that would have given rise to reasonable suspicion.  In *United States v. Colon*, 250 F.3d 130, 138 (2d Cir. 2001), the Second Circuit explained that the officer conducting the search, or another officer with the training to determine reasonable suspicion, "must possess sufficient information to permit the conclusion that a search or arrest is justified."  *Id*. at 136-38 (holding that a pat frisk by the police could not be justified based on information learned after the frisk occurred or based on information know to a 911 operator employed by the police "because the operator lacked the training to assess the information in terms of reasonable suspicion, and the operator failed to convey sufficient information from which the dispatcher, a law enforcement

-28-

officer, could have concluded that a stop and frisk could be ordered"); *see also United States v. Edwards*, 885 F.2d 377, 382 (7th Cir. 1989) ("A supervising officer's knowledge about a defendant cannot be relied upon to provide probable cause for his arrest where there is no evidence that such knowledge was communicated to the agents on the scene who actually made or ordered the defendant's arrest"); *United States v. Woods*, 544 F.2d 242, 259 (6th Cir. 1976) (information known to superior officer cannot be used to establish probable cause for arrest where officers making arrest were not acting on superior's orders); *Salter v. State*, 163 Ind. App. 35, 37, 321 N.E.2d 760, 762 (1975) (observations of officer giving rise to probable cause to arrest for drug possession cannot be relied on to justify arrest and search by second officer later in the day, where no evidence that first officer's observations were communicated to second officer).

Because the Prior Admission Policy mandated strip searches of all detainees – regardless of the nature of the charge, the particular characteristics of the detainee, or the circumstances of the arrest – the 1999-2002 Admission Class members were all *automatically* strip searched upon intake to a DOC facility. The officers strip searching the 1999-2002 Admission Class pursuant to the Prior Admission Policy – including plaintiffs Daniel Velazquez, Kenneth Williams, and Arthur Wallace – did not make individualized determinations as to whether a detainee might be concealing weapons or contraband. (Pls. 56.1 Stat. ¶¶ 15, 19-21, 120-21, 188, 203-04.) Furthermore, it was the policy and practice for DOC officers and DOC supervisory personnel not to inquire if the detainee was arraigned on an offense that related to possession or use of a drug or weapon. (*Id.* ¶ 24-26.) There would have been no reason for them to do so, of course, since the only information the DOC officers needed to know before strip searching detainees under the Prior Admission Policy was the fact that the detainee was being

admitted.  As such, the fact that they were arraigned on weapons or drugs charges is irrelevant – there can be no particularized suspicion when the officer has no knowledge of the charges or does not rely upon them before conducting the strip search.[7]

Thus, if this Court agrees – as it must given the ruling in *Shain* – that defendants' Prior Admission Policy was unlawful, defendants cannot now contend that they are not liable for the violation in an individual plaintiff's case.  Plaintiffs are therefore entitled to partial summary judgment on the issue of liability.  *See Marriott v. County of Montgomery*, 426 F.Supp.2d 1, 6-11 (N.D.N.Y. 2006) (granting permanent injunction at summary judgment stage to a certified class of detainees after finding that indiscriminate strip searches without individualized suspicion at jail of misdemeanor detainees, or those held on violations, violations of parole or probation, or civil holds post-arraignment violates the Fourth Amendment).

### D. Defendants' Current Blanket Policies of Strip Searching Misdemeanor Pretrial Detainees In Their Housing Areas And Before Transporting Them Are Unconstitutional; Those Policies Should Be Permanently Enjoined

Defendants' current Housing and Exit Policies are unconstitutional for the same reasons that their Prior Admission Policy was unconstitutional – blanket, indiscriminate policies providing for the strip search of pretrial detainees held on misdemeanor or lesser charges are *per se* illegal.  *See supra*, Part I.C.  Indeed, the current Housing and Exit Policies are even more

---

[7]   Moreover, many courts have held that mere knowledge that an individual has been arrested for an offense related to drugs and/or weapons is not sufficient.  *See, e.g.*, *Sarnicola v. County of Westchester*, 229 F. Supp.2d 259, 273-74 (S.D.N.Y. 2002) ("An automatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the totality of the circumstances." ); *Hartline v. Gallo*, No. 03-1974, 2006 WL 2850609, at *6 (E.D.N.Y. Sept. 30, 2006) (same).  The Ninth Circuit recently held that being charged with the offense of being under the influence of a drug cannot, by itself, give rise to reasonable suspicion for a strip search.  *Way v. County of Ventura*, 445 F.3d 1157, 1162 (9th Cir. 2006) ("We cannot see how the charge of being under the influence of a drug necessarily poses a threat of concealing (and thereby using or trafficking) additional drugs in jail during the limited time between booking and bail, or booking and placement in the general population").

susceptible to attack than is the Prior Admission Policy because the Housing and Exit Policies permit *repeated* strip searches of pretrial detainees who have never left the supervision and custody of the DOC and for whom no intervening event or circumstance gives rise to individualized suspicion.  *See N.G. v. Connecticut*, 382 F.3d 225, 233-234 (2d Cir. 2004) (upholding a strip search of a child at admission to a juvenile facility, due in part to state's *in loco parentis* position,[8] but finding subsequent strip searches to be unconstitutional absent a reasonable basis to believe that the particular individual has obtained contraband); *see also Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir. 1983) (per curiam) (second search of administrative detainee appeared to be unnecessary and unreasonable when the detainee had been under continuous escort since the initial search).

   Although DOC repudiated its Prior Admission Policy and claims that it no longer strip searches individuals charged with misdemeanor or lessor offenses upon admission, it is undisputed that DOC *currently* strip searches all pretrial detainees arraigned on misdemeanors *after* they are admitted to a DOC facility under their Exit and Housing Policies.

   Pursuant to DOC's Exit Policy, all pretrial detainees must be strip searched before leaving a DOC facility, whether they are on their way to court, the hospital, work detail, or a funeral, except when insufficient staff, room, or time is available to conduct the searches ("Exit Policy").  (Pls. 56.1 Stat. ¶¶ 56-78.)  As of at least August 31, 2006, a sign in the new admission intake area of one DOC facility on Rikers Island informs the detainees of the policy.  The sign states, "EVERY INMATE WILL BE SUBJECT TO A GROUP STRIP SEARCH PRIOR TO DEPARTING OR RETURNING TO THE FACILITY. . . PER DIRECTIVE 4508/91."  (*Id.* ¶

---

  [8]  The Second Circuit in *N.G.* made clear that "strip searches may not be performed upon *adults* confined after arrest for misdemeanors, in the absence of reasonable suspicion concerning possession of contraband."  *N.G.*, 382 F.3d at 232 (collecting Second Circuit cases and cases from other circuits holding such) (emphasis added).

83.)  Pursuant to DOC's Housing Policy, all pretrial detainees must be strip searched at any time

that a detainee's living quarters are searched.  (*Id.* ¶¶ 84, 88.)  Searches of detainees' living

quarters are conducted "on a regular and frequent basis," and may be done pursuant to random

housing searches, as well as pursuant to scheduled searches that are pre-set one month at a time.

(*Id.* ¶¶ 89-92.)

          Pretrial detainees are strip searched pursuant to DOC's Housing and Exit Policies

regardless of the existence of individualized reasonable suspicion that the  detainees were

concealing weapons or other contraband.  (*Id.* ¶¶ 72-78, 102-12.)  The officers conducting strip

searches under these policies, and the supervisors ordering these searches, have a policy, custom,

and practice of not making individualized determinations of whether a detainee might be

concealing contraband.  (*Id.* ¶¶ 72, 104.)  Nor do the officers take into account when the last time

a particular detainee was searched and whether the detainee has been in continuous custody since

the last time he or she was searched.  (*Id.* ¶71, 113.)  For example, a detainee could have just

recently returned from court, and thus been subject to a strip search[9] moments prior to their living

quarters comes under inspection; they would nevertheless be required under the governing policy

to be strip searched again.  Indeed, plaintiff Danny Velazquez had exactly this happen to him:

despite having just been strip searched upon admission, he was moments later strip searched

again when he arrived at a housing area that was in the midst of being searched.  (*Id.* ¶ 207.)  It is

perhaps precisely because inmates are in continuous custody when these strip searches occur, that

the increased use of strip searches prior to court does not appear to have had any impact on the

number of incidents at court. (*See Id.* ¶ 63.)

---

          [9]  While plaintiffs do not concede the constitutionality of such a search, it is important to
note that strip searches conducted upon an inmate's *return* from court is not being challenged
here, in part because of the opportunity for detainees to have in-person contact visits while at
court.  *See Bell v. Wolfish*, 441 U.S. 520, 558-560 (1979).

Defendants appear to contend that these strip searches are constitutional because they are conducted *after* the detainee has been admitted to a facility and housed, as opposed to during the initial intake process.  But as discussed previously, *supra,* Part I.C.1., the Second Circuit in *Shain* did not distinguish between admission and post-admission strip searches. Rather, the Second Circuit held broadly that "persons charged with a misdemeanor and remanded to a local correctional facility like [the Nassau County Correctional Facility] have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons." *Shain*, 273 F.3d at 66.

The Second Circuit in *Shain* distinguished *Bell v. Wolfish*, 441 U.S. 520 (1979), which held that strip searching a pretrial detainee in a federal detention center is constitutional, and *Block v. Rutherford*, 468 U.S. 576 (1984), which authorized random searches (though not strip searches) of the cells of pretrial detainees held in federal detention centers.  The *Shain* court explained that (1) these cases "did not address the issue of whether persons charged only with misdemeanors must be treated differently from persons charged with felonies"; and (2) that the "very fact of nonrelease pending trial" in the federal system is an indication that the detainee is a security risk.  *Shain*, 273 F.3d at 64-65.[10]  In contrast, the court held that pretrial detention in a

_____

[10]  The *Shain* court also distinguished *Bell* because "*Bell* authorized strip searches after contact visits, where contraband is often passed" and because detainees "had presumably chosen to receive visitors and to enjoy physical contact with them."  *Shain*, 273 F.3d at 64.  Plaintiffs are not challenging strip searches that occur after contact visits, nor are they challenging strip searches that occur after a detainee returns to a DOC facility from a trip outside the facility, where they may have had the opportunity for contact visits.  *Supra,* at n. 9.  Rather, plaintiff are challenging strip searches that occur, without reasonable suspicion determinations, in the DOC housing areas and *on the way out* of DOC facilities.  These challenged strip searches occur even though the detainee has already been searched (either strip searched or otherwise thoroughly searched at intake), been under continuous custody, and DOC officers have no individualized reason to believe they have acquired contraband.

Moreover, as the Second Circuit pointed out in *Weber v. Dell*, 804 F.2d 796 (2d Cir. (continued...)

-33-

New York *jail* on a misdemeanor *cannot* be used as "an indicator of an increased security risk" because all persons charged with misdemeanors "*must* be released on his own recognizance or granted bail." *Shain*, 273 F.3d at 65 (emphasis in original).[11]

       The Second Circuit in *Shain* also drew a sharp line between cases involving local *jails*, such as those at issue here, and those involving state *prisons* – holding that those detained at jails cannot be strip searched "absent reasonable suspicion that they are carrying contraband or weapons." *Shain*, 273 F.3d at 66.  In doing so, the court distinguished *Covino v. Patrissi*, 967 F.2d 73 (2d Cir. 1992), which held that a pretrial detainee held in a state prison on a charge of kidnapping a child could be strip searched during a random housing search.  The *Shain* court could have, but chose not to, distinguish *Covino* on the ground that it involved a random, post-

---

[10](...continued)
1986), *Block* is distinguishable because the privacy-type interests in Block (searching a cell) are "of lower order than the interest in avoiding strip/body cavity searches."  *Weber*, 804 F.2d at 801, 803-4.

[11]  Cases involving sentenced prisoners, and those detainees held in isolation due to a specifically identified security risk that a detainee poses, are inapposite, and indeed only serve to support the view that jails are able to create segregated units for more dangerous inmates based on particularized facts, and that those inmates may then be subjected to searches which plaintiffs do not challenge.  *Cf. Iqbal v. Hasty,* – F.3d. –, No. 05-6388, 2007 WL 1717803 (2d Cir. June 14, 2007) (holding that a maximum security section for those arrested on terrorism charges of one DOC facility was more like a prison than a jail and that strip searches were permissible under those circumstances);  *Arruda v. Fair*, 710 F.2d 886, 887 (1st Cir. 1983) (upholding periodic, random strip searches of inmate held, due to that inmate's assault on another inmate, in prison's "special security area, known as the . . . 'a prison within a prison,' designed to hold the most dangerous inmates");  *Michenfelder v. Sumner*, 860 F.2d 328, 330-333 (9th Cir. 1998) (upholding strip searches of sentenced prisoner held in "the maximum security unit for the state's 40 most dangerous prisoners" each time the inmate leaves or returns to the maximum security unit and noting that these searches "might be unreasonable" in other areas of the prison that do not house "the state's most difficult prisoners"); *Davidson v. Kyle*, No. 01-706S, 2004 WL 941458, at *4 (W.D.N.Y. March 30, 2004) (permitting strip search of felons sentenced to state prison before and after transport out of the facility, though only if the Deputy Superintendent of Security first makes an *individualized* determination that the strip search of the particular inmate is necessary due to "probable cause to believe the inmate was concealing contraband, a history of being an escape risk, and/or when the inmate had notice of the date of the trip").

intake strip search, while Mr. Shain was challenging an intake strip search.  Instead, the Second

Circuit in *Shain* held that *Covino* applies to prisons, not jails.[12]

Similarly, the *Shain* court held that *Turner v. Safley*, 482 U.S. 78 (1987) and its

progeny – which hold that a reasonable relation to a legitimate penological interest suffices to

establish the constitutionality of a *prison* regulation – apply only to prisons, not to jails, such as

those operated by DOC.  *See Shain*, 273 F.3d at 65-66 (emphasis in original); *see also Shain*, 356

F.3d 211, at n.3 (2d Cir. 2004) (reaffirming that the *Turner* test does not apply to jails, but only

---

[12]  In an *amicus* brief to the Supreme Court seeking reversal of the decision in *Shain*, the
City of New York stated: "The Circuit Court's decision turns on an artificial distinction, jail
versus prison, that bears little relation to reality of running a penal system in a city the size of
New York.  The myriad safety and security issues of a penal system the size of New York City's
is and would continue to be seriously compromised by a decision that takes little account of its
inherent dangers."  Brief for City of New York as *Amicus Curiae* Supporting Defendants-
Appellants-Cross-Appellees' Petition for a Writ of Certiorari, Oct. 24, 2002 in *Nassau County v.
Shain*, 537 U.S. 1083 (2002) (No. 02-541), attached as Ex. 117.  The City pointed out that many
of those arraigned on misdemeanors had prior felony arrests, that "the jail/prison division ignores
the arrestee's past criminal history, age, and other background information," that contraband is
often recovered from those arraigned on misdemeanors, that misdemeanor detainees commingle
with felony detainees, that felony detainees would pass contraband to misdemeanor detainees if
they know misdemeanor detainees are not subject to search, and that the jail/prison distinction
"has no bearing on running complex penal institutional in a metropolitan area such as New York
City.  *Id.* at 5-8.  The City of New York made these same arguments in their *amicus* to the
Second Circuit as well.  Brief for City of New York as *Amicus Curiae* Supporting Defendants-
Appellants-Cross-Appellees, 2000 WL 33977258, June 1, 2000 in *Shain v. Ellison*, 273 F.3d 56
(2nd Cir. 2001) (No. 00-7061), attached as Ex. 116.  Affidavit of William Fraser, May 9, 2000,
attached as Ex. 114 (and attached to amicus).

The Supreme Court denied *certiori*, and rightly so.  The constitutional right to be
free from indiscriminate strip-searches does not stops at the City's door.  To the contrary, courts
in urban areas have joined their rural counterparts in the remarkably unified body of decisions
rejecting suspicionless strip-search policies.  *See, e.g., Mary Beth G.*, 723 F.2d at 1266
(Chicago); *Davis v. City of Camden*, 657 F. Supp. 396 (D.N.J. 1987) (Camden, N.J.); *Fann v.
City of Cleveland*, 616 F. Supp. 305, 313 (D.C.Ohio 1985) (Cleveland).  In any event, when
deciding *Shain* – and drawing a line between jails and prisons, not cities and rural areas – the
Second Circuit took into account an *amicus* brief from DOC that set out in some detail it security
concerns.  *See* Brief for City of New York as *Amicus Curiae* Supporting Defendants-Appellants-
Cross-Appellees, 2000 WL 33977258, June 1, 2000 in *Shain v. Ellison*, 273 F.3d 56 (2nd Cir.
2001) (No. 00-7061), attached as Ex. 116.

to prisons).  Defendants therefore cannot defend their Housing and Exit Policies by asserting that general security interests necessitate them.

The Second Circuit requires individualized, reasonable suspicion before permitting strip searches of pretrial detainees held on misdemeanors because it recognizes that those who have not been found guilty of a crime, have been arrested on minor offenses, and are in jail most likely because they lack the money to pay bail, should not be subjected to strip searches which are inherently degrading and violative of human dignity.  *See N.G. v. Connecticut*, 382 F.3d at 233 (collecting cases finding strip searches "demeaning," "dehumanizing," "terrifying," and "humiliating" (citations and internal quotation marks omitted)); *see also N.G.*, 382 F.3d at 239 (Sotomayor, J., concurring, dissenting in part) (noting the "uniquely invasive and upsetting nature of strip searches" and collecting numerous additional cases where courts reached similar conclusions).[13]

Since it is uncontested that DOC officers conducting strip searches pursuant to the Housing and Exit Policies have a policy and practice of not undertaking any individualized analysis, these policies are plainly unconstitutional and must be enjoined.[14]  For the same reason,

---

[13]  Due to the highly intrusive nature of strip searches, cases involving less intrusive searches – such as searches of bags – are inapposite.  *See Phaneuf v. Fraikin*, 448 F.3d 591, 596-7 (2d Cir. 2006) (holding that "the reasonableness of the suspicion is informed by the very intrusive nature of a strip search, requiring for its justification a high level of suspicion" and noting that "What may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonabless for a nude search.") (citations and internal quotation marks omitted).  *Cf., e.g. MacWade v. Kelly*, 460 F.3d 260, 275 (S.D.N.Y. 2006) (2d Cir. 2006) (upholding random suspicion-less searches of passengers' containers in subways under a special needs test only after emphasizing the minimally invasive nature of the search); *Hudson v. Palmer*, 468 U.S. 517, 526 (1984) (upholding random searches of a sentenced felon's prison cell).

[14]  It is immaterial that defendants appear to contend that these strip searches never include visual cavity searches, while plaintiffs contend that they do.  *See Marriott v. County of Montgomery*, 426 F.Supp.2d 1 (N.D.N.Y. 2006) (on summary judgment, permanently enjoining

(continued...)

individual plaintiffs who have indisputably been subjected to these grotesque, repeated, group strip searches should be granted summary judgment on liability, and damages hearings should be set for their individual damages claims.

## II.   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION SHOULD BE GRANTED

Plaintiffs seek certification of two classes.  First, the Court should certify the following injunctive class, pursuant to Fed. R. Civ. P. 23(b)(2):

> All persons arraigned on non-felony charges who have been, or will be, strip searched pursuant to defendants' blanket policy, practice and custom which requires that all pre-trial detainees be strip searched (a) prior to leaving a DOC facility, unless insufficient staff, room, or time is available to conduct the searches and (b) at the time that a housing area is being searched (the "Housing and Exit Class").

Second, the Court should certify the following damages class, pursuant to Fed. R. Civ. P. 23(b)(3):

> All persons arraigned solely on non-felony charges – at least one of which must be a charge listed in paragraph 2 of the Stipulation and Order of Class Action Settlement, dated June 21, 2005– and who were strip searched during the period between July 15, 1999 and July 22, 2002, pursuant the defendants' blanket policy, practice and

---

[14](...continued)
"change-out" policy, holding that indiscriminate strip searches at jail of misdemeanor detainees violate the Fourth Amendment and fact that material dispute as to whether the strip searches included cavity searches is irrelevant because all that matters is that, without reasonable suspicion, "the admittees are required to strip naked in front of a CO and submit to the observation of their body by a CO").  In fact, of the eleven circuit court decisions that the Second Circuit in *Weber v. Dell,* 804 F.2d 796 (2d Cir. 1986) cited in support of its decision to hold strip searches of misdemeanants unconstitutional, "five of [them] involved strip (not body cavity) searches."  *Marriott v. County of Montgomery*, 227 F.R.D.159, 169-170 (N.D.N.Y. 2005) (certifying class and preliminarily enjoining jail's admission "change-out" policy, holding that it is unconstitutional to require a detainee to "remove his or her clothing" even if "the purpose was for hygiene, and not to detect contraband or tatoos" and even if the policy did not require cavity searches), *aff'd* No. 05-1590, 2005 WL 3117194 (2d Cir. Nov. 22, 2005) (unpublished order).

custom which required that every pretrial detainee be strip searched during initial admission processing into a DOC facility (the "1999-2002 Admission Class").

Class certification is appropriate where plaintiffs establish that the prerequisites of Rule 23(a) are satisfied, and that a class action may be maintained under one of the subsections of Rule 23(b).  Rule 23(a) permits class certification if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  *See* Fed. R. Civ. P. 23(a).

Plaintiffs may seek class relief where defendants "have acted or refused to act on grounds generally applicable to the class," so that injunctive or declaratory relief is appropriate "with respect to the class as a whole," Rule 23(b)(2), or where questions of law or fact common to the members of the class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Rule 23(b)(3).

Rule 23 is traditionally given liberal construction.  *See Marisol A. v. Guiliani*, 126 F.3d 372, 377 (2d Cir. 1997).  While the decision to certify a class is committed to the district court's discretion, the Second Circuit is "noticeably less deferential . . . when that court has denied class status than when it has certified a class." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999) (quoting *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)).  Courts must err "in favor and not against the maintenance of a class action." *Sharif v. New York State Bd. of Educ. Dep't.*, 127 F.R.D. 84, 87 (S.D.N.Y. 1989) (citations omitted).

In determining whether to certify the proposed classes in this case, one need look no further than the raft of cases where courts, including this Court, have granted class certification (under both Rule 23(b)(2) and 23(b)(3)) in nearly identical circumstances. *See McBean v. City of New York*, 228 F.R.D. 487 (S.D.N.Y. 2005) (certifying damages class of pre-trial detainees who were strip searched upon admission to DOC facilities) ("*McBean I*"); *see also, e.g., Mitchell v. County of Clinton*, No. 06 Civ. 254, 2007 WL 1988716, *1 (N.D.N.Y. Jul. 5, 2007) (certifying damages class of pre-trial detainees who were strip searched upon admission to Clinton County Jail); *Kelsey v.County of Schoharie*, No. 04 Civ. 299, 2007 WL 603406, *6 (N.D.N.Y. Feb. 21, 2007) (certifying injunctive strip search class); *Marriott v. County of Montgomery*, 227 F.R.D. 159, 173 (N.D.N.Y. 2005) (certifying strip search damages and injunctive class); *Calvin v. Sheriff of Will County*, No. 03 C 3086, 2004 WL 1125922 (N.D. Ill. May 17, 2004) (certifying strip search damages sub-classes); *Tardiff v. Knox County*, 365 F.3d 1 (1st Cir. 2004) (affirming *Nilsen v. York County*, 219 F.R.D. 19 (D. Me. 2003) and *Tardiff v. Knox County*, 218 F.R.D. 332 (D. Me. 2003) (both certifying strip search damages classes); *Mack v. Suffolk County*, 191 F.R.D. 16 (D. Mass. 2000) (same); *Bynum v. District of Columbia*, 217 F.R.D. 27 (D.D.C. 2003) (same); *Tyson v. City of New York*, No. 97 Civ. 3762 (S.D.N.Y. Mar. 18, 1998) (oral decision) (cited in *Augustin v. Jablonsky*, No. 99 CV 3126, 2001 WL 770839, at *11-12 (E.D.N.Y. Mar. 8, 2001) (certifying damages class of about 60,000 persons strip searched prior to arraignment); *Eddleman v. Jefferson County*, No. 95-5394, 1996 WL 495013 (6th Cir. Aug. 29, 1996) ("*Eddleman II*") (affirming Rule 23(b)(3) class of persons strip searched), *aff'g, Eddleman v. Jefferson County*, C-91-0144 (W.D. Ky., Aug. 10, 1994) ("*Eddleman I*"); *Doe v. Calumet City*, 128 F.R.D. 93, 94-95 (N.D. Ill. 1989) (same).

**A.    The Proposed Classes Satisfy Rule 23(a)**

**1.    Numerosity - Rule 23(a)(1)**

Rule 23(a)(1) requires that the class sought to be certified be so numerous as to
make joinder of all members impracticable.  There is no "magic number" for determining
whether joinder is impracticable.  *Ewh v. Monarch Wine Co.*, 73 F.R.D. 131, 133 (E.D.N.Y.
1977).  Indeed, where it may be clearly concluded from reasonable estimates that joinder would
be impracticable, the ability to determine class size with precision is not necessary.  *Deary v.
Guardian Loan Co.*, 534 F. Supp. 1178, 1190 (S.D.N.Y. 1982).

"Numerosity is generally presumed when a class consists of forty or more
members." *McBean I*, 228 F.R.D. at 493 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47
F.3d 473, 483 (2d Cir. 1995)).  Plaintiffs are not required to demonstrate the exact number of
class members. *See Robidoux v. Celani*, 987 F.2d at 935.  Because the proposed classes consists
of thousands of individuals (conservatively estimated), joinder is impracticable.[15]  Thus, the first
prerequisite for class certification is satisfied.

**2.    Common Questions of Law or Fact - Rule 23(a)(2)**

Common issues abound.  All plaintiffs' claims and injuries derive from a unitary
course of conduct: defendants' uniform policy and practice of strip searching all detainees (1)
upon admission, (2) upon exiting, and (3) when a housing facility is searched.  "The fact that the
claims of the proposed class stem from the same alleged unconstitutional conduct of the

---

[15]  Class certification is also appropriate here under Rule (b)(2) because future members
of the proposed class cannot be enumerated or identified.  *See Boucher v. Syracuse Univ.*, 164
F.3d 113, 119 n.11 (2d Cir. 1999) (noting that a class including future college students would
satisfy the numerosity requirement because joinder would be impracticable); *Jane B. by Martin v.
New York City Dep't of Soc. Svs.*, 117 F.R.D. 64, 70 (S.D.N.Y. 1987) (recognizing that joinder of
future residents was impracticable and certifying class of current and future residents of centers
for troubled girls with population of 60).

defendants proves the existence of common questions of law or fact." *Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001) (citations omitted).

Rule 23(a)(2) does not require that all questions of law or fact be common to the class, but only that the named plaintiffs share at least one question of fact or law with the rest of the putative class. *Marisol A.v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997); *Daniels*, 198 F.R.D. at 417 (citing *In Re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 166-67 (2d Cir. 1987)). "The factual background of each named plaintiff's claims need not be identical to that of all class members, so long as the claims arise from the same events, and the legal arguments on liability are the same. *McBean I*, 228 F.R.D. at 493 (citations omitted). This is particularly true where, as here, plaintiffs challenge a common policy or practice. The commonality requirement is satisfied where "the injuries complained of by the named plaintiffs allegedly resulted from the same unconstitutional practice or policy that allegedly injured or will injure the proposed class members." *Daniels*, 198 F.R.D. at 417; *see also McBean I*, 228 F.R.D. at 493; *Marisol A.*, 126 F.3d at 376-77.

Here, the common questions of law and fact are set forth in detail in plaintiffs' motion for partial summary judgment, *supra*. Because the injuries complained of and the injunctive relief sought stem from the identical unconstitutional practices or policies that injured plaintiffs, the commonality requirement is satisfied.

### 3.      Typicality - Rule 23(a)(3)

Rule 23(a)(3) requires that the claims of the class representative must be "typical" of those of the absent class members. *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 607 n.11 (1997). A proposed class representative's claims or defenses are typical when they arise from the same general "course of events" as those of the absent class members and rely on "similar legal

arguments" to prove defendants' liability. *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001). The typicality requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *In re "MTBE" Prod. Liab. Litig.*, 241 F.R.D. 435, 444 (S.D.N.Y. 2007) (citations omitted). Typicality is determined by the nature of the claims of the class representative, not by the specific facts from which they arose. *See generally* Alba Conte & Herbert B. Newberg, *Class Actions*, § 3:15 (West 2002).

The purpose of the typicality requirement is to "ensure that maintenance of a class action is economical and that the named plaintiff's claims and the class claims are so intertwined that the interests of the class members will be fairly and adequately protected in their absence." *Cromer Finance Ltd. v. Berger,* 205 F.R.D. 113, 122 (S.D.N.Y. 2001) (internal punctuation and citation omitted). "[V]iewed in the most practical way, typicality is present when all members of the putative class would benefit by the success of the named plaintiff." *Cutler v. Perales*, 128 F.R.D. 39, 45 (S.D.N.Y. 1989) (citations omitted).

Here, plaintiffs assert precisely the same constitutional claims, based on materially identical facts, as those of the putative absent class members. Defendants' uniform policy of strip searching all detainees charged with non-felonies upon admission, exit, and during housing facility searches represents a course of conduct directed against each and every person held in DOC jails during the relevant class periods. Plaintiffs, in all material respects, typify the absent class members, both in terms of their charges and the strip searches they suffered. These common claims are central to both damages and the request for injunctive relief. Thus, "by advancing their own interests, [the named] plaintiffs will advance the interests of the class." *Ventura v. New York City Health & Hosp. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989) (citations

omitted); *see also Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3rd Cir. 1994) ("[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfies the typicality requirement.").

The factual circumstances of the representatives and the legal theories upon which the action is grounded are not only typical for the entire class, they are identical. *See McBean I*, 228 F.R.D. at 493. Rule 23(a)(3) is satisfied.

### 4.    Adequacy of Representation - Rule 23(a)(4)

Rule 23(a)(4) requires that class representatives must "fairly and adequately protect the interests of the class." "[A]dequacy of representation entails inquiry as to whether: 1) plaintiff[s'] interests are antagonistic to the interest of other members of the class and 2) plaintiff[s'] attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Both requirements are met here.

The proposed class representatives have no conflict with any class members, and will fairly and adequately protect the interests of the classes. Plaintiffs fully understand the significance of their roles as class representatives, should they be appointed, including their duties of loyalty to the interests of all absent class members, and their responsibilities to fully cooperate with the vigorous prosecution of this case. (Williams Decl. ¶ 14, Ex. 82; Thomas Decl. ¶ 11, Ex. 89; Phitts Decl. ¶14, Ex. 97; Bolds Dep. 214:3-8, Ex. 85.) Plaintiffs are adequate representatives because they were subjected to the same unlawful conduct as absent class members. *Hirschfeld v. Stone*, 193 F.R.D. 175, 183 (S.D.N.Y. 2000). All have been subjected to the Housing/Exit Policies and Williams, Velazquez and Wallace were subjected to strip searches pursuant to the Prior Admission Policy. *Supra,* at 13, 17-18. Plaintiffs have suffered the same

injury sought to be prevented and/or compensated by class-wide injunctive relief and damages. Plaintiffs' interests are coextensive with, not antagonistic to, those of the putative classes. Plaintiffs are adequate class representatives.

Counsel competent and experienced in federal class action and federal civil rights litigation have been retained to represent the plaintiff classes. Emery Celli Brinckerhoff & Abady LLP ("ECBA"), a law firm with offices in New York City, has extensive experience in civil rights litigation and class action lawsuits against state and local governments. ECBA has litigated a number of cases in which illegal strip searches were alleged, including as class counsel to over 60,000 arrestees who were forced to strip search pursuant to a policy similar to the one at issue here.

On these facts, the elements of Rule 23(a)(4) and 23(g)(1) are handily satisfied.

### 5. Ascertainability

"The requirement of ascertainability, though not expressly mentioned in *Rule 23*, is fundamental." *McBean I*, 228 F.R.D. at 492 (citation omitted). "A class is ascertainable when defined by objective criteria that are administratively feasible, without subjective determination." *Id.* (citations omitted).

Here, the 1999-2002 Admission Class members "are readily identifiable as all those admitted to certain facilities, following arraignment on specific charges, and subjected to strip searches." *Id.* No subjective criteria are present. Ascertainabililty for this proposed damages class is thus established.

Ascertainability is not as fundamental when an injunctive class is sought under Rule 23(b)(2). Because relief for the absent class members in the Housing and Exit Class is limited to a prospective injunction and/or declaratory judgment, it does not matter that some

components of the class definition might otherwise raise ascertainability issues.  For example, for purposes of awarding damages, the Housing and Exit Class definition references to exit strip searches "unless insufficient staff, room or time is available to conduct the searches" and housing strip searches "at the time that a housing area is being searched" might prove problematic.  For the purpose of prospective equitable relief, however, all plaintiffs must demonstrate is that the challenged policies are unconstitutional.  The absent class members who will benefit from the relief are, by definition, members of the class.  Determining their individual identities is unnecessary.

### B.    The Housing And Exit Class Satisfies Rule 23(b)(2)

Each of the plaintiffs in this action seek to represent a class consisting of all persons arraigned on non-felony charges who have been, or will be, strip searched pursuant to defendants' blanket policy, practice and custom which requires that all pre-trial detainees be strip searched (a) prior to leaving a DOC facility, unless insufficient staff, room, or time is available to conduct the searches and (b) at the time that a housing area is being searched.

Rule 23(b)(2) was designed especially for civil rights cases such as this one, seeking declaratory or injunctive relief for a large class of persons.  *See* Fed. R. Civ. P 23(b)(2), Advisory Committee Notes to 1966 Amendment; *Amchem Prods*, 521 U.S. at 614; *Newberg* § 4:11; *Alexander A. ex rel. Barr v. Novello*, 210 F.R.D. 27, 34 (E.D.N.Y. 2002) ("There is a long line of cases in the Second Circuit allowing class actions that seek to enjoin governmental actions") (collecting cases).  This section is typically relied on where, as here, a plaintiff class is seeking systematic reform through injunctive relief.  *Marisol A.*, 126 F.3d at 378; *Nicholson v. Williams*, 205 F.R.D. 92, 99 (E.D.N.Y. 2001).

Rule 23(b)(2) provides a basis for certifying a class in actions challenging a pattern and practice of constitutional violations by law enforcement officers. *See e.g. Daniels*, 198 F.R.D. at 415 (racially-motivated police stop-and-frisk). Indeed, "(b)(2) classes have been certified in legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." *Baby Neal*, 43 F.3d at 57.

The Second Circuit instructs that district courts should weigh "whether (b)(2) certification is appropriate in light of the relative importance of the remedies sought, given all the facts and circumstances of the case." *Robinson*, 267 F.3d at 164 (citation and internal quotations omitted). In this case, certification is appropriate because "broad class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Id.* at 167; *Latino Officers Assoc. Of New York v. City of New York*, 209 F.R.D. 79, 93 (S.D.N.Y. 2002) (certifying a (b)(2) class where plaintiffs sought "significant" injunctive relief including training within the NYPD's ranks). As set forth above, plaintiffs seek prospective injunctive and declaratory relief, consisting of enjoining defendants' housing and exit search policies and declaring them unconstitutional.

**C.     The 1999-2002 Admission Class Satisfies Rule 23(b)(3)**

Plaintiffs Wallace, Velazquez, and Williams also seek to represent a class consisting of all persons arraigned on non-felony charges that are listed in paragraph 2 of the Stipulation and Order of Class Action Settlement, dated June 21, 2005, who were strip searched between July 15, 1999 and July 22, 2002 pursuant to the defendants' blanket policy, practice and custom which required that every pre-trial detainee be strip searched during initial admission

processing into a DOC facility, except that any strip searches conducted upon admission for a period of detention after such individuals were also arraigned on felonies are excluded.[16]

Rule 23(b)(3) certification is appropriate in cases where common legal or factual issues predominate over individual issues and where a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). Courts have not developed a precise test to determine whether common issues predominate but often look for "an essential common link among class members" that can be remedied through litigation. *Newberg* § 4.25.

### 1.  Common Legal and Factual Issues Predominate

To satisfy predominance under Rule 23(b)(3), plaintiffs must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *In Re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (citation and internal quotations omitted)). Predominance is generally satisfied unless "it is clear that individual issues will overwhelm the common questions." *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. at 517.

Here, as set forth in the discussion of common issues under Rule 23(a)(2), there are numerous common issues of law and fact. Plaintiffs will use common proof to establish defendants' liability for the violations of their constitutional rights. Defendants' computer records contain the names of all persons who are members of the 1999-2002 Admission Class, thereby making the determination of class membership simple. *In re Visa Check*, 280 F.3d at 142 (approving class certification where class members can be identified "by defendants' own

---

[16]  Paragraph 2 of the Stipulation sets forth a list of the drug- and weapon-related non-felony offenses that were excluded from the earlier partial settlement of this action. *Supra* n. 6.

records"); *In re Nassau County Strip Search Cases*, 461 F.3d 219, 229 (2d Cir. 2006) (defendants possessed records of misdemeanor detainees strip searched during class period).

Here, as set forth in plaintiffs' motion for summary judgment, *supra,* at 24-30, the claims of all putative members of the 1999-2002 Admission Class revolve around one common, legal issue:  does a wholesale, indiscriminate policy of strip searching everyone after arraignment on non-felony charges upon admission to a DOC facility violate the constitution?  All Admission Class plaintiffs also share a common factual issue:  did defendants implement a wholesale, indiscriminate policy of strip searching all persons arraigned on non-felony charges and, if so, were plaintiffs strip searched pursuant to that policy?

The predominance requirement can be satisfied where there is "one common question of fact (whether defendant has detained the class members later than their scheduled release date) and at least one common question of law (whether these alleged overdetentions violate the Fourth, Fifth, and Eighth Amendments).  *Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 39-40 (D.D.C. 2003).

The reasoning of the Court of Appeals in *Eddleman II* is instructive on this point:

> Defendants argue that because the reasonableness of any search must be examined on a case-by-case basis, the constitutionality of strip searches cannot be properly evaluated in a class action.  *The basis for the complaint, however, arises precisely because the Defendants did not conduct an individualized assessment of the need for each search.*  Plaintiffs allege, and that allegation must be taken as true for our purposes here, that their constitutional rights were violated by a policy or custom, written or unwritten, to search every arrestee who entered the jail, regardless of the individual circumstances.  Due to the single legal theory and the similar facts for each Plaintiff, a class action would be superior to individual actions.

1996 WL 495013 at *5 (emphasis supplied); *see also ICN/Viratek Sec. Litig.*, 87 Civ. 4296 (KMW), 1996 WL 164732 at *9 (S.D.N.Y. Apr. 9, 1996) ("Despite a lack of common alleged

damages, the claims . . . still implicate common questions of fact and law"); *Langley v. Coughlin*, 715 F. Supp. 522, 557-58 (S.D.N.Y. 1989) (LBS) (rejecting defendants' attempt to decertify Rule 23(b)(3) class in civil rights case based on claim that emotional injuries necessitated individual damage trials); *Bresson v. Thomson McKinnon Sec.*, 118 F.R.D. 339, 343 (S.D.N.Y. 1988) (presence of individual issues of damages do not defeat certification if common liability issues otherwise predominate).[17]

This case is well suited for class certification under Rule 23(b)(3) because it concerns the systemic enforcement of a strip search policy. *See Mitchell*, 2007 WL 1988716, *1 ("The putative class here comprises all persons who were . . . charged with misdemeanors or other minor crimes and were strip searched pursuant to the policy and practice of the Clinton County Sheriff's Department and the County of Clinton. The questions of whether the alleged policy and practice existed, whether they were unconstitutional, and whether defendants are liable are subject to generalized proof and are common to all potential class members.  These issues predominate over those issues that are subject to individualized proof."*); Kelsey,* 2007 WL 603406, *6 (the question "is whether the [strip search] policy and practices existed and whether they were unconstitutional – questions common to all potential class members . . . the existence of defenses in connection with individual plaintiffs, such as the conduct of a strip search based on contemporaneously held suspicion, does not foreclose certification because such an inquiry will only be sought against a limited number of plaintiffs").

The mere existence of a potential defense that "may affect different class members differently does not compel a finding that individual issues predominate over common ones." *In*

---

[17]  Moreover, Rule 23(b)(3) class certification is granted in mass tort cases involving not just individual determinations of pain and suffering, as here, but individual questions of causation and sometimes even liability. *See, e.g., In re Agent Orange*, 818 F.2d 145.

*Re Visa Check*, 280 F.3d at 137 (citation omitted).  Rather, "[a]s long as a sufficient constellation

of common issues binds class members together, variations in the sources and application of [a

defense] will not automatically foreclose class certification under Rule 23(b)(3).  *Id*. (citation

omitted).  "Therefore, the question for purposes of determining predominance is not whether a

defense exists, but whether the common issues will predominate over the individual questions

raised by that defense."  *Id.*

       Here, as set forth in detail, *supra*, at 26-30, the defense that reasonable suspicion

existed cannot be made out though a *post hoc* analysis of information that was unknown or

immaterial to the DOC officer who conducted the strip search.

       Defendants will presumably argue that individual issues predominate because

plaintiffs' damages, at least for emotional harm, may vary.  This is a nonstarter.  The Second

Circuit has squarely ruled that individualized damages determinations will not preclude a finding

of predominance.  "Common issues may predominate when liability can be determined on a

class-wide basis, even when there are some individualized damage issues."  *In re Visa Check*,

280 F.3d at 139.  Here, issues concerning liability for enforcing the unconstitutional Statute links

the class neatly and provides the basis for a systematic resolution.  Thus, "it appears that virtually

every issue prior to damages is a common issue."  *Id.* (citation omitted).  Moreover, even issues

related to compensatory damages are susceptible to class treatment.[18]  Of course, punitive

damages issues also lend themselves to class treatment.

---

[18]   Lest there be any confusion, plaintiffs do not concede that emotional damages cannot
be resolved on a class basis.  There are many options and devices that could be employed to
resolve and quantify plaintiffs' emotional harm.  Representative trials followed by statistical
sampling and aggregation could be employed.  The determination of compensation for emotional
damages could be referred to a magistrate or special master for resolution.

Because common factual and legal issues far outweigh the individual issues in this case, the requirements of Rule 23(b)(3) are easily established.

## 2.    A Class Action Is Superior to Other Methods of Adjudication

Given the sheer number of class members and the presumed demographics[19] of the class, a class action is not just superior to other methods of adjudication.[20]  It is the *only* method of adjudication.  Absent class certification, it is virtually certain, that the rights of individual class members will go unvindicated.  *See, e.g., D'alauro v. GC Servs. Ltd. P'ship*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996) (in considering Rule 23(b)(3) superiority, it is appropriate for the court to consider the "inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually").

Class certification is appropriate when it will result in the efficient resolution of the claims or liabilities of many individuals in a single action, eliminate repetitious litigation, and avoid possibly inconsistent adjudications.  *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979).  Class certification will permit the resolution of thousands of individual claims in a single forum,

---

[19]  The simple fact is that lawyers are unlikely to take these cases piecemeal.  When strip search claims *are* litigated, they are nearly always brought in conjunction with claims for false arrest, excessive force, or malicious prosecution.  Individual strip search claims, alone, are rarely pursued, even when a powerful claim exists.  *See, e.g., Morales v. United States*, 961 F. Supp. 633 (S.D.N.Y. 1997) (claims for excessive force, malicious prosecution, and illegal strip search); *Nowasad v. English*, 903 F. Supp. 377 (E.D.N.Y. 1995) (claims for false arrest, excessive force, malicious prosecution and illegal strip search); *Lopez v. City of New York*, 901 F. Supp. 684 (S.D.N.Y. 1995) (claims for false arrest, malicious prosecution and illegal strip search).

[20]  Factors relevant to the superiority of a class action under Rule 23(b)(3) include: "(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action."  Fed. R. Civ. P. 23(b)(3).

at one time, thereby avoiding either a multiplicity of repetitive lawsuits in different jurisdictions across New York State, or worse yet, and more likely, no lawsuits at all.  When plaintiffs are "aggrieved by a single policy of the defendants," such as the policy of enforcement of a void penal statute at issue here, the case "presents precisely the type of situation for which the class action device is suited," since may nearly identical litigations can be adjudicated in unison.  *In re Visa Check*, 280 F.3d at 146.

A class action is also superior to any other method for the fair and efficient adjudication of this dispute, as the damages suffered by certain members of the class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation. Rather than have thousands of persons subjected to unconstitutional strip searches commence individual actions, these claims should be adjudicated together, in a single proceeding.  Without class certification, thousands of individuals will lose any practical means for obtaining relief for defendants' illegal conduct.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that their motions for partial summary judgment and class certification be granted.

Dated: July 16, 2007
         New York, New York

                                EMERY CELLI BRINCKERHOFF &
                                ABADY LLP

                                By: *Mariann Wang*
                                     Richard D. Emery (RE 5181)
                                     Matthew D. Brinckerhoff (MB 3552)
                                     Mariann Meier Wang (MW 7417)
                                     Elizabeth S. Saylor (ESS 8091)
                                     75 Rockefeller Plaza, 20th Floor
                                     New York, New York 10019
                                     (212) 763-5000

                                *Attorneys for Plaintiffs & Proposed Classes*