UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
KADIAN MCBEAN, et al.,

                                    Plaintiffs,              02 Civ. 05426 (GEL)(THK)

          -against-

THE CITY OF NEW YORK, et al.

                                  Defendants.

---------------------------------------------------------------------X
JOEL RAMOS, et al.,

                                Intervenor-Plaintiffs,

          -against-

THE CITY OF NEW YORK, et al.,

                                  Defendants.

---------------------------------------------------------------------X

**PLAINTIFFS' STATEMENT PURSUANT TO LOCAL RULE 56.1**

       Pursuant to Rule 56.1 of the Civil Rules of this Court, intervenor-plaintiffs (hereinafter "plaintiffs") submit this statement of material facts as to which they contend there in no genuine issue to be tried:

### Definitions

1.      A "strip search" or "strip frisk" of a person is conducted by having that person's clothes removed completely so that a visual inspection of the person's naked body can be made in order to find any contraband the person might be hiding.  (Directive 4508R-B, Control and Search for Contraband, June 10, 2005 ("Directive 4508"), at NYC1199-1203, attached as Ex. 9; Directive 4508R-A, Control and Search for Contraband, July 23, 2002 ("Directive 4508R-A"), attached as Ex. 8; Directive 4508, Control and Search for Contraband, June 3, 1991 ("Directive 4508"), attached as Ex. 7.)

2.    A "strip search" or "strip frisk" sometimes includes, but is not required to include, a visual inspection of the person's anal cavity. *Marriott v. County of Montgomery*, 227 F.R.D.159, 170 (N.D.N.Y. 2005) (reviewing dictionary definitions and use in case law), *aff'd* No. 05-1590, 2005 WL 3117194 (2d Cir. Nov. 22, 2005) (unpublished order); *see also* Black's Law Dictionary, "search" (8th ed. 2004).

3.    "Strip searches" conducted by New York City Department of Corrections ("DOC") officers sometimes, but not always, include a visual inspection of the detainee's anal or vaginal cavity. (Directive 4508R-B, at NYC1199-1203, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7.)

4.    Pursuant to DOC written policy, which has been in effect from June 3, 1991 to the present, a detainee undergoing a Strip Frisk Without a Visual Body Cavity Search must strip naked and allow a DOC officer visually to inspect the detainee's armpits, oral cavity, ears, nose, navel, and feet while the detainee is undressed.  Detainees may also be required to perform a deep knee bend so that the anus or vagina is opened.  (Directive 4508R-B, at NYC1199-1201, Ex. 9; Directive 4508R-A, Ex. 8;  Directive 4508, Ex. 7; Deposition of DOC Chief Stephen Conry, 30(b)(6) Policy Designee, Sept. 9, 2005 ("Conry Dep.") 79:23-83:14, Ex. 126.)

5.    Pursuant to DOC policy, which has been in effect from June 3, 1991 to the present, a detainee undergoing a Strip Frisk With a Visual Body Cavity must strip naked so that a DOC officer can make a thorough visual inspection of the detainee's armpits, oral cavity, ears, nose, navel areas, and feet while the detainee is undressed, as well as make a thorough visual inspection of the detainee's genital and anal cavities while the detainee is standing with his or her legs spread and body bent forward at the waist.  Women may be required to lift their breasts and men are sometimes asked to lift their genitals. (Directive 4508R-B, at NYC1201-1203, Ex. 9;

Directive 4508R-A, Ex. 8; Directive 4508; Conry Dep. 128:18-131:25, Ex. 126; Pagan Dep. 74:20-81:12, Ex. 135.)

6.    A "strip search" and/or "strip frisk" refers below and throughout DOC to a  Strip Frisk Without a Visual Body Cavity Search, a Strip Frisk With a Visual Body Cavity Search, and/or any other procedure that requires the detainee to remove all of his clothes and stand before a DOC officer without any clothing or covering so that the DOC officer can conduct a visual inspection of the detainee's body.  (Directive 4508R-B, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7.)

7.    A "strip search" does not refer to a modified search that is conducted while a detainee is wearing a hospital gown or other covering that covers his or her genital areas.  (Conry Dep. 199:11-203:43, Ex. 126; Directive 4508R-B, at NYC1201-1203, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508; Operations Order 08/02, New Admission Search Procedures For Detainee Detainees Incarcerated For Misdemeanor and/or Violation Offenses, dated July 22, 2002 ("Operations Order 08/02"), attached as Ex. 11.)

### Directive 4508 and Its Revisions

8.    Since at least June 1991, an approximately 40-page Directive concerning the "Control of and Search for Contraband" has been in effect at DOC facilities.  (Directive 4508R-B, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7.)

9.    A Directive constitutes DOC policy, and it has equal governing force and weight as other written DOC policies, which also come in the form of Operations Orders or Teletype Orders.  (Conry Dep. 203:25-208:10; 208:16- 22, Ex. 126.)

10.    The Directive concerning the "Control of and Search for Contraband" sets forth in one lengthy policy document, the manner, means, and requirements for conducting searches at

DOC – whether such search is of the personal property of a detainee or is a bodily search of the detainee himself. (*See generally* Directive 4508R-B, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7; *e.g.*, Directive 4508R-B, Ex. 9 at NYC 1211 (personal property of detainees searched during living quarters search), NYC1189 (search of packages), NYC1224 (search of clothing), NYC 1196-1206.)

11.    While there have been changes to the text of the Directive concerning the "Control of and Search for Contraband" over the years, including Revision A in 2002 (Directive 4508R-A) and Revision B in 2005 (Directive 4508R-B), the specific provisions concerning the three Policies being challenged herein have not materially changed, as set forth below. (*See generally* Directive 4508R-B, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7.)

**Prior Admission Policy**:

**Undisputed Facts Concerning the Admission Policy Prior to July 22, 2002**

12.    From April 13, 1989 until July 22, 2002, the procedures relating to the processing and monitoring of new admission detainees in DOC custody were promulgated in Operations Order 16/89. Operations Order 16/89 established the timing of the processing and monitoring of new admission detainees placed in DOC custody. (Declaration of Bret H. Klein, Senior Counsel for NYC Corporation Counsel, Jan. 13, 2003 ("Klein Decl.") ¶ 2, attached as Ex. 111; Operations Order 16/89, Processing and Monitoring New Admissions, April 13, 1989 ("Operations Order 16/89"), attached as Ex. 3.)

13.    Between June 3, 1991 and July 22, 2002, the procedures regulating the search and inspection aspect of the monitoring and processing of new admission detainees, in any department facility, including the court divisions, the borough facilities, and Rikers Island facilities, were set forth in Directive 4508. (Klein Decl. ¶ 3, Ex. 111; Directive 4508, Ex. 7.)

4

14.     Operations Order 16/89, together with Directive 4508, formed the basis of DOC's policy with respect to the monitoring and processing of new admission detainees and applied Department-wide, including without limitation, to Rikers Island facilities, borough facilities (general population centers) and the court divisions (those central booking facilities that fell under the control of joint control of DOC).  (Klein Decl. ¶ 4, Ex. 111.)

15.     From at least June 3, 1991 until July 22, 2002, defendants had a policy and practice requiring the systematic strip search of *all* post-arraignment, pretrial detainees during the initial processing of every detainee into a DOC facility ("Prior Admission Policy").  (DOC Directive 4508, at NYC709, Ex. 7; Affidavit of William Fraser, former DOC Chief, May 8, 2000 ("Fraser Decl.") ¶ 17, attached as Ex. 114; Conry Dep. 163:12-164:12, Ex. 126.)

16.     Strip search conducted pursuant to the Prior Admission Policy included a visual body cavity inspection of, *inter alia*, the detainee's anal cavity.  (DOC Directive 4508, at NYC709, Ex. 7; Conry Dep. 163:12-164:12, Ex. 126.)

17.     Directive 4508 stated: "Upon completion of the new admission procedures, each inmate *shall* be given a Strip Frisk With A Visual Body Cavity Search by a correction officer of the same gender."  (Directive 4508, at NYC709, Ex. 7.)

18.     Every new admission detainee was processed in the same manner until at least July 22, 2002.  (Directive 4508, Ex.7; *see also* Fraser Decl. ¶ 17, Ex. 114.)

19.     This was a blanket policy of strip searching all new admission detainees, including detainees who had been arraigned on misdemeanors and lesser offenses.  (Directive 4508, Ex. 7; Soto memorandum attached as Ex. to Fraser Decl., Ex. 114.)

20.     The Prior Admission Policy mandated that each pretrial detainee be strip searched during the initial admission process to DOC; neither the nature of the crime, the circumstances of

5

the particular arrest, nor the characteristics of the particular detainee were relevant to enforcement of the Prior Admission Policy. (Directive 4508, Ex. 7; Soto memorandum attached as Ex. to Fraser Decl., Ex. 114; Deposition of Joseph Archibald, Oct. 25, 2006 ("Archibald Dep.") at 145:19-146:3, attached as Ex. 122; Deposition of Antonio Cepeda, Oct. 22, 2006 ("Cepeda Dep.") at 141:8-142:3, attached as Ex. 125; Deposition of Malcolm Davis, Oct. 17, 2006 ("Davis Dep.") at 91:22-92:9; 136:8-138:5; 146:6-146:19; Deposition of Richard Pagan, Feb. 28, 2007 ("Pagan Dep.") at 142:21-146:23, attached as Ex. 135; Deposition of Theresa Joseph, Dec. 28, 2006 ("Joseph Dep.") at 49:7-52:15, attached as Ex. 130; Deposition of Fred Sporrer, Nov. 16, 2006 ("Sporrer Dep.") 103:12-105:14; 107:8-107:23, Ex. 139.)

21.     The Prior Admission Policy did *not* require that searches conducted pursuant to the Prior Admission Policy be conducted only after a particularized inquiry had yielded reasonable suspicion to believe that the pretrial detainee was concealing a weapon or other contraband. (Directive 4508, Ex. 7.)

22.     Pursuant to the Prior Admission Policy, DOC officers strip searched all pretrial detainees during the new admission procedure without undertaking any individualized determination as to whether a detainee might be concealing weapons or contraband. (Directive 4508, Ex. 7; Soto memorandum attached as Ex. to Fraser Decl., Ex. 114; Joseph Dep. 49:7-52:15, Ex. 130; Archibald Dep. 136:8-138:5; 145:19-146:3, Ex. 122; Cepeda Dep. 141:8-142:3, Ex. 125; Pagan Dep. 142:21-146:23, Ex. 135; Sporrer Dep. 103:12-105:14; 107:8-107:23, Ex. 139.)

23.     Pursuant to the Prior Admission Policy, DOC officers strip searched all pretrial detainees during the new admission procedure without making any determination as to whether they had been arraigned on a charge under the New York Penal Code that was related to

6

possession or use of a drug and/or weapon. (Directive 4508, Ex. 7; Soto memorandum attached

as Ex. to Fraser Decl., Ex. 114; Joseph Dep. 49:7-52:15, Ex. 130; Archibald Dep. 145:19-146:3,

Ex. 122; Cepeda Dep. 141:8-142:3, Ex. 125; Davis Dep. 91:22-92:9; 136:8-138:5, 146:6-146:19

Ex. 127; Pagan Dep. 142:21-146:23, Ex. 135; Sporrer Dep. 103:12-105:14; 107:8-107:23, Ex.

139.)

  24. Pursuant to the Prior Admission Policy, it was the policy and practice for DOC

officers and/or DOC supervisory personnel ordering the strip searches of pretrial detainees during

the new admission procedure not to rely on the nature of the crimes the proposed class members

were charged with before deciding to strip search them. (Directive 4508, Ex. 7; Soto

memorandum attached as Ex. to Fraser Decl., Ex. 114; Joseph Dep. 49:7-52:15, Ex. 130;

Archibald Dep. 145:19-146:3, Ex. 122; Cepeda Dep. 141:8-142:3, Ex. 125; Davis Dep. 91:22-

92:9; 136:8-138:5, Ex. 127; Davis Dep. 91:22-92:9, 136:8-138:5, 146:6-146:19, Ex. 127; Pagan

Dep. 142:21-146:23, Ex. 135; Sporrer Dep. 103:12-105:14; 107:8-107:23, Ex. 139.)

  25. Pursuant to the Prior Admission Policy, it was the policy and practice for DOC

officers performing strip searches of pretrial detainees during the new admission procedure not to

inquire whether the detainee was arraigned on a charge under the New York Penal Code that

related to possession or use of a drug and/or weapon. (Joseph Dep. 49:7-52:15, Ex. 130;

Archibald Dep. 145:19-146:3, Ex. 122; Cepeda Dep. 141:8-142:3, Ex. 125; Davis Dep. 91:22-

92:9; 136:8-138:5, 146:6-146:19, Ex. 127; Pagan Dep. 142:21-146:23, Ex. 135; Sporrer Dep.

103:12-105:14; 107:8-107:23, Ex. 139.)

  26. Pursuant to the Prior Admission Policy, it was the policy and practice for DOC

supervisory personnel ordering the strip searches of pretrial detainees during the new admission

procedure not to inquire if the detainee was arraigned on a charge under the New York Penal

Code that related to possession or use of a drug and/or weapon. (Joseph Dep. 49:7-52:15,
Ex. 130; Archibald Dep. 145:19-146:3, Ex. 122; Cepeda Dep. 141:8-142:3, Ex. 125; Davis Dep.
91:22-92:9; 136:8-138:5, 146:6-146:19, Ex. 127; Pagan Dep. 142:21-146:23, Ex. 135; Sporrer
Dep. 103:12-105:14; 107:8-107:23, Ex. 139.)

27.    Officers conducting the strip searches and DOC supervisory personnel ordering
the strip searches conducted under the Prior Admission Policy in fact usually did not know the
nature of the charges on which the detainees were arraigned. (Joseph Dep. 49:7-52:15, Ex. 130;
Davis Dep. 91:22-92:9; 136:8-138:5, 146:6-146:19, Ex. 127; Archibald Dep. 145:19-146:3, Ex.
122; Cepeda Dep. 141:8-142:3, Ex. 125; Pagan Dep. 142:21-146:23, Ex. 135; Sporrer Dep.
103:12-105:14; 107:8-107:23, Ex. 139.)

28.    Pursuant to the Prior Admission Policy, pretrial detainees may be strip searched at
initial intake to DOC even though they have been thoroughly searched repeatedly by DOC and by
the New York City Policy Department and remained in continual custody of a law enforcement
agency and under continual DOC supervision since the last time they were searched. (Directive
4508R-B, Ex. 9; Conry Dep. 92:20-24; 88:14-16; 168:7-169:13; 170:24-172:2, Ex. 126; Davis
Dep. 138:6-138:25, Ex. 127.)

29.    Pursuant to the Prior Admission Policy, prior to July 22, 2002, everyone detained
by DOC prior to July 22, 2002, who had been arraigned for misdemeanors, violations, and/or
civil violations was forced to remove all of his or her clothing during the new admission process
so that a DOC officer could visually inspect the detainee's mouth, armpits, oral cavity, ears, nose,
knees, toes, and navel while the inmate was undressed. (Directive 4508, at NYC709, 712-6,
Ex.7; Fraser Decl. ¶ 25 & Soto Memorandum, attached as Ex., Ex. 114.)

30.    Pursuant to the Prior Admission Policy, the initial processing of every detainee, including those who had been arraigned for misdemeanors, violations, and/or civil violations also included a thorough visual inspection of the detainee's anus and genital cavities while the inmate was standing with his/her legs spread and body bent forward at the waist to ensure that no contraband is being secreted in the area of the buttocks.  Women might be required to lift their breasts and men are sometimes required to lift their genitals.  (Fraser Decl. ¶ 17, attached as Ex. 114; Directive 4508, at NYC709, 714, Ex.7; Conry Dep. 79:23-83:14, Ex. 126.)

31.    Pursuant to the Prior Admission Policy, prior to July 22, 2002, pretrial detainees were not provided a hospital gown during the admission strip search that was performed. (Directive 4508, Ex. 7.)

32.    Pursuant to the Prior Admission Policy, under certain circumstances, more than one detainee was strip searched at a time.  (Soto Memo at 2, attached as Ex. to Fraser Decl., Ex. 114; Pagan Dep. 54:24-57:2; 92:4-92:19 Ex. 135; Joseph Dep. 57:3-57:9, Ex. 130; Lopez Dep. 81:17-81:23, Ex. 131; Pagan Dep. 54:24-57:2; 92:4-92:19, Ex. 135.)

**Current Admission Policy**:

**Undisputed Facts Concerning the Post July 22, 2002 Admission Policy**

33.    Directive 4508 was superseded by Directive 4508R-A on July 22, 2002.  (Klein Decl. ¶ 3, Ex. 111; Directive 4508R-A, Ex. 8.)  The revision from 4508 to 4508R-A did *not* change the text of Directive 4508 with respect to the new admission procedure – 4508R-A still states that "[u]pon completion of new admission procedures, each inmate *shall be given a Strip Frisk With a Visual Body Cavity Search*"; that "[e]xcept for the searching of new admissions to a facility," a strip frisk with a visual body cavity search may be performed without a supervisory officer; and that "[a] strip frisk with a visual body cavity search is permitted . . . when . . .

9

[p]rocessing new admissions into a facility." (Directive 4508R-B, Ex. 9 at NYC1196, 1201; *see also id.* at NYC 1202 (explaining documentation requirements for strip searches conducted of "new admissions").

34.    On July 22, 2002, defendants issued a new policy, Operations Order 08/02 which created a new search policy and procedure for newly admitted misdemeanor and violation detainees ("Current Admission Procedure"). (Declaration of Deputy Warden of Security of Rose M. Singer Facility at Rikers Island, signed by Fidel Gonzalez, Dec. 9, 2002 ("Gonzalez Decl.") ¶ 2, attached as Ex. 112; Operations Order 08/02, New Admission Search Procedures For Detainee Detainees Incarcerated For Misdemeanor and/or Violation Offenses, dated July 22, 2002 ("Operations Order 08/02"), attached as Ex. 11; Conry Dep. 199:11-203:3, Ex. 126; Deposition of Valerie Oliver, Sept. 25, 2006 ("Oliver Decl.") ¶ 2, Ex. 17; Pagan Dep. 138:21-139:14, Ex. 135.)

35.    Typically, an Operations Order is a very specific short document that describes a single procedure in detail, as opposed to an overall change in policy. (Conry Dep. 203:25-204:4, Ex. 126.) When Directives are revised, they should be drafted to comport with the rest of DOC policy, but Directive 4508 in each of its revisions since 1991 has never been changed to reflect the Current Admission Procedure memorialized in Operations Order 08/02, even though Chief Conry, DOC's 30(b)(6) deponent on strip search policies, thinks such a revision would be a good idea. (Conry Dep. 5:21-7:8 & Ex. 1; 208:23-210:18; 296:25-299:9; 301:2-10; 303:12-23, Ex. 126).

36.    Operation Order 08/02 states: "Post arraignment detainee inmates incarcerated for Misdemeanor and/or Violation Offenses shall *not* be made the subject of a strip search during the new admission process unless there is reasonable suspicion that the inmate is in possession of contraband." (Operations Order 08/02, at NYC000026, Ex. 11) (emphasis added).

37.     DOC supervisory staff was informed that Operations Order 08/02 was created in response to a court order.  (Gonzalez Decl. ¶ 4, Ex. 112.)

38.     The Current Admission Policy, as set out in Operations Order 08/02, requires that upon initial entry into a DOC facility a designated officer shall review the detainee's Securing Order(s) entitled "Major Arraignment Charge" to determine if a detainee has been charged with either a felony, misdemeanor or violation.  (Gonzalez Decl. ¶ 6, Ex. 112; Operations Order 08/02, Ex. 11.)

39.     Pursuant to DOC Operations Order 08/02, which was effective on July 22, 2002, pretrial detainees arraigned for misdemeanor and/or violation offenses are not to be subject to a strip search during the new admission process unless they have one or a combination of any of the following offenses or conditions: (a) a charge for a felony offense; (b) a violation of parole; (c) they are state inmates; and/or (d) an outstanding warrant for a felony offense.  (Operations Order 08/02, at NYC000026, Ex. 11; Gonzalez Decl. ¶ 2., Ex. 112; Conry Dep. 199:11-203:3, Ex. 126; Archibald 139:4-140:14, Ex. 122; Joseph Dep. 48:14-48:18, Ex. 130; Sporrer Dep. 103:12-105:14; 107:8-107:23, Ex. 139.)

40.     Operations Order 08/02, which makes no distinction between pretrial detainees arraigned for misdemeanor or violation offenses, applies regardless of the nature of the misdemeanor or violation offense, and thus applies to pretrial detainees who are arraigned for misdemeanor and/or violation offenses related to drug or weapon charges.  (Operations Order 08/02, at NYC000026, Ex. 11; Conry Dep. 199:11-203:3, Ex. 126; Archibald 139:4-140:14, Ex. 122; Pagan Dep. 138:21-139:14; 142:21-146:23, Ex. 135; Joseph Dep. 48:14-48:18, Ex. 130.; Sporrer Dep. 103:12-105:14; 107:8-107:23, Ex. 139)

41.     If the detainee has been charged with only a misdemeanor or violation, according to the Current Admission Policy, they are to be separated and given a paper type medical gown

11

prior to undergoing any search procedures. (Gonzalez Decl. ¶ 7, Ex. 112; Operations Order 08/02, Ex. 11; Conry Dep. 199:11-203:3, Ex. 126.)

42.     According to the Current Admission Policy, female detainees charges with misdemeanor or violation offenses are to be directed to an area equipped with a privacy screen free of detainees and staff. At this point, the detainees are to remove all of their clothing and put on the medical gown. The detainees clothing and other personal items are to be put into a bag and given to the officer. (Gonzalez Decl. ¶ 8, Ex. 112; Operations Order 08/02, Ex. 11.)

43.     According to the Current Admission Policy, male detainees who are charged with misdemeanor or lesser offenses are to be directed to remove their upper garments, don a hospital/medical gown, and remove all of their remaining clothing including undergarments. (Operations Order 08/02, Ex. 11; Pagan Dep. 138:21-139:14, Ex. 135.)

44.     According to the Current Admission Policy, detainees are never to be completely naked in front of other detainees or DOC staff. (Operations Order 08/02, Ex. 11; Conry Dep. 199:11-203:3, Ex. 126; Pagan Dep. 138:21-139:14, Ex. 135.)

45.     According to the Current Admission Policy, male and female detainees will then be electronically searched either by walking through a magnetometer, or by sitting on the Body Orifice Screening System commonly referred to as a "B.O.S.S. Chair," and if necessary a hand-held metal detecting device. The personal items and clothes will also be examined both visually and by using an x-ray machine. (Gonzalez Decl. ¶ 9, Ex. 112; Operations Order 08/02, Ex. 11; Conry Dep. 199:11-203:3, Ex. 126; Pagan Dep. 138:21-139:14, Ex. 135.)

46.     According to the Current Admission Policy, detainees who fail to clear the electronic search procedure are to be searched by an officer using a hand-held device, when practical, in order to isolate the location of the suspected contraband. (Gonzalez Decl. ¶ 12, Ex. 112; Operations Order 08/02, Ex. 11.)

47.     According to the Current Admission Policy, if the officer is unable to resolve or identify the suspected contraband then the officer must notify a supervisor. (Gonzalez Decl. ¶ 13, Ex. 112; Operations Order 08/02, Ex. 11.)

48.     The supervisor then determines if it is necessary to proceed with a "strip frisk with a visual body cavity search." (Gonzalez Decl. ¶ 13, Ex. 112; Operations Order 08/02, Ex. 11.)

49.     According to the Current Admission Policy, before conducting a strip search during the initial intake processing of a detainee arraigned on misdemeanor or lesser offense, a DOC supervisor must make an individualized determination that a strip search is necessary because there is a specific reason to suspect that the detainee has contraband and that contraband could not be found utilizing the electronic search procedures. (Gonzalez Decl. ¶ 13, Ex. 112; Operations Order 08/02, Ex. 11; Conry Dep. 139:10-140:20; 311:18-313:10, Ex. 126.)

50.     The supervisor authorizing any strip search during the intake process of a pretrial detainee arraigned on misdemeanor or lesser charges must prepare and complete a Visual Body Cavity Search Report (Form #443), stating the reasons for, circumstances, and findings of the search. A sworn statement by the officer or supervisor with direct knowledge of the underlying basis for the search shall also be included. A copy of the completed form shall be given to the detainee and a copy shall be maintained in the institution's security office. (Operations Order 08/02, Ex. 11; Conry Dep. 139:10-140:20; 271:23-272:7, Ex. 126.)

### Classification & Security Risk Groups Undisputed Facts

51.     DOC detainees are housed based on a security risk assessment/classification system. The classification is based on a variety of factors including the detainee's medical condition, criminal history, institutional history, security risk group affiliation, escape history, and severity of the current charge. (Fraser Decl. ¶¶ 36, 38, Ex. 114; Directive 4100R-A, Classification, Oct. 14, 2005 ("Classification Directive"), Ex. 142.)

52.     Each housing area must be designated for one of the following classifications: low; low medium; high medium; and high.  (Fraser Decl. ¶ 36, Ex. 114; Classification Directive, at NYC7956, Ex. 142.)

53.     DOC also has established numerous speciality housing areas to house detainees for their own protection, or for the safety and security of other detainees.  Those housing areas include Close Custody Housing, Punitive Segregation, and Pre-Hearing Detention Housing. (Directive 6006R-A, Close Custody Housing, May 5, 2006 ("Close Custody Housing Directive"), Ex. 143; Classification Directive, Ex. 142; Directive 4501R-A, Pre-Hearing Detention and Punitive Segregation Status Inmates, Oct. 14, 2005 ("Punitive Segregation Directive"), Ex. 146; Deposition of Patrick Walsh, Oct. 16, 2006 ("Walsh Dep.") at 270:15-273:25, 169:17-170:13, attached as Ex. 141.)

54.     DOC has a policy and practice of identifying detainees as "security risk group members."  Security risk group members are either identified gang members, incoming contraband recipients, or know weapons carriers.  Known weapons carriers must carry a Red identification card ("ID"), intended contraband recipients must carry a Green ID.  General population detainees who are not know weapons carriers or intended contraband recipients must carry salmon IDs.  (Fraser Decl. ¶ 28, Ex. 114; Walsh Dep. 169:17-170:13, Ex. 141; Directive 4518R-A, Red ID Status and Enhanced Restraint Status Due Process, June 30, 2004, Ex. 147; Operations Order 06/99, Identification, Tracking and Monitoring of Intended Contraband Recipients, Ex. 148.)

55.     The most dangerous detainees are always escorted and are not permitted to intermingle with other detainees.  (Directive 4020, Department Definitions of Inmate Categories, Dec. 5, 1988, Ex. 144; Teletype Order No. HQ - 00592-0, Directive 4020 – Department Definitions of Inmate Categories (Revision Notice), March 8, 2006, Ex. 145; Punitive Segregation Directive, Ex. 146.)

**Exit Policy**:

**Undisputed Facts Concerning Strip Searches of Pretrial Detainees Exiting DOC Facilities**

      56.     Defendants have a policy and practice requiring the systematic strip search of *all* pretrial detainees whenever a detainee is leaving the confines of a DOC facility, unless the detainee is being released from custody, except when insufficient staff, room, or time is available to conduct the searches ("Exit Policy"). (Conry Dep. 96:2-97:18; 117:23-128:17; 156:25-159:16; 183:11-183:17, Ex. 126; Declaration of Patrick Walsh, Assistant Chief of Special Operations for DOC, Aug. 17, 2006 ("Walsh Decl.") ¶ 7, Ex. 113; Archibald Dep. 153:23-156:14, Ex. 122; Cepeda Dep. 144:21-145:5, Ex. 125; Davis Dep. 185:16-186:20; 189:16-189:11, Ex, 127; Deposition of Michael Greys, Oct. 18, 2006 ("Greys Dep.") 116:10-117:20; 151:14-151:20; 175:3-175:20; 176:3-176:5, Ex. 129; Sporrer Dep. 110:17-115:10, Ex. 139; Lopez Dep. 139:20-143:23; 147:18-148:8, Ex. 131.)

      57.     At a minimum, the strip searches conducted pursuant to the Exit Policy require that detainees strip naked and allow a DOC officer visually to inspect the detainee's armpits, oral cavity, ears, nose, navel, and feet while the detainee is undressed. At times, detainees may also be required to perform a deep knee bend so that their anus or vagina is opened. (Directive 4508, at NYC1199-1201, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7; Conry Dep. 79:23-83:14, Ex. 126.)

      58.     DOC's Exit Policy has been set out without change from 1991 to the present in three successive directives: from June 3, 1991 until July 23, 2002 in Directive 4508; from July 23, 2002 until June 10, 2005 in Directive 4508R-A; and from June 10, 2005 to the present in Directive 4508R-B. (Directive 4508R-B, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7.)

59.      Even though the approximately 40 page directive that addresses the Exit Policy
has changed to some degree, the written Exit Policy has not changed from June 3, 1991 until the
present. (Directive 4508R-B, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7.)

60.      Directive 4508R-B, currently in effect, states: "A strip frisk without a visual body
search *may* be conducted at the *discretion* of the facility whenever an inmate is leaving the
confines of the facility." (Directive 4508R-B, at NYC1199, Ex. 9.)

61.      There are no written guidelines delineating how officers should exercise their
"discretion" when deciding whether to conduct a strip search before a detainee is transported out
of a facility. (Conry Dep. 94:3-13; 117:9-128:17; 295:12-298:6; Pagan Dep. 84:16-90:19; 201:7-
203:11, Ex. 135.)

62.      At some point prior to 2002, an oral instruction was issued to DOC staff stating
that they should increase the amount of inmates being strip searched on the way to court and, if
possible, strip search all inmates before they are transported to court. That instruction is still in
effect. (Conry Dep. 94:11-95:19, Ex. 126; *see also* Pagan Dep. 84:16-90:19; 201:7-203:11, Ex.
135; Ahl Dep. 159:14-161:22, Ex. 121.)

63.      The number of incidents in the courts did not decrease as a result of the increase
in strip searches conducted of detainees on the way to court. (Pagan Dep. 84:16-90:19.)

64.      Pursuant to this Exit Policy, defendants have a practice and custom of strip
searching *all* pretrial detainees before they are transported to court, except when insufficient
staff, room, or time is available to conduct the searches. (Conry Dep. 94:11-95:19, 96:2-97:18;
117:23-128:17; 156:25-159:16; 183:11-183:17, Ex. 126; Archibald Dep. 153:23-156:6, Ex. 122;
Cepeda Dep. 144:21-145:5, Ex. 125; Davis Dep. 185:16-186:20, Ex, 127; Photo of Sign in Intake
Area of Robert N. Davoren Complex ("RNDC"), taken 8/31/06 ("RNDC 2006 Intake Sign"),

16

attached as Ex. 118; Greys Dep. 116:10-117:20; 151:14-151:20; 175:3-175:20; 176:3-176:5, Ex.

129; Sporrer Dep. 110:17-115:10, Ex. 139; Ahl Dep. 159:14-161:22, Ex. 121; Lopez Dep.

139:20-143:23; 147:18-148:8, Ex. 131.)

65.     Pursuant to this Exit Policy, defendants strip search *all* pretrial detainees before

they are transported to a funeral, burial, wake, or visit to a critically ill relative, except when

insufficient staff, room, or time is available to conduct the searches.  (Conry Dep. 96:2-97:18;

117:23-128:17; 156:25-159:16; 183:11-183:17, Ex. 126; RNDC Intake Sign, Ex. 118; Greys

Dep. 175:3-175:20; 176:3-176:5, Ex. 129; Sporrer Dep. 110:17-115:10, Ex. 139; Lopez Dep.

139:20-143:23; 147:18-148:8, Ex. 131.)

66.     Pursuant to this Exit Policy, defendants strip search *all* pretrial detainees before

they are transported to a hospital or outside medical appointment, except when insufficient staff,

room, or time is available to conduct the searches.  (Conry Dep. 96:2-97:18; 117:23-128:17;

156:25-159:16; 183:11-183:17, Ex. 126; Archibald Dep. 154:18-156:14, Ex. 122; RNDC Intake

Sign, Ex. 118; Davis Dep. 188:16-189:11, Ex. 127; Greys Dep. 176:3-176:5, Ex. 129; Sporrer

Dep. 110:17-115:10, Ex. 139; Lopez Dep. Lopez Dep. 139:20-143:23; 147:18-148:8, Ex. 131.)

67.     Pursuant to this Exit Policy, defendants strip search *all* pretrial detainees before

they are transported to an outside work detail, except when insufficient staff, room, or time is

available to conduct the searches.  (Conry Dep. 96:2-97:18; 117:23-128:17; 156:25-159:16;

183:11-183:17, Ex. 126; RNDC Intake Sign, Ex. 118; Greys Dep. 176:3-176:5, Ex. 127; Sporrer

Dep. 110:17-115:10, Ex. 139; Lopez Dep. 139:20-143:23; 147:18-148:8, Ex. 131.)

68.     Since at least 2002, at most DOC facilities, defendants have ensured that there is

sufficient staff, time, and room to strip search *all* pretrial detainees whenever a detainee is

leaving the confines of a DOC facility, unless the detainee is being released from custody.

(Walsh Dep. 276:15-277:9, Ex. 141; RNDC Intake Sign, Ex. 118; Conry Dep. 95:2-97:18; 96:2-97:18; 117:23-128:17; 156:25-159:16; 183:11-183:17, Ex. 126; Archibald Dep. 153:23-156:6, Ex. 122; Cepeda Dep. 144:21-145:5, Ex. 125; Davis Dep. 185:16-186:20, Ex, 127; Pagan Dep. 201:7-203:11, Ex. 135; Greys Dep. 116:10-117:20; 151:14-151:20; 175:3-175:20; 176:3-176:5, Ex. 127; Sporrer Dep. 110:17-115:10, Ex. 139; Ahl Dep. 159:14-161:22, Ex. 121; Lopez Dep. 139:20-143:23; 147:18-148:8, Ex. 131.)

69.     DOC's Exit Policy mandates that each pretrial detainee be strip searched whenever a detainee is leaving the confines of a DOC facility, unless the detainee is being released from custody, except when insufficient staff, room, or time is available to conduct the searches; neither the circumstances of the particular arrest, nor the characteristics of the particular detainee are relevant to enforcement of the Exit Policy. (Conry Dep. 96:2-97:18; 117:23-128:17; 156:25-159:16; 183:11-183:17, Ex. 126; RNDC Intake Sign, Ex. 118; Cepeda Dep. 144:21-145:5, Ex. 125; Davis Dep. 188:16-189:11, Ex. 127; Greys Dep. 116:10-117:20; 151:14-151:20; 151:25-152:6; 175:3-175:20; 176:3-176:5, Ex. 129; Sporrer Dep. 110:17-115:10, Ex. 139; Lopez Dep. 139:20-143:23; 147:18-148:8, Ex. 131; Pagan Dep. 201:7-203:11, Ex. 135.)

70.     DOC's Exit Policy does *not* require that searches conducted pursuant to the Exit Policy be conducted only after a particularized inquiry has yielded reasonable suspicion to believe that the pretrial detainee is concealing a weapon or other contraband. (Directive 4508R-B, Ex. 9; Pagan Dep. 201:7-203:11, Ex. 135.)

71.     Pursuant to DOC's Exit Policy, pretrial detainees may be strip searched even if they have remained in continual DOC custody and under continual DOC supervision since the last time they were strip searched. (Directive 4508R-B, Ex. 9; Conry Dep. 92:20-24, 88:14-16.)

72.     Pursuant to the Exit Policy, DOC officers strip search pretrial detainees who are

18

leaving the confines of a DOC facility without undertaking any individualized determination as to whether a detainee might be concealing weapons or contraband. (Conry Dep. 96:2-97:18; 117:23-128:17; 156:25-159:16; 183:11-183:17, Ex. 126; RNDC Intake Sign, Ex. 118; Lopez Dep. 117:10-118:8; 120:23-121:7, Ex. 131; Greys Dep. 116:10-117:20, Ex. 129; Sporrer Dep. 110:17-115:10, Ex. 139.)

73.    Pursuant to the Exit Policy, DOC officers strip search pretrial detainees who are leaving the confines of a DOC facility without making any determination as to whether they had been arraigned on a charge under the New York Penal Code that was related to possession or use of a drug and/or weapon. (Conry Dep. 96:2-97:18; 117:23-128:17; 156:25-159:16; 183:11-183:17, Ex. 126; RNDC Intake Sign, Ex. 118; Lopez Dep. 117:10-118:8; 120:23-121:7, Ex. 131; Joseph Dep. 49:7-52:15, Ex. 130; Sporrer Dep. 110:17-115:10, Ex. 139.)

74.    Pursuant to the Exit Policy, it is the policy and practice for DOC officers performing strip searches of pretrial detainees who are leaving the confines of a DOC facility not to inquire whether the detainee was arraigned on a charge under the New York Penal Code that related to possession or use of a drug and/or weapon. (Conry Dep. 96:2-97:18; 117:23-128:17; 156:25-159:16; 183:11-183:17, Ex. 126; RNDC Intake Sign, Ex. 118; Greys Dep. 116:10-117:20; 151:14-151:20; 175:3-175:20, Ex. 129; Joseph Dep. 49:7-52:15, Ex. 130; Sporrer Dep. 110:17-115:10, Ex. 139; Lopez Dep. 117:10-118:8; 120:23-121:7, Ex. 131.)

75.    Pursuant to the Exit Policy, it is the policy and practice for DOC officers and/or DOC supervisory personnel ordering the strip searches of pretrial detainees who are leaving the confines of a DOC facility not to inquire if the detainee was arraigned on a charge under the New York Penal Code that related to possession or use of a drug and/or weapon. (Conry Dep. 96:2-97:18; 117:23-128:17; 156:25-159:16; 183:11-183:17, Ex. 126; RNDC Intake Sign, Ex. 118;

19

Greys Dep. 116:10-117:20; 151:14-151:20; 175:3-175:20, Ex. 129; Joseph Dep. 49:7-52:15, Ex.

130; Sporrer Dep. 110:17-115:10, Ex. 139; Lopez Dep. 117:10-118:8; 120:23-121:7, Ex. 131.)

76.    The strip searches conducted pursuant to the Exit Policy are undertaken without

any prior or intervening event or circumstance that would give rise to individualized reasonable

suspicion, or indeed suspicion of any sort.  (Conry Dep. 96:2-97:18; 117:23-128:17; 156:25-

159:16; 183:11-183:17, Ex. 126; Directive 4508R-B, Ex. 9; Greys Dep. 175:3-175:2,  116:10-

117:20; 151:14-151:20, Ex. 129; Sporrer Dep. 110:17-115:10, Ex. 139; Lopez Dep. 117:10-

118:8; 120:23-121:7, Ex. 131.)

77.    DOC officers are required to conduct strip searches pursuant to the Exit Policy

even if they have no reason to believe the particular detainees strip searched are concealing

contraband. (Directive 4508R-B, Ex. 9; Conry Dep. 96:2-97:18; 117:23-128:17; 156:25-159:16;

183:11-183:17, Ex. 126; Greys Dep. 175:3-175:20, 116:10-117:20; 151:14-151:20;, Ex. 129;

Sporrer Dep. 110:17-115:10, Ex. 139; Lopez Dep. 117:10-118:8; 120:23-121:7, Ex. 131.)

78. ·    The Exit Policy mandates the strip search of detainees, regardless of (a) their

classification level; (b) whether they have a Red ID for having have been found previously in jail

with a weapon; (c) whether they have a Green ID for having been found previously in jail with

other contraband; (d) whether they are identified as a gang member; (e) whether they are

identified as an intended contraband recipient.  (Directive 4508R-B, Ex. 9; Conry Dep. 96:2-

97:18; 117:23-128:17; 156:25-159:16; 183:11-183:17, Ex. 126; Greys Dep. 116:10-117:20;

151:14-151:20; 175:3-175:20; 176:3-176:5, Ex. 129; Joseph Dep. 49:7-52:15, Ex. 130; Sporrer

Dep. 110:17-115:10, Ex. 139; Lopez Dep. 117:10-118:8; 120:23-121:7, Ex. 131.)

79. .    DOC's Exit Policy does *not* require that searches conducted pursuant to the Exit

or Housing Policy be conducted in private without any other detainees present. (Directive

4508R-B, Ex. 9.)

80.     Strip searches conducted pursuant to the Exit Policy may be conducted in groups. (Conry Dep. 77:2-8; 78:6-11, Ex. 126; RNDC Intake Sign, Ex. 118; Davis Dep. 224:16-225:3; Pagan Dep. 54:24-57:2; 92:4-92:19 Ex. 135; Pagan Dep. 54:24-57:2; 92:4-92:19; 94:11-98:17, Ex. 135.)

81.     Strip searches conducted pursuant to the Exit Policy are sometimes conducted in groups.  (Conry Dep. 77:2-8; 78:6-11, Ex. 126; RNDC Intake Sign, Ex. 118; (Pagan Dep. 54:24-57:2; 92:4-92:19; 94:11-98:17, Ex. 135.)

82.     In some DOC facilities, detainees exiting the facility are strip searched in the gymnasium areas of the facilities in groups of as many as ten or twenty at a time.  (Pagan Dep. 92:4-92:19 (discussing the procedure at George R. Vierno Center), Ex. 135; Greys Dep. 116:10-117:20, Ex. 129 (discussing the procedure at Rose M. Singer Correctional Center ("RMSC").)

83.     As of at least August 31, 2006, a sign in the new admission intake area of RNDC, a DOC facility on Rikers Island, informs the detainees of the policy.  The sign states, "EVERY INMATE WILL BE SUBJECT TO A GROUP STRIP SEARCH PRIOR TO DEPARTING OR RETURNING TO THE FACILITY. . . PER DIRECTIVE 4508/91."  A photograph of the sign, which was taken on August 31, 2006 in the new admission intake area of RNDC is attached as Ex. 118.  (RNDC Intake Sign, Ex. 118.)

**Housing Policy**:

**Undisputed Facts Concerning the Policy of Strip Searching in Housing Areas**

84.    Defendants have a policy and practice providing for the routine and periodic strip search of *all* pretrial detainees when a detainee's living quarters are searched ("Housing Policy"). (Directive 4508-B, Ex. 9; Conry Dep. 78:22-79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113; Archibald Dep. 73:15-74:7; 82:2-83:11, Ex. 122.)

85.    DOC's Housing Policy has been the policy and practice of DOC from before July 15, 1999 until the present. (Directive 4508R-B, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7.)

86.    DOC's Housing Policy has been set forth without change in three successive directives: from June 3, 1991 until July 23, 2002 in Directive 4508; from July 23, 2002 until June 10, 2005 in Directive 4508R-A; from June 10, 2005 to the present in Directive 4508R-B. (Directive 4508R-B, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7.)

87.    Even though the approximately 40-page directive governing the Housing Policy has changed to some degree, the Housing Policy has remained the same since June 3, 1991. (Directive 4508R-B, Ex. 9; Directive 4508R-A, Ex. 8; Directive 4508, Ex. 7.)

88.    Directive 4508R-B, which is currently in effect, states: "A strip frisk without a visual body cavity search must be conducted when . . . an individual area of a facility or living quarters is being searched." (Directive 4508R-B, at NYC1199-1200, 1209-10, Ex. 9.)

89.    Detainee's living quarters are searched "on a regular and frequent basis." (Directive 4508R-B, at NYC1209, Ex. 9; Conry Dep. 98:9-99:17, 285:10-287:3, Ex. 126.)

90.    Detainee's living quarters are searched according to a schedule developed by supervisory DOC officials. (Directive 4508R-B, at NYC1209, Ex. 9; Conry Dep. 98:6-99:17.)

91.    The schedule for many of the searches (those called "scheduled institutional searches") conducted pursuant to the Housing Policy is typically developed a month at a time. (Conry Dep. 98:6-99:17.)

92.    DOC's Housing Policy also mandates that at least seven completely random searches (called "random searches") be conducted each day in every facility.  Random searches are "just random" – they are not done in response to any reason, incident, intelligence.  (Directive 5408R-B, at NYC1215, Ex. 9; Deposition of Patrick Walsh, Assistant Chief of Special Operations, Oct. 16, 2006 ("Walsh Dep."), 109:9-110:11; 208:16-212:8, Ex. 141.)

93.    According to Directive 4508R-B, "Prior to the search of an inmate's living quarters, such inmate *shall* undergo a Strip Frisk Without a Body Cavity Search to ensure that the inmate is not concealing contraband on his/her person.  (Inmates assigned to cells shall be searched inside their cells.)  During the search, the inmate shall be directed to remove all wearing apparel.  After the clothing has been removed the inmate shall submit the clothing to the officer for examination to insure that the clothing contains no contraband.  After the officer has completed the above examination, the clothing shall be returned to the inmate who shall be directed to dress and move to an assigned area . . . while the officer conducts the search of the inmate's living quarters."  (Directive 4508R-B, at NYC1210, Ex. 9 (emphasis added).)

94.    Pursuant to the definition of a Strip Frisk Without a Body Cavity Search, at a minimum, the strip searches conducted pursuant to the Housing Policy require that detainees strip naked and allow a DOC officer to inspect visually the detainee's armpits, oral cavity, ears, nose, navel, and feet while the detainee is undressed.  Detainees may also be required to perform a deep knee bend so that their anus or vagina is opened.  (Directive 4508, at NYC1199-1201, Ex. 9; Directive 4508R-A, Ex. 8;  Directive 4508, Ex. 7; Conry Dep. 79:23-83:14, Ex. 126.)

95.     Directive 4508R-B does *not* require that searches conducted pursuant to the Housing Policy be conducted in private without any other detainees present.  (Directive 4508R-B, Ex. 9.)

96.     While Directive 4508R-B states that strip searches of detainees assigned to cells must be conducted inside those cells, Directive 4508R-B does not provide direction with respect to where strip searches of detainees assigned to dormitory housing areas must be conducted. (Directive 4508R-B, at NYC1210, Ex. 9.)

97.     Pursuant to DOC's Housing Policy, pretrial detainees living in dormitories are strip searched in groups.  In dormitory settings, often five or more detainees get naked at the same time next to each other, with seven or more officers immediately in front of them observing; these take place either in the bathroom area or in the bed area of the dormitory. (Conry Dep. 78:22-83:14, Ex. 126; Walsh Dep. 129:18-139:16, Ex. 141; Archibald Dep. 100:14-101:3; Cepeda Dep. 70:17-71:15, 158:21-159:2, Ex. 125; Davis Dep. 224:16-225:3; Pagan Dep. 54:24-57:2; 92:4-92:19, Ex. 135.)

98.     Sometimes as many as 50 detainees are in the bed area during strip searches conducted pursuant to the Housing Policy.  Of them approximately 10 to 15 detainees may be strip searched at the same time.  There is nothing physically separating the detainees, and they may be as little as four feet apart while completely naked.  (Walsh Dep. 129:18-139:16, Ex. 141; Cepeda Dep. 158:21-159:2, Ex. 125; Pagan Dep. 54:24-57:2; 92:4-92:19, Ex. 135.)

99.     Pursuant to DOC's Housing Policy, pretrial detainees are strip searched in their living quarters "on a regular and frequent basis."  (Directive 4508R-B, at NYC1209, Ex. 9; Conry Dep. 98:9-99:17, 285:10-287:3, Ex. 126.)

24

100.    Pursuant to DOC's Housing Policy, pretrial detainees are strip searched in their living quarters according to a schedule developed by supervisory DOC officials.  (Directive 4508R-B, at NYC1209, Ex. 9; Conry Dep. 98:6-99:17.)

101.    There is no written policy setting forth how to choose which living quarters to search, and DOC does not provide any formal training on how to schedule living quarters searches.  (Pagan Dep. 130:23-133:22, Ex. 135.)

102.    DOC's Housing Policy provides that a pretrial detainee *must* be strip searched whenever the detainee's living quarters are searched; neither the circumstances of the particular arrest, nor the characteristics of the particular detainee are relevant to enforcement of the Housing Policy.  (Directive 4508R-B, Ex. 9; Archibald Dep. 167:20-169:5, Ex. 122; Davis Dep. 188:16-189:11, 216:23-217:15, Ex. 127; Conry Dep. 78:22-79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113; Archibald Dep. 73:15-74:7; 82:2-83:11, Ex. 122.)

103.    DOC 's Housing Policy does *not* require that searches conducted pursuant to the Housing Policy be conducted only after a particularized inquiry has yielded reasonable suspicion to believe that the pretrial detainee is concealing a weapon or other contraband.  (Directive 4508R-B, Ex. 9; Walsh Dep. 109:9-110:11, Ex. 141; Archibald Dep. 73:15-74:7; 82:2-83:11; 167:20-169:5, Ex. 122; Davis Dep. 188:16-189:11, 216:23-217:15, Ex. 127; Conry Dep. 78:22-79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113.)

104.    Pursuant to the Housing Policy, DOC officers have a policy and practice of strip searching detainees without undertaking any individualized determination as to whether a detainee might be concealing weapons or contraband.  (Directive 4508R-B, Ex. 9; Walsh Dep. 109:9-110:11, Ex. 141; Archibald Dep. 167:20-169:5; Davis Dep. 188:16-189:11, 216:23-217:15, Ex. 127; Conry Dep. 78:22-79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113;

Archibald Dep. 73:15-74:7; 82:2-83:11, Ex. 122.)

105.    The Housing Policy mandates the strip search of all detainees, regardless of (a)

their classification level; (b) whether they have a Red ID for having have been found previously

in jail with a weapon; (c) whether they have a Green ID for having been found previously in jail

with other contraband; (d) whether they are identified as a gang member; (e) whether they are

identified as an intended contraband recipient.  (Directive 4508R-B, Ex. 9; Archibald Dep.

73:15-74:7; 82:2-83:11; 167:20-169:5, Ex. 122; Davis Dep. 188:16-189:11, 216:23-217:15, Ex.

127; Conry Dep. 78:22-79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113.)

106.    Pursuant to the Housing Policy, DOC officers have a policy and practice of strip

searching all pretrial detainees whenever the detainee's living quarters are searched without

making any determination as to whether they have been arraigned on a charge under the New

York Penal Code that was related to possession or use of a drug and/or weapon.  (Directive

4508R-B, Ex. 9; Joseph Dep. 49:7-52:15, Ex. 130; Archibald Dep. 73:15-74:7; 82:2-83:11;

167:20-169:5, Ex. 122; Davis Dep. 188:16-189:11, 216:23-217:15, Ex. 127; Conry Dep. 78:22-

79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113.)

107.    Pursuant to the Housing Policy, it is the policy and practice for DOC officers

performing strip searches not to inquire whether the detainee was arraigned on a charge under the

New York Penal Code that related to possession or use of a drug and/or weapon. (Directive

4508R-B, Ex. 9; Joseph Dep. 49:7-52:15, Ex. 130; Archibald Dep. 73:15-74:7; 82:2-83:11;

167:20-169:5, Ex. 122; Davis Dep. 188:16-189:11, 216:23-217:15, Ex. 127; Conry Dep. 78:22-

79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113.)

108.    Pursuant to the Housing Policy, it is the policy and practice for DOC officers

and/or DOC supervisory personnel ordering strip searches not to inquire if the detainee was

arraigned on a charge under the New York Penal Code that related to possession or use of a drug

and/or weapon. (Directive 4508R-B, Ex. 9; Joseph Dep. 49:7-52:15, Ex. 130; Archibald Dep.

73:15-74:7; 82:2-83:11; 167:20-169:5, Ex. 122; Davis Dep. 188:16-189:11, 216:23-217:15, Ex.

127; Conry Dep. 78:22-79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113.)

109.    Pursuant to DOC's Housing Policy, a pretrial detainee's living quarter may be

searched and the pretrial detainee strip searched even if DOC possesses no intelligence that the

pretrial detainee or others in the cell block or dormitory possess contraband and/or weapons.

(Directive 4508R-B, Ex. 9; Joseph Dep. 49:7-52:15, Ex. 130; Archibald Dep. 73:15-74:7; 82:2-

83:11; 167:20-169:5, Ex. 122; Davis Dep. 188:16-189:11, 216:23-217:15, Ex. 127; Conry Dep.

78:22-79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113.)

110.    Pursuant to DOC's Housing Policy, a pretrial detainee's living quarters may be

searched and the pretrial detainee strip searched even if DOC possesses no intelligence that a

fight and/or other incident has recently occurred or is likely to occur in the near future. (Directive

4508R-B, Ex. 9; Joseph Dep. 49:7-52:15, Ex. 130; Archibald Dep. 73:15-74:7; 82:2-83:11;

167:20-169:5, Ex. 122; Davis Dep. 188:16-189:11, 216:23-217:15, Ex. 127; Conry Dep. 78:22-

79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113.)

111.    DOC officers are required to conduct strip searches pursuant to the Housing

Policy even if they have no reason to believe the particular detainees strip searched are

concealing contraband. (Directive 4508R-B, Ex. 9; Joseph Dep. 49:7-52:15, Ex. 130; Archibald

Dep. 73:15-74:7; 82:2-83:11; 167:20-169:5, Ex. 122; Davis Dep. 188:16-189:11, 216:23-217:15,

Ex. 127; Conry Dep. 78:22-79:10, 83:3-21, 101:2-7, Ex. 126; Walsh Decl. ¶ 6, Ex. 113.)

112.    The strip searches conducted pursuant to the Housing Policy are undertaken even

without any prior or intervening event or circumstance that would give rise to individualized

27

reasonable suspicion, or indeed suspicion of any sort. (Directive 4508R-B, Ex. 9; Joseph Dep.

49:7-52:15, Ex. 130; Archibald Dep. 73:15-74:7; 82:2-83:11; 167:20-169:5, Ex. 122; Davis Dep.

188:16-189:11, 216:23-217:15, Ex. 127; Conry Dep. 78:22-79:10, 83:3-21, 101:2-7, Ex. 126;

Walsh Decl. ¶ 6, Ex. 113.)

113.    Pursuant to DOC's Housing Policy, pretrial detainees may be strip searched even

if they have remained in continual DOC custody and under continual DOC supervision since the

last time they were strip searched. (Directive 4508R-B, Ex. 9; Conry Dep. 92:20-24, 88:14-16,

Ex. 126; Archibald Dep. 167:20-169:5, Ex. 122.)

114.    While DOC's Housing Policy provides that all detainees must be strip searched

when their living quarters are searched, some DOC officers (including low level officers)

exercise discretion and do not conduct strip searches of all detainees during housing searches.

There are no written guidelines guiding this discretion, and DOC officers are not provided with

training on this issue. (Pagan Dep. 106:2-108:3; 130:23-138:7, Ex. 135.)

### Partial Settlement of McBean Action

115.    On June 21, 2005, this Court so-ordered an agreement between defendants and

plaintiffs' counsel, Cardinale, Hueston & Marinelli, in partial settlement of this action.

(Stipulation and Order of Class Settlement, *McBean v. City of New York*, June 21, 2005

("*McBean* Partial Settlement Agreement"), attached as Ex. 119.)

116.    The "Settlement Class" for the strip search claims consisted of "pretrial detainees

who, between July 15, 1999 and July 22, 2002, were arraigned on certain misdemeanor,

violations, misdemeanor charges of civil contempt, and non-felony warrants regarding same, and

who, after arraignment, were strip-searched in DOC jails pursuant to the standard new admission

search procedure," otherwise known as the Prior Admission Policy. (McBean Partial Settlement

Agreement ¶ 1, Ex. 119.)

117.    The *McBean* Settlement Class did not include pretrial detainees "who, at the time they were admitted to DOC facilities, were charged with the following Penal Law Sections: (a) § 220.03, Criminal Possession of a Controlled Substance in the Seventh Degree, a class A misdemeanor; (b) § 220.45, Criminal Possession of a Hypodermic Instrument, a class A misdemeanor;(c) § 220.50, Criminal Possession of Drug Paraphernalia in the Second Degree, a class A misdemeanor; (d) § 221.05, Unlawful Possession of Marijuana, a violation; (e) § 221.10, Criminal Possession of Marijuana in the Fifth Degree, a class B misdemeanor; (f) § 221.15, Criminal Possession of Marijuana in the Fourth Degree, a class A misdemeanor; (g) § 221.35, Criminal Sale of Marijuana in the Fifth Degree, a class B misdemeanor; (h) § 221.40, Criminal Sale of Marijuana in the Fourth Degree, a class A misdemeanor; (i) § 265.01, Criminal Possession of a Weapon in the Fourth Degree, a class A misdemeanor; and (j) § 265.06, Unlawful Possession of a Weapon upon School Grounds, a violation; or were charged pursuant to the following New York City Administrative Code Sections: (a) § 10-131, Firearms; (b) § 10-133, Possession of Knives or Instruments; and (c) § 10-134, Prohibition on Sale of Certain Knives; or were charged pursuant to Vehicle and Traffic Law 21 1192(4), Operating a Motor Vehicle while impaired by the use of a drug."

## Undisputed Facts Concerning Representative Named Plaintiffs

### Kenneth Williams

118.    Kenneth Williams is 32 years old and resides in New York City. (Deposition of Kenneth Williams, Sept. 15, 2006 ("Williams Dep.") 5:12, attached as Ex. 81.) He works for the New York City Parks and Recreation Department and the YMCA. (Williams Dep. 46:24, Ex. 81.)

119.    On or about January 19, 2002, Mr. Williams was arrested. (Declaration of Kenneth Williams, June 17, 2004 ("Williams Decl.") ¶ 3, attached as Ex. 82.)

120.    After being arraigned for criminal contempt in the second degree (a class A misdemeanor) and for criminal marijuana possession (a misdemeanor), Mr. Williams was brought to the Manhattan Detention Center (otherwise known as "MDC," the Manhattan House of Detention, and the "Tombs") where he was strip searched with several other detainees pursuant to the Prior Admission Policy. (Williams Decl. ¶ 7, Ex. 82; Williams Dep. 136:7-15, Ex. 81.)

121.    During the process, Mr. Williams asked the correctional officers if the strip search was necessary, and they responded that it was standard procedure for all post-arraignment detainees housed in DOC facilities who are charged with misdemeanors or non-criminal offenses. (Williams Decl. ¶ 5, Ex. 82; Williams Dep. 150:8-20, Ex. 81.)

122.    A few days later, Mr. Williams was brought from MDC to Rikers Island, where he was strip searched three additional times. (Williams Dep. 186:1-2, Ex. 81.)

123.    During these housing searches, Mr. Williams was forced along with other detainees to remove all clothing, bend over, spread his butt cheeks, and cough while his anal cavity was exposed. (Williams Dep. 174:14-18, Ex. 81.)

124.    All strip searches were conducted in the presence of at least five other detainees (Williams Dep. 172:8-18, Ex. 81) and between two and four correctional officers (Williams Dep. 139:14-22; 171:1; 198:5-6; 208:18-22; 224:10-16, Ex. 81).

125.    During at least one of these searches, correctional officers taunted the prisoners and video taped the strip searches. (Williams Dep. 213: 6-21; 217:5-21, Ex. 81.)

### Chareama Bolds

126.    Chareama Sharett Bolds is 31 years old and resided in Brooklyn at the time she joined this case. (Deposition of Chareama Bolds, Mar. 8, 2007 ("Bolds Dep.") 5:11-12; 12:18-19, attached as Ex. 85.)

127.    Ms. Bolds was incarcerated at Rikers Island between November 14 and 21, 2006, after being arraigned on charges of assault in the third degree (a misdemeanor), resisting arrest (a misdemeanor), endangering the welfare of a child (a misdemeanor), menacing (a misdemeanor), and harassment in the second degree (a violation).  (Criminal Complaint of Chareama Bolds, Nov. 13, 2006 ("Bolds Crim. Compl.") at 1, attached as Ex. 86.)

128.    Though she had already been pat frisked once at the precinct (Bolds Dep. 136:4-10, Ex. 85) and another time at central booking (Bolds Dep. 137: 1-11, Ex. 85), when she arrived at RMSC on Rikers Island, Ms. Bolds was strip searched (Bolds Dep. 141:8-9, Ex. 85).

129.    During this initial admission strip search, Ms. Bolds was required to take off all her clothing, squat down, bend over, spread her butt cheeks, and lift her breasts so that correctional officers could visually inspect those parts of her body.  (Bolds Dep. 155:10-25; 156:1-9; 157:6-8, Ex. 85.)  This strip search was conducted of four inmates total and by four officers.  (Bolds Dep. 152:18-20, Ex. 85.)

130.    Ms. Bolds was subjected to several additional strip searches while detained at RMSC in November 2006.  Ms. Bolds underwent two strip searches while in her dormitory housing area.  (Bolds Dep. 151:14-18, Ex. 85.)

131.    As with the previous strip search, here Ms. Bolds was again required to remove all clothing, squat, turn around, bend over, open her mouth, run her hands through her hair, lift her arms up, lift her breasts up, spread her butt cheeks, and cough while bent over.  (Bolds Dep. 156:2-23; 157:6-8; 159:18-25; 160:1-3, Ex. 85.)

132.    Both of these strip searches were in the presence of four other detainees (Bolds Dep. 152:2-4; 158:22-23, Ex. 85) and four correctional officers (Bolds Dep. 152:18-20; 158:17-23, Ex. 85).

133.    At least one of these searches was conducted in the presence of male correctional

officer. (Bolds Dep. 153:17-25; 154:1, Ex. 85.)

134.    Ms. Bolds was also strip searched before each of the approximately two trips she made to court during that period of incarceration. (Bolds Dep. 163:1-18, Ex. 85.)

135.    Correction officers would wake her up at 4:00 a.m., and before it was even light outside, she would be taken along with approximately sixty other detainees into the gymnasium of RMSC, where they were strip searched, six detainees at a time. (Bolds Dep. 163: 12-18; 164:4-12, Ex. 85.)

136.    The group searches were conducted in an open area, albeit slightly partitioned off from the rest of the gym. During these group strip searches, six correction officers would instruct six detainees to remove all clothing, bounce up and down, run their hands through their hair, lift their tongues, lift their breasts, squat, spread their butt cheeks, and cough. (Bolds Dep. 164:10-17, 23-25; 165:1; 166:1-9,.Ex. 85)

137.    At court, she was pat frisked (Bolds Dep. 172:1-11, Ex. 85), and when she arrived back at Rikers, she yet again underwent a group strip search (Bolds Dep. 172:15-22, Ex. 85).

138.    When menstruating, Ms. Bolds was never given a private search or exempted from the full strip search. (Bolds Dep. 76:7-15, Ex. 85.)

139.    In all her searches, Ms. Bolds saw that every woman was always strip searched with everyone else, and like everyone else, was required to remove all clothing, including their feminine pads. (Bolds Dep. 76:7-17, Ex. 85.)

140.    The only special provision that Ms. Bolds experienced for menstruating women was that they were given a new pad after the search is over. (Bolds Dep. 76:12-20, Ex. 85.)

### Foster Thomas

141.    Foster Lee Thomas is 55 years old and resides in Monroe County. (Deposition of Foster Thomas, Sept. 18, 2006 ("Thomas Dep.") 5:13; 10:14-15, 21, attached as Ex. 88.)  He

works and lives at The Boys' School, an all boys' Jewish academy.  (Thomas Dep. 18:3-20, Ex. 88.)

142.    On numerous occasions between 1999 and the present, including without limitation on June 2, 2000, December 16, 2001, February 17, 2002, April 6, 2002, November 20, 2002, February 29, 2004, and October 3, 2004, Mr. Thomas has been arraigned on misdemeanor charges (related to gambling and/or criminal trespass) and held as a pretrial detainee at a number of DOC facilities, including  Vernon C. Bain Center ("VCBC"), MDC, and several Rikers Island facilities (Criminal Record of Foster Thomas, Sept. 6, 2005 ("Thomas Criminal R."), attached as Ex. 101; New History NYSID Number Search for Foster Thomas ("Thomas History Search"), attached as Ex. 102; Thomas Dep. 37:7-22; 218:1-10; 235: 2, Ex. 88).

143.    Upon each admission, Mr. Thomas, along with between one to five other detainees, was instructed to remove all his clothing, turn around, bend over and spread his buttocks.  (Thomas Dep. 50:16-22; 110:5-11; 111:7-12; 123:16-22; 186:1-15, Ex. 88.)

144.    Approximately one to three corrections officers conducted these group, new admission strip searches.  (Thomas Dep. 59:1; 124:10-12, Ex. 88.)  The entranceway to the cells where the group admission strip searches were being conducted were kept open during the strip searches.  (Thomas Dep. 61:2-4; 114:11-20; 202:12-15, Ex. 88.)  On at least one occasion, approximately four other detainees filtered in during Mr. Thomas's search. (Thomas Dep. 61:2-4, Ex. 88.)

145.    While at the above DOC facilities as a pretrial detainee, Mr. Thomas was also strip searched each time before and after he traveled to court from the facility, which was at least twelve or thirteen times. (Thomas Dep. 64:4-16; 69:1-4; 110:10-11, 17-25; 111:13-22; 149:14-15; 188:9-11, Ex. 88.)

146.    These searches were conducted by approximately three or four corrections officers

33

(Thomas Dep. 71:1-4, 73:2-7; 45:16-22, Ex. 88), and in the presence of at least three to four

other detainees, some of whom entered the room during Mr. Thomas's strip search (Thomas Dep.

72:2-10, 177:15-20, 201:8-16, Ex. 88.)

147.    At Rikers, these exit strip searches were often conducted in an open hallway with

up to six other detainees.  (Thomas Dep. 166:1-16; 168:6-8, Ex. 88.)

148.    Mr. Thomas was also subject to weekly housing group strip searches.  (Thomas

Dep. 77:9-19; 84:5-9; 135:7-20; 141:4-8; 152:1-3; 187:8-17, Ex. 88.)

149.    All of the group strip searches were conducted with a similar procedure: detainees

were instructed to remove all their clothing, open their mouths, turn around, bend over and

spread their butt cheeks.  (Thomas Dep. 50: 19-22; 45:16-22; 67:16-21; 93:13-16; 110:10-11;

128:4-20; 153:1-5; 172:1-6; 190:1-5; 200:14-17; 220:6-12, Ex. 88.)

150.    Mr. Thomas underwent at least 27 strip searches during the detentions described

above, and in not a single one of these searches did correctional officers find a prohibited item on

Mr. Thomas or any other detainee.  (Thomas Dep. 77: 1-2; 96:13-17; 126:13-18; 129:14-21;

156:2-8; 173:7-18; 176:12-21; 191:19-24; 192:5-10; 201:17-25; 202:1-3; 221:21-25; 222:20-25,

Ex. 88.)

### David Sanchez

151.    David Sanchez is 36 years old and resides in the Bronx.  (Deposition of David

Sanchez, Mar. 8, 2007 ("Sanchez Dep."), attached as Ex. 93; Declaration of David Sanchez, Dec.

7, 2006 ("Sanchez Decl."), ¶ 2, attached as Ex. 95 )  Mr. Sanchez is employed as a personal

trainer.  (Sanchez Dep. 14:16-21, Ex. 93.)

152.    On or about November 12, 2006, Mr. Sanchez was arrested and searched twice at

the 48th police precinct and once at the 41st precinct.  During one of these searches at the

precinct, he was required to take off his two shirts, a belt and his shoe laces.  (Sanchez Dep.

26:13-25; 27:1-8, 28:6-8; 29:1; Ex. 93.)

153.   After being arraigned on charges of criminal sale of marijuana in the fourth degree (a misdemeanor), criminal possession of marijuana in the fifth degree (a misdemeanor) and unlawful possession of marijuana (a violation), he was taken to VCBC, a DOC facility, as a pretrial detainee.  (Declaration of David Sanchez, Dec. 7, 2006 ("Sanchez Decl."), ¶ 5, Ex. 95; Criminal Complaint of David Sanchez, Nov. 13, 2006 at 1, attached as Ex. 94.)  Mr. Sanchez spent a total of five days in jail.  (Sanchez Dep. 21:2-6, Ex. 93.)

154.   When Mr. Sanchez arrived at VCBC as a new admission detainee, he was led to a room where detainees were being taken, in groups of three to four, to be strip searched.  (Sanchez Dep. 36:15-25, Ex. 93.)

155.   During the group strip search, Mr. Sanchez was instructed to remove his clothing, put his arms out, run his fingers through his hair, lift his genitals, run his fingers through his mouth, turn around, and squat with his arms out.  (Sanchez Dep. 37:2-20, Ex. 93.)  Mr. Sanchez and the other detainees being strip searched were standing close enough to each other to touch shoulders and rub elbows while taking off their clothing.  (Sanchez Dep. 58:11-25, Ex. 93.)

156.   While the detainees were being strip searched, the corrections officers joked with each other and laughed at the detainees. (Sanchez Dep. 62:19-25, Ex. 93).  As Mr. Sanchez stood naked, two corrections officers described Mr. Sanchez as "a freak" and his tatoo body art as "sick."  (Sanchez Dep. 64:10-13, Ex. 93.)

157.   The strip search cell was open and Mr. Sanchez could see over ten other detainees in the cell opposite the strip search cell while as he was being strip searched.  (Sanchez Dep. 67:11-18, Ex. 93.)

### Julio Phitts

158.    Julio Phitts is 39 years old and is a resident of Fitchburg, Massachusetts. (Declaration of Julio Phitts, Jan. 10, 2007 ("Phitts Decl.") ¶ 2, attached as Ex. 97.)

159.    Mr. Phitts works in shipping for Starlite, a company in Townsing, Massachusetts, but he visits New York City frequently because his nine-year old son lives in New York. (*Id.*)

160.    In October 2005, Mr. Phitts was arraigned on assault charges, and was taken to Anna M. Kross Center ("AMKC"), a DOC facility, as a pretrial detainee where he was strip searched with five other detainees. (Deposition of Julio Phitts, Mar. 19, 2007 ("Phitts Dep.") 114:14-23; 115:22-25, 117:2, attached as Ex. 96.)

161.    The strip search room was an open room, uncovered by a sheet, curtain or any other type of partition. (Phitts Dep. 117:20-25; 118:1-3, Ex. 96.) Once in the strip search room, Mr. Phitts and the other detainees were instructed to remove all their clothing, lift their arms, run their hands through their hair, open their mouth, lift their genitals, run their fingers through their mouths, bend over at the waist, spread their buttocks, and squat. (Phitts Dep. 118:8-19, Ex. 96.)

162.    In October 2006, Mr. Phitts was arrested and arraigned on charges of assault (a misdemeanor). (Phitts Decl. ¶5, Ex. 97.)

163.    After his arraignment, Mr. Phitts was taken to AMKC, where he was strip searched with five other detainees. (Phitts Decl. ¶6, Ex. 97.)

164.    As in the 2005 strip search, Mr. Phitts was asked to take off all his clothing, bend over, spread his butt cheeks, squat, lift his feet, run his hands through his hair and lift his genitals. (Phitts Dep. 130:13-25, Ex. 96.)

165.    As in the previous strip search, Mr. Phitts was strip searched in an open room with five other detainees. (Phitts Dep. 132:5-7, 20-25, Ex. 96.)

166.    During those approximately nine days that Mr. Phitts was held at AMKC in

October 2006 as a pretrial detainee (New History NYSID Number Search of Julio Phitts at NYC14542, attached as Ex. 105), he was strip searched four times, once upon admission, once in a housing search, and once going to and once coming back from court.  (Phitts Dep. 137:6-12; 138:2-9, 139:5-7, Ex. 96.)

167.    Each of those strip searches were conducted in the same manner: he had to take off all his clothes, bend over, spread his buttocks, squat, lift his genitals, run his hands through his hair and fingers through his mouth, lift his arms, and show the soles of his feet.  (Phitts Dep. 139:23-25, 140:1-5, Ex. 96.)

168.    Nothing was ever recovered from his body.  (Phitts Dep, 141:6-11, Ex. 96.)

### Arthur Wallace

169.    Arthur Wallace is a resident of the Bronx.  (Deposition of Arthur Wallace, March 13, 2007 ("Wallace Dep.") 5:10-11, attached as Ex. 98.)

170.    On December 2, 2006, Mr. Wallace was arrested and arraigned on a misdemeanor and taken to VCBC.  (Wallace Dep. 36:5-9, Ex. 98;  Criminal Record of Arthur Wallace, Feb. 6, 2007 ("Wallace Crim. R.") at  NYC15513, Ex. 103; New History NYSID Number Search of Arthur Wallace ("Wallace Mov't.") at  NYC14648, Ex. 104.)

171.    He was incarcerated at VCBC as a pretrial detainee for approximately five days. (Wallace Dep. 46:18-19, Ex. 98; Wallace Crim. R. at  NYC15513, Ex. 103; Wallace Mov't., at NYC14648, Ex. 104.)

172.    Upon arrival, Mr. Wallace was taken with four other detainees to the admission search cell (Wallace Dep. 37:17-20, Ex. 98) and instructed to remove all clothing and squat (Wallace Dep. 38:2-6, Ex. 98).

173.    During this five-days at Rikers, Mr. Wallace was strip searched an additional two times, before and after appearing in court.  (Wallace Dep. 47:4-9, Ex. 98.)

174.    On or about October 30, 2006, Mr. Wallace was brought to VCBC, after being arrested and arraigned on charges of petit larceny (a misdemeanor) and criminal possession of stolen property in the fifth degree (a misdemeanor). (Criminal Complaint of Arthur Wallace, Oct. 30, 2006 at 1, attached as Ex. 99; Wallace Dep. 29:13-14, Ex. 98.)

175.    Mr. Wallace was accused of shoplifting $34.80 worth of gum from a Rite Aid Pharmacy. (*Id.*)

176.    He spent approximately five days incarcerated at VCBC as a pretrial detainee. (Wallace Dep. 61:1-4, Ex. 98; Wallace Crim. R. at NYC15512, attached as Ex.103.)

177.    Upon admission to VCBC, Mr. Wallace along with approximately four other detainees, was forced to strip search. (Wallace Dep. 57:3-14, Ex. 98.)

178.    Mr. Wallace was instructed to take all clothing off, put his hands up, squat, turn around and show his feet. (Wallace Dep. 58:1-4, Ex. 98.)

179.    During this period of detention, Mr. Wallace was strip searched before and after going to court from the facility. (Wallace Dep. 61:10-14, Ex. 98.)

180.    Nothing was ever recovered from his body. (Wallace Dep. 64:1-5, Ex. 98.)

181.    In July 14, 2006, Mr. Wallace was arrested and arraigned on trespassing and criminal possession of a controlled substance and taken to AMKC as a pretrial detainee. (Wallace Dep. 116:21-25, Ex. 98; Wallace Crim. R. at NYC15511, Ex. 103; Wallace Mov't. at NYC14648, Ex. 104.)

182.    Mr. Wallace spent two weeks at AMKC, and was strip searched twice when going to court. (Wallace Dep.120:18-24, Ex. 98; Wallace Mov't. at NYC14648, Ex. 104; Wallace Crim. R. at NYC15511, Ex. 103.)

183.    As previous strip searches, these two strip searches were conducted in a group of five detainees, and Mr. Wallace was instructed to remove all clothing, bend over, and squat.

(Wallace Dep. 123:12-25, Ex. 98.)

184.    In April 29, 2005, Mr. Wallace was arrested for a misdemeanor and was held at

VCBC for four days as a pretrial detainee.  (Wallace Dep. 68:2-3, Ex. 98; Wallace Crim. R. at

NYC15508, Ex. 103; Wallace Mov't. at  NYC14648, Ex. 104.)

185.    Upon admission, he was instructed along with four other detainees to take off all

his clothing, show the bottom of his feet, turn around, and squat.  (Wallace Dep. 68:18-22,

69:3-6, Ex. 98.)

186.    Approximately four days later, Mr. Wallace was strip searched twice on the same

day – before and after he went to court.  (Wallace Dep. 72:1-5, Ex. 98.)  The procedure was

conducted in a similar manner to the intake strip search, and was also conducted in a group with

five other detainees.  (Wallace Dep. 72:12-19, Ex. 98.)

187.    Mr. Wallace was also arrested and arraigned on May 21, 2002 for criminal

possession of a controlled substance (a misdemeanor), resisting arrest (a misdemeanor), criminal

contempt (a misdemeanor) and harassment (a violation).  (Wallace Dep., 22:4-6, Ex. 98; Wallace

Crim. R. at  NYC15498, Ex. 103).

188.    During the initial intake process on or about May 21, 2002, Mr. Wallace was strip

searched pursuant to the Prior Admission Policy.  (Wallace Dep. 77:25; 78:1-25; 79:4, Ex. 98.)

189.    This strip search was conducted in a group with approximately four other

detainees.  (Wallace Dep. 77:25; 78:1-25; 79:4, 93:17-19; 99:1-11; 100:2-5; 112:13-18, Ex. 98.)

190.    The procedure for this admission strip search was similar to the ones described

above.  He was required to remove all of this clothes, lift his arms, run his fingers through his

hair, open his mouth, bend over, and spread his buttocks with his hands.  (Wallace Dep. 77:25;

78:1-25; 79:4; 93:17-19; 99:1-11; 100:2-5; 112:13-18, Ex. 98.)

191.    After the arraignment on or about May 21, 2002, Mr. Wallace was held at VCBC

for four days where he was strip searched in the same manner as described above (Wallace Dep. 77:25-23; 78:1-3; 93:17-19:1-11; 100:2-5, Ex. 98; Wallace Mov't. at NYC14603, Ex. 104; Wallace Crim. R. at NYC15498, Ex. 103.)

192.    During those four days, Mr. Wallace underwent three additional group strip searches, one housing strip search, and one strip search before and after going to court. (Wallace Dep. 84:6-6-10, Ex. 98.)

193.    In addition to the arrests described above, Mr. Wallace has been admitted to other DOC facilities approximately 15 more times, many of these as a pretrial misdemeanor detainee since July 1999. (Wallace Dep. 142:24-25; 143:1-3, 146:1-5, Ex. 98; Wallace Crim. R., Ex. 103; Wallace Mov't., Ex. 104.)

194.    Mr. Wallace was strip searched upon every admission to the facility, and approximately ten times before and after going to court and was sometimes subject to a weekly housing strip search.  As part of many of these admission, housing, and exit searches, Mr. Wallace was always required to squat, and he was often forced to bend over and spread his buttocks with his hands. (Wallace Dep. 148:7-21; 176:3-4; 165:25; 166:1-7; 170:15-25; 171:1-3, Ex. 98.)

195.    Nothing was ever recovered from his body during these searches. (Wallace Dep. 159:9-14, Ex. 98.)

196.    Mr. Wallace is representative of the proposed class because he is frequently arrested, each time on misdemeanors or lesser crimes. (Wallace Crim. R., Ex. 103.)

197.    He has been in DOC custody following arraignment on many of these arrests, where he is subject to repeated unconstitutional strip searches. (Wallace Crim. R. Ex. 103; Wallace Mov't., Ex. 104.)

198.    He has also been arrested since joining this lawsuit. (Wallace Crim. R. at NYC15513, Ex. 103.)

### Daniel Velazquez

199.    Daniel Velazquez is 29 years old and lived on Staten Island at the time he joined this lawsuit.  (Deposition of Daniel Velazquez, Sept. 26, 2006 ("Velazquez Dep.") 16:6, 17:10, attached as Ex. 100.)

200.    Mr. Velazquez works for a company called Family Vending.  (Velazquez Dep. 16:19-20, 42:2-3, 58:20-21, Ex. 100.)

201.    On January 4, 2002, Mr. Velazquez was arrested for the possession and sale of marijuana and taken to the 13th precinct.  (Velazquez Dep. 74:10-24, 76:17-19, Ex. 100.)

202.    At the precinct, Mr. Velazquez was required to undergo a strip search conducted by two officers.  (Velazquez Dep. 77:2-10, Ex. 100.)

203.    After arraignment on misdemeanor charges of the criminal sale of marijuana and unlawful possession of marijuana, Mr. Velazquez was taken to MDC.  (Criminal Complaint of Daniel Velazquez, Jan. 5, 2002, attached as Ex. 107; New History NYSID Number Search of Daniel Velazquez at  NYC5764, attached as Ex. 106.)

204.    At MDC, Mr. Velazquez was instructed to remove all his clothing, raise his hands, lift his genitals, turn around, bend over, spread his buttocks and cough.  (Velazquez Dep. 90:2-4; 102:6-7, 19-24; 111:8-10; 147:17-23, Ex. 100.)

205.    At MDC, Mr. Velazquez was strip searched together with several other detainees. (Velazquez Dep. 103:23-25, 147:24-25, Ex. 100.)  This strip search was conducted by three officers and in full view of approximately a dozen other officers.  (Velazquez Dep. 127:2-23, Ex. 100.)

206.    Nothing was recovered from Mr. Velazquez or any of the other detainees. (Velazquez Dep. 123:14-24, Ex. 100.)

207.    After the admission search, Mr. Velazquez walked to the housing area and stumbled into an ongoing housing search.  (Velazquez Dep. 133:7-12, Ex. 100.)  Only a few

minutes after his intake search, Mr. Velazquez was pat frisked and then instructed to remove all his clothing, squat, and cough all over again. (Velazquez Dep. 139:1-5, 18-19, Ex. 100.)

208.    Mr. Velazquez was also strip searched when he came back to DOC facility from court. (Velazquez Dep. 167:5-8, Ex. 100.)

Dated:        July 23, 2007
              New York, New York

EMERY CELLI BRINCKERHOFF & ABADY LLP

75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

By:_____
       Elizabeth S. Saylor (ESS 8091)
       *Attorney for Intervenor-Plaintiffs*