UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
KADIAN MCBEAN, et al.,

                                        Plaintiffs,                    02 Civ. 05426 (GEL)(THK)

                        -against-                        _____

THE CITY OF NEW YORK, et al.
                                        Defendants.
-----------------------------------------------------------------------x
JOEL RAMOS, et al.,

                                        Intervenor-Plaintiffs,

                        -against-

THE CITY OF NEW YORK, et al.,
                                        Defendants.
-----------------------------------------------------------------------x


# Reply Memorandum of Law in Further Support of Plaintiffs' Motions for Summary Judgment, a Permanent Injunction and Class Certification, and in Opposition to Defendants' Motion for Summary Judgment


Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

*Attorneys for Plaintiffs and Class Counsel*

# TABLE OF CONTENTS

**PAGE NO(s):**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-x

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.     PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND A
PERMANENT INJUNCTION SHOULD BE GRANTED AND
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.     Defendants Are Liable For Strip Searching at Admission
Misdemeanor Detainees Arraigned on Drug and/or Weapons
Charges From July 15, 1999 Through July 22, 2002 and From
July 23, 2002 Through October 4, 2007 . . . . . . . . . . . . . . . . . . . . . . . 5

          1.     Defendants cannot escape liability by attempting to
show *post hoc* that correctional officers *could have*
formed reasonable suspicion needed to strip search
some of the plaintiffs and class members . . . . . . . . . . . . . . . . . . 6

          2.     Arraignment on a charge related to drugs or weapons
by itself does not constitute individualized reasonable
suspicion under *Shain* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          3.     Even if certain drug or weapon charges *per se* constitute
individualized suspicion under *Shain* (which they do not)
defendants' list of drug and/or weapon- related charges is
overbroad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     B.     Defendants' Current Blanket Policies of Strip Searching
Misdemeanor Pretrial Detainees in Their Housing Areas
and Before Transporting Them are Unconstitutional And
Should Be Enjoined Permanently . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          1.     *Shain, N.G.* and *Hodges* control; the *Covino* standard
does not apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

2. Even if *Covino* did apply, plaintiffs should still win summary judgment on the Housing and Exit Policies . . . . . . . . . . . . . . . . 23

3. Defendants' reliance on contraband recovery incidents is inadmissible and off-point; DOC has never actually determined whether strip searches are an effective tool to find or deter contraband . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C. Qualified Immunity Does Not Bar Plaintiffs' Claims . . . . . . . . . . . . . . 33

D. Defendants' Procedural Arguments Are Without Merit and Fail to Provide Any Basis for Denying Plaintiffs' Motions . . . . . . . . . . 35

1. The class representatives have standing to seek injunctive relief on the Housing and Exit Policies . . . . . . . . . . . . . . . . . . . . 35

2. The Prison Reform Litigation Act is not a bar to plaintiffs' and the putative classes' claims . . . . . . . . . . . . . . . . . . . . . . . . . 38

(a) Neither the PLRA exhaustion requirement nor the physical injury provision bars this suit . . . . . . . . . . . . . . . 39

(b) The injunctive relief that plaintiffs seek is appropriately and narrowly tailored. . . . . . . . . . . . . . . . . . . . . . . . . . . 43

3. Claims relating to post-admission strip search policies were addressed by the original complaint in this action and as such, plaintiffs have not improperly expanded the scope of the case . . 44

4. There is no bar to plaintiffs' claims based on the statute of limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

5. Defendants' arguments of res judicata and accord/satisfaction are frivolous and should be rejected, particularly given the history of this action . . . . . . . . . . . . . . . . 48

6. Miscellaneous procedural issues . . . . . . . . . . . . . . . . . . . . . . . . 50

II. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION SHOULD BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

A. Plaintiffs' Proposed Rule 23(b)(2) Class Does Not Include Felons . . . . 52

B.     Defendants' Claim That Housing and Exit Searches Are in Service of Different Goals Is Irrelevant ................................... 52

C.     Defendants' Ascertainability Argument Is Confused .............. 53

D.     Defendants' Argument That Plaintiffs Cannot Adequately Represent Absent Class Members Who Were Strip Searched During Months Different From Their Own Is Frivolous .......................... 54

CONCLUSION ......................................................... 56

## TABLE OF AUTHORITIES

**PAGE NO(s):**

*African Trade & Info. Ctr., Inc. v. Abromaitis,*
    294 F.3d 355 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Ahmed v. Dragovich,*
    297 F.3d 201 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Allegheny Co. Prison Employees Independent Union v. Co. of Allegheny,*
    315 F. Supp. 2d 728 (W.D. Pa. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*American Pipe & Const. Co. v. Utah,*
    414 U.S. 538 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47, 48

*Arruda v. Fair,*
    710 F.2d 866 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Baby Neal ex rel. v. Casey,*
    43 F.3d 48 (3 rd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Bacon v. Kolender,*
    No. 05-310, 2007 WL 2669541 (S.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bame v. Clark,*
    466 F. Supp. 2d 105 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Bell v. Wolfish,*
    441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) . . . . . . . . . . . . . . . . . . . . . . . 10, 23

*Billingsley v. Shelby County Dep't of Correction,*
    No. 02-2920, 2004 WL 2757915 (W.D. Tenn., Nov. 24, 2004) . . . . . . . . . . . . . . . . . . 42

*Booth v. Churner,*
    532 U.S. 731 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Bull v. City & County of San Francisco,*
    No. 03-1840, 2006 WL 449148 (N.D. Cal. Feb. 23, 2006) . . . . . . . . . . . . . . . . . . . . . 31

*Chandler & Price Co. v. Brandtjen & Kluge, Inc.,*
    296 U.S. 53 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 38

*Cox v. Malone,*
  199 F. Supp. 2d 135, 140 (S.D.N.Y.), *aff'd,*
  No. 02-161, 2003 WL 366724 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Craft v. County of Berndardino,*
  468 F. Supp. 2d 1172 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

*Craft v. San Bernardino,*
  486 F.Supp.2d 1172 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Crown, Cork & Seal Co. v. Parker,*
  462 U.S. 345, 350-51 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Daniels v. City of New York,*
  198 F.R.D. 409 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Deshawn v. Safir,*
  156 F.3d 340 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Dodge v. County of Orange,*
  282 F.Supp.2d 41 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

*Duamutef v. Leonardo,*
  No. 91-1100, 1993 WL 428509 (N.D.N.Y. Oct. 22, 1993), *adopted by,*
  No. 91-1100 1994 WL 86700 (N.D.N.Y., Mar. 7, 1994) . . . . . . . . . . . . . . . . . . . . 19, 25

*Elk v. Townson,*
  839 F.Supp. 1047 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Espinosa v. The Delgago Travel Agency,*
  2006 WL 2792689 (S.D.N.Y. Sept. 27, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Farmer v. Perrill,*
  288 F.3d 1254 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Foote v. Spiegel,*
  118 F.3d 1416 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Frey v. Masters,*
  493 U.S. 977 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Gibson v. Kendrick,*
   No. 04-2960, 2005 WL 1309161 (E.D. La., May 19, 2005) . . . . . . . . . . . . . . . . . . . . . . 42

*Greig v. Goord,*
   169 F.3d 165 (2d Cir.1999); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Harris v. Garner,*
   216 F.3d 970 (11th Cir. 2000) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Hartley Pen Co. v. Lindy Pen Co., Inc.,*
   16 F.R.D. 141 (S.D. Cal. 1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Hartline v. Gallo,*
   No. 03-1974, 2006 WL 2850609 (E.D.N.Y. Sept. 30, 2006) . . . . . . . . . . . . . . . . . . 9, 10

*Hemphill v. New York,*
   380 F.3d 680 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-40, 40

*Hills v. Bogans,*
   735 F.2d 391 (10th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hodges v. Stanley,*
   712 F.2d 34 (2d Cir. 1983) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22, 23, 25

*Hurley v. Ward,*
   549 F. Supp. 174 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Nassau County Strip Search Cases,*
   461 F.3d 219 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In Re Rezulin Prods. Liab. Litig.*
   2005 WL 26867 (S.D.N.Y. Jan. 5, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Iqbal v. Hasty,*
   490 F.3d 143 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Janes v. Hernandez,*
   215 F.3d 541 (5th Cir. 2000), *cert. denied,*
   531 U.S. 1113 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Johnson v. Newburgh Enlarged School Dist.,*
   239 F.3d 246 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Jones v. Bock,*
    -- U.S. --, 127 S.Ct. 910 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Jones v. Parmley,*
    465 F.3d 46 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Kelsey v. County of Schoharie,*
    No. 04-299, 2005 WL 1972557 (N.D.N.Y. Aug. 5, 2005) . . . . . . . . . . . . . . . . 41, 42, 43

*Kerr v. Puckett,*
    138 F.3d 321 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

*Kolendar v. Lawson,*
    461 U.S. 352 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Liner v. Goord,*
    196 F.3d 132 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Logan v. Shealy,*
    660 F.2d 1007 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Mack v. Suffolk County,*
    191 F.R.D. 16 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Marisol A. v. Giuliani,*
    136 F.3d 372 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Masters v. Crouch,*
    872 F.2d 1248 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Morgan v. Ward,*
    699 F. Supp. 1025 (N.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*N.G. v. Connecticut,*
    382 F.3d 225 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 22

*Nerness v. Johnson,*
    401 F.3d 874 (8th Cir. 2005) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Norton v. City of Marietta,*
    432 F.3d 1145 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Ortiz v. McBride*,
   380 F.3d 649 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Porter v. Nussle*,
   534 U.S. 516 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Roberts v. State of Rhode Island*,
   239 F.3d 107 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Romo v. Champion*,
   46 F.3d 1013 (10th Cir.), *cert. denied*,
   516 U.S. 947, 116 S.Ct. 387, 133 L.Ed.2d 309 (1995) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Rose v. Saginaw Co.*,
   No. 01-10337, 2005 U.S. Dist. Lexis 29567 (E.D. Mich., Nov. 21, 2005) . . . . . . . . . . 42

*Sarnicola v. Westchester*,
   229 F.Supp.2d 259, 273-74 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Security & Law Enforcement Empl. v. Carey*,
   737 F.2d 187 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Shain v. Ellison*,
   273 F.3d 56 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 17, 20, 21, 23, 24, 34

*Shain v. Ellison*,
   356 F.3d 211 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Sutton v. Hopkins Co.*,
   No. 403-003, 2005 WL 3478152 (W.D. Ky., Dec. 19, 2005) . . . . . . . . . . . . . . . . . . . . 42

*Thompson v. Carter*,
   284 F.3d 411 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Thompson v. City of Los Angeles*,
   885 F.2d 1439 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Wachtler v. County of Herkimer*,
   35 F.3d 77 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Way v. Ventura*,
   445 F.3d 1157 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 27

*Williams v. City of New York,*
    No. 05-10230, 2007 WL 2214390 (S.D.N.Y. July 26, 2007)  . . . . . . . . . . . . . . . . . . 9, 10

## FEDERAL STATUTES

18 U.S.C. § 3626(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

18 U.S.C. § 3626(a)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

42 U.S.C. § 1997e(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

42 U.S.C. § 1997e(e)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 43

## STATE STATUTES

NYC Administrative Code, § 10-131  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

NYC Administrative Code, § 10-133  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

NYC Administrative Code, § 10-134  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Penal Law § 220 03  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Penal Law § 220 45  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Penal Law § 220 50  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Penal Law § 221 05  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Penal Law § 221 10  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Penal Law § 221 15  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Penal Law § 221 35  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

Penal Law § 221 40  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Penal Law § 265 01  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Penal Law § 265 06  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Penal Law § 265 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Penal Law § 265 35(3)(c ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

N.Y. VTL § 1192(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

N.Y. VTL § 1193 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**FEDERAL RULES**

Fed. R. Civ. P. 23(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 55, 53, 54, 55

Fed. R. Civ. P. 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 53, 55

Foster Thomas, Daniel Velazquez, Kenneth Williams, Arthur Wallace, Julio Phitts, Chareama Bolds, and David Sanchez[1] ("plaintiffs"), submit this memorandum of law in further support of intervenor-plaintiffs' ("plaintiffs") motions for partial summary judgment, a permanent injunction, and class certification, and in opposition to defendants' motion for summary judgment.

## PRELIMINARY STATEMENT

As set forth more fully in Plaintiffs' opening brief ("Pls. Br."), plaintiffs do not seek an overhaul of DOC's extensive search practices that have long been in place.[2]  Instead, plaintiffs seek only to give genuine meaning and effect to the limited and narrow constitutional rule that *does* exist – that invasive strip searches of non-felony pretrial detainees are permitted only after some modicum of individualized cause has been established, and that when strip searches are conducted, the brutalizing and humiliating nature of *en masse* searches be prohibited.  (Pls. Memo. Introduction at 1-7.)  As such, plaintiffs seek entry of summary judgment, class certification, and an injunction with respect to the Housing and Exit Policies

---

[1]  David Sanchez was not specifically listed in the opening memorandum because the evidence remained unclear whether he had been subjected to a strip search that was pertinent to the instant motions for relief.  He has since clarified through a sworn statement that he was subjected to a strip search before leaving for court on November 17, 2006 while being held as a pretrial detainee on a misdemeanor. He was ordered to walk through a magnetometer, face the wall, pull his underwear down to his ankles, lift his arms and wiggle his fingers. (Declaration of David Sanchez, August 15, 2007 ("Sanchez Decl. II") ¶¶ 5, 15, Ex. 152).

[2]  Plaintiffs also reiterate what we have stated many times before and which defendants appear deliberately to ignore – that we do not concede that any of DOC's other search practices are in fact constitutional.  (*Compare* Pls. Br. at n.4 *with* Defs. Br. at 6.)

1

which require the blanket, group strip searches of non-felony pretrial detainees.[3]

          In this respect, defendants' opposition papers only confirm what plaintiffs set forth in their opening brief – that there simply are no disputed issues of material fact and that these Policies should be enjoined under governing law.  In particular, the arguments on which defendants rely are the same ones they presented as an *amicus* to the Second Circuit in *Shain v. Ellison*, and which that court *expressly* rejected – that the *Covino* prison standard should apply, and that under that lower standard, blanket strip searches are reasonably related to DOC's penological interests.  As set forth below, defendants are plainly wrong on the law: the governing standard for pretrial detainees charged with misdemeanors at DOC remains *Shain* even for Housing and Exit strip searches, and individualized suspicion, which indisputably is not required by the blanket and uniformly applicable Housing and Exit Policies, must be required.  Moreover, even if this Court were to apply a lower standard (which we respectfully submit it should not), plaintiffs' motion for summary judgment should be granted because humiliating and invasive *group* body cavity strip searches cannot be justified as a means of serving *any* penological interest, and because defendants now seek to rely on untested evidence produced long after the close of discovery – a prejudicial fact that could only be corrected by granting plaintiffs' Rule 56(f) motion for more discovery.

          Moreover, plaintiffs ask that this Court follow well-established, controlling law that forbids defendants now from creating *post hoc* justifications for blanket *admission* strip searches of non-felony detainees charged with drug- or weapon-related offenses, and likewise

---

[3]  The named plaintiffs also seek summary judgment on these claims for purposes of seeking damages individually; no class-wide damages are sought with respect to the Housing and Exit Policies.

enter summary judgment for plaintiffs and certify a 1999-2002 class in this regard.

As the Court is well aware, defendants recently stipulated to facts they could no longer conceal or deny – that DOC continued to strip search all non-felony detainees upon their admission into DOC up and through at least October 4, 2007, even after protesting loudly and repeatedly under oath throughout this litigation, including at a preliminary injunction hearing in December 2002, that they had stopped such unconstitutional conduct on July 23, 2002.  As part of the Stipulation and Order settling that aspect of the parties' dispute, defendants notably stipulated to a number of several other significant points that are pertinent to the open questions now before the Court.

First, defendants conceded and agreed that class certification was the appropriate mechanism both for purposes of injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2), and also for purposes of seeking and adjudicating damage claims under Fed. R. Civ. P. 23(b)(3).  In particular, defendants agreed to certify an "Admission Injunctive Class" of all non-felony new admission inmates who have been or will be admitted to DOC custody, and also agreed to certify two classes – (1) non-felony detainees *with* drug- and weapon-related charges and (2) non-felony detainees *without* drug- and weapon-related charges – seeking damages for past admission strip searches conducted from July 23, 2002 through October 4, 2007.   (Stipulation & Order, Oct. 4, 2007, § I  ("Stip. II").  )  And of course, defendants had already long ago agreed to certify a Rule 23(b)(3) class for damages awards for 1999-2002 detainees admitted into DOC custody on non-felony charges unrelated to drug and weapon offenses, which this Court approved.  *See McBean v. City of New York*, 228 F.R.D. 487 (S.D.N.Y. 2005) (certifying damages class of pre-trial detainees who were strip searched upon admission to DOC facilities) ("*McBean I*").

3

Notwithstanding these concessions, defendants continue to oppose, at times with borderline frivolous arguments, that a Rule 23(b)(2) class for non-felony detainees subjected to Housing and Exit strip searches and a Rule 23(b)(3) class for 1999-2002 non-felony new admission detainees charged with drug/weapon related offenses is inappropriate. (*See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment and in Opposition to Plaintiff-Intervernors' Motions, Aug. 31, 2007 ("Def. Br.") at 60-78.) Such arguments hold no weight and should be rejected; plaintiffs' classes should be certified. (*See infra* § II.)

Second, defendants have now affirmatively stipulated and conceded what the record evidence has long shown, that: "DOC officers and supervisory personnel strip searched members [of the 2002-2007 non-felony admission classes] without making any determination or knowing whether they had been arraigned on a charge under the New York Penal Code that was related to the possession or use of a drug and/or weapon." (Stip. II. at 3, Ex. 561.) Defendants have likewise admitted that this was as true for DOC officers subjecting individuals to blanket admission strip searches from 1999-2002. (Def. Rule 56.1 Resp. ¶¶ 15-32, Ex. 200.) Notwithstanding these undisputed facts, and notwithstanding this Court's unambiguous statement of the law in a decision issued in this same case – that "[i]t is indeed well-settled that reasonable suspicion must exist at the time the search is conducted, not supplied *post hoc,*" *McBean v. City of New York*, 228 F.R.D. 487, 497 (S.D.N.Y. 2005) – defendants still continue to argue that they are not liable for unconstitutionally subjecting individuals to blanket strip searches upon admission who were charged with drug/weapon-related offenses. (Def. Br. at 41-44.) Remarkably, defendants *completely ignore* the well-settled law concerning *post hoc* justifications, and blithely argue that nonetheless they should not be held liable. Because

4

defendants arguments in this regard similarly are without merit, and because the parties have

agreed that the drug/weapon issue is identical for both those subjected to admission strip searches

and charged with drug/weapon misdemeanor offenses in 1999-2002 and in 2002-2007, the Court

should enter summary judgment for plaintiffs on this point as well.[4]

**ARGUMENT**

**I.      PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND A PERMANENT INJUNCTION SHOULD BE GRANTED AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED**

**A.      Defendants Are Liable For Strip Searching at Admission Misdemeanor Detainees Arraigned on Drug and/or Weapons Charges From July 15, 1999 Through July 22, 2002 and From July 23, 2002 Through October 4, 2007**

Defendants attempt to argue that they should not be held liable for blanket

admission strip searches of inmates charged with drug or weapon related misdemeanor offenses.

They do so only by ignoring governing law, and plaintiffs respectfully submit that this Court

should grant summary judgment to plaintiffs in this regard.

---

[4] Plaintiffs originally moved only for summary judgment with respect to the admission policy in effect through July 22, 2002 as it applied to those charged with drug or weapon offenses. Given defendants' recent admission that DOC continued its blanket practice of strip searching all misdemeanor detainees, regardless of the nature of their charges, the parties have agreed that the admission practice in effect from July 23, 2002 through October 4, 2007 also is ripe for summary judgment. Because defendants have already agreed to pay damages to those strip searched on charges unrelated to drugs and/or weapons, the only new issue for the Court is whether defendants are liable for strip searching those arraigned on non-felony drug and/or weapon charges from July 23, 2002 through October 4, 2007. The parties agree that this issue is identical to the issue of whether defendants are liable for admission strip searches of those arraigned on drug and/or weapon charges from 1999 to 2002, and that addressing it through these submissions is the most efficient approach.

5

1.     **Defendants cannot escape liability by attempting to show *post hoc* that correctional officers *could have* formed reasonable suspicion needed to strip search some of the plaintiffs and class members**

As explained in detail in plaintiffs' opening brief, the Supreme Court and Second Circuit have both repeatedly held that defendants cannot justify searches *post hoc* based on facts that were not relied upon at the time the searches were conducted.  (Pls. Br. Part I.C.2 (citing and discussing extensive case law); *McBean v. City of New York*, 228 F.R.D. 487, 497 (S.D.N.Y. 2005) ("It is indeed well-settled that reasonable suspicion must exist at the time the search is conducted, not supplied post hoc.").)

Defendants do not even once address this argument in their 89-page brief, despite admitting that DOC officers conducting strip searches, and those supervising officers ordering the strip searches, did not rely on or even know the nature of the charges on which plaintiffs and class members were arraigned either in the 1999-2002 or the 2002-2007 period.  (Defs. Rule 56.1 Resp. ¶ 23, Ex. 200 (Defendants admit that until July 22, 2002 "DOC strip searched all pretrial detainees during the new admission process without making any determination as to whether they had been arraigned on a charge under the New York Penal Code that was related to possession or use of a drug and/or weapon.")[5]; Stip. II. at 3, Ex. 561 (For those subjected to strip

---

[5]  While quibbling with the language of plaintiffs' statements, defendants also admitted that through July 22, 2002, DOC officers were unaware of the nature of the charges on which misdemeanor detainees were arraigned and that all detainees were strip searched pursuant to a blanket mandatory policy.  (Defs. Rule 56.1 Resp. ¶ 15, Ex. 200 ("Prior to July 2002, all new admission inmates were subject to a strip frisk with a visual body cavity search irrespective of their charges."); *id.* ¶ 27 ("Generally officers were aware only of the type of the charge," that is whether it was a misdemeanor or felony, not whether it was a drug or weapon charge.); *id.* ¶ 24 ("Prior to July 22, 2002, the nature of the pretrial detainees' crime was not a factor to be considered when strip searches of said detainees were conducted as part of the admission process."); *see also generally id.* ¶¶ 15-32.)

searches from 2002-2007, "DOC officers and supervisory personnel strip searched members of the aforementioned classes *without making any determination or knowing* whether they had been arraigned on a charge under the New York Penal Code that was related to possession or use of a drug and/or weapon.") (emphasis added).)

Given defendants' admissions that DOC officers conducted admission strip searches from July 15, 1999 through October 4, 2007 pursuant to *blanket* policies that provided for strip searches of all new admissions, and that they conducted the strip searches without knowing what charges the detainees had been arraigned on, defendants cannot escape liability by arguing now *post hoc* that DOC had reasonable suspicion to strip search those arraigned on charges related to drugs or weapons under the New York Penal Code.  Presumably aware of this, defendants did not even attempt to challenge the clearly established law (1) that "it is unconstitutional for jail officials to strip search pre-trial detainees who have been arraigned on misdemeanor or lesser charges, absent a reasonable suspicion to believe that they were concealing contraband based on individualized circumstances," *McBean III*, 2007 WL 2947448, at *1 (citing *Shain*, 273 F.3d at 66); or (2) that the necessary reasonable suspicion cannot be manufactured based on facts not relied upon at the time of the search, *see e.g.*, *In re Nassau County Strip Search Cases*, 461 F.3d 219, 224 (2d Cir. 2006).

For this reason alone, summary judgment should be entered on plaintiffs' behalf in this regard.  The Court need not address any other arguments.

2.     **Arraignment on a charge related to drugs or weapons by itself does not constitute individualized reasonable suspicion under *Shain***

Instead of addressing the issue at the heart of these claims – whether DOC can rely *post hoc* on facts not relied upon at the time of the search – defendants attempt to distract the Court with irrelevant arguments.  Defendants argue that for those "who *were* charged with weapon or drug offenses, *Shain's* holding provides a constitutional basis for corrections department officials to strip search them precisely because such charges *create* reasonable suspicion of contraband concealment."  (Defs. Br. at 42; *see also id.* at Points VI, X, XII.A.4.) Whether or not this is true (which it is not) is immaterial since DOC did not rely on or who know the charges on which plaintiffs and class members were strip searched.  The Court therefore need not reach this issue.

In any event, defendants are wrong.  *Shain* did not hold that arraignment on drug or weapons charges *alone* can create reasonable suspicion.  Rather, *Shain* holds that "individualized reasonable suspicion" based on a totality of the circumstances is necessary before any pretrial detainee held in a jail may be constitutionally strip searched.  273 F.3d at 63; *see also id.* at 66 ("[I]t was clearly established in 1995 that persons charged with a misdemeanor and remanded to a local correctional facility . . . have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons.").  At no point did the Court in *Shain* state that the charges alone are sufficient to create reasonable suspicion.  While the Court did note that the "crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest" could provide the basis for reasonable suspicion that a detainee is concealing weapons or other contraband, *id.* at 63 (internal quotation marks and citation

omitted), the Court in *Shain* emphasized the "individualized" nature of the inquiry, *id.* at 63, 66. The totality of the circumstances – the crime charged, the particular characteristics of the arrestee, and the circumstances of the arrest – must be taken together in order to determine if reasonable suspicion exists.  *See id.* at 63.

    In accord with the animating principle of considering the totality of the circumstances, district courts since *Shain* have held that the charges *alone*, with nothing else, do not necessarily satisfy individualized suspicion.  In *Sarnicola v. Westchester*, 229 F.Supp.2d 259, 273-74 (S.D.N.Y. 2002), the court held: "An automatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the *totality* of the circumstances."  *Sarnicola* 229 F.Supp.2d at 273-74 (emphasis in original) (finding that it was unconstitutional to strip search a person arrested on a drug charge when the arrestee had no notice of the arrest or time to secret anything, was not acting strange or high, and the police did not try a less invasive means of search first).  An Eastern District of New York judge reaffirmed in 2006 this essential holding, stating again that the "totality of the circumstances" must create the "individualized reasonable suspicion," and holding that an "automatic strip search" based solely on the crime charged is unconstitutional. *Hartline v. Gallo*, No. 03-1974, 2006 WL 2850609, at *6 (E.D.N.Y. Sept. 30, 2006).  Just a few months ago, Judge Scheindlin of the Southern District of New York reached the same result, rejecting the City's summary judgment motion because she found that the police lacked reasonable suspicion to strip search the plaintiff even though he was charged with possession of marijuana and resisting arrest.  *Williams v. City of New York*, No. 05-10230, 2007 WL 2214390 (S.D.N.Y. July 26, 2007).  The court emphasized that "to establish reasonable suspicion, officers

9

must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience." *Id.* at *7 (citations and quotation marks omitted).  In *Williams*, the plaintiff was wearing light summer clothing, a pat down failed to reveal any contraband, and the plaintiff "was approached without warning at the scene of the arrest, which gave him no opportunity to hide contraband." *Id.* at *12 (citing approvingly to *Hartline*, *Sarnicola*, and *Foote v. Spiegel*, 118 F.3d 1416, 1425 (10th Cir. 1997)).[6]

Moreover, at least two circuit courts that have addressed the matter have reached similar conclusions.  In *Foote v. Spiegel*, 118 F.3d 1416 (10th Cir. 1997), the Tenth Circuit held: "The mere fact that [the plaintiff] Foote was driving while under the influence of drugs does not justify the strip search." *Id.* at 1425.  The court explained:

> The record establishes a thorough pat-down search through Foote's light summer clothing did not reveal anything.  Almost anything the strip search could have revealed would already have been discovered in the pat-down search. . . . The record cannot support a conclusion that a reasonable officer could have believed there was reasonable suspicion that Foote was hiding drugs on her person.  The belief that Foote had drugs hidden in a body cavity because she was suspected of driving while under the influence of drugs, when no drugs had been found in her vehicle, on her passenger, or in a pat-down search, was unreasonable.  Foote was not suspected of trying to smuggle contraband into a prison or smuggle cocaine or heroin through customs; she was suspected of driving while under the influence of marijuana.  *Cf. Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Romo v. Champion*, 46 F.3d 1013 (10th Cir.), *cert. denied* 516 U.S. 947, 116 S.Ct. 387, 133 L.Ed.2d 309 (1995).  It may be reasonable to believe a person driving while under the influence of marijuana could have marijuana in a pocket, a bag, or other container, or somewhere in the vehicle.  However, because Foote had no opportunity to hide anything beneath her clothing after Howe had stopped her vehicle and a thorough pat-down search at the jail had revealed no drugs, the strip search could be justified only if it were reasonable to believe persons driving while under the influence of marijuana, who have no particular reason to expect

---

[6] While some of these cases also involved false arrest claims, the essential analysis with respect to the strip search remains the same: a totality of circumstances analysis is key and no bright line rule alone is sufficient.

> they will be searched, routinely carry a personal stash in a body cavity. That belief
> is unreasonable.

*Id.* at 1425-26.  Similarly, the Ninth Circuit in *Way v. Ventura*, 445 F.3d 1157 (9th Cir. 2006)

recently held that "an arrest for being under the influence of a drug does not supply reasonable

suspicion that drugs are concealed in a body cavity." *Id.* at 1162.  Accordingly, the Ninth Circuit

granted summary judgment for the plaintiff and struck down the county's policy that "provided

for a visual body cavity search of all persons arrested on fresh misdemeanor drug charges."  *Id.* at

1158, 1162.  These circuit cases, as well as the district court cases discussed above, emphasize

three essential points: (1) an individualized inquiry based on the totality of the circumstances

must be conducted; (2) *per se* automatic rules based on the offense charged are unconstitutional;

and (3) less invasive search methods such as pat frisks or electronic searches should be used

before strip searches are justified.

      The cases relied upon by defendants (Defs. Br. at 42-43) are not to the contrary,

and indeed further demonstrate that an individualized inquiry is required.  In *Wachtler v. County*

*of Herkimer*, 35 F.3d 77 (2d Cir. 1994), the Court granted the officers qualified immunity only

after analyzing closely the "somewhat unique facts" *known* to the officers conducting the strip

search, including that the plaintiff refused to identify himself, possessed $1000 in cash, and yet

refused to post the $250 in bail set.  *Id.* at 79, 81.  Furthermore, the Court held that the county,

which did not have a qualified immunity defense, was liable if it were shown, as has already been

proven here, that "the standard procedure included routine strip-searches of misdemeanor

arrestees absent reasonable suspicion of weapons or contraband, and if no reasonable suspicion

concerning [plaintiffs'] possession of such items existed."  *Id.* at 82.

Similarly, in *Elk v. Townson*, 839 F.Supp. 1047 (S.D.N.Y. 1993), the court found reasonable suspicion for a strip search only after analyzing the particular circumstances of the arrest and the nature of the crime.  The court did not find that the arrest for possession of marijuana *alone* was sufficient to justify the strip search, but that the strip search was justified due to the combination of many factors including the strong smell of marijuana in the car, and the fact that the other person in the car was found to possess small bags of marijuana, that marijuana was found in the car within easy reach of the plaintiff, and that the plaintiff was observed by an officer shortly before the arrest smoking a marijuana cigarette and participating in a drug sale.  *Id.* at 1050-52.[7]  Furthermore, in *Dodge v. County of Orange*, 282 F.Supp.2d 41 (S.D.N.Y. 2003), the court undertakes an individualized analysis and finds that appearing to be under the influence of drugs "might" provide the necessary reasonable suspicion.  *Id.* at 83.  The court does not find however that being charged with any drug charge *per se* leads to the necessary reasonable suspicion, and indeed explicitly holds that "alcohol intoxication is not a *per se* reason to conduct a strip search."  *Id*. at 60, 83.  Indeed, since the same judge who decided *Dodge* also decided *Sarnicola*, which as discussed above clearly holds that *per se* automatic rules are impermissible, *Dodge* should not be read as allowing *per se* strip searches based solely on the charge alleged.

Defendants notably argue that "[t]here is a tremendous need for DOC to identify and then strip search those misdemeanor detainees who pose the greatest threat to security by virtue of their charges, their characteristics and/or circumstances of their arrests."  (Defs. Br. at

---

[7]  Indeed, in *Sarnicola,* the court distinguishes *Elk* for these reasons.  *Sarnicola*, 229 F.Supp.2d 259, at 274 & n.6.

44.)  Yet, DOC has never instituted a policy that provides for a strip search based on the nature of the crime on which a person is arraigned.  (Defs. 56.1 Resp. ¶ 40, Ex. 200.)  Instead, DOC instituted (though did not implement) a policy that *prohibited* the strip search of all detainees arraigned solely on misdemeanor charges.   (Stip. I, Ex. 119; Stip. II, Ex. 561.)  This is unsurprising for several reasons, given the record in this case.  First, the evidence establishes that individuals charged with drug or weapon offenses have already been subjected to extensive searches by the police.[8]  (Pls. 56.1 Reply ¶ 28, Ex. 568.)  Second, DOC has no evidence that those arraigned on drug and/or weapon charges are any more likely to attempt to bring contraband into the facility than those arraigned on charges that are not related to drugs and/or weapons.  (Pls. 56.1 Resp. ¶ 169, Ex. 569.)   Third, DOC's own 30(b)(6) witness on strip search policy, Mark Cranston, admitted as much during a recent deposition.  He stated that the mere arrest on drug and/or weapons charges does not, in his opinion, amount to reasonable suspicion. (Cranston Dep. 149:13-150:3, Ex. 484.)  Fourth, DOC does not even have any evidence that strip searches – as opposed to pat frisks, electronic searches (including magnetometers, BOSS chairs, x-ray machines, and transfriskers) that detect metal, Ion Scans and canine searches that detect even small traces of drugs, and other less-intrusive search mechanisms, such as canine drug

---

[8]  If the circumstances of the arrest, combined with the nature of the offense or characteristics of the arrestee, lead the police to believe that the arrestee is concealing drugs or a weapon, then the police will conduct a strip search.  (Pls. 56.1 Reply ¶ 28, Ex. 568.)  If the police have already conducted a strip search, detainees – all of whom are in jail for the sole reason that they did not post bail – should not be subjected to a second strip search when they have been in the continuous custody of law enforcement agencies.  If the police do not conduct a strip search, then it is likely because the police – who have far more information than the correctional officers – decided that there was not reasonable suspicion to conduct a strip search.  Defendants have produced no evidence that the police department errs when it decides not to conduct strip searches or that the strip searches conducted by the police are less effective than those conducted by DOC.

13

searches – are an effective means of preventing the introduction of contraband.[9]   (*See* Directive 4530, Ion Scan Searches, Ex. 567; GMDC, Command Level Order 86/05, Canine Drug Searches, Ex. 572; Pls. 56.1 Resp. ¶¶ 169, 179, 184, Ex. 569.)  Finally, plaintiffs are not challenging any DOC policies and practices that require identification and special security procedures for high-risk detainees, including segregating these inmates and always escorting them.  (Pls. 56.1 Reply, ¶¶ 54-56, Ex. 568).

　　　　For these reasons, defendants argument that the mere arraignment on drug or weapon charges constitutes reasonable suspicion is without merit.

### 3.　Even if certain drug or weapon charges *per se* constitute individualized suspicion under *Shain* (which they do not) defendants' list of drug and/or weapon- related charges is overbroad

　　　　Even if the Court were to find that certain drug or weapon charges *per se* amount to reasonable suspicion – an issue plaintiffs strongly dispute and which the Court need not reach given the *post hoc* nature of the argument – the Court should not accept defendants' categorization of crimes as drug or weapon- related.  Defendants' settlement with prior plaintiffs' attorneys of those illegally strip searched at admission by DOC between July 15, 1999 and July 22, 2002 excluded those pretrial detainees arraigned on thirteen different misdemeanor and lesser

---

　　[9]  There is no reason to subject these detainees to a second humiliating strip search in the absence of particularized reasonable suspicion to believe they are concealing drugs and/or weapon.  According to its policy memorandum, DOC already uses all of these electronic search mechanisms to search detainees during the new admission process.  DOC has produced no evidence that additional contraband can be found by a strip search, though DOC does argue that these metal detectors cannot detect drugs.  Drugs, however, can be detected using Ion Scans.  Inexplicably, DOC does not use Ion Scans to search new admission detainees.  Ion Scans are currently only used to search visitors for drugs.  (*See* Directive 4530, Ion Scan Searches, Ex. 567.)  There is no reason, however, that DOC could not use Ion Scans in order to detect drugs present on new admission detainees.

offenses.[10]  Defendants' settlement of those illegally strip searched at admission between July 23,

2002 and October 4, 2007 excludes those same thirteen charges and adds another seven.[11]

Many of the twenty charges excluded from the settlement agreements are

extremely minor offenses, often violations that are not even considered "criminal" and/or are

only offenses in New York City but not in the rest of the state.  For example, under §10-131 of

the NYC Administrative Code, it is an offense to sell certain *toy* pistols to a minor, §§ 10-131(d)

& (g); to fail to pay the $10 annual renewal fee for an air pistol license, § 10-131(b)(3); to

---

[10]  Specifically, the settlement agreement, which was so-ordered on June 21, 2005, stated: "The Settlement Class shall not include pre-trial detainees who, at the time they were admitted to DOC facilities, were charged with the following Penal Law Sections (a) § 220 03, Criminal Possession of a Controlled Substance in the Seventh Degree a class A misdemeanor (b) § 220 45 Criminal Possession of a Hypodermic Instrument, a class A misdemeanor, (c) § 220 50, Criminal Possession of Drug Paraphernalia in the Second Degree, a class A misdemeanor; (d) § 221.05, Unlawful Possession of Marijuana, a violation; (e) § 221.10, Criminal Possession of Marijuana in the Fifth Degree, a class B misdemeanor; (f) § 221.15, Criminal Possession of Marijuana in the Fourth Degree, a class A misdemeanor; (g) § 221.35, Criminal Sale of Marijuana in the Fifth Degree, a class B misdemeanor; (h) § 221.40, Criminal Sale of Marijuana in the Fourth Degree, a class A misdemeanor; (i) § 265.01, Criminal Possession of a Weapon in the Fourth Degree, a class A misdemeanor; and (j) § 265.06, Unlawful Possession of a Weapon upon School Grounds, a violation; or were charged pursuant to the following New York City Administrative Code Sections: (a) § 10-131, Firearms; (b) § 10-133, Possession of Knives or Instruments; and (c) § 10-134, Prohibition on Sale of Certain Knives; or were charged pursuant to Vehicle and Traffic Law § 1192(4), Operating a Motor Vehicle while impaired by the use of a drug."  (Stip. I ¶ 2, Ex. 119.)

[11]  The stipulation, signed October 4, 2007, and preliminarily approved by the Court, excluded, for purposes of damages, those arraigned on drug or weapons charges.  The stipulation defined "Drug or Weapon Charges" as "the list of drug- and weapon related charges listed in paragraph 2 of the Stipulation and Order of Class Action Settlement, dated June 21, 2005 in this action and any the following charges: § 205.20, Promoting Prison Contraband (2nd Degree); § 240.40, Appearance in Public Under the Influence of Narcotics or Drugs, other than Alcohol; § 265.10, Manufacture, Transport, Disposition & Defacement of Weapon and Dangerous Instrument and Appliances; § 265.35C, Prohibited Use of Weapon; § 270.05, Possession or Sale of Noxious Mater; § 400.00, Firearms License Violations; VTL § 1193, Driving Impaired (3rd Offense); and VTL § 1192(1), Driving Impaired."  (Stip. II. at 2.)

possess an air or spring gun inside the city, § 10-131(b)(1); to dispose of ammunition unless you are a gun dealer, § 10-131(i); or to fail to keep a record of all ammunition disposed of if you are a dealer, § 10-131(h)(13).  Such minor offenses, though nominally related to weapons, obviously cannot provide a *per se* basis for an invasive and demeaning body cavity strip search.

Second, most, if not all, of the "weapon" offenses excluded from the settlements and therefore at issue in this motion involve metal items that could easily be detected through the use of metal detector devices that the defendants already utilize, such as BOSS chairs that detect metal hidden in body cavities, or magnetometers or transfriskers.[12]  If detainees charged with offenses related to possessing metal items do not set off these highly sensitive metal detector devices, then there is absolutely no reason to subject them to a degrading strip search.  Defendants have proffered no evidence whatsoever to demonstrate that gown searches,

---

[12]  For example, § 265.01, Criminal Possession of a Weapon in the Fourth Degree, a class A misdemeanor, outlaws, *inter alia*, possession of metal knuckles, metal knuckle knives, firearms, and gravity knives; 265.06, Unlawful Possession of a Weapon upon School Grounds, a violation, outlaws possession on school grounds of an air or spring gun; § 10-131, Firearms, outlaws, *inter alia*, possession of a pistol, rifle, air or spring gun without a valid license, or possession of an air or spring gun inside the city; § 10-133, Possession of Knives or Instruments, a violation, outlaws the possession of large knives, unless *inter alia* the knife is being used or transported immediately to or from a place where it is used for hunting, fishing, camping, hiking, picnicking, or any job requiring use of such knife; § 10-134, Prohibition on Sale of Certain Knives, a violation, outlaws the sale within New York City of folding knives with a blade four or more inches in length that can lock in an open position; § 265.10, Manufacture, Transport, Disposition & Defacement of Weapon and Dangerous Instrument and Appliances, makes it a misdemeanor for any person lawfully in possession of a firearm to dispose of it without first notifying the licensing officer, or to manufacture, *inter alia*, a metal knuckle knife, metal knuckles, or a gravity knife; and § 400.00, Firearms License Violations, makes it a misdemeanor to fail to obtain a license to carry, possess, repair, or dispose of a firearm.  Section 265.35C, Prohibited Use of Weapon, which is another section excluded from the recent settlement, is not a valid cite.  Possibly, defendants intended to list § 265.35(3)(c), which makes it a misdemeanor to discharge a firearm toward another person, without an intent to cause harm and without actually causing harm.  In any event, because defendants failed to list a proper citation in the settlement agreement, this offense should not be excluded.

accompanied by electronic searches and other noninvasive search mechanisms, are not just as effective (if not more effective) than strip searches.  In fact, DOC admits that it has never studied the efficacy of strip searches and does not even maintain statistics on contraband recovered from such searches.  (Pls. 56.1 Resp. ¶ 169, Ex. 569.)

Third, defendants have included in their list of "drug" offenses those which only involve the use of alcohol.  For example, Driving While Ability Impaired, makes it an offense to "operate a motor vehicle while the person's ability to operate such motor vehicle is impaired by the consumption of alcohol."  N.Y. VTL § 1192(1); *see also* N.Y. VTL § 1193.  Defendants provide no explanation or citation to explain why an arrest for an alcohol offense should justify a humiliating and invasive body cavity strip search.  Moreover, in *Dodge*, 282 F.Supp.2d 41, a case upon which defendants rely, the court explicitly finds that "alcohol intoxication is not a *per se* reason to conduct a strip search."  *Id.* at 60, 83.

Fourth, all of the "drug" offenses at issue, with one exception,[13] involves only the possession or use of drugs, not the sale of a drug.  Defendants have produced no evidence that persons arraigned on drug charges, much less those arrested for the mere possession of drugs are likely to hide those drugs on or in a part of their body, and certainly not that the drug will be hidden in a manner that can be detected *only* through an invasive strip search.  As the *Shain* court explained, "arrestees do not ordinarily have notice that they are about to be arrested and thus an opportunity to hide something."  273 F.3d at 64.  Furthermore, before conducting an invasive strip search, defendants could conduct thorough pat frisks; use Ion Scans, which detect even

---

[13]  Section 221.35, Criminal Sale of Marijuana in the Fifth Degree, a class B misdemeanor, involves the sale of two grams or less of marijuana.

small traces of drugs;[14] and carefully inspect detainees clothing while the detainees are wearing a

gown.  A strip search is justified only if these less invasive search mechanisms provide

defendants with a reason to suspect that the detainee is hiding drugs.

   Fifth, as discussed *supra* Part I.A.2, detainees entering DOC facilities have

already been thoroughly searched by the police and have been in the continuous custody of law

enforcement since the search.

   For the foregoing reasons, defendants cannot escape liability for their blanket

policy of strip searching those charged with misdemeanor drug or weapon offenses.  Summary

judgment should therefore be granted to the plaintiffs.

**B.**  **Defendants' Current Blanket Policies of Strip Searching Misdemeanor
Pretrial Detainees in Their Housing Areas and Before Transporting Them
are Unconstitutional And Should Be Enjoined Permanently**

   Defendants argue in Points V, IX, XI, and XIII.D of their brief that blanket

strip searches pursuant to the Housing and Exit Policies are constitutional.  As set forth below,

those arguments are wrong, and the policies should be enjoined permanently.[15]

   **1.**  *Shain, N.G.* **and** *Hodges* **control; the** *Covino* **standard does not apply**

   Defendants do not dispute the current existence and enforcement of the Housing

and Exit Policies, which require pretrial detainees charged with misdemeanor or lesser offenses

---

  [14]  Defendants use Ion Scans to search visitors but inexplicably not to search detainees
during the new admission process.  (Directive 4530, Ion Scan Searches, Ex. 567 ("Each visitor
entering a DOC building may be subjected to an Ion Scan search in addition to the routine visitor
processing and other non-intrusive search procedures . . . .").)

  [15]  In addition, the named plaintiffs seek damages for their individual claims relating
to Housing and Exit strip searches, and accordingly move for partial summary judgment on the
unconstitutionality of the Housing and Exit Policies individually.

to be strip searched on their way to court and in their housing units.  (Pls. 56.1 Reply ¶¶ 56, 84,
Exs. 568, 200.)  The Housing and Exit Policies require *repeated unnecessary* blanket strip
searches of pretrial detainees who have never left the supervision and custody of the DOC and
for whom no intervening event or circumstance gives rise to individualized suspicion.  (*See* Pls.
56.1 Reply ¶¶ 56-114, Ex. 568.)  The Housing and Exit Policies require correctional officers to
strip search pretrial detainees even when the officers have no reason to believe a particular
detainee is concealing contraband, and even when the detainee has not been charged with a drug
or weapon offense and is not identified as a security risk.  (Pls. 56.1 Reply ¶ 77 (Exit Policy), Ex.
568; *see generally id.* ¶¶ 68-78 (same); *id.* ¶ 111 (Housing Policy); *see generally id.* ¶¶ 102-113
(same).)  The Housing and Exit Policies permit these strip searches to be conducted in groups,
which at times include as many as twenty detainees.  (Pls. 56.1 Reply ¶¶ 81-83, 98-99, Ex. 568.)
As such, the Housing and Exit Policies are unconstitutional.  (*See* Pls. Br. at 30-37 (discussing
*N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004); *Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir.
1983) (per curiam)).  *See also Bacon v. Kolender*, No. 05-310, 2007 WL 2669541 (S.D. Cal.
2007) (denying defendants' motion for summary judgment where "[d]efendants failed to show
any link between their blanket strip search policy and legitimate security concerns for detainee.")
(internal quotations and citations omitted); *Duamutef v. Leonardo*, No. 91-1100, 1993 WL
428509, at *5 (N.D.N.Y. Oct. 22, 1993) ("redundant or wholly unnecessary strip frisk is
presumptively unreasonable"), *adopted by*, No. 91-1100, 1994 WL 86700 (N.D.N.Y., Mar. 7,
1994); *Morgan v. Ward*, 699 F. Supp. 1025, 1051-52 (N.D.N.Y. 1988) (strip frisks
unconstitutional when routinely conducted before and after inmates exit special housing unit,
since "the danger of smuggling something *out* of" the Spartan-like cells typical of SHU

confinement "was nonexistent").)

    Defendants contend nevertheless that strip searches pursuant to the Housing and Exit Policies are constitutional under *Covino* and *Bell*. (Defs. Br. at 30-32, 53.) In doing so, defendants reveal their failure to read *Shain* closely.

    First, contrary to defendants' claims (Defs. Br. at 30-32), the *Shain* Court did *not* limit its holding to admission strip searches. Although the policy at issue in *Shain* did concern admission searches, the Court repeatedly announced the broader principle that individuals charged with misdemeanors in jails are to be strip searched only when the strict Fourth Amendment reasonable suspicion standard has been satisfied. *Shain*, 273 F.3d at 66 ("[P]ersons charged with a misdemeanor and remanded to a local correctional facility like [the Nassau County Correctional Facility] have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons.")

    Secondly, *Shain* expressly addressed and distinguished *Covino* and *Bell* on multiple grounds. (*See* Pls. Br. at 33-35.) Among these explicit grounds is the fact that *Covino* applies to prisons, which DOC facilities are not, and *Shain* applies to jails, such as DOC facilities. *Shain*, 273 F.3d at 65 ("*Covino* . . . approved a regulation of a state correctional facility or prison, but NCCC is a local correctional facility or jail. . . . This distinction is reflected in New York where state correctional facilities, commonly referred to as *prisons*, house those convicted of the most serious crimes and local correctional facilities or *jails* house persons convicted of minor crimes and pre-trial detainees.") (emphasis added); *id.* at 66 ("*Covino* [does not] purport[] [to] addresses any issue other than *prison* regulations") (emphasis in original). Accordingly, *Shain* plainly held that *Covino* is inapplicable to jails such as those run by DOC. Indeed, DOC

presented its arguments to the Second Circuit in *Shain* through an amicus brief, specifically arguing that *Covino* should apply, but the Court rejected DOC's arguments.  (*See* Pl. Br. at 35 n.11 (discussing Brief for City of New York as *Amicus Curiae* Supporting Defendants-Appellants-Cross-Appellees, 2000 WL 33979258, June 1, 2000, in *Shain v. Ellison*, 273 F.3d 56 (2d Cir. 2001) (No. 00-7061).)

Defendants also attempt to argue that *N.G.* does not govern the analysis of the Housing and Exit strip searches.  (Defs. Br. at 50-56.)  Defendants first attempt to distinguish the facts of *N.G.* by arguing that it involved "1) juveniles who were held in juvenile detention center; and 2) persons who were not charged with having committed any crimes."  (Defs. Br. at 53.) While these factual descriptions are accurate, defendants ignore *N.G.*'s express reliance on *Shain* and its related case law:  "[I]n several decisions, we have ruled that strip searches may not be performed upon adults confined after arrest for misdemeanors, in the absence of reasonable suspicion concerning possession of contraband."  382 F.3d 225, 232 (2d Cir. 2004) (collecting Second Circuit cases holding same) (emphasis added).  The Court continued, "[a]s far as we can tell, all the circuits to have considered the issue have reached the same conclusion *with respect to strip searches of adults confined for minor offenses*."[16]  *Id.* (collecting circuit court cases).

Defendants next claim that *N.G.* is inapplicable because, unlike in *N.G.*, "the strip searches that DOC performs [pursuant to the Housing and Exit policies] do not involve visual or manual body cavity inspections, unless there is reasonable suspicion."  (Defs. Br. at 54.)  In fact, plaintiffs have overwhelming direct evidence from 27 individuals that the strip searches

---

[16]  Once again, the Second Circuit made no distinction of *Shain* as applying solely to admission strip searches.

conducted pursuant to both the Housing and Exit policies are conducted *in groups with officers visually inspecting the anal and/or vaginal cavities of the detainees.*[17]  (Pls. 56.1 Reply ¶¶ 57, 81-82, 94-98, Ex. 568.)  *Cf. N.G.*, 382 F.3d at 228 (policy required that detainees be given gown for strip search).  For this reason, *N.G.*'s descriptions of strip searches with visual body cavity inspections as "demeaning," "dehumanizing," "terrifying," and "humiliating" are particularly relevant for examining the constitutionality of the Housing and Exit strip searches at issue here.  *Id.* at 233 (collecting cases) (citations and internal quotation marks omitted); *see also N.G.*, 382 F.3d at 239 (Sotomayor, J., concurring, dissenting in part) (noting the "uniquely invasive and upsetting nature of strip searches" and collecting numerous additional cases where courts reached similar conclusions).

   Defendants likewise make a weak attempt to distinguish *Hodges*, describing it as "quite clearly an outdated opinion and thus . . . inapposite to the instant case."  (Defs. Br. at 56; *see generally id.* at 54-56.)  But *Hodges* remains clearly on point.  The plaintiff in that case did not challenge "the validity of predetention searches per se, but instead . . . the need for a *second* search," which took place shortly after the first and while the plaintiff was under continuous escort.  712 F.2d at 36 (emphasis in original).  The Court held that the "second search appears to have been unnecessary" and thus the plaintiff had stated a claim for a constitutional violation.  *Id.* Like the plaintiff in *Hodges*, the plaintiffs here are challenging the repeated and unnecessary strip searches that they are subjected to pursuant to the Housing and Exit policies.  Between these searches, there is "no possibility" that plaintiffs can "obtain[] and conceal[] contraband" since

---

[17]  It is immaterial that defendants appear to contend that these strip searches never include visual cavity searches, while plaintiffs have overwhelming evidence to the contrary.  (*See* Pls. Br. at 36 n. 14 (discussing relevant cases).)

plaintiffs are in continuous custody.[18]  *Id.* at 35.

Because defendants' efforts to distinguish *Shain*, *N.G.*, and *Hodges* are unavailing, this Court should find DOC's Housing and Exit Policies, requiring blanket strip searching of those charged with misdemeanors, unconstitutional and enter summary judgment for plaintiffs.  (*See* Pls. Br. at 30-37.)[19]

### 2.    Even if *Covino* did apply, plaintiffs should still win summary judgment on the Housing and Exit Policies

Defendants claim that the Housing and Exit strip searches "are reasonably related to DOC's legitimate penological interests."  (Defs. Br. at 32-35.)  This argument is based on the *Bell/Covino* standard, which is inapplicable here.  Under the controlling case law, the Court need not reach the issue of whether the blanket strip searches conducted pursuant to the Housing and Exit Policies are related to any security interests.  Instead, the Court only needs to find that the

---

[18]  Although plaintiffs do not concede the constitutionality of such a search, it is important to note that strip searches conducted upon an inmate's *return* from court are not being challenged here, in part because of the opportunity for detainees to have in-person contact visits while at court.  *See Bell v. Wolfish*, 441 U.S. 520, 558-60 (1979).  Because such strip searches upon return are mandatory, *see* Directive 4508R-C, the challenge is to the Housing and Exit Policies are routinely being conducted on people who have already been strip searched and been in continuous custody.

[19]  It is also worth noting that, to the extent that defendants may rely on *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007), that case is inapplicable here.  *Iqbal* held that a maximum security section for those arrested on terrorism charges of one DOC facility was more like a prison than a jail.  *Id.* at 172.  But  *Iqbal* in no way authorizes repeated unnecessary strip searches such as those required by the Housing and Exit Policies: "[T]he post-9/11 context does *not* provide a basis for conducting repeated and needless strip and body-cavity searches of a pretrial detainee." *Id.* at 173.  The Court has already recognized the inapplicability of the *Iqbal* analysis here. (Order at 3 n.2, Docket No. 173, Sept. 20, 2007 ("In *Iqbal*, the Second Circuit reviewed the distinction between jails and prisons made in *Shain* . . . . *Iqbal* did not purport to alter the relevant analysis, which was well-established long before defendants made clear their understanding that *Shain* governed DOC facilities.").)

strip searches are conducted pursuant to a blanket policy and without any reasonable suspicion. That alone provides sufficient grounds to declare the Housing and Exit strip search policies unconstitutional. *Shain*, 273 F.3d 56 (2d Cir. 2001).

If the Court were to assess the Housing and Exit Policies under the *Covino* standard (which plaintiffs submit it should not do), the Court should *still* grant plaintiffs summary judgment. Defendants claim that the searches are used to "maintain[] order and keep[] inmates, visitors and DOC staff safe" and that none of these searches "was intended to harass, intimidate or punish." (Defs. Br. at 34.) But in detainees' experiences – and even based on the undisputed facts as defendants aver them, for example, that the strip searches are routinely conducted *en masse* – the actual purpose of these strip searches is to humiliate and degrade inmates. (*See* Pls. 56.1 Response ¶ 91, Ex. 569.)

The searches conducted pursuant to the Housing and Exit Policies are undertaken without any inquiry into individualized reasonable suspicion or suspicion of any sort. (Pls. 56.1 Reply ¶¶ 70-78, 102-113, Exs. 568, 200.) Twenty-eight (28) persons charged with non-felony offenses have submitted sworn statements evidencing routine, invasive strip searches – including vaginal and anal body cavity searches – taking place pursuant to the Housing and Exit Policies. (Pls. 56.1 Reply ¶¶ 56-57, 84, 94, Exs. 568, 200.) The sworn testimony establishes that these searches have been conducted routinely and continuously from July 2002 to the present at DOC facilities. (Pls. 56.1 Resp. ¶¶ 224, 238, Ex. 569.)

If these searches were actually aimed at ensuring safety, officers would – at a bare minimum – take into account when the last time a particular detainee was searched and whether

24

the detainee has been in continuous custody since the last time he or she was searched.[20]  (Pls. 56.1 Stat. & Reply ¶¶ 71, 113, Exs. 200, 568.)  But, in the experiences of detainees, officers never do so.  (*Id.*)  As a result, a detainee could have just recently returned from court, and thus would be subject to a strip search upon return to the facility, just moments prior to an inspection of a living quarter; they would nevertheless be required under the Housing Policy to be strip searched again.  (*See, e.g.*, Velazquez Decl., Ex. 181, ¶¶ 16-19; Pls. 56.1 Reply ¶ 207, Ex. 568.) This type of repeated unnecessary search plainly does nothing to advance any security interest and as such is unconstitutional,[21] humiliating, and offensive.

Danny Velazquez was subjected to precisely such a seriatim baseless strip search. Mr. Velazquez is twenty-nine years old, and he was not in custody at the time he joined this case. (Velazquez Decl. ¶ 2, Ex. 181.)  On January 18, 2002, he was arrested and subjected to a strip search at AMKC upon admission.  (*Id.* at ¶¶ 16-18; Pls. 56.1 Reply ¶ 207, Ex. 568.)  Immediately after the admission strip search, Mr. Velazquez was taken to the housing area, where a housing search was ongoing.  (Velazquez Decl. ¶ 19, Ex. 181.)  Although only about ten minutes had passed since the admission strip search, and although he was under continuous custody during

---

[20]  To the extent that administrative concerns motivate the group strip searches conducted pursuant to the Housing and/or Exit Policie, that issue is addressed *infra*.

[21]  *Compare Hodges*, 712 F.2d at 36; *Duamutef*, No. 91-1100, 1993 WL 428509, at *5 ("[i]f an inmate has no opportunity to obtain and secret contraband in his body cavities between the two searches, then a second search of the prisoner's body cavities is unnecessary and therefore unreasonable.  Thus, if, as the plaintiff alleges, he was continuously observed by security personnel, then he is entitled to judgment as a matter of law" on the second search); *id.* at *8 (although "it may have been possible for the plaintiff to covertly obtain and secret contraband in a body cavity at while under continuous escort by security personnel[,] . . . a strip frisk requires more than a metaphysical possibility that the circumstances of the transport merely permitted contact.").

that time, Mr. Velazquez was forced to strip naked once again.  (*Id.*)  He was required to remove all his clothing, run his fingers through his hair, show the soles of his feet, open his mouth, lift his tongue, lift his testicles, turn away from the officer, spread his buttocks, squat, and cough so that the officer could inspect his anal cavity.  (*Id.*)   During the search, several female officers were present.  (*Id.*)

   The experience of Mr. Velazquez of the many steps toward degradation is representative of that of other putative class members.  During Housing and Exit strip searches, pretrial detainees held on non-felony offenses are required to remove all their clothing, turn away from the officer, bend over, and squat down so that the officers can inspect their anal and/or vaginal cavities.  Often, the searches also require detainees to lift their breasts or genitals, or spread their buttocks apart with their hands.  (Pls. 56.1 Resp. ¶¶ 229, 238, Ex. 569.)

   Moreover, it is undisputed that the Housing and Exit strip searches are conducted *en masse*, with multiple individuals forced to get naked and have their bodies visually examined and inspected at the same time.  (Defs. Rule 56.1 Resp. ¶¶ 81, 97, Ex. 200; *see also* Pls. 56.1 Reply ¶¶ 81-83, 97-99, Ex. 568.)  People subjected to this horrible practice found each strip search extremely humiliating, degrading, and embarrassing, particularly for those whose religious beliefs forbid them from being naked in front of others and for those who were forced to be naked and inspected in front of officers of the opposite sex.  (Pls. 56.1 Resp. ¶ 91, Ex. 569.)  Sadly, DOC staff – who apparently routinely subject groups of human beings to this degrading process over the course of years – are often brutally insulting as they review the naked bodies that are before them during the group Housing and Exit strip searches.  For example, Kenneth Williams states "during the second housing strip search, the DOC captain told us that the 'next

time we come here, we're going to embarrass you,'" and that during his third housing strip search "corrections officers taunted prisoners." (Williams Decl. II ¶¶ 18-19, Ex. 154; *see also* Pls. 56.1 Resp. ¶ 26, Ex. 569.).

Based on this overwhelming evidence, it appears that a primary purpose of the Housing and Exit Policies is to humiliate and degrade those charged with misdemeanor offenses. (*See* Pls. 56.1 Resp. ¶ 91, Ex. 569.)

Defendants seek to justify these blanket, routine, repeated, and unnecessary group searches by pointing to administrative considerations. (Defs. Br. at 29, 35-41, 53, 57-59.) The crux of defendants' argument is that "it is not possible for DOC staff to observe every inmate at every moment of the day," and that ending the Housing strip search policies would be "impossible on a practical level" since those charged with non-felonies are housed with those charged with felonies. (*Id.* at 39, 58.) Defendants' arguments are unavailing. Where, as here, the policies of a detention facility permit repeated violations of the constitutional rights of detainees charged with non-felony offenses, courts consistently reject administrative considerations as justification for blanket strip searches. The fact that it is simply easier to conduct *seriatim* group strip searches, without even considering whether someone had even been strip searched five minutes before, is not sufficient to overcome constitutional mandates. *See, e.g.*, *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981) ("An indiscriminate strip search policy routinely applied . . . can not be justified simply on the basis of administrative ease in attending to security considerations."); *see also Way v. County of Ventura*, 445 F.3d 1157, 1161 (9th Cir. 2006) (recognizing "the difficulty of operating a detention facility safely," but noting that "this does not mean that a blanket [strip search] policy is constitutionally acceptable simply

27

by virtue of jail officials' invocation of security concerns."); *Craft v. County of San Berndardino*, 468 F. Supp. 2d 1172, 1176 (C.D. Cal. 2006) ("The Court is not unsympathetic to defendants' attempt to ensure security within the jail facilities. . . . Nevertheless, jail officials must structure their attempts to maintain security with the clear dictates of the Constitution.").

        Likewise, defendants' attempt to rely on the intermingling of pretrial detainees charged with non-felony offenses and those charged with felony offenses as a basis for blanket strip search practices ignores the weight of the case law.[22]  In comparable contexts, "the fact of intermingling alone has never been found to justify a [strip] search without consideration of the nature of the offense and the question of whether there is any reasonable basis for concern that the particular detainee will attempt to introduce weapons or other contraband into the institution."  *Craft*, 468 F. Supp. 2d at 1177; *Masters v. Crouch*, 872 F.2d 1248, 1254 (6th Cir. 1989) (same), *cert. denied sub nom.*, *Frey v. Masters*, 493 U.S. 977 (1989), *cited with approval in Thompson v. City of Los Angeles*, 885 F.2d 1439, 1447 (9th Cir. 1989) (the "fact that arrestee may ultimately be intermingled with general jail population does not, by itself, justify strip search as such intermingling is both limited and avoidable") (internal quotations and citations omitted); *see also Roberts v. State of Rhode Island*, 239 F.3d 107, 113 (1st Cir. 2001) ("[I]ntermingling is a dubious reason for a strip search because it is inherently 'limited and avoidable.'") (quoting *Giles*, 746 F.2d at 619); *Hills v. Bogans*, 735 F.2d 391 (10th Cir. 1984).

        Finally, even if this Court were to find that strip searches pursuant to the Housing

---

[22] Defendants' intermingling argument also belies the facts in the record.  DOC has policies and practices that require (1) the identification of certain detainees as "security risk group members" – identified gang members, incoming contraband recipients, or known weapon carriers – and special procedures for these detainees to ensure safety (Pls. 56.1 Reply, ¶ 54, Ex. 568); and (2) always escorting and segregating the most dangerous inmates (*id.* at ¶ 56).

and/or Exit Policies could potentially be constitutional if conducted in private, it is clear that the practice of carrying out these strip searches in *groups* is unconstitutional.  *See Farmer v. Perrill*, 288 F.3d 1254, 1259-61 (10th Cir. 2002) ("[P]laintiff has identified a well established right, the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonable related to a legitimate penological interest.") (emphasis removed); *Craft v. San Bernardino*, 486 F.Supp.2d 1172, 1176 (C.D. Cal. 2006) (criticizing "[strip] searches *en masse* without any attempt to limit the humiliation occasioned by conducting the searches in full view of dozens of other individuals.").  Once again, the fact that it may be more convenient administratively to conduct *en masse* strip searches is not sufficient reason to permit the unconstitutional practice from continuing.

> **3.    Defendants' reliance on contraband recovery incidents is inadmissible and off-point; DOC has never actually determined whether strip searches are an effective tool to find or deter contraband**

Defendants contend that "DOC encounters daily attempts to introduce contraband into its facilities" which necessitates the Housing and Exit Policies.  (Defs. Br. at 35-41.)  In support of this argument, defendants cite dozens of documents that refer to instances of alleged contraband discoveries.  (*See generally* Exs. K, Z; Defs. 56.1 Stat, Ex. 201.)  Defendants' reliance on these recently produced documents is prejudicial.  The documents were produced long after the close of discovery in this case and, to a large extent, *after* plaintiffs filed the instant motion.  Accordingly, plaintiffs have had little opportunity to examine these tens of thousands of pages of documents, let alone conduct meaningful discovery by questioning DOC witnesses

about them since all depositions had been completed when they were produced.[23]  For that

reason, in the event the Court chooses to consider such material, we respectfully request that

plaintiffs' accompanying Rule 56(f) motion be granted.

But the Court need not even consider the recently produced materials purporting

to document instances of contraband because they are on their face irrelevant and misleading.

High-level DOC officials have testified that DOC does not track *any* statistics on when

contraband is found as a result of strip searches, and have never even studied whether strip

searches help to reduce the presence of contraband.  (Pls. 56.1 Resp., ¶ 169, Ex. 569.)  And

defendants *admit* that they have no idea of whether an increase in strip searches has actually

reduced the incidence of violence.  (Pls. 56.1 Reply, ¶ 63, Ex. 568.) While reliable statistics or

studies might be helpful in understanding the efficacy of strip searches, the dozens of irrelevant

and vague documents contained the recently produced materials are not.  From the face of the

documents, even the most basic information is absent, such as whether the contraband at issue

was recovered from a Housing or Exit strip search, whether the strip search was conducted on an

individual charged with a misdemeanor or lesser offense, or whether reasonable suspicion had

been established prior to the strip search.  (Pls. Motion for Additional Discovery Pursuant to Fed.

R. Civ. P. 56(f), and Declaration in Support Thereof.)  To name just a few examples from the

very first page of Exhibit K:

> • "C.O. [redact] discovered two plastic bags, which contained 24 small bags
>   of crack cocaine in *the right pocket of new admission inmate . . . .*"  (Ex. K

---

[23]  Although the Court granted a few narrow depositions to occur after the onslaught on
the newly produced documents, those depositions concerned only particular issues relating to the
preliminary injunction hearing and, specifically, whether admission strip searches of those
charged with misdemeanors was continuing.

at NY2308 (emphasis added).)

- "A search of [an inmate's] *locker* revealed two five inch (5") metal rods."
  (Ex. K at NY2308 (emphasis added).)

- "[D]uring the institutional search, [redacted] discovered ninety-nine
  dollars ($ 99.00) secreted in an inmate's *sneaker*."  (Ex. K at NY2308
  (emphasis added).)

Contraband found in the pocket of a new admission inmate, and in the locker and

sneaker of inmates, is completely irrelevant to the need for group strip searches pursuant to the

Housing or Exit Policy.  And of course there is no explanation of whether these inmates were

charged with a misdemeanor or lesser offense, or whether there was reasonable suspicion prior to

the searches.

Indeed, despite relying extensively on the documents in Exhibit K in their brief,

defendants make no attempt to identify which documents specifically reference contraband

recovered from individuals charged with misdemeanor or lesser offenses pursuant to the Housing

or Exit Policies, in the absence of reasonable suspicion.  There is no basis for this Court to

conclude that these documents refer to instances of contraband recovered from *en masse* strip

searches conducted pursuant to the Housing or Exit Policies at all, and certainly not as a matter

of law at the summary judgment stage.  *Compare Craft*, 468 F. Supp. 2d at 1178 (holding

government's evidence of two contraband discoveries was insufficient to justify blanket strip

search policy where "defendants make no attempt to demonstrate that any *particular* pre-

arraignment [detainee] had been identified as likely or potentially likely to smuggle contraband in

a manner likely to be detected by a strip and/or visual body search."); *see also Bull v. City &

County of San Francisco*, No. 03-1840, 2006 WL 449148, at *6 (N.D. Cal. Feb. 23, 2006) ("It is

not enough, as defendants would have it, for the government to demonstrate that contraband is a significant problem.  Instead, there must be some reasonable relationship between the criteria used to identify individuals as eligible for a strip search and the interest in preventing the introduction of contraband.") (citing *Giles*, 746 F.2d at 618).

In arguing for strip searches conducted pursuant to the Exit Policy, defendants draw attention to the January 19, 2006 incident when two inmates injured their attorney with a concealed shiv during a court appearance in Kings County Supreme Court.  (Defs. Br. at 37-38.)  Defendants' reliance on this incident is ironic because *these inmates were subject to a three-point search – which includes a strip search – on their way to Court, and the search "was done right and confirmed on video."*  (Pls. 56.1 Resp. ¶ 22, Ex. 569 (citing Email from S. Conry to M. Horn, Mar. 8, 2006, Ex. 571); *see also* Directive 4508R-C at NYC 23871 (explaining that a three-point search includes a strip search).)

Defendants also list incidents of DOC staff passing contraband to inmates in an attempt to justify the Housing and Exit Policies.  (Defs. Br. at 38-39.)  But this rationale for strip searching inmates has been routinely discredited.  *See, e.g.*, *Arruda v. Fair*, 710 F.2d 866, 889 (1st Cir. 1983) (Maletz, J., concurring in part, dissenting in part) ("to the extent that the state cites its incorrigible guards as the justification for all other [post-visit] strip searches, this seems no rationale at all here."); *Hurley v. Ward*, 549 F. Supp. 174, 186 (S.D.N.Y. 1982) (where defendants "conceded that most of the contraband comes onto the premises through corrupted prison employees and . . . even through correction officers themselves," that was "no rational" for routine strip frisk procedures).  To deal with this problem, DOC should focus on disciplining and training its staff to minimize corruption, and on hiring and promotion practices that place

premiums on staff integrity.  And if need be and the particular circumstances warrant it, DOC can and should search staff to locate contraband.  *Security & Law Enforcement Empl. v. Carey*, 737 F.2d 187, 203 (2d Cir. 1984) (strip searches of correction officers, under certain circumstances, may be reasonable, even in the absence of warrants); *Allegheny Co. Prison Employees Independent Union v. Co. of Allegheny*, 315 F. Supp. 2d 728, 740 ("it is reasonable in the context of an entrance into a jail by employees and others who will have contact visits with inmates for the prison administration to require searches which include, among other things, the removal of outer garments, shoes and belts, but not socks, and patdowns over the abdomen and groin area that do not involve groping or massaging.").  Individuals charged with misdemeanors and lesser offenses should not bear the brunt of DOC staff corruption by being routinely subjected to humiliating, degrading group searches.[24]

Because even if the *Covino/Bell* standard were to apply (and it should not), defendants have not presented undisputed material facts that group strip searching under the Housing and Exit Policies are reasonably related to security interests, defendants' motion for summary judgment should be denied.

## C.     Qualified Immunity Does Not Bar Plaintiffs' Claims

A defendant is entitled to qualified immunity only where "(a) the defendant's actions did not violate clearly established law, or (b) it was objectively reasonable for the

---

[24]  Defendants similarly attempt to justify Housing and Exit strip searches by citing the problem of attorneys passing contraband to their clients.  (Defs. Br. at 39.)  Like the DOC staff corruption, this problem can be addressed by subjecting attorneys to reasonable searches upon their entry to DOC facilities.  *Allegheny Co. Prison Employees Independent Union*, 315 F. Supp. 2d at 735, 740.  Subjecting *all* inmates to routine and repeated Housing and Exit strip searches – even though many have not been visited by an attorney – is simply unconstitutional.

defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 250 (2d Cir. 2001).  Here, the defendants fail each prong.

As discussed above, defendants violated plaintiffs' rights and the rights of the putative class by subjecting them to routine, unnecessary, blanket, group strip searches pursuant to the Housing and Exit Policies.  (*See supra* Part II.)

In the event that the Court finds that defendants violated plaintiffs' rights, defendants argue that these rights are not clearly established, and thus defendants are entitled to qualified immunity.  (Defs. Br. at 48-49.)  But it has been clearly established since at least 1995 that subjecting individuals charged with misdemeanors to repeated unnecessary group strip searches in the absence of any reasonable suspicion violates the Constitution.  (*See supra* Part II.) *See Shain*, 273 F.3d at 66 ("because it was clearly established in 1995 that persons charged with a misdemeanor and remanded to a local correctional facility have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons, [defendant] was not entitled to qualified immunity."); *id.* ("persons charged with a misdemeanor and remanded to a local correctional facility . . . have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons."); *see also Bame v. Clark*, 466 F. Supp. 2d 105, 110-11 (D.D.C. 2006) (citing *Shain* in denial of defendants' motion for qualified immunity for the proposition that "blanket strip searches without reasonable individualized suspicion that the class members were concealing weapons or contraband" violate the Fourth Amendment).

Defendants also argue that their conduct is "completely reasonable."  (Defs. Br. at 48.)  But, as discussed above, defendants conduct cannot be objectively reasonable given the

controlling, settled law.  (*See supra* Part II.)  Moreover, even if there were merit to defendants'

arguments that post-intake blanket strip searches were somehow objectively reasonable, at a bare

minimum, the fact that such invasive, indiscriminate, blanket strip searches are being conducted

in a degrading *en masse* and seriatim way is not.  Alternatively, the material factual disputes

about individual defendants' beliefs regarding the "reasonableness" of blanket group strip

searches pursuant to the Housing and Exit Policies preclude summary judgment in favor of the

defendants.  *See Jones v. Parmley*, 465 F.3d 46, 60-63 (2d Cir. 2006) (factual issues preclude

summary judgment on basis of qualified immunity).

Finally, even assuming *arguendo* that defendants were entitled to qualified

immunity, such immunity is no defense to claims for injunctive relief such as those plaintiffs

seek here.[25]  *See, e.g.*, *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir.

2002) (holding that where "plaintiffs seek injunctive relief . . . qualified immunity is not a

defense").   For these reasons, defendants' motion for qualified immunity should be denied.

**D.      Defendants' Procedural Arguments Are Without Merit and Fail to Provide
Any Basis for Denying Plaintiffs' Motions**

**1.      The class representatives have standing to seek injunctive relief on the
Housing and Exit Policies**

Defendants argue that the named plaintiffs lack standing to seek an order

enjoining defendants from enforcing the Housing and Exit Policies.  (Defs. Br. at 76-77.)

Notably, defendants make this argument despite the fact that they apparently did not think these

very same plaintiffs lacked standing for a different injunction – one they signed on October 4,

---

[25]  Plaintiffs reiterate, however, that individual named plaintiffs do seek damages for the
unconstitutional blanket strip searches to which they were subject under the Housing and Exit
Policies.  Plaintiffs also seek damages for the Admission Classes.

2007 that prohibits *admission* strip searching from continuing.  (Stip. II, Ex. 561.)  In any event, while defendants correctly point out that the Second Circuit addressed standing for injunctive relief on a blanket strip search policy in Ray Shain's second journey to the Court of Appeals (Defs. Br. at 76 (citing *Shain v. Ellison*, 356 F.3d 211 (2d Cir. 2004) ("*Shain II*")), they deliberately ignore undisputed facts that render this case distinct from *Shain II* and in compliance with standing requirements.

   *Shain II* explained "that a plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." *Shain II,* 356 F.2d at 216 (emphasis in original) (citing *Deshawn E. v. Safir*, 156 F.3d 340, 344-45 (2d Cir. 1998) and *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)).  Defendants do not dispute – since they cannot – that plaintiffs have demonstrated the second prong of this test.  The Housing and Exit Policies are undisputed policies currently in existence to which any pretrial detainee charged with non-felony offenses entering DOC custody will be subjected, should they not be enjoined.  (Pls. 56.1 Reply, ¶¶ 56, 84, Ex. 568.)

   Defendants instead attempt to argue that named plaintiffs cannot demonstrate "likelihood of future harm" because "Thomas, Velazquez, Williams and Phitts are no longer in DOC custody" and because "Wallace was sentenced on July 30, 2007" and accordingly is no longer a pretrial detainee.  But defendants entirely ignore undisputed facts confirming the unfortunate reality that named plaintiffs are repeatedly subjected to arrest on non-felony charges and detained at DOC on such charges prior to dismissal or conviction.

   For example, Arthur Wallace has been arrested and held at DOC as a pretrial detainee on approximately twenty occasions over the past eight years.  (Pls. 56.1 Reply, ¶¶ 169-

198, Ex. 568 (detailing five recent detentions since May 2002, and referencing another fifteen occasions as set forth in his rap sheet).) The vast majority of these detentions were short stays during which Mr. Wallace was charged with misdemeanor or lesser offenses, including on one occasion for stealing $34.80 worth of gum from a Rite Aid Pharmacy. (*Id.* ¶¶ 170, 174-75, 181, 184, 187, 193, 196.) As defendants themselves concede, "Mr. Wallace has been frequently arrested, on mostly misdemeanor or lesser crimes," (*id.* ¶ 196), including "since joining this lawsuit." (*Id.* ¶ 198.) During each of the detentions that Mr. Wallace has specifically recounted as a pretrial detainee at DOC, he was subjected to Exit and/or Housing strip searches. (*Id.* ¶¶ 173, 179, 182, 186, 192, 197.) Similarly, Foster Thomas has also been in and out of DOC custody as a pretrial detainee on misdemeanor charges often related to gambling, including at least seven times since June 2000, and as such has repeatedly been subjected to the Housing and Exit Policies. (*Id.* ¶¶ 142, 145-50.)

It is precisely these facts which demonstrate that named plaintiffs are likely to be subjected again to the future harm of indiscriminate, blanket group Housing and Exit strip searches, and which make plaintiffs' case distinct from both *Shain II* and *Lyons*. *Shain* involved a plaintiff who neither alleged nor established that he was likely ever to be arrested again: the Court noted that Mr. Shain had no criminal record prior to the incident, had never been subject to any criminal proceedings outside the context of his contentious divorce proceedings which had since ended, had not been re-arrested since instigating the lawsuit, and for all those reasons, was unlikely to be remanded even if he were arrested again in the future. *Shain II*, 356 F.3d at 215. *Lyons, o*n the other hand, involved a challenge to a choke-hold practice which admittedly was *not* a uniform policy or practice to which someone arrested would definitively be subjected.

37

Additionally, the Court noted that Lyons himself had not had any encounters with the police since filing the lawsuit.  *Lyons*, 461 U.S. at 107-08.

Plaintiffs here demonstrate a very different set of facts – a set that unquestionably satisfies both prongs of the standing test: their history renders them vulnerable and unfortunately likely to be subjected again to arrest in the future, and specifically to being detained and held at DOC while those charges are pending, while the undisputed blanket nature of the Housing and Exit Policies means that during such detention they will be subjected to such strip searches. Indeed, in a decision issued less than two weeks after *Lyons*, it was precisely these kinds of facts which the Supreme Court held expressly satisfied federal standing requirements.  *Kolendar v. Lawson*, 461 U.S. 352, 357 n. 3 (1983) (plaintiff stopped by the police on 15 occasions under challenged statute had standing to seek injunctive relief); *see also Mack v. Suffolk County*, 191 F.R.D. 16, 20 (D. Mass. 2000) (finding that named plaintiffs with criminal histories had standing since "it is not unreasonable to conclude that future arrests are likely" and the claim of a blanket strip search policy meant the plaintiffs would be subjected to the strip search if they were rearrested).  Because these facts render the named plaintiffs unfortunate enough to very likely be subjected to the harm of DOC's Housing and Exit Policies again in the future, they unquestionably have standing to request the relief of having such Policies enjoined.

      **2.**     **The Prison Reform Litigation Act is not a bar to plaintiffs' and the putative classes' claims**

Defendants argue that the Prison Litigation Reform Act ("PLRA") bars the present action entirely because (1) plaintiffs failed to exhaust administrative remedies and (2) did not make a showing of physical injury.  (Defs. Br. at 10-18.)  Although the PLRA generally

38

*does* apply to the specific injunctive relief that plaintiffs and the putative class seek, defendants

are otherwise wrong on the facts and the law, as they evidently are themselves aware given their

payments of millions of dollars to the prior *McBean* class settlement and their current recognition

of the need to pay some form of damages to the 2002-2007 non-drug-and-weapon misdemeanor

admission class.  (Stip. I ¶¶ 28-35, Ex. 119; *see* Hrg. Tr. Oct. 4, 2007, 118:11-119:1, Ex. 570.)

> **(a)     Neither the PLRA exhaustion requirement nor the physical injury provision bars this suit**

None of the plaintiffs was confined in a DOC facility at the time his or her claims

were filed.  (Pls. 56.1 Resp. ¶ 250, Ex. 569.)  The law is well settled in this Circuit and others

that the PLRA requirement that plaintiffs first exhaust their claims through grievance or

administrative procedures, 42 U.S.C. § 1997e(a), does not apply to suits filed after a plaintiff has

been released, even if the suits relate to events that occurred while in jail or prison.  (*See Greig v.

Goord*, 169 F.3d 165, 167 (2d Cir.1999); *Norton v. City of Marietta*, 432 F.3d 1145, 1150 (10th

Cir. 2005); *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005) (per curiam); *Ahmed v.

Dragovich*, 297 F.3d 201, 210 n.10 (3d Cir. 2002) (citing cases);  *Janes v. Hernandez*, 215 F.3d

541, 543 (5th Cir. 2000), *cert. denied*, 531 U.S. 1113 (2001); *Kerr v. Puckett*, 138 F.3d 321, 322

(7th Cir. 1998).)

The cases cited by defendants to the contrary are inapposite since they all concern

prisoners (not detainees) who were incarcerated at the time of filing.  (*See* Defs. Br. at 10-16;

*Jones v. Bock*, -- U.S. --, 127 S.Ct. 910, 918-19 (2007) (describing PLRA exhaustion

requirements *for inmates confined in prison* at the time of filing); *Porter v. Nussle*, 534 U.S. 516,

524 (2002) (same); *Booth v. Churner*, 532 U.S. 731, 739 (same); *Hemphill v. New York*, 380

F.3d 680, 686 (2d Cir. 2004) (same); *Liner v. Goord*, 196 F.3d 132, 134 (2d Cir. 1999) (declining

to decide whether 42 U.S.C. § 1997e(a) applies to cases where an inmate confined in prison

alleges use of force or where the relief that the inmate requests is not available through the

administrative process).)  Even the three-part *Hemphill* test, on which defendants rely (Defs. Br.

at 12- 16) is inapplicable.  (*Hemphill*, 380 F.3d at 686 ("a three-part inquiry is appropriate in

cases where a *prisoner plaintiff* plausibly seeks to counter defendants' contention that *the*

*prisoner* has failed to exhaust available administrative remedies as required by the PLRA, 42

U.S.C. § 1997e(a).") (emphasis added).)

        Even if the exhaustion requirement were to apply – which it plainly does not –

contrary to defendants' suggestion (Defs. Br. at 13), pretrial detainees charged with non-felony

offenses in DOC facilities do not have *any* opportunity or mechanism for grieving Housing or

Exit strip searches.  In fact, inmates have long been expressly informed through DOC notices that

such strip searches are mandatory.  In particular, the notice states: "All inmates *shall* be subjected

to a strip frisk without a visual body cavity search when . . . leaving the confines of the facility . .

. [and] an individual area of a facility or living quarter is being searched."  (Ex. LL at

NYC023897) (emphasis added).[26]  These notices plainly inform inmates that Housing and Exit

strip searches are mandatory and fully authorized by DOC, and that any grievances about these

---

        [26]  As of at least August 31, 2006, a sign in the new admission intake area of RNDC
informs the detainees of the policy.  The sign states, "EVERY INMATE WILL BE SUBJECT
TO A GROUP STRIP SEARCH PRIOR TO DEPARTING OR RETURNING TO THE
FACILITY. . . PER DIRECTIVE 4508/91." (*See* Pls. Stat. ¶ 83 (citing RNDC Intake Sign, Ex.
118); Defs. Resp. ¶ 83 ("undisputed"), Ex. 200.)

searches would therefore be futile.[27]  This is particularly so because the Inmate Rule Book states that "Complaints pertaining to matters in litigation" are non-grievable.  (Pls. 56.1 Resp. ¶ 133, Ex. 569.)  Because this litigation has been ongoing since 2002, all grievances related to Housing and Exit strip searches are non-grievable according to the written policy.  (*Id.*)

Moreover, as with the exhaustion requirement, the PLRA's requirement of a showing of physical injury to obtain damages, 42 U.S.C. § 1997e(e), is not applicable to a plaintiff who files when she or he is not in custody.[28]  *See Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir.1998) (holding that the PLRA's physical injury requirement does not apply to parolee since "[t]he statutory language does not leave wriggle room; a convict out on parole is not a 'person incarcerated or detained in any facility who is . . . adjudicated delinquent for, violations of . . . the terms and conditions of parole.'"); *id.* ("a distinction between current and former prisoners makes a modicum of sense"); *Harris v. Garner*, 216 F.3d 970, 976-80 (11th Cir. 2000) (en banc) ("Because section 1997e(e) applies only to claims filed while an inmate is confined, it does not prevent a former prisoner from filing after release a monetary damages claim for mental and emotional injury suffered while confined, without a prior showing of physical injury."); *Kelsey v. County of Schoharie*, No. 04-299, 2005 WL 1972557,  at *1-3 (N.D.N.Y. Aug. 5, 2005) (noting that "[t]he plain language of § 1997e(e) [the physical injury requirement] limits its applicability

---

[27]  In fact, witnesses have testified that they did not file grievances about these strip searches because they knew the process would be futile, or because they feared retaliation.  (Pls. 56.1 Resp. ¶ 139, Ex. 569 (citing, *inter alia*, Crosby Decl. ¶ 13, Ex. 177 ("In 1996, I refused to be strip searched in a large group during a shake-down and was beaten up by multiple officers as a result. My ribs were broken. Because of this incident, I am afraid to refuse strip searches now.")).)

[28]  Notably, defendants have not even attempted to invoke this argument, apparently recognizing its lack of merit, when settling with the prior *McBean* class or agreeing to negotiate in good faith over damages for the current 2002-2007 non-drug/weapons class.

to 'a prisoner confined in a jail, prison, or other correctional facility'"); *id.* at *2 (collecting cases).

The defendants' reliance on *Cox v. Malone*, 199 F. Supp. 2d 135, 140 (S.D.N.Y.), *aff'd*, No. 02-161, 2003 WL 366724 (2d Cir. 2002), is unavailing. (Defs. Br. at 16-17.) *Cox* held that the PLRA physical injury requirement applied to a parolee released from custody before commencing his action. Although affirmed by a non-precedential opinion, *Cox* disregarded the plain language of the statute that the physical injury requirement applies to actions "brought by a *prisoner confined in a jail, prison, or other correctional facility.*" 42 U.S.C. § 1997e(e) (emphasis added). A person on parole, like Mr. Cox, is not considered "a prisoner confined" in one of the listed institutions. For this reason, *Cox* has been repeatedly criticized, and courts have held that the PLRA physical injury provision is inapplicable to those who are not confined at the time when they commence lawsuits. *Kelsey*, 2005 WL 1972557 at *3 ("[The *Cox*] rational appears founded on an analysis not supported by the plain language of § 1997e(e) upon which other courts have relied."); *id.* ("The *Cox* decision, of course, does not constitute binding precedent for this Court."); *Rose v. Saginaw Co.*, No. 01-10337, 2005 U.S. Dist. Lexis 29567, at *31-*32 (E.D. Mich., Nov. 21, 2005) (*Cox* analysis of § 1997e(e) "ignores the plain language of the statute."); *Sutton v. Hopkins Co.*, No. 403-003, 2005 WL 3478152 (W.D. Ky., Dec. 19, 2005) (noting that "[t]he *Cox* opinion has been criticized" and following *Rose* analysis); *see also Gibson v. Kendrick*, No. 04-2960, 2005 WL 1309161, at *1 (E.D. La., May 19, 2005); *Billingsley v. Shelby County Dep't of Correction*, No. 02-2920, 2004 WL 2757915, at *7 n.4 (W.D. Tenn., Nov. 24, 2004).

In any event, even assuming *arguendo* that the physical injury requirement were

42

to apply here, Section 1997e(e) would not bar plaintiffs' "ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002); *see also Kelsey*, 2005 WL 1972557, at *10.

> **(b)     The injunctive relief that plaintiffs seek is appropriately and narrowly tailored.**

Although the PLRA plainly does not apply as a bar to plaintiffs' damages claims, its requirement of narrow tailoring does pertain to the specific forward-looking injunctive relief sought herein.[29]  Specifically, under the PLRA, injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct that violation.  *See* 18 U.S.C. § 3626(a)(1).  Here the injunctive relief that plaintiffs seek includes:

- an end to blanket, mandatory, and indiscriminate group strip searches pursuant to the Housing and Exit Policies, and

- an end to repeated unnecessary strip searches in the absence of individualized suspicion.

This injunctive relief is necessary because of "DOC's long record of failing to comply with well-established law."  *McBean v. City of New York*, No. 02-5426, 2007 WL 2947448, at *3 (S.D.N.Y. Oct. 5, 2007).  The proposed relief also is narrowly drawn and non-

---

[29]  While the PLRA sought to reduce the number of frivolous lawsuits filed by prisoners who were in custody, *see generally Ortiz v. McBride*, 380 F.3d 649, 658 (2d Cir. 2004) (analyzing legislative history), it also separately sought to ensure that any injunctive relief authorized thereunder would be narrowly tailored and minimally intrusive.  *See generally* 18 U.S.C. § 3626(a), *et seq*. For this reason, it is not illogical that the PLRA applies to injunctive relief, but that its exhaustion and physical injury provisions do not apply to meritorious claims filed by persons who are no longer prisoners or incarcerated at the time of filing their cases.

intrusive because it would allow DOC to continue its policies and practices of (1) identifying

certain detainees as "security risk group members" – identified gang members, incoming

contraband recipients, or known weapon carriers – and subjecting them to special procedures to

ensure safety (Pls. 56.1 Reply, ¶ 54, Ex. 568); and (2) always escorting and segregating the most

dangerous inmates  (*id.* at ¶ 55).  For these reasons, the proposed injunctive relief meets the

requirements of the PLRA, and the PLRA does not bar plaintiffs' claims for relief.

> **3.      Claims relating to post-admission strip search policies were addressed
> by the original complaint in this action and as such, plaintiffs have not
> improperly expanded the scope of the case**

Defendants argue that plaintiffs' "post-intake strip search claims must be

dismissed as an impermissible enlargement of the scope of this litigation."  (Defs. Br. at 20-24.)

Once again, defendants have chosen blithely to ignore both relevant law and the facts of this case

in order to make this argument.

A blanket policy of strip searching misdemeanor pretrial detainees without the

requisite showing of reasonable suspicion – which is exactly what constitutes the Housing and

Exit Policies – also appeared precisely to be the focus and target of the original Complaint filed

in this action.   In particular, the Original Complaint, filed on July 15, 2002, specifically sought

certification of a class "defined as all women[30] who since 1999: (1) have been charged with

misdemeanors or non-criminal offenses in the City of New York; (2) who were detained at

Rikers Island Correctional Facility; and (3) who were *subjected to defendants' policy, practice

and custom of strip searching pretrial detainees (a) without reasonable suspicion that the*

---

[30]  Indeed, the original complaint was on behalf only of women, but defendants have not
contended that the addition of men is an impermissible expansion, since several men ultimately
joined the suit.

*arrestee is concealing a weapon or other contraband, and/or in the presence of onlookers or members of the opposite sex. . . .*"  (Original Compl. ¶ 4, Ex. B.)   Similarly, the original plaintiffs broadly sought relief that included "[a]n injunction ceasing all improper strip searches." (*Id.* at 11.)    Read broadly and with these key strictures in mind – the class definition and prayer for relief – it would not be unreasonable to determine that the original complaint also encompassed all unconstitutional, indiscriminate, and blanket strip search policies imposed on pretrial detainees charged with misdemeanors without first establishing the requisite individualized suspicion.  For that reason alone, claims based on post-admission blanket strip search policies are encompassed by the plain language of the Original Complaint itself, and the cases cited by defendants – all involving far different, *wholly unrelated* and unquestionably previously unpled claims from the original claims that began the lawsuit, and oftentimes against entirely different actors are parties – are inapposite.   (*See* Defs. Br. at 21-22 (discussing, for example, *Chandler & Price Co. v. Brandtjen & Kluge, Inc.*, 296 U.S. 53, 58 (1935), holding that a counterclaim for a wholly different patent entirely unrelated to the original patent subject to dispute was an expansion); *see also Hartley Pen Co. v. Lindy Pen Co., Inc.*, 16 F.R.D. 141, 153 (S.D. Cal. 1954) (disallowing intervention on a "wholly independent" cause of action for infringement against a different set of defendants.)  Here, the claims arise from the same course of unconstitutional conduct effectuated by the same or similar actors all working on behalf of DOC and the City of New York.  In particular, regardless of whether claims are for admission or post-admission strip searches, defendants have chosen to implement and enforce an indiscriminate policy of group strip searches without any individualized suspicion on non-felony pretrial detainees, in violation of *Shain*.  As such, these claims are directly related and

interdependent.

Moreover, defendants' arguments are largely beside the point: the core relief sought here is a forward-looking injunction, and to the extent that defendants contend that discovery had been conducted with the original parties and they are somehow prejudiced by these post-intake strip search claims (Defs. Br. at 22), such contention is patently meritless.[31]

**4.   There is no bar to plaintiffs' claims based on the statute of limitations**

To the extent defendants' argument is really a statute of limitations defense for barring the 1999-2002 damages claims for strip searches conducted after someone had been arraigned on drug- or weapon-related charges (*see* Defs. Br. at 69, 74 (arguing that Daniel Velazquez's claim for an admission strip search after being arraigned on drug-related misdemeanor charges in January 2002 is barred by the statute of limitations), defendants are plainly wrong under governing law.  As the court is aware, the filing of a class action complaint will toll the statute of limitations for the benefit of the class.  *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 551 (1974); *Newburg on Class Actions* § 5:5.

*American Pipe* found equitable tolling appropriate precisely because the Supreme Court did not want to punish putative class members who had waited to file an action, as encouraged by Rule 23, and had relied, knowingly or not, on the existing class litigation, only to find that the class was not certified (or, as in this case, class relief was never sought) and their time to file independent actions had expired.  *Id*. at 551.  *American Pipe* tolling permits an absent class member to rely on a pending class action to toll the statute of limitations as to her

---

[31]  As set forth in earlier motion papers challenging the prior settlement in this case, the original plaintiffs did not take a single deposition in this case, whereas current plaintiffs have taken more than twenty.

individual claim, obviating the need for her to file a separate action to guard against the possibility that class certification will eventually be denied.  Without this tolling rule, "[a] putative plaintiff would have every incentive to file a separate action prior to the expiration of his own period of limitations," which would result in "a needless multiplicity of actions."  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350-51 (1981).

   As this Court recently recognized, one of the rationales underlying *American Pipe* is that "commencement of the class action adequately notifies defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. Within a period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation."  *Espinosa v. The Delgago Travel Agency*, 2006 WL 2792689, at * 3 (S.D.N.Y.  Sept. 27, 2006) (citation omitted).   Here, the commencement of this putative class action in July 2002, alleging constitutional claims on behalf of the putative class of misdemeanor pretrial detainees against the City of New York and other defendants, effectively notified defendants not only of the substantive claims being brought, but of the fact and even precise number of thousands of potential plaintiffs who had been subjected to defendants' unconstitutional strip search policies, customs or practices.[32]

   "The toll adopted in *American Pipe* was a toll of the federal statute of limitations

---

[32] Defendants are fully aware of the number of persons in the putative 1999-2002 drug/weapon admissions class, since this was expressly discussed during court conferences when this Court considered arguments that the earlier settlement was not addressing these claims.  At a court conference on May 20, 2004, defense counsel represented to the Court that there were approximately 82,000 individuals who had been strip searched upon admission after being charged with misdemeanor drug/weapon charges.

on a federal claim by virtue of the institution of a federal class action." *In Re Rezulin Prods.*
*Liab. Litig.* 2005 WL 26867, at * 3 (S.D.N.Y. Jan. 5, 2005).  Here, the three year statute of
limitations on plaintiffs' federal constitutional claims pursuant to Section 1983 was tolled by
virtue of the institution of this federal class action in July 2002.  Thus, plaintiffs' claims are
timely under the *American Pipe* tolling doctrine, and plaintiffs may serve as a named plaintiff in
this putative class action

> **5.   Defendants' arguments of res judicata and accord/satisfaction are
> frivolous and should be rejected, particularly given the history of this
> action**

Defendants have the temerity apparently to argue now – years after repeatedly
representing in open Court, in court filings, and to the parties that they absolutely refuse to settle
claims based on strip searches suffered by those being arraigned on drug- or weapon-related
misdemeanor charges, *McBean I*, 228 F.R.D. 487, 496 (noting that defendants were unwilling to
settle such claims)  – that certain named plaintiffs and unnamed class members are now
nonetheless barred from seeking damages entirely *for those precise, unsettled claims* because
such individuals already participated, or could have participated, in the earlier *McBean*
settlement. (Defs. Br. at 45-46, 65, 74.)[33]  This baseless, hypocritical argument is frivolous and
should be rejected out of hand.[34]

---

[33]  Defendants arguments on this point are far from clear – this is the best summary of an
argument we can conceivably surmise they are making.  Obviously to the extent they argue that
individual plaintiffs cannot be paid twice for the same exact strip search, we concur – and in fact,
have never sought any such relief, since all the claims now being submitted to this Court are
those that were *not* settled in the prior settlement.

[34]  Defendants are remarkably strident in their arguments, considering their repeated
representations to this Court and the parties that they *refused* to settle these claims. They accuse
named plaintiffs Williams and Wallace of "trying to deprive defendants of a bargained for benefit

On its face, the prior *McBean* settlement, including the class definition itself which this Court approved, unquestionably addressed only the unconstitutional strip searches conducted upon those charged with non-drug and non-weapon related offenses.  (Stip. I, Ex. 119.)  Indeed, as this Court is fully aware, intervenors objected to the settlement *precisely because* the claims of strip searches conducted on individuals arraigned on drug- and weapon-related charges appeared to have been cut loose.  *See McBean II*, 233 F.R.D. at 384.  This Court nevertheless approved the settlement, relying in part on the fact that such claims could still be pursued by individuals or by intervenor-plaintiffs' counsel.  *See also McBean I*, 228 F.R.D. at 496 (noting that intervenors had objected to the narrowing of the claims and class, but likewise noting that "Those detained on narcotics or weapons charges remain free to pursue their claims in a separate action, or via the presence in this case of intervenor-plaintiffs charged on narcotics or weapons-related offenses.")

Notably, defendants attempt to argue that because of a single, ambiguously worded sentence in an eight-page class notice referring generally to strip searches during 1999-2002 (Defs. Br. at 46), all individuals who received payments in the prior settlement have effectively executed a binding, general release foreclosing them for asserting claims for all other admission strip searches during such time period.  Of course, that cannot be the case given the history of this litigation and this Court's express reliance on intervenor-plaintiffs' ability to

---

in the *McBean* settlement.  This attempt is the antithesis of every notion of settlement agreements and contract law that exists.  It would eliminate the possibility of settlement in cases because it would render the agreements that arose from settlement worthless and unenforceable."  (Defs. Br. at 65.)  Of course that is flatly wrong.  Defendants did not bargain for the benefit of settling unconstitutional drug- and weapon-related strip searches, did not pay for them, and the settlement therefore did not encompass them. The settlement nevertheless remains valid and binding with respect to the non-drug and non-weapon related strip searches.

pursue relief for both the drug and weapon-related admission strip searches and post-admission strip searches.  *See McBean I*, 228 F.R.D. at 496 ("Those detained on narcotics or weapons charges remain free to pursue their claims in a separate action, or via the presence in this case of intervenor-plaintiffs charged on narcotics or weapons-related offenses."); *see also id*. at 487 (noting that intervenor-plaintiffs may now seek relief and class certification for claims not settled).   Moreover, to the extent named plaintiffs were represented by counsel at the time, such as Kenneth Williams and Foster Thomas, they expressly noted that they were continuing to pursue claims against the City through this lawsuit.  (*See* Ex. I at 5 (inserting typed phrase that claims were still being pursued under the intervenors' Amended Complaint).)

Despite defendants' strident tones on this point, *supra* n. 43, it is in fact *they* who are ignoring well settled contract law, and indeed, attempting slying to get *more* of a benefit than they ever bargained for.  They cannot now, years after expressly telling the class, the parties and the Court, that they refused to address or settle the drug or weapon-related strip search claims, argue that in fact those claims have been settled and extinguished.

### 6.    Miscellaneous procedural issues

Defendants also assert a number of miscellaneous procedural arguments that are either entirely off point – such as those relating solely to the female individuals' gynecological claim, which are not the subject of this motion practice (Defs. Br. at 18-19 (arguments concerning service of P.H.S. Medical Services, PC, a defendant only for the gynecological claims) – or are either frivolous or uncontroverted.  With respect to the latter type of arguments, defendants remarkably attempt to argue that the claims of plaintiffs Chareama Bolds, Arthur Wallace, Julio Phitts and David Sanchez are not properly before this Court because their claims

50

were set forth in the form of an addendum and part of an intervention motion served on

defendants and submitted to Magistrate Judge Katz.  (Defs. Br. at 87-88.) Defendants fail to note,

however, that Magistrate Judge Katz had, during a conference on November 16, 2006, *expressly*

*approved* just such a procedure, as a means of efficiently proceeding with the intervention

motions and not requiring repeated submission and service of a much longer complaint.   For

precisely that reason, Magistrate Judge Katz granted plaintiffs' intervention motions and made no

comment on any procedural irregularity or any need to re-serve the entire Amended Complaint

by stapling on copies of the very same addenda that had already been served.[35]  *See*

Memorandum and Opinion, dated Jan. 29, 2007 (Docket Entry No. 145.).

## II.    PLAINTIFFS' MOTION FOR CLASS CERTIFICATION SHOULD BE GRANTED

Defendants' "opposition" to plaintiffs' motion for class certification consists

primarily of (i) rehashing their substantive arguments on liability and (ii) proclaiming plaintiffs

do not meet various Rule 23 strictures in a manner that is so devoid of reasoning or factual

support that the arguments are borderline frivolous.

Plaintiffs' response to the substantive arguments are addressed elsewhere.  (*See,*

*e.g., supra* § I.D.1. (standing); § I.A.1. (*post hoc* justification for strip searches); § I.D.5.

---

[35]  Finally, defendants argue that plaintiffs Gonzalez, Ramos and Hudspeth's claims
should be dismissed.  Plaintiffs have not moved on any of these individuals' behalf for relief
from the Court.  In any event, plaintiff David Gonzalez was already dismissed by Order of this
Court. (Letter endorsed Order, dated Feb. 27, 2007, Docket Entry No. 147, Ex. GGG.)  Joel
Ramos, as we have repeatedly told defendants, had only ever alleged being subjected to a single
admission strip search for which he has been compensated under the prior settlement; we do not
dispute that based on our knowledge, he has no other claims for strip searches against
Defendants.  Finally, as we have also expressed repeatedly to defendants, we no longer represent
Afifa Hudspeth and therefore take no position with respect to their request to have her dismissed.

(preclusion based on *McBean* settlement); Section I.D.4. (statute of limitations).  What little remains is addressed below.

### A.    Plaintiffs' Proposed Rule 23(b)(2) Class Does Not Include Felons

Defendants argue that the proposed classes are "overbroad" because they "encompass individuals whose alleged claims are barred or precluded."  (Defs.' Br. at 62.)  Plaintiffs omission of the word "solely" to describe those charged with non-felony offenses in their proposed Rule 23(b)(2) class definition was not intentional.  Plaintiffs have plainly set forth repeatedly in papers and at court conferences that we are not seeking relief on behalf of those charged with felonies, including in the Preliminary Statement of the opening brief.  Plaintiffs proposed class plainly does not include any pretrial detainee who has been charged with a felony. To avoid any further confusion, plaintiffs request that the word solely be inserted in their proposed class definition.

### B.    Defendants' Claim That Housing and Exit Searches Are in Service of Different Goals Is Irrelevant

Defendants argue that their policy of strip searching persons charged with non-felonies in large groups upon exiting DOC custody and during housing searches "are two separate policies dealing with two distinct aspects of the contraband dilemma."  (Defs.' Br. at 62.)  Fond of this point, they repeat it in varying formulations: "two separate and distinct policies have separate goals and purposes," and "vast difference between the two will result in different questions of law and fact."  (*Id.*)

Defendants do not, however, anywhere explain why "it is beyond cavil to suggest, as Intervenors do, that these two policies should be combined together for the purpose of creating

one single class." (*Id.* at 62-63.)  There's nothing "cavil" about it.  Strip searching pretrial detainees charged with non-felonies can only be justified by particularized reasonable suspicion at the time of the search.  The legal analysis of the question presented here does not change because defendants claim to be pursuing different alleged penological goals.  Defendants proffered justifications are irrelevant.[36]

### C.   Defendants' Ascertainability Argument Is Confused

Defendants claim – repeatedly and without analysis – that determining class membership will require "mini-trials" where "the Court would have to assess" (1) whether each individual search was supported by reasonable suspicion (Defs.' Br. at 66-68), and (2) whether class members were *in fact* subjected to an Exit or Housing strip search or both (*id.* at 63).  This makes no sense.

First, unlike the cases defendants cite in support of this argument, plaintiffs proposed class definitions do not require a determination of the existence of reasonable suspicion *vel non*.  The Rule 23(b)(3) class definition includes everyone who was charged with non-felonies and admitted to a DOC facility because *every* such person was strip searched pursuant to a policy that required that *everyone* be searched without regard to anything.  Thus, *every* member of the class was strip searched without reasonable suspicion at the time of the search.  (*See supra* § I.A.1.)  Similarly, the Rule 23(b)(2) class definition does not require an individual determination of whether each Housing and/or Exit search was supported by reasonable suspicion because the policy uniformly and indisputably does not allow for such an analysis.

---

[36]  Insofar as the Court were to endorse an analysis that created meaningful legal distinctions between the two components of the class, the matter could be easily handled by certifying separate, but overlapping classes or subclasses.

(Pls. 56.1 Reply ¶¶ 70-78, 102-113, Ex. 568.)

Second, defendants glide by the most significant ascertainability issue concerning the proposed Rule 23 (b)(2) class. Defendants "mini-trial" argument ignores the governing law for a Rule 23 (b)(2) injunctive class: "[t]he absence of a claim for money damages eliminates the need for individualized assessments of liability and harm." " *Daniels v. City of New York*, 198 F.R.D. 409, 415 (S.D.N.Y. 2001). The issue in a (b)(2) injunctive class is *defendants' conduct*. Because plaintiffs challenge a common course of illegal conduct against them, there is "no need for individualized determinations regarding the propriety of injunctive relief." *Baby Neal ex rel. v. Casey*, 43 F.3d 48, 52 (3 rd Cir. 1994); *see also Marisol A. v. Giuliani*, 136 F.3d 372 (2d Cir. 1997).

As set forth in plaintiffs' initial brief, there simply is no ascertainability issue where certification is sought solely for injunctive purposes. This makes perfect sense. There is no need to determine the exact identities of those subjected to a Housing and/or Exit search because plaintiffs only seek relief in the form of a prospective order prohibiting such searches. It simply does not matter whether the experience of detainees was historically variable in this regard. All that matters is that a policy to conduct Housing and Exit searches indisputably exists which plaintiffs seek to enjoin prospectively and have declared unconstitutional.

### D. Defendants' Argument That Plaintiffs Cannot Adequately Represent Absent Class Members Who Were Strip Searched During Months Different From Their Own Is Frivolous

Not wanting for hubris, defendants argue that plaintiffs are inadequate class representatives because – collectively – they only managed to have their Fourth Amendment rights violated during 19 of the 84 months sought to be covered by the class period. As is their

wont, defendants do not explain why this has any bearing on the question of adequacy. It does not. Defendants' argument is frivolous.

*   *   *

Finally, it is worth observing that defendants have repeatedly, throughout this action, stipulated to the certification of both Rule 23(b)(2) and Rule 23(b)(3) classes. While not binding, defendants' willingness to so stipulate betrays the weakness of their current opposition to plaintiffs motion for class certification. Most notably, with respect to the 23(b)(3) class plaintiffs has now proposed to the Court (Pls. Memo. at 37-38), defendants have *already stipulated* to certifying a nearly identical Rule 23(b)(3) class of individuals who were subjected from 2002-2007 (instead of 1999-2002, as requested here) to blanket strip searches *and who were charged with drug and/or weapon misdemeanor offenses*. (Stip. II at 4, Ex. 561.) Defendants nevertheless continue to press the argument that such a class is "overbroad because it encompasses individuals who would have been strip searched because of the existence of reasonable suspicion that those individuals were concealing weapons or contraband." (Defs. Br. at 66.)

In a similar vein, defendants insist on making arguments that *this Court in this case* has already expressly rejected. (*Compare, e.g.,* Defs. Br. at 71-73 (classes fail "typicality" and numerosity") *with McBean* 228 F.R.D. at 493 (finding typicality and commonality satisfied with similar class and similar claims).)

Because the two classes proposed by plaintiffs unquestionably satisfy all the pertinent requirements of Rule 23 (Pls. Memo. at 37-52), and because defendants present no meritorious arguments to defeat this request, the two classes should be certified.

55

**CONCLUSION**

For the foregoing reasons, plaintiffs respectfully request that their motions for

partial summary judgment and class certification be granted.


Dated:  November 9, 2007
        New York, New York


                                        EMERY CELLI BRINCKERHOFF &
                                        ABADY LLP

                                        By:_____/s/_____
                                                Richard D. Emery (RE 5181)
                                                Matthew D. Brinckerhoff (MB 3552)
                                                Mariann Meier Wang (MW 7417)
                                                Elizabeth S. Saylor (ESS 8091)
                                                Elora Mukherjee (EM 0921)
                                                75 Rockefeller Plaza, 20th Floor
                                                New York, New York 10019
                                                (212) 763-5000

                                        *Attorneys for Plaintiffs, Proposed Classes
                                        and Class Counsel for certain already
                                        certified classes*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
KADIAN MCBEAN, et al.,                                    :

                       Plaintiffs,          :   02 Civ. 5426 (GEL) (THK)
                                            :
                                            :   **CERTIFICATE OF SERVICE**
    -against-                                              :
                                            :
THE CITY OF NEW YORK, et al.,                             :
                                            :
                       Defendants.             :                              :
-------------------------------------------------------------------------X
JOEL RAMOS, et al.,

                       Plaintiffs,

    -against-

THE CITY OF NEW YORK, et al.,

                       Defendants
-------------------------------------------------------------------------X

         I, Elizabeth Saylor an Associate at the law firm of Emery Celli Brinckerhoff and Abady LLP, hereby affirm under penalty of perjury that I am not a party to the action am over the age of eighteen years old and reside in the County of Kings, New York:

         On November 9, 2007, I electronically served true and accurate copies of **Reply Memorandum of Law in Further Support of Plaintiffs' Motions for Summary Judgment, a Permanent Injunction and Class Certification, and in Opposition to Defendants' Motion for Summary Judgment, Notice of Motion for Additional Discovery Pursuant to Fed. R. Civ. P. 56(f), Declaration in Support of Motion, Plaintiffs' Reply to Defendants' Response to Plaintiffs' Statement Pursuant to Local Rule 56,1 and Plaintiffs' Response to Defendants' Statement Pursuant to Local Rule 56.1 and Plaintiffs' Counter-Statement of Additional Undisputed Facts, and an updated Trial Exhibit list of new exhibits,** dated November 9, 2007.  On November 13, 2007, I caused to be served by hand the same documents as well as copies of the actual additional exhibits, which defendants already had in their possession.

Genevieve Nelson (gnelson@law.nyc.gov)

Afsaam Saleem (asaleem@law.nyc.gov)

Corporation Counsel

City of New York, Law Department

100 Church Street

New York, NY 10007

Dated: New York, New York

November 13, 2007

_____

Elizabeth Saylor