UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                           :

KADIAN MCBEAN, et al., individually and    :
on behalf of a class of all others similarly   :
situated,                                  :
                  Plaintiffs,    :
                                           :

            -against-               :
                                           :

THE CITY OF NEW YORK, et al.,         :
                 Defendants.    :
                                         :       02 Civ. 5426 (GEL)

----------------------------------------------------------------x
                                         :    **OPINION AND ORDER**

JOEL RAMOS, et al., individually and on     :
behalf of all others similarly situated,     :
                Intervenor-Plaintiffs,  :
                                           :

            -against-               :
                                           :

THE CITY OF NEW YORK, et al.,         :
                 Defendants.    :
                                         :
----------------------------------------------------------------x

Richard D. Emery, Matthew D. Brinckerhoff,
Marian Meier Wang, Elizabeth S. Saylor, Emery,
Celli, Brinckerhoff & Abady LLP, New York,
New York, for Intervenor-Plaintiffs.

Michael A. Cardozo, Corporation Counsel of the
City of New York (by Genevieve Nelson, Assistant
Corporation Counsel), New York, New York,
for Defendants.

GERARD E. LYNCH, District Judge:

      In a continuation of this putative class action for federal civil rights violations arising

from policies or practices of the New York City Department of Corrections ("DOC") applied at

New York City jails, intervenor-plaintiffs move for partial summary judgment and to certify a

damages class of pre-trial detainees who were charged with certain narcotics- or weapons-related misdemeanors and who, after arraignment, were strip-searched pursuant to a mandatory and indiscriminate intake policy.  Intervenor-plaintiffs also move for summary judgment, preliminary injunctive relief, and class certification with respect to all pre-trial detainee misdemeanants who have been or will be affected by DOC's Housing and Exit Policies, or, in the alternative, to reopen discovery.  Defendants oppose intervenor-plaintiffs' motions and cross-move for summary judgment.

The principal issues raised by these cross-motions for summary judgment are twofold: first, whether arraignment on a narcotics- or weapons-related misdemeanor offense is, in itself, sufficient to evoke reasonable suspicion that a detainee may be concealing weapons or contraband at intake despite the fact that the offense was not known to the searching officer at the time of the search; and second, whether DOC's Housing and Exit Policies, under which all pre-trial misdemeanants are routinely strip-searched throughout their stay at DOC, is controlled by the holding of Shain v. Ellison, which requires that searching officers have an individualized reasonable suspicion that a misdemeanant is secreting weapons or contraband.  See 273 F.3d 56, 66 (2d Cir. 2001).  For the reasons set forth below, the motions will be granted in part and denied in part.

**BACKGROUND**

Much of the lengthy history of this case is laid out in this Court's opinions certifying the original class of plaintiffs (the "McBean Settlement Class"), see McBean v. City of New York ("McBean I"), 228 F.R.D. 487, 489-91 (S.D.N.Y. 2005), and approving the parties' stipulation to injunctive relief and additional class certifications, see McBean v. City of New York ("McBean II"), No. 02 Civ. 5426, 2007 WL 2947448 (S.D.N.Y. Oct. 5, 2007).  Nevertheless, the instant

2

motions require a detailed recitation of that history, as intervenor-plaintiffs seek not only to certify a class of plaintiffs who were specifically excluded from the McBean Settlement Class on account of their narcotics- and weapons-related misdemeanors,[1] but also to challenge strip searches conducted under DOC's Housing and Exit policies.  In particular, intervenor-plaintiffs allege that these post-intake searches are constitutionally identical to those conducted prior to intake, and thus require individualized reasonable suspicion under Shain, 273 F.3d at 66. Whether Shain controls these post-intake searches, however, is a matter of first impression that, in turn, compels the Court to decide whether plaintiff-intervenors' pursuit of post-intake strip-search claims impermissibly expands the scope of this litigation.  Because resolution of this issue implicates both procedural and substantive issues, a thorough explication of the history of this litigation is warranted.

I.      The Original McBean Plaintiffs

The original McBean plaintiffs were female pre-trial detainees who were strip-searched and allegedly subjected to nonconsensual gynecological examinations on admission to Rikers

---

[1] Each party originally moved for summary judgment only with respect to those narcotics and weapons misdemeanants excluded from the McBean Settlement Class, that is, those who were admitted between July 15, 1999, and July 22, 2002.  However, in light of defendants' admission that they continued the blanket practice of strip searching all misdemeanor detainees at intake irrespective of the nature of their charges through October 4, 2007, the parties have agreed that the issue of whether defendants are liable for the intake searches of certain narcotics and weapons misdemeanants conducted from July 23, 2002 (the end of the class period at issue in these motions), through October 4, 2007, is substantially identical to whether defendants are liable for the intake searches of narcotics and weapons misdemeanants conducted between July 15, 1999, and July 22, 2002.  Accordingly, the resolution of these summary judgment motions will include narcotics and weapons misdemeanants who were searched between July 15, 1999, and October 4, 2007.

Island Correctional Facility.[2]  In their complaint they alleged that the blanket policy of strip-searching every detainee newly admitted to DOC's facilities, including those charged with misdemeanors and lesser offenses (the "Prior Admission Policy"), was unconstitutional because it was substantially similar to the policy struck down by the Second Circuit in Shain as violative of the Fourth Amendment.  (Pl. Original Compl. ¶¶ 9-14; Pl. First Am. Compl. ¶¶ 10-15.)  As in Shain, the plaintiffs alleged that they were strip-searched absent reasonable suspicion that they were concealing weapons or other contraband.[3]

On October 11, 2002, plaintiffs amended their complaint to add additional named plaintiffs, at least one of whom was male, and to propose two separate classes: first, a class of all newly-admitted pre-trial detainees, without regard to gender, who were strip-searched under DOC's Prior Admission Policy; and second, a class of newly-admitted female detainees subjected to forced gynecological examinations.  (Pl. 2d Am. Compl. ¶¶ 5-6.)

Just one week after the suit was filed, DOC issued a new intake policy, Operations Order 08/02, which purported to abandon – as required by Shain – the practice of strip-searching misdemeanor detainees absent reasonable suspicion.  The policy specifically provided that

---

[2] The parties have agreed that the issue of gynecological examinations is not at issue in the present motions.  (Def. Reply Mem. at 6; Int.-Pl. Reply Mem. 50.)  It is therefore unnecessary to reach defendants' arguments concerning the failure of intervenor-plaintiffs to properly serve P.H.S. Medical Services, PC.

[3] The search followed the following protocol:

a search of the inmate['s] apparel after the inmate has removed his/her clothing[,] accompanied by a visual inspection of the inmate's mouth, hair, armpits, knees and toes.  The inmate is then instructed to squat to ensure that no contraband is being secreted in the area of the buttocks.

McBean I, 228 F.R.D. at 489.

"[p]ost-arraignment detainee inmates incarcerated for Misdemeanor and/or Violation Offenses shall not be made the subject of a strip search during the new admission process unless there is reasonable suspicion that the inmate is in possession of contraband."  (Int.-Pl. R. 56.1 ¶¶ 34, 36.) On October 17, 2002, plaintiffs moved for a preliminary injunction and for class certification, claiming that, in spite of the purported policy change, DOC had not ended its unlawful practices. (Letter of Richard J. Cardinale to the Court, dated Dec. 9, 2002, at I.)  On December 18, 2002, the Court, believing that principles of judicial restraint and the letter and spirit of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626 et seq., cautioned against intrusive court supervision, accepted DOC's representations that, whatever its past derelictions, there would be no future violations.  (See 12/18/02 Hr'g Tr. 24:18-26:8.)  Accordingly, the Court denied plaintiffs' preliminary injunction motion in an oral opinion, and deferred decision on plaintiffs' class certification motion pending the completion of discovery on certain issues material to certification and resolution of defendants' motion to disqualify plaintiffs' counsel.[4]

Following its denial of defendants' motion to disqualify plaintiffs' counsel, see McBean v. City of New York, No. 02 Civ. 5426, 2003 WL 21277115 (S.D.N.Y. June 3, 2003), the Court again postponed its decision on the certification motion pending the outcome of settlement negotiations.  Those negotiations yielded a proposed settlement class that differed from the one suggested in plaintiffs' amended complaint.  In particular, the proposed settlement class specifically excluded pre-trial detainees arraigned on certain narcotics- and weapons-related charges and consisted of only those "pre-trial detainees who, during the class period [July 15,

---

[4] A related case, Cence v. City of New York, No. 03 Civ. 4114 (GEL), was filed on June 5, 2003, and consolidated for all purposes with the McBean case on July 25, 2003.  The classes proposed in the Cence complaint were coextensive with those for which the McBean plaintiffs moved for certification in October 2002.

1999 through July 22, 2002], were arraigned on certain misdemeanors, violations, and

misdemeanor charges of civil contempt, and non-felony warrants regarding same, and who, after

arraignment, were strip-searched in DOC jails."  (Stipulation and Order of Class Action Stlmt.

("Proposed McBean Stlmt."), Def. Cert. Opp. Mem., Ex. A, ¶ 1.)[5]

On February 18, 2004, just prior to the conclusion of the settlement negotiations, putative

class members Joel Ramos, Foster Thomas, Daniel Velazquez, and Kenneth Williams, all of

whom were represented by Emery, Celli, Brinckerhoff & Abady LLP, moved to intervene as of

right in the case.[6]  The putative intervenor-plaintiffs, one of whom had been charged with a

misdemeanor narcotics offense, claimed their interests would be adversely affected by various

_____

[5]  Excluded from the class were pre-trial detainees who, at the time they were admitted to
DOC facilities, were charged with the following narcotics- and weapons-related offenses: N.Y.
Penal Law Sections: (a) § 220.03 Criminal Possession of a Controlled Substance in the Seventh
Degree, a class A misdemeanor; (b) § 220.45, Criminal Possession of a Hypodermic Instrument,
a class A misdemeanor; (c) § 220.50, Criminal Possession of Drug Paraphernalia in the Second
Degree, a class A misdemeanor; (d) § 221.05, Unlawful Possession of Marijuana, a violation; (e)
§ 221.10, Criminal Possession of Marijuana in the Fifth Degree, a class B misdemeanor; (f) §
221.15, Criminal Possession of Marijuana in the Fourth Degree, a class A misdemeanor; (g) §
221.35, Criminal Sale of Marijuana in the Fifth Degree, a class B misdemeanor; (h) § 221.40,
Criminal Sale of Marijuana in the Fourth Degree, a class A misdemeanor; (i) § 265.01, Criminal
Possession of a Weapon in the Fourth Degree, a class A misdemeanor; and (j) § 265.06,
Unlawful Possession of a Weapon upon School Grounds, a violation.  Also excluded from the
class were those who were charged pursuant to the following New York City Administrative
Code Sections: (a) § 10-131, Firearms; (b) § 10-133, Possession of Knives or Instruments; and
(c) § 10-134, Prohibition on Sale of Certain Knives; and those who were charged pursuant to
Vehicle and Traffic Law § 1192(4), Operating a Motor Vehicle while impaired by the use of a
drug.

[6]  Rule 24(a)(2), Fed. R. Civ. P., on "Intervention of Right," states: "Upon timely
application anyone shall be permitted to intervene in an action . . . (2) when the applicant claims
an interest relating to the property or transaction which is the subject of the action and the
applicant is so situated that the disposition of the action may as a practical matter impair or
impede the applicant's ability to protect that interest, unless the applicant's interest is adequately
protected by the existing parties."

terms of the proposed settlement, including plaintiffs' decision to narrow the intake class to

exclude misdemeanor arrestees charged with certain narcotics- or weapons-related offenses.  In

their Intervenor Class Action Complaint, the putative intervenor-plaintiffs purported to bring suit

on behalf of an intake class of "all persons who have been or will be arraigned on misdemeanor

or non-criminal offenses and then were or will be strip-searched pursuant to City and DOC

policy, practice, and custom."  (Int.-Pl. Compl. ¶ 21.)  This formulation endeavored to restore the

broader class originally proposed by the McBean plaintiffs in their October 2002 motion for

class certification.  McBean I, 228 F.R.D. at 490.

    After further briefing, the Court granted the motion to intervene and directed the original

plaintiffs to file an amended motion for certification of the narrower class as defined in the

proposed settlement.  Intervenor-plaintiffs opposed certification of the narrower class, and

cross-moved for certification of the broader class, appointment of intervenor-plaintiffs as class

representatives, and appointment of Emery, Celli, Brinckerhoff & Abady LLP, as class counsel.

Presented with competing motions for class certification and appointment of class counsel, the

Court granted the original plaintiffs' certification motion on April 27, 2005, finding that

"plaintiffs' decision to narrow the class in order to obtain relief for a subset of the original

plaintiffs . . . [left] unimpaired the rights of those excluded to pursue their claims separately,"

and that the narrowing of the class would permit members of the class who were clearly entitled

to relief to obtain speedy compensation, while avoiding delay occasioned by litigating the claims

of other detainees as to whom the defendants vigorously contested liability.  See McBean I, 228

F.R.D. at 504-05.  Finding no reason to take the case out of the hands of the attorneys who had

initiated and prosecuted the action up until that point, the Court appointed counsel for the

original plaintiffs class counsel.  Id.

With a class in place, the original McBean plaintiffs settled, providing damages to misdemeanor detainees not arraigned on the excluded offenses (the "McBean Settlement Class").[7]  The settlement was preliminarily approved by this Court on June 21, 2005, and finally approved in McBean v. City of New York, 233 F.R.D. 377 (S.D.N.Y. 2006) (approving of the settlement, the payments to class representatives, and the attorneys' fees).

II.    The Intervenor-Plaintiffs

 Following the Court's preliminary approval of the McBean Settlement Class, intervenor-plaintiffs pursued discovery concerning a number of claims relevant to their First Amended Complaint, which was filed on April 7, 2005.

Discovery revealed that, contrary to DOC's representations, on which the Court had relied in denying injunctive relief, Operations Order 08/02 had never been implemented.  Indeed, for the five years following its announcement that the 08/02 directive had ended the practice of strip-searching misdemeanor detainees – and even after it had agreed to pay substantial damages to settle this action with the original class of plaintiffs – DOC continued to strip-search virtually all misdemeanor detainees per the Prior Admission Policy.

Following a period of intense negotiation, the parties arrived at a settlement in response to this revelation, in the form of a stipulation of facts and preliminary injunctive relief.  The stipulation, subsequently put into place by the Court's Order of October 4, 2007, provided that

---

[7] In order to clarify that the McBean Settlement Class included only individuals strip-searched in accordance with the Prior Admission Policy and not those subjected to strip searches conducted after intake pursuant to other DOC policies, the Court amended the proposed class definition to include "pre-trial detainees who, during the class period [July 15, 1999 through July 22, 2002], were arraigned on certain misdemeanors, violations, and misdemeanor charges of civil contempt, and non-felony warrants regarding same, and who, after arraignment, were strip-searched in DOC jails *pursuant to the standard new admission strip search procedure*." McBean I, 228 F.R.D. at 496 (new language italicized).

DOC would implement Operations Order 08/02 (the "Current Admission Policy"), allow

certification of certain classes for purposes of damages or injunctive relief, and refrain from

"subject[ing any misdemeanor detainees] to a strip search upon admission into DOC custody

without reasonable suspicion."  (Stipulation and Order 4, § II, ¶ 1, Oct. 4, 2007); see McBean II,

2007 WL 2947448 at *2-3.  The Current Admission Policy requires that when any detainee

enters a DOC facility, a designated officer will review the detainee's securing order(s) to

determine whether a detainee has been charged with a felony, a misdemeanor, or a violation.

(Int-Pl. R. 56.1 ¶ 38.)  If the detainee has not been charged with a felony, and does not meet any

of the other, limited conditions,[8] the detainee "shall not be made the subject of a strip search

during the new admission process unless there is reasonable suspicion that the inmate is in

possession of contraband."  (Int-Pl. R. 56.1 ¶ 36.)  Detainees in this category – which include

pre-trial detainees charged with narcotics- or weapons-related misdemeanors – are given a

disposable medical gown so that the detainee is not naked during the intake search.  The Court

appointed a Special Master to supervise the implementation of the intake procedures, and to

report on DOC's compliance with the October 4, 2007, Order.

III.   Intervenor-Plaintiffs' Housing and Exit Search Claims

        In addition to pursuing discovery on behalf of narcotics and weapons midemeanants,

intervenor-plaintiffs also pursued discovery with respect to claims raised in their First Amended

Complaint concerning post-intake searches conducted pursuant to the Housing and Exit Policies.

Under the Housing Policy, detainees are strip-searched whenever their living quarters are

---

        [8] Those conditions include a detainee's violation of parole, his or her status as a state
inmate, or an outstanding warrant for his or her arrest involving a felony offense.  (Int.-Pl. R.
56.1 ¶ 40.)

searched, which occurs "regular[ly] and frequent[ly]."  (Int.-Pl. R. 56.1 ¶¶ 84, 89, 99.)  Detainees are also strip-searched when they exit a DOC facility (the "Exit Policy"), except when insufficient staff, room, or time is available to conduct the searches.  (Int-Pl. R. 56.1 ¶¶ 56, 64.) These searches take place regardless of whether a particular detainee has recently been searched or has been in continuous custody since his last search.[9]  (Int.-Pl. R. 56.1 ¶¶ 71, 113.)

With respect to intervenor-plaintiffs' Housing and Exit claims, they now move for summary judgment, for preliminary injunctive relief, and to certify a class of all pre-trial detainee misdemeanants who have been or will be affected by DOC's Housing and Exit Policies, or, in the alternative, to reopen discovery.

## DISCUSSION

I.   <u>Motions for Summary Judgment</u>

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the "burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law." <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996).  However, when moving against a party who will bear the ultimate burden of proof on an issue, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."

---

[9] Like the intake searches conducted under the Prior Admission Policy, these searches require that the detainee disrobe so that a DOC officer can visually inspect the detainee's mouth, armpits, oral cavity, ears, nose, knees, toes, and naval.  (Int-Pl. R. 56.1 ¶¶ 57, 94.)  The officer also conducts a visual inspection of the detainee's anus and genital cavities, while the inmate stands with his or her legs spread and body bent forward at the waist to ensure that no contraband is being secured in the area of the buttocks.  (<u>Id</u>.)

Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("The moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.") (internal quotation marks omitted).

Once the moving party has satisfied its burden, the burden then shifts to the nonmoving party to come forward with affidavits, depositions, interrogatories, or other sworn evidence sufficient to create a genuine issue of material fact for trial. See Fed. R. Civ. P. 56(e)(2); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The nonmoving party may not satisfy this burden simply by "show[ing] that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; see also Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (holding that a nonmovant cannot defeat a motion for summary judgment "merely . . . on the basis of conjecture or surmise"), quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (internal quotation marks omitted). Rather, the nonmovant must advance "enough evidence to support a jury verdict in its favor." Trans Sport, Inc., 964 F.2d at 188. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587.

These standards apply with equal force where, as here, the parties have filed cross-motions for summary judgment. See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). In such a situation, "a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citation omitted).

II.    The Narcotics and Weapons Misdemeanants: Liability

The first principal issue raised by these cross-motions for summary judgment is whether arraignment on a narcotics- or weapons-related offense is sufficient to evoke reasonable suspicion that a detainee may be concealing weapons or contraband at intake, despite the fact that the nature of the detainee's alleged offense was not known to the searching officer at the time of the search.[10]   Intervenor-plaintiffs argue that it cannot and urge the Court to grant partial summary judgment finding that the Prior Admission Policy was unconstitutional,[11] and to certify a damages class pursuant to Fed. R. Civ. P. 23(b)(3) of all pre-trial detainees charged with non-felony narcotics and weapons offenses who were either excluded from the McBean Settlement Class or the subject of the October 4, 2007, Stipulation and Order.

As the Second Circuit recently noted in Kelsey v. County of Schoharie, 567 F.3d 54, 62 (2d Cir. 2009), it is "long-standing precedent" that before a misdemeanant may be lawfully strip-searched on intake, the Fourth Amendment requires an individualized "reasonable suspicion that [he] is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest."  Id., quoting Hartline v. Gallo, 546 F.3d 95, 100-101 (2d Cir. 2008); see also Shain, 273 F.3d at 66 ("[P]ersons charged with a misdemeanor and remanded to a local correctional facility . . . have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons . . . .");

---

[10] Defendants contend that the issue is simply whether a narcotics or weapons charge creates a reasonable suspicion of contraband concealment, and if it does, they assert that no liability can attach because the searching officer *could have formed* a reasonable suspicion necessary to justify the search, even if he did not do so at the time.  For the reasons that follow, this argument is without merit.

[11] See supra note 1.

Walsh v. Franco, 849 F.2d 66, 69 (2d Cir. 1988) ("[T]he unconstitutionality of a blanket policy calling for strip searches of all misdemeanor arrestees [is] clearly established.").  "To establish reasonable suspicion, [officers] must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience."  Hartline, 546 F.3d at 100 (internal quotation marks and citations omitted).  While "challenged searches are judged 'without regard to the underlying intent or motivation of the officers involved,'"  Hudson v. New York City, 271 F.3d 62, 68 (2d Cir. 2001), quoting Scott v. United States, 436 U.S. 128, 138 (1978), whether a particular strip search is constitutional "turns on an objective assessment of the . . . facts and circumstances confronting [the searching officer] *at the time*" of the search.  Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (internal quotation marks and citations omitted) (emphasis added); see also Simms v. Village of Albion, N.Y., 115 F.3d 1098, 1108 (2d Cir. 1997).  Put simply, it is well-settled that reasonable suspicion is not the product of omniscient retrospection; it may not be retroactively imputed.  United States v. Colon, 250 F.3d 130, 138 (2d Cir. 2001) (finding that "[t]he fact that the 911 operator turned out, after the fact, to have additional information which would have given the arresting officers reasonable suspicion cannot retroactively make their actions objectively reasonable").

Here, DOC has conceded not only that all misdemeanants were strip-searched pursuant to a mandatory and indiscriminate policy, but also that "the record in this [a]ction demonstrates" a pattern and practice of strip-searching all misdemeanants during the intake process "without [the searching officer's] making any determination *or knowing* whether [the detainee] had been arraigned on a charge under the New York Penal Code that was related to the possession or use of a drug and/or weapon."  (Stipulation and Order at 3, Oct. 4, 2007 (emphasis added); see also

Def. R. 56.1 Resp. ¶¶ 15-32).[12]  Accordingly, it is undisputed that, at the time those searches were performed, they were undertaken without the searching officers' knowing any facts other than the person's status as a misdemeanant-detainee, and therefore indiscriminately and without any reference to "the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest."  Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986).  On these facts, the searches cannot have been supported by reasonable suspicion.  Because, as this Court has already explained, "[i]t is indeed well-settled that reasonable suspicion must exist at the time the search is conducted, not supplied *post hoc*," McBean I, 228 F.R.D. at 497, it is a straightforward matter to resolve the issue of liability squarely against the defendants.

Defendants' sole remaining argument is that the claims of narcotics and weapons misdemeants should nevertheless be dismissed as a matter of law because, "like felony detainees, [these misdemeanants] could never legitimately claim that they had a 'right' not to be strip searched."  (Def. Reply Mem. at 38.)  This assertion requires a response because it gravely misconstrues a point on which controlling precedent offers absolute clarity.  It is bedrock law that whatever the relevant misdemeanor charge – whether it relates to narcotics or weapons – all misdemeanants have a right not to be strip-searched at intake absent reasonable suspicion.  See Weber, 804 F.2d at 802-04 (finding that misdemeanor arrestees have a clearly-established constitutional right to be free of "strip/body cavity searches" absent "a reasonable suspicion that

_____

[12] The October 4, 2007, Stipulation and Order only addresses intake searches performed between July 23, 2002, and October 4, 2007.  However, DOC does not contend that the searches conducted between July 15, 1999, and July 22, 2002, were performed any differently – indeed they were conducted under the same Prior Admission Policy – nor has DOC mounted any argument that facts (including the underlying charge) giving rise to reasonable suspicion were known to any of the searching officers, or to officers on whom the searching officers might be entitled to rely under United States v. Colon, 250 F.3d at 135-37.

the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest").

To the extent that defendants suggest that strip searches of narcotics and weapons misdemeanants do not implicate the Fourth Amendment, this argument is contrary to precedent and wholly without basis.  See Bell v. Wolfish, 441 U.S. 520, 559 (1979) (holding that the Fourth Amendment reasonableness analysis balances the need for a particular search against the invasion of personal rights it occasions).  To the extent that the argument is a narrower attempt to rewrite Weber so as to exclude certain misdemeanants from its purview, it is simply unpersuasive.  The issue is not, as the defendants would have it, whether a certain stripe of misdemeanant can be plucked from the purview of Weber, but rather whether a misdemeanor narcotics or weapons charge, standing alone, provides a valid basis for a "reasonable suspicion" that contraband is being concealed.[13]  As discussed above, however, the Court does not – and indeed cannot – reach *that* novel issue because it is undisputed that the officers conducting the searches pursuant to the Prior Admission Policy were wholly unaware whether a particular detainee had been arraigned on narcotics- or weapons-related charges, and thus the officers lacked reasonable suspicion based on such charges as a matter of law.  See Shain, 273 F.3d at 66 (rejecting a could-have-known argument where the only information known to the searching officer and required by the blanket policy was the fact of the remand); N.G. v. Connecticut, 382 F.3d 225, 244-45 (2d Cir. 2004) (Sotomayor, J., concurring in part and dissenting in part) (citing

_____

[13] Specifically, the issue is whether the fact that an individualized "reasonable suspicion . . . [may be] based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest," Weber, 804 F.2d at 802-04, implies that the charge alone – the finding of probable cause that a detainee has committed a specific offense – warrants a reasonable suspicion that the detainee is concealing contraband, and if so, what offenses might qualify as warranting such suspicion.  See infra note 14.

relevant Supreme Court precedent for the proposition that "[i]f the information causing reasonable suspicion was unknown or irrelevant to the person performing the search, it is not part of [a] determination of 'reasonableness' under the Fourth Amendment").[14]

Nevertheless, if that question were squarely before the Court, it is worth noting that there appears to be no support in this circuit's precedent for the proposition that a bare misdemeanor charge is sufficient to establish reasonable suspicion that a detainee is secreting contraband. The weight of district court authority is squarely against such a proposition,[15] and the Second Circuit's recent decision in Hartline casts considerable doubt on its prospects of becoming law. In Hartline, the court considered whether reasonable suspicion existed to strip-search a plaintiff at the police station after she had been charged with misdemeanor possession following the officer's discovery of "unusable bits of marijuana, including a butt of a marijuana cigarette, a

_____

[14] Accordingly, it is unnecessary to parse the narcotics and weapons charges at issue to decide whether each could, per se, constitute individualized suspicion that contraband was being secreted. As intervenor-plaintiffs point out, some of the charges relevant to the proposed classes involve only minor offenses relating to weapons, including unlawfully selling certain toy pistols to a minor and failing to pay a $10 annual renewal fee for an air pistol license. See N.Y.C. Admin. Code §§ 10-131(d),(g). Whether any of these charges could cause reasonable suspicion standing alone does not matter for purposes of establishing liability here, because the searching officers did not know the specific charge(s) on which the detainees had been arraigned. Thus, in this analysis, no work is done by the applicable charge. The charge is merely category-creating in that it divides misdemeanants searched pursuant to the Prior Admission Policy into two classes – those with charges that excluded them from the prior class, and those who have already received relief under the prior settlement. For this reason, it is unnecessary to confront the argument, not raised by the defendants, of whether, with respect to both ease of concealment and the institutional risk, the sufficiency of a weapons-related charge might fare differently in the reasonable suspicion analysis than a narcotics-related charge.

[15] See, e.g., Sarnicola v. County of Westchester, 229 F. Supp. 2d 259, 274-75 (S.D.N.Y. 2002) (finding that "[a]n automatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the totality of the circumstances"); Harriston v. Mead, No. 05 Civ. 2058, 2008 WL 4507608, at *3 (E.D.N.Y. Sept. 30, 2008) (declining to "adopt a per se rule that crimes of violence trigger individualized reasonable suspicion sufficient to justify a strip search").

16

container with a few seeds, and a pipe" in her motor vehicle.  In a strongly worded opinion, the court found it "hard to imagine" that reasonable suspicion existed for the search because the arresting officer, who also conducted the search, "had no reason to believe that [the arrestee] was under the influence of narcotics at the time of her arrest . . . [and] found no useable narcotics in [the arrestee's] vehicle."  Hartline, 546 F.3d at 101.  It then specifically noted that the charge itself was insufficient to establish reasonable suspicion, as the defendant "had been arrested for nothing more serious than a [narcotics-related] B-misdemeanor."  Id.; see also id. (citing persuasive authority for the proposition that "it is [not] reasonable to strip search every inmate booked on a drug related charge" and reasoning that "if the facts of this case amount to reasonable suspicion, then strip searches will become commonplace").

Several other circuits that have addressed the distinction between a lawful arrest related to contraband and a reasonable suspicion that the arrestee is *concealing* contraband on his person have come to the same conclusion.  See Way v. County of Ventura, 445 F.3d 1157, 1162 (9th Cir. 2006) ("We cannot see how the charge of being under the influence of a drug necessarily poses a threat of concealing (and thereby using or trafficking) additional drugs in jail during the limited time between booking and bail, or booking and placement in the general population."); Foote v. Spiegel, 118 F.3d 1416, 1425 (10th Cir. 1997) ("[A] strip search of a person arrested for driving while under the influence of drugs . . . is not justified in the absence of reasonable suspicion that the arrestee has drugs . . . hidden on . . . her person. . . .  [T]his court expressly rejected the proposition that it is reasonable to strip search every inmate booked on a drug related charge . . . .").[16]

---

[16] Indeed, it bears noting that the DOC itself, upon reforming its policy, chose not to single out narcotics and weapon misdemeanants and instead implemented gown searches for

While this case arguably raises certain security concerns not otherwise present in Hartline because the detainees here, unlike the plaintiff in Hartline, were admitted into the general jail population, it is unlikely that Hartline could be distinguished on this basis.  In Weber, the court concluded that even if the detainee had been unable to make bail and had been moved from a holding cell to a cell near other arraigned inmates, such a change of circumstances "would still not provide that particularized suspicion, arising either from the nature of the charges and/or the arrest, which the law requires for so intrusive and demeaning a procedure as a strip/body cavity search."  804 F.2d at 802 (citation and internal quotation marks omitted); accord Shain, 273 F.3d at 63.

For much the same reasons, moreover, defendants' suggestion that the Court find, as a matter of law, that narcotics and weapons misdemeanants are entitled only to nominal damages because their rights were, "at best[,] . . . infringed upon in a technical manner" (Def. Reply Mem. at 42) is rejected.  In light of Hartline, it is unlikely that these misdemeanants could have been constitutionally strip-searched even if the searching officer had known of their narcotics- or weapons-related charges.  In any event, there is nothing "technical" about being subjected to an unconstitutional strip search.

Accordingly, intervenor-plaintiffs' motion for summary judgment as to narcotics and weapons misdemeanants who were searched between July 15, 1999, and October 4, 2007, is granted.  The issue of damages will proceed to trial.

III.    Class Certification Standards

It is well established that, in order to certify the proposed class, intervenor-plaintiffs must

---

nearly all misdemeanants, except those discussed at supra note 8.

demonstrate that the proposed class representatives meet all of the requirements of Rule 23(a) –

numerosity, commonality, typicality, and adequacy – and that the proposed class action meets

one of the subsections of Rule 23(b).  In re Salomon Analyst Metromedia Litig., 544 F.3d 474,

478 (2d Cir. 2008); see Fed. R. Civ. P. 23(a).  Here, plaintiff-intervenors seek certification under

Rule 23(b)(3), which requires that they demonstrate that "questions of law or fact common to

class members predominate over any questions affecting only individual members, and that a

class action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  Fed. R. Civ. P. 23(b)(3).

        In determining whether each of these Rule 23 requirements are met, a district court must

undertake a "rigorous analysis."  Heerwagen v. Clear Channel Comm'ns, 435 F.3d 219, 225 (2d

Cir. 2006).  Because this analysis may require the resolution of "factual disputes relevant to each

Rule 23 requirement," a court may make findings with respect to "whatever underlying facts are

relevant to a particular Rule 23 requirement."  In re IPO Sec. Litig., 471 F.3d 24, 41 (2d Cir.

2006).  In making such findings, it is not sufficient that there be "some showing" by plaintiff that

the requirements are met.  Id. at 42; accord Teamsters Local 445 Freight Div. Pension Fund v.

Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008).  Rather, a "district judge is to assess all of

the relevant evidence admitted at the class certification stage and determine whether each Rule

23 requirement has been met, just as the judge would resolve a dispute about any other threshold

prerequisite for continuing a lawsuit."  In re IPO Sec. Litig., 471 F.3d at 42.  This assessment

includes weighing "conflicting evidence" where it exists.  Id.  Although a judge must make his

determinations about the Rule 23 requirements even where doing so requires the determination

of an issue that is "identical to an issue on the merits," any such Rule 23 fact-finding "is not

binding on the trier of facts" at the merits stage, "even if that trier is the class certification

judge." Id. at 41-42.

IV.    Rule 23(a) Requirements

Defendants have already consented to certifying a Rule 23(b)(3) class of certain narcotics

and weapons misdemeanants that were searched between July 23, 2002, and October 4, 2007.

(Stipulation and Order 4, § I(c), Oct. 4, 2007).[17]  That class includes

> [a]ll pretrial detainees arraigned solely on non-felony charges who
> were arraigned on Drug or Weapon Charges[[18]] and who were
> admitted to DOC custody between July 23, 2002 and October 4,
> 2007 but were not also simultaneously admitted on: (i) any felony
> charges; (ii) a parole violation; (iii) an outstanding warrant for a
> felony offense; (iv) a violation of felony probation; (v) a City
> sentence of less than one year; or (vi) who were not already
> serving a State sentence at the time of their admission.

Id.

For purposes of the present motions, the only issue with respect to class certification

involves the Rule 23(b)(3) certification of the class of certain narcotics and weapons

misdemeanants searched between July 15, 1999, and July 22, 2002.  With respect to this group,

plaintiffs propose that Arthur Wallace, Kenneth Williams, and Daniel Velazquez be permitted to

---

[17] The parties have also agreed that intervenor-plaintiffs' counsel, Emery Celli Brinckerhoff & Abady LLP, will serve as class counsel.  (Id. § I.)  The Court approves that appointment, finding that the services already provided by counsel in this matter amply demonstrate counsel's ability and determination to represent the class effectively.

[18] According to the terms of the October 4, 2007, Stipulation and Order, "Drug or Weapon Charges" means the narcotics- and weapons-related charges listed in the June 21, 2005, Stipulation and Order of Class Action Settlement, see supra note 4, as well as "any [of] the following charges: § 205.20, Promoting Prison Contraband (2nd Degree); § 240.40, Appearance in Public Under the Influence of Narcotics or Drugs, other than Alcohol; § 265.10, Manufacture, Transport, Disposition & Defacement of Weapon and Dangerous Instrument and Appliances; § 265.35[3(c)], Prohibited Use of Weapon; § 270.05, Possession or Sale of Noxious Mat[t]er; § 400.00, Firearms License Violations; VTL § 1193, Driving Impaired (3rd Offense); and VTL § 1192(1), Driving Impaired."

sue as representative parties[19] on behalf of

> [a]ll persons arraigned solely on non-felony charges – at least one
> of which must be a charge listed in paragraph 2 of the Stipulation
> and Order of Class Action Settlement, dated June 21, 2005 – and
> who were strip searched during the period between July 15, 1999,
> and July 22, 2002, pursuant to the defendants' blanket policy,
> practice and custom which required that every pretrial detainee be
> strip searched during initial admission processing into a DOC
> facility.

This class is, in all respects, the complement to the McBean Settlement Class, in that it includes,

by definition, the claims that were specifically excluded from the McBean Settlement Class.  See

McBean I, 228 F.R.D. at 504.  Although the Court must carefully examine each of the

requirements antecedent to certification, defendants oppose intervenor-plaintiffs' motion for

class certification based solely on their alleged failure to meet the adequacy requirement of Rule

23(a)(4), and to satisfy Rule 23(b)(3).

A.    Ascertainability

The requirement of ascertainability, though not expressly mentioned in Rule 23, is

fundamental.  Hnot v. Willis Group Holdings Ltd., 228 F.R.D. 476, 480-81 (S.D.N.Y. 2005).  It

obligates plaintiffs to demonstrate that the class they seek to certify is readily identifiable, such

that the court can determine who is in the class and, thus, bound by the ruling.  See Dunnigan v.

Metropolitan Life Ins. Co., 214 F.R.D. 125, 135 (S.D.N.Y. 2003) ("[P]laintiffs must demonstrate

the existence of an 'aggrieved class' [and] that the aggrieved class can be readily identified.");

People United for Children, Inc. v. City of New York, 214 F.R.D. 252, 256 (S.D.N.Y. 2003)

---

[19] Defendants raise no objection in their papers to Daniel Velazquez serving as a class
representative, and it is undisputed that Velazquez was arrested on January 4, 2002, for
possession and sale of marijuana, and that he was arraigned the following day and admitted to
the Manhattan Detention Center, a DOC facility.  (Int.-Pl. R 56.1 ¶ 203; Def. R. 56.1 ¶ 70;
Velazquez Decl. ¶ 12; New History NYSID Number Search of Daniel Velazquez, Ex. 106.)

("[C]ourts should ensure that the class definition is 'precise, objective, and presently ascertainable.'").  A class is ascertainable when defined by objective criteria that are administratively feasible, without a subjective determination.  Dunnigan, 214 F.R.D. at 135; Fears v. Wilhelmina Model Agency Inc., 02 Civ. 4911, 2003 WL 21659373, at *2 (S.D.N.Y. July 15, 2003).

As the Court found in McBean I, the class members are readily identifiable as all those admitted to certain facilities, following arraignment on specific charges, and subjected to strip searches.[20]  In other words, the class is defined wholly in regard to objective criteria, and no subjective determination of any sort will be required to determine membership.  Indeed, defendants have apparently already been able to identify and count putative class members.  See infra Part IV.B.

B.   Numerosity

To satisfy the numerosity requirement of Rule 23(a), plaintiffs must show that the class is so numerous that joinder is "impracticable."  Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).  Numerosity is generally presumed when a class consists of forty or more members.  See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).  In the past, defendants have represented that the class size is approximately 82,000 persons.  (Int.-Pl. Reply Mem. at 47.)  They now challenge the numerosity of the class, however, on the basis that intervenor-plaintiffs' claims related to searches conducted prior to April 7, 2002, are barred by the statute of limitations, and therefore the only viable claims are for strip searches that occurred

_____

[20] To the extent that it is necessary to determine whether any individual released defendants from any claims as a result of receiving payment as part of the McBean Settlement Class, that, too, is easily identifiable.

22

between April 7, 2002, and July 22, 2002, which do not exist in a sufficient number to support the certification of a class.  (Def. Reply Mem. at 54.)

This argument is thoroughly unpersuasive, but emerges from defendants' contention that the statute of limitations is tied to the filing of intervenor-plaintiffs' First Amended Complaint on April 7, 2005, almost a year after they intervened as of right, and not to the filing of the complaint by the original McBean plaintiffs.  This argument, which lacks clarity in part because defendants' moving papers do not support it with any reasoning or citation to precedent, appears to boil down to the assertion that intervenor-plaintiffs' claims on behalf of this purported damages class constitute some kind of successive class action wholly unmoored from the original action filed by the McBean plaintiffs.  With respect to the narcotics and weapons misdemeanants that constitute this damages class, however, this argument is without basis.  These are neither "new" claims, nor claims that the filing of the original class action would have failed to toll.  See Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554 (1974) (announcing the principle that the filing of a class action complaint will toll the statute of limitations for the benefit of the class).

Intervenor-plaintiffs moved to intervene as of right in this litigation in early 2004, claiming that their interests would be adversely affected by the original plaintiffs' decision to narrow the scope of the complaint so as to exclude misdemeanants charged with narcotics- or weapons-related offenses from the settlement class.  Intervenor-plaintiffs then opposed certification of just such a class, pointing out that certification would deprive four of the eight original named plaintiffs of a recovery.  The Court acknowledged intervenor-plaintiffs' position, but, in weighing the competing claims for class certification and in ultimately certifying the narrower McBean Settlement Class, reasoned that "the claims of those [narcotics and weapons

misdemeanants] excluded from the class now certified are still preserved by the presence of similarly-situated intervenor-plaintiffs in this suit."  McBean I, 228 F.R.D. at 505 & n.12.

The Court so concluded because it is a well-settled principle that the filing of a class action complaint will toll the statute of limitations for the benefit of the class.  See Am. Pipe, 414 U.S. at 554.  Defendants' argument that this precept has no application here is unpersuasive not only because it is based on precedent that is inapposite,[21] but also because even if defendants had made the more plausible argument that premature intervention in the original McBean action precluded the tolling of the claims under American Pipe, this argument was squarely resolved to the contrary in In re Worldcom Sec. Litig., 496 F.3d 245, 255 (2d Cir. 2007), which was decided six months prior to the filing of defendants' reply brief.  See id. (holding that the doctrine of American Pipe applies regardless of whether intervention occurs prior to, or following, class certification because tolling does not conflict with the purpose of statutes of limitations, which is to put defendants on notice of claims against them and to prevent plaintiffs from sleeping on their rights).  Accordingly, searches conducted prior to April 7, 2002 are not barred by the statute of limitations, and the numerosity requirement is satisfied.[22]

---

[21] Defendants' references to Korwek v. Hunt, 827 F.2d 874, 876 (2d Cir. 1987) and In re Agent Orange Product Liability Litig., 818 F.2d 210, 213 (2d Cir. 1987), are unavailing because both of those cases involved the pursuit of a separate and distinct class action.  See also Agent Orange, 818 F.2d at 213 (further distinguishing American Pipe's discussion of federal tolling, because "[h]ere, we are dealing with Hawaii's limitation statutes [and b]ecause none of them provides for tolling in a situation such as exists here, it is doubtful that . . . American Pipe . . . can be treated as applicable precedent").

[22] The numerosity requirement would be satisfied in any event because while this is nominally a separate class, it is substantially identical to the Rule 23(b)(3) class of certain narcotics and weapons misdemeanants searched between July 23, 2002, and October 4, 2007 that defendants have already consented to certify.  (Stipulation and Order 4, § I(c), Oct. 4, 2007.)

C.      Commonality and Typicality

Rule 23(a) also requires that the action raise an issue of law or fact that is common to the class (commonality), and that "each class member's claim arise[] from the same course of events, and each class member make[] similar legal arguments to prove the defendant's liability" (typicality).  Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 155 (2d Cir. 2001) (citation omitted); see also In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992).  "The crux of both requirements is to ensure that maintenance of a class action is economical and [that] the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Marisol A. v. Guiliani, 126 F.3d 372, 376 (2d Cir. 1997) (internal quotation marks omitted) (alteration in original).  Accordingly, the factual background of each proposed class representative's claim need not be identical to that of all of the class members, In re Sumitomo Copper Litig., 182 F.R.D. 85, 94 (S.D.N.Y. 1998), so long as the claims arise from the same events, and the legal arguments for liability are the same.  In re Drexel, 960 F.2d at 291.

Intervenor-plaintiffs have identified legal and factual issues common to all proposed class members, e.g., whether defendants had a policy of strip-searching all newly-admitted pre-trial detainees without regard to reasonable suspicion, and whether plaintiffs were strip-searched pursuant to that policy.  As in McBean I, each class member's claim arises from the same events – the blanket application of the policy – and the alleged absence of reasonable suspicion at the time the searches were conducted supplies the legal theory of liability for each and every class member.  It is simply not the case, as defendants claim, that every single class member would "have to be examined, with testimony and evidence introduced by both sides" in order to determine whether reasonable suspicion existed for the search.  (Def. Mem. at 72.)  Even if there

25

were hypothetical individuals whose special circumstances (had the searching officer been aware of them) might have led to the officer's reasonable suspicion that a class member was secreting contraband, there is no evidence in this case that any such facts or circumstances were ever presented to any searching officer, nor have defendants even made such a claim.  "As long as [intervenor-]plaintiffs assert, as they do here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish [the] necessary typicality."  In re Towers Fin. Corp, Noteholders Litig., 177 F.R.D. 167, 170 (S.D.N.Y. 1997) (internal quotation marks and citation omitted); see also Robidoux, 987 F.2d at 936-37 ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.").  Thus, the requirements of commonality and typicality are met.

     D.    Adequacy

To determine whether a named plaintiff will be an adequate class representative, courts inquire whether: "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000).  The analysis turns on whether the proposed class representatives possess "the same interest and suffer the same injury as the class members" and the focus is on uncovering "conflicts of interest between named parties and the class they seek to represent."  Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 625-26 (1997) (internal quotations and citation omitted); see also In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 142 (2d Cir. 2001) (requiring courts to "ask whether plaintiff's interests are antagonistic to the interest of other members of the class")

26

(quotation marks and citation omitted).

Here, defendants do not contest counsel's experience, qualifications, or ability to conduct the litigation.  Indeed, defendants have already stipulated that Emery Celli Brinckckerhoff & Abady LLP, would serve as class counsel for the class of certain drug and weapon misdemeanants that were searched between July 23, 2002 and October 4, 2007 (Stipulation and Order 4, § I(c), Oct. 4, 2007).  Accordingly, their sole challenge concerns the adequacy of the proposed class representatives.  They contend that some of the proposed class representatives lack viable claims, either because the statute of limitations has run or because they purportedly released defendants from any claims resulting from their intake strip searches by participating in the McBean Settlement Class.[23]  The statute of limitations argument has already been rejected as without merit.  Moreover, because defendants raise no objection to proposed class representative Daniel Velazquez, there is no question that the class has an adequate representative.[24]

---

[23] Defendants also make two other arguments that are without merit.  First, they contend that the proposed class representatives, who admittedly were searched on specific dates during the class period, cannot represent plaintiffs who were searched on other dates during the class period.  There is, however, no evidence anywhere in the record to support the claim that any aspect of the strip searches – including how they were conducted or upon whom – varied throughout the duration of the class period.  Second, defendants argue that the claims of Arthur Wallace, among other named intervenor-plaintiffs, are not properly before this Court because they were set forth in the form of an addendum and as part of an intervention motion served on the defendants and submitted to Magistrate Judge Theodore H. Katz, but not thereafter re-served as part of a subsequent amended complaint.  Even if Judge Katz did not explicitly approve this procedure on November 16, 2006, defendants have offered no explanation for how this failure deprived them of "the ability to properly frame the issues" (Def. Mem. at 87-88), particularly where there is no question that they were served with intervenor-plaintiffs' allegations, and Judge Katz subsequently granted the intervention motions.

[24] Velazquez was arrested on January 4, 2002, for possession and sale of marijuana, and he was arraigned the following day and admitted to the Manhattan Detention Center.  (Int.-Pl. R. 56.1 ¶ 203; Def. R. 56.1 ¶ 70; Velazquez Decl. ¶ 12; New History NYSID Number Search of Daniel Velazquez, Ex. 106.)  To the extent defendants can be understood to dispute Velazquez's adequacy to any extent, it is the contention that "[t]here is no way to independently verify[] the

27

Nevertheless, defendants' argument regarding the McBean Settlement Class requires further discussion because this issue affects the scope of the proposed class, as well as the adequacy of two of the three proposed class representatives.

Regardless of whether the issue is framed in terms of the typicality of the representative's claims or the adequacy of his representation, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation . . . [because] there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990) (citations omitted). Still, the unique defense rule is not "rigidly applied" and is "intended to protect plaintiff class – not to shield defendants from a potentially meritorious suit." In re Parmalat Sec. Litig., No. 04 MD 1653, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008) (internal quotations and citations omitted).

Here, defendants argue that two of the three proposed class representatives, and presumably a substantial minority of the proposed class, were members of the McBean Settlement Class and therefore have released, as a condition of the settlement, claims for intake searches conducted during the class period, including searches that involved narcotics- and weapons-related charges. In response, intervenor-plaintiffs contend that regardless of whether a person participated, or could have participated, in the McBean Settlement Class, such claims

---

occurrence . . . of any routine strip search performed at a DOC facility." (Def. R. 56.1 ¶¶ 120, 204.) This statement is wholly insufficient to raise a triable issue as to whether Velazquez was strip-searched, not only because Velazquez has submitted a sworn declaration that such a search took place, but because DOC admits that, per the Prior Admission Policy, it strip searched *every* detainee admitted to its facilities during the class period. (Int.-Pl. R. 56.1 ¶ 16.)

remain unsettled.

Defendants rest their argument on the portion of the Claim Form to participate in the McBean Settlement Class that requires detainees to list the dates "[d]uring [the class period]" they were "detained . . . [at any DOC facility]," and to account for whether, "at the time you were a pre-trial detainee, were you, if you know, charged with [the list of excluded drug-weapon offenses]." (Claim Form at 3.)  The Claim Form then states "[i]f the answer . . . is 'yes,' you are not a member of the plaintiff class and therefore cannot receive payment under this class action settlement."  (Id.)  Defendants argue that because this portion of the Claim Form requires the claimant to affirm that the only times he was admitted into DOC custody during the class period were the times listed on the Claim Form, and that none of those admissions involved the excluded narcotics or weapons charges, those who submitted a claim form and accepted payment are barred from asserting that they are now entitled to additional payments for any other searches during the class period.  This argument, like the argument that no person may recover twice for a single search,[25] has some persuasive force.

_____

[25] On this point, intervenor-plaintiffs and defendants appear to agree.  (Int.-Pl. Reply Mem. at 48 & n.33.)   Although this accord would appear to have few practical consequences, given that any claim eligible for the McBean Class Settlement, by definition, excludes the claim that would make recovery possible here, it appears that proposed class representative Kenneth Williams may – through a mistake in the administration of the prior settlement – be seeking to recover a second time for the same search.  Williams submitted a claim as part of the McBean Settlement Class for a search conducted on January 19, 2002, in which he reported that he was "not sure" whether he had been arraigned on any of the excluded narcotics or weapons charges. (Nelson Decl. Ex. I.)  Williams may subsequently have received payment for the January 19, 2002, search – a detail on which this record is silent – despite the fact it is now clear that Williams's claim involved a charge for misdemeanor narcotics possession (Int.-Pl. R. 56.1 ¶ 120), which should have rendered his claim ineligible for recovery as part of the McBean Settlement Class.  If Williams recovered for the January 19, 2002, search, his claim relating to that search is extinguished on the basic principle that a plaintiff may not secure a double recovery.  However, if, as should have happened, Williams received no payment because "official records establish[ed] that [he was not] a class member" (Class Notice at 5), Williams's

Although intervenor-plaintiffs argue that the McBean Settlement Class was intended to consist only of non-excluded *claims*, the Class Notice and the portion of the Claim Form discussed above, indicate that the affected *individual* agreed to "give up and release <u>all</u> claims against <u>all</u> defendants for strip searches during the jail admission or intake process that took place during the [period of July 15, 1999 to July 22, 2002]." (Class Notice at 5 (emphasis added).) That the settlement was organized by claimant, rather than by claim, is not obviously counter to the purposes of the McBean Settlement Class. Anyone who participated in the class did so, arguably, to take advantage of a swift and certain settlement, which was made possible by the pruning of claims involving certain narcotics and weapons charges. While the release of "all" claims impacted a fraction of those in the class who by dint of multiple searches had some claims that were excluded from the class, the Claim Form put those persons on notice that they could either opt out and pursue all of their claims on their own terms, or agree to the terms of the settlement, accept payment, and release any other claims they might have. Thus, class members who accepted payment for their non-narcotics and non-weapons claims can hardly be said to be unfairly surprised that they are now barred from asserting additional claims.

The same cannot be said, however, for those who did not fill out a Claim Form. As the defendants point out, the Claim Form specifically asks those seeking to settle their claims to affirm that the only times they were admitted into DOC custody during the class period were the times listed on the Claim Form and that none of those admissions involved the excluded narcotics or weapons charges. It seems entirely plausible, however, that a person who had suffered multiple searches, at least one of which was a search that involved one of the excluded

_____

claim is preserved, and he may proceed as a class representative.

charges, might have discarded his Claim Form, believing that answering "yes" to the question about the excluded charges precluded class membership and, accordingly, that he preserved his rights, at least with respect to the searches that involved the excluded charges, by doing absolutely nothing.

Far from being a mere theoretical possibility, this is precisely the position of proposed class representative Arthur Wallace.  Wallace was strip-searched at intake on multiple occasions throughout the class period.  (Int.-Pl. R. 56.1 ¶ 194.)  He was, therefore, by dint of some of those searches, a member of the McBean Settlement Class, although the record reveals that he was also searched pursuant to an arrest for misdemeanor narcotics possession on May 21, 2002 (Int.-Pl. R. 56.1 ¶¶ 187-88), a charge that was specifically excluded from the McBean Settlement Class.  Wallace never filed a Claim Form – and, so far, has received nothing.  Wallace, and any other person similarly situated, could reasonably have failed to file a Claim Form after concluding that the presence of excluded charges – even if those charges were only relevant to one of several search-claims – made him "not a member of the [McBean Settlement C]lass" (Claim Form at 3), and therefore ineligible for recovery.[26]

While the McBean Settlement Class is long since closed – indeed plaintiffs do not even contend that claims with respect to the non-narcotics, non-weapons searches during the period

---

[26] On close examination, the Class Notice and Claim Form do not appear to have contemplated that some detainees would have both "class" claims and claims that were specifically excluded from the settlement.  Indeed, the only fair way to read the Claim Form in particular is as a document that attempted to steer claimants into *either* filing a claim if the searches to which they were subjected did not involve certain narcotics- and weapons-related charges, *or* discarding the notice if the searches to which they were subjected did.  While such an approach would have been sufficient to instruct those with only one type of claim as to how to exercise or preserve their rights, it is, in retrospect, unintelligible for those with both class and excluded claims.

covered by the settlement have been preserved – defendants' argument that Wallace forfeited his claims because, in failing to submit a Claim Form, he, too, "[gave] up and release[d] *all* claims against *all* defendants" (Class Notice at 5) for searches conducted during the class period lacks merit.  The ambiguity in the Class Notice and Claim Form renders it fundamentally unfair to preclude the claims of detainees who were arguably part of the McBean Settlement Class by virtue of one or more strip searches occasioned by non-narcotics or non-weapons charges, but who also had narcotics- or weapons-related misdemeanor admissions during the same period. Accordingly, those persons with multiple claims during the class period, one or more of which involved a charge excluded from the McBean Settlement Class, to whom no payment in settlement was made, may bring their narcotics- and weapons-related claims as part of the instant class.

The Court therefore finds that proposed class representatives Arthur Wallace and Daniel Velazquez adequately represent the class, and that the prerequisites for class certification under Rule 23(a) have been satisfied.

III.  Rule 23(b) Requirements

In addition to meeting the requirements of Rule 23(a), a class action must also satisfy one of the requirements of Rule 23(b).  In re Vivendi Universal, S.A., 242 F.R.D. 76, 83 (S.D.N.Y. 2007), citing In re IPO Sec. Litig., 471 F.3d at 33 & n.3.  Intervenor-plaintiffs have moved for certification under Rule 23(b)(3), which provides for certification where "the Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  As in McBean I, the narcotics and weapons misdemeanants in this action are unified by a common

32

legal theory (DOC's blanket policy subjecting all post-arraignment misdemeanor arrestees to intake strip searches was unconstitutional) and by common facts (each was allegedly subjected to one or more strip searches in accordance with this policy).  See McBean I, 228 F.R.D. at 502-504.

While these claims may be defended against by showing that reasonable suspicion existed at the time the particular searches were conducted, these individual defenses do not preclude certification provided they do not predominate.  "As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of [a defense] will not automatically foreclose class certification under Rule 23(b)(3)."  In re Visa Check, 280 F.3d at 136 (internal quotation marks omitted) (alteration in original).

On occasion, courts have declined to certify broad classes of individuals subject to blanket strip-search policies because of the role the particular circumstances of each search might play, whether as to liability, class membership, or individual damages claims.  See, e.g., Maneely v. City of Newburgh, 208 F.R.D. 69, 78-79 (S.D.N.Y. 2002) (collecting cases and granting only partial class certification as to the issue of whether a policy of indiscriminately strip-searching all arrestees existed, and leaving it up to class members to bring individual suits to adjudicate whether the defendants had violated their own rights).  Here, however, the availability of individual defenses as to liability is substantially limited because, as in McBean I, the defendants do not dispute that the searches at issue took place pursuant to a policy that required that every detainee be searched irrespective of any particular factor, and under which the searching officers were not required to, and generally did not, become aware of any individualized facts about the vast majority of detainees.  Accordingly, no evidentiary hearings will be required to determine class membership in the first instance.  Moreover, as noted above,

the record is silent as to whether DOC possesses any evidence whatsoever from which a defense as to even a single detainee could be mounted.  The predominance of the central legal and factual issues common to all class members, therefore, is in no way threatened by the possibility of hypothetical defenses.

A class action is also the most efficient and superior means through which to resolve these claims, especially given defendants' representation at one point in this litigation that the class size is approximately 82,000 persons.  (Int.-Pl. Reply Mem. at 47.)  Although the assumed socio-economic status of the proposed class members – misdemeanants remanded due to their inability to post bail – is likely to preclude a significant portion of the class from burdening the courts with individual claims, that fact argues in favor of class action treatment to protect the rights of class members unable to litigate their individual claims.  See Labbate-D'Alauro v. GC Serv. Ltd. P'ship, 168 F.R.D. 451, 458 (E.D.N.Y. 1996) ("It is appropriate for the court [in examining Rule 23(b)(3) superiority] to consider the inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually.") (internal quotation marks omitted).

For the foregoing reasons, the class as proposed by plaintiffs meets the requirements of both Rule 23(a) and Rule 23(b)(3).  Accordingly, plaintiffs' motion for certification is granted.

V.    Housing and Exit Searches

The next substantive issue raised by these cross-motions is whether DOC's Housing and Exit Policies, pursuant to which all pre-trial misdemeanants are routinely strip-searched in various circumstances after intake, is controlled by the mandate of Shain "that persons charged with a misdemeanor and remanded to a local correctional facility . . . have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons."  273

F.3d at 66.  Plaintiff-intervenors argue that, because Shain controls *all* strip searches performed

on misdemeanants and not just those at intake, indiscriminate and mandatory post-intake

searches like those alleged here are as impermissible following intake as they are upon intake.

Shain, however, says nothing of the kind.  Indeed, the Shain court took pains to emphasize that it

was "consider[ing] the legality of [NCCC's strip search policy] as it applies to post-arraignment

*admitees* to the jail because Shain himself was a post-arraignment *admittee*."  Id. at 62 (emphasis

added).[27]

Even holding that statement in abeyance as dictum, the precedent on which Shain relies

still forecloses intervenor-plaintiffs' argument.  Shain emerges from a line of cases that address

searches conducted as part of a correctional facility's admissions process, not searches

conducted after a detainee's entrance into a general institutional population.  See Weber, 804

F.2d at 802 (finding that the risk of a misdemeanor arrestee's *introducing* contraband into the

general jail population at intake did not warrant a strip search); Walsh v. Franco, 849 F.2d 66, 69

(2d Cir. 1988) (same); Wachtler v. County of Herkimer, 35 F.3d 77 (2d Cir. 1994) (finding that

mere fact of arraignment did not remove a misdemeanor arrestee from the purview of Weber).

This is not an historical accident.  Shain is the progeny of Weber, and Weber is an application –

in the context of a strip search at intake – of the rule announced by the Supreme Court in

Wolfish that the need for a particular search must be weighed against the invasion of personal

---

[27] That only intake searches were being contemplated is further emphasized by the fact that within the context of the Shain opinion, the accent in the language falls not on the word "admitee" but on the word "post-arraignment."  In Wachtler v. County of Herkimer, 35 F.3d 77 (2d Cir. 1994), the Court of Appeals had applied the analysis of Weber and Walsh, sub silentio, to a misdemeanor arrestee who was strip-searched after his arraignment.  Part of the ostensible purpose of Shain was to emphasize that the law in this Circuit relating to strip searches of pre-trial misdemeanants arriving at a local correctional facility was also well-settled.

rights it occasions.  See Wolfish, 441 U.S. at 559 (considering searches after contact visits and holding that the "test of reasonableness" for the search requires courts to consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted").  Weber explicitly acknowledged Wolfish, not only in deciding that reasonable suspicion struck the proper balance for searches at intake, but in announcing that the factors that constitute such suspicion would include, "the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest."  Weber v. Dell, 804 F.2d at 800-02.  Consequently, even if there were more clarity or certainty about how the arrest-centered factors enunciated by Weber – once attenuated by time and co-mingling with the institutional population – could provide the requisite suspicion that a detainee was secreting contraband, Weber would still be confined to the intake searches because the test of reasonableness is – as Wolfish instructed – context-specific: a search must "be justified as reasonable under the circumstances."  Id. at 800; see also Shain, 273 F.3d at 64 (reasoning that "arrestees do not ordinarily have notice that they are about to be arrested and thus an opportunity to hide something").

Intervenor-plaintiffs' argument to the contrary boils down to the fact that they find it nonsensical that reasonable suspicion of secreted contraband is required to search a detainee upon intake at a correctional facility, while the same detainee can be searched hours later upon entering the general population on "less than probable cause."  See Bell v. Wolfish, 441 U.S. at 560.  Not only does this argument fail to address the holding in Shain, but it also misunderstands the extent to which controlling precedent is, as Wolfish commanded, responsive to the *circumstances* under which a search takes place – not the extent to which strip searches conducted across various circumstances are uniformly "methodical, extensive and highly

intrusive."  (Int.-Pl. Mem. at 21.)  Ultimately whether <u>Shain</u> *should* control post-intake searches is not, as plaintiffs argue, evident from <u>Shain</u> itself, but is a question of first impression subject to argument.

Because post-intake searches are not – as a constitutional matter – indistinguishable from those occurring at intake, the Court must decide the standard under which the constitutionality of the search will be analyzed.  Before reaching that issue, however, it is necessary to resolve the threshold question of whether the original complaint in this action addressed claims arising from such searches, or whether the post-intake strip search claims brought by the plaintiff-intervenors must be dismissed as an impermissible enlargement of the scope of this litigation.

It is well-settled that intervenors must take the litigation as they find it at the time of intervention; they cannot change the issues framed between the original parties.  <u>See</u> <u>Hartley Pen Co. v. Lindy Pen Co., Inc.</u>, 16 F.R.D. 141, 153 (S.D. Cal. 1954) (finding that an intervenor "join[s] subject to the proceedings that occurred prior to his intervention; he cannot unring the bell.").  Here, when intervenor-plaintiffs purported to intervene as a matter of right, they did so in order to represent the rights of certain narcotics and weapons misdemeanants who were being excluded from the settlement class that had originally been proposed in the complaints filed by the original plaintiffs.  <u>See</u> May 20, 2004 Order; <u>see also</u> <u>McBean I</u>, 228 F.R.D. at 490.  Thus, at the time the Court granted the motion to intervene, there was no question that intervenor-plaintiffs merely sought to preserve the issues as framed between the original parties – not to expand them.  Indeed, there was no hint until the filing of intervenor-plaintiffs' First Amended Complaint more than a year later that intervenor-plaintiffs intended to pursue additional claims concerning post-intake strip search policies, practices, or procedures.  <u>See</u> <u>McBean I</u>, 228 F.R.D. at 504 n.10 (noting that the amended complaint added allegations as to illegal post-intake strip

searches).

Introduction of these claims is problematic, however, because, as discussed above, they arise under different factual circumstances and do not raise common questions of law with the claims raised by the original plaintiffs.  And, because they were not raised at the time intervenor-plaintiffs sought to intervene, the Court had no opportunity to exercise its discretion in limiting the scope of intervention, "subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings."  Fed. R. Civ. P. 24, Notes of Advisory Committee on Rules at 18; Shore v. Parklane Hosiery Co., Inc., 606 F.2d 354, 356 (2d Cir. 1979).  However, "what the court could do at the time when intervention was sought it could do later."  Stewart-Warner Corp. v. Westinghouse Elec. Corp., 325 F.2d 822, 827 (2d Cir. 1963); see also McBean I, 228 F.R.D. at 504 & n.10 ("deferring for another day whether claims of illegal, post-intake strip searches would impermissibly enlarge the scope of the litigation").   As the defendants propose, that day has arrived.

Notably, plaintiff-intervenors do not contest that additional allegations pertaining to post-intake searches could constitute an impermissible enlargement of the litigation under the principle discussed in Hartley Pen,16 F.R.D. at 153.  Instead, they contend that *they* are not enlarging the scope of the action because "the plain language" of the original plaintiffs' complaint in this action, filed on July 15, 2002, contemplated post-intake searches.  In particular, intervenor-plaintiffs cite language in that complaint in which the plaintiffs sought to certify a class of those "who were subjected to defendants' policy, practice and custom of strip searching pretrial detainees . . . without reasonable suspicion," as well as where they sought "[a]n injunction ceasing all improper strip searches."  (Pl. Original Compl. ¶ 4.)

Plaintiff-intervenors' reliance on this language, however, to establish that the original plaintiffs were contending that *all* strip searches of detained misdemeanants were unconstitutional, is unpersuasive. First, for the reasons previously discussed, intervenor-plaintiffs' argument that a claim for intake searches is really a claim for post-intake searches because the two are constitutionally indistinguishable under <u>Shain</u>, is rejected. Second, it is abundantly clear from the context of plaintiffs' original and amended complaints that the only searches grieved by the plaintiffs were those that occurred upon intake. There is no mention in either of the original plaintiffs' complaints that the plaintiffs intended to complain of post-intake strip searches, or even that DOC, in fact, conducted any such searches. Thus, the fact that not every sentence of the complaint modified the word "searches" with the word "intake" does not now permit intervenor-plaintiffs to enlarge the scope of the litigation, particularly where it is manifest that the violations alleged in the original complaint arose from searches of pre-trial detainees conducted at intake.

Next, the original plaintiffs' filings in this litigation establish that their position up to the point that they settled their claims was that post-intake searches provided no basis for a legal claim because "in the post arraignment context, *only the initial intake search* into the jail is illegal." (Pl. Mem. Class Cert. at 13, Mar. 16, 2004 (emphasis added).) In fact, the plaintiffs explicitly negotiated settlement awards in light of this understanding, <u>see</u> <u>McBean I</u>, 228 F.R.D. at 496, and it was precisely this narrow position that caused plaintiff-intervenors to oppose certification of the McBean Settlement Class. (<u>See</u> Int.-Pl. Mem. Opp. Pl. App. at 20-21, Apr. 15, 2004.)[28]

---

[28] Precisely when intervenor-plaintiffs introduced post-intake claims into the litigation is unclear. The complaint purporting to intervene in this litigation lacks any explicit mention of

Finally, the original plaintiffs' conduct throughout the litigation makes clear that they were merely trying to strike down an intake policy substantially identical to the one already deemed unconstitutional in <u>Shain</u>.  The original plaintiffs took no depositions and retained no experts.  (<u>Id</u>.)  Moreover, contrary to plaintiff-intervenors' assertion, there is nothing in the record to support the view that the original plaintiffs raised post-intake claims but, following discovery or some other development, "casually dropp[ed]" those claims in pursuit of a quick, favorable settlement (Int.-Pl. Mem. Opp. Pl. App. at 20-21).  <u>See</u> <u>McBean I</u>, 228 F.R.D. at 496 (finding that there is "no substance" to intervenor-plaintiffs' claims that the original plaintiffs abandoned "potentially valuable [post-intake] claims at the expense of absent class members").  Indeed, a fair reading of the original plaintiffs' initial and amended complaints, as well as the entire record in this case, conclusively demonstrates that the original plaintiffs did not grieve post-intake strip searches; they merely pursued enough discovery to establish that "plaintiff class-members . . . were subjected to unconstitutional [intake] strip searches pursuant to an established policy of the Department of Corrections."  <u>McBean II</u>, 233 F.R.D. at 384-86.

On the strength of <u>Shain</u>, no more was needed.  But, as intervenor-plaintiffs' request for additional discovery attests, much more factual development is required in order to address the

---

post-intake searches.  While including broad language similar to that of the original plaintiffs' complaints (<u>see</u> Int.-Pl.Compl. ¶ 21), not a single intervenor-plaintiff alleged that he or she was subject to a post-intake strip search (<u>see</u> Int.-Pl. Compl. ¶¶ 38-58), and no allegations relevant to DOC's policies of post-intake searches are mentioned.  Although at some point between moving to intervene as of right on February 18, 2004, and opposing the original plaintiffs' request for class certification on April 15, 2004, intervenor-plaintiffs adopted the position that the original plaintiffs were "relinquishing" class members' rights to pursue claims for post-intake searches, only in intervenor-plaintiffs' First Amended Complaint, filed on April 7, 2005, approximately three years after this litigation commenced, is there a specific allegation that post-intake strip searches of pre-trial detainees already in DOC custody were "routine" and in violation of <u>Shain</u>. (Int.-Pl. Am. Compl. ¶ 59; <u>see also</u> Int.-Pl. Mem. Opp. Pl. App. at 20, Apr. 15, 2004.)

search claims involving the Housing and Exit Policies, which were introduced in this litigation for the first time by intervenor-plaintiffs in their First Amended Complaint, and which raise issues distinct from the well-settled principles governing intake searches.

Accordingly, intervenor-plaintiffs' post-intake search claims must be dismissed as an impermissible enlargement of the scope of this litigation. Intervenor-plaintiffs remain free to pursue such claims without prejudice in a new action.

VI.   PLRA

Defendants' final argument is that intervenor-plaintiffs' claims and recovery are barred in their entirety by the Prison Litigation Reform Act ("PLRA"). In particular, defendants contend that intervenor-plaintiffs have failed to exhaust their administrative remedies pursuant to § 1997e(a) and to show physical injury as required by § 1997e(e). The first point is easily disposed of, as it is squarely controlled by Greig v. Goord, 169 F.3d 165 (2d Cir. 1999). There, the Second Circuit held that "litigants . . . who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of th[e] provision." Id. at 167. A plaintiff is subject to the exhaustion requirement of § 1997e(a) if, and only if, he "was a confined prisoner at the time he filed his lawsuit[ ]." Berry v. Kerik, 366 F.3d 85, 87 (2d Cir. 2003); accord Doe v. Washington County, 150 F.3d 920, 924 (8th Cir. 1998). Because it is undisputed that none of the intervenor-plaintiffs were confined in a DOC facility at the time their claims were filed, the PLRA requirement that plaintiffs first exhaust their claims through grievance or administrative procedures does not bar this action.

The question of whether the physical injury requirement of § 1997e(e) applies to a plaintiff who is no longer incarcerated when he commences his action is closer, but it, too, fails

to provide defendants with a valid defense.[29]  The plain language of § 1997e(e) limits its applicability to "a prisoner confined in a jail, prison, or other correctional facility" at the time the action is "brought."  Although the Second Circuit has yet to consider the question, the two courts of appeals to have squarely addressed the meaning of the phrase "brought by a prisoner," have both concluded that the provision does not apply to non-incarcerated plaintiffs.  In Harris v. Garner, 216 F.3d 970 (11th Cir. 2000), the court sitting en banc thoroughly reviewed the statutory language and held that "[b]ecause section 1997e(e) applies only to claims filed while an inmate is confined, it does not prevent a former prisoner from filing after release a monetary damages claim for mental and emotional injury suffered while confined, without a prior showing of physical injury."  Id. at 979-80.  The court then reviewed the legislative history of the PLRA and found that "Congress' deliberate decision to draw the confinement line – with plain and unequivocal language – where it did," id. at 979, served the "legislation's overriding goal" of precluding filings by confined prisoners who have little to lose by filing frivolous lawsuits.  Id. at 978-79.  In Kerr v. Puckett, 138 F.3d 321, 322-23 (7th Cir. 1998) (Easterbrook, J.), the Seventh Circuit examined the plain language of § 1997e(e) and similarly concluded that Congress intended to exclude the possibility "that 'prisoner' refers to the plaintiff's status at the time of the injury rather than at the time the litigation begins."  Id. at 323; see id. (finding that the "[t]he statutory language does not leave wriggle room" and holding that "by waiting until his release from prison [plaintiff] avoided § 1997e(e).").

---

[29] The physical injury requirement precludes prisoners from bringing federal civil actions "for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).

Although defendants cite <u>Cox v. Malone</u>, 199 F. Supp. 2d 135 (S.D.N.Y. 2002), <u>aff'd</u>, 56 Fed. Appx. 43 (2d Cir. 2003), in support of their position, <u>Cox</u> is neither persuasive nor binding on this Court.  <u>See</u> 2d Cir. R. 32.1 (limiting the precedential value of summary orders).  In <u>Cox</u>, the court reasoned that release from incarceration does not relieve a plaintiff of the obligation to satisfy the physical injury requirement because the "fortuity of release . . . does not affect the kind of damages that must be alleged in order to survive the gate-keeping function of section 1997e(e)." <u>Cox</u>, 199 F. Supp. 2d at 140.  Nevertheless, the question is not, as <u>Cox</u> reasoned, whether the statute's gatekeeping function is well-served, or even better-served, by barring suits about prison injuries regardless of the plaintiff's confinement status.  Rather, the question is whether the language chosen by Congress in § 1997e(e) plainly limits the provision to prisoners incarcerated at the time an action is commenced.  As persuasively found by both the Seventh and Eleventh Circuits, this question must be answered in the affirmative.

Accordingly, because intervenor-plaintiffs were not incarcerated at the time this action was commenced, the Court finds that § 1997e(e) is inapplicable and does not preclude them from proceeding with this litigation.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment as to all pre-trial detainee misdemeanants who have or will be affected by DOC's Housing and Exit Policies is granted and those claims are dismissed without prejudice to their being renewed in an independent action.  Intervenor-plaintiffs' motion for partial summary judgment as to all narcotics and weapons misdemeanants that were searched between July 15, 1999, and October 4, 2007, and to certify a damages class of pre-trial detainees who were charged with certain narcotic or weapons misdemeanors between July 15, 1999, and July 22, 2002, is also granted.

The motions are, in all other respects, denied.

With respect to certification of the aforementioned class, intervenor-plaintiffs have demonstrated that their proposed class and two of its proposed representatives satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3).  Arthur Wallace and Daniel Velazquez are appointed as class representatives.  Other named intervenor-plaintiffs, including Kenneth Williams, may apply to the court to be appointed class representatives upon a showing of their class membership.  The class certified, as proposed by plaintiffs and amended herein, comprises

> [a]ll persons who did not receive a monetary settlement as part of
> the McBean Settlement Class and who were arraigned solely on
> non-felony charges – at least one of which must be a charge listed
> in paragraph 2 of the Stipulation and Order of Class Action
> Settlement, dated June 21, 2005 – and who were strip searched
> during the period between July 15, 1999, and July 22, 2002,
> pursuant to the defendants' blanket policy, practice and custom
> which required that every pretrial detainee be strip searched during
> initial admission processing into a DOC facility.

Finally, the firm of Emery, Celli, Brinckerhoff & Abady LLP, is appointed as lead counsel for the class.

SO ORDERED.

Dated:  New York, New York
        August 14, 2009

_____
        GERARD E. LYNCH
        United States District Judge

44