RICHARD D. EMERY
ANDREW G. CELLI, JR.
MATTHEW D. BRINCKERHOFF
JONATHAN S. ABADY
EARL S. WARD
ILANN M. MAAZEL
O. ANDREW F. WILSON
KATHERINE ROSENFELD
ELIZABETH S. SAYLOR
DEBRA L. GREENBERGER
ZOE SALZMAN
SAM SHAPIRO
VASUDHA TALLA
ALISON FRICK
DAVID LEBOWITZ
HAYLEY HOROWITZ

EMERY CELLI BRINCKERHOFF & ABADY LLP

ATTORNEYS AT LAW
75 ROCKEFELLER PLAZA, 20TH FLOOR
NEW YORK, NEW YORK 10019

TELEPHONE
(212) 763-5000
FACSIMILE
(212) 763-5001
WEB ADDRESS
www.ecbalaw.com

CHARLES J. OGLETREE, JR.
DIANE L. HOUK

July 3, 2014

*Via ECF*

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: *McBean v. The City of New York,* 02 Civ. 5426

Dear Judge Koeltl:

   As the Court is aware, we represent class counsel for plaintiff-intervenors in the above-captioned matter. We write to (1) provide a final accounting, (2) to request the Court's consent to reissue settlement checks to claimants after the Court-ordered deadlines of April 30, 2013 and August 27, 2013, due to errors by Rust Consulting ("Rust") and the New York State Department of Correctional Services ("DOCS"), and (3) to update the Court on our discussions with the City concerning the settlement money remaining due to uncashed checks.

  **I.**  **Settlement Fund's Final Accounting**

   Pursuant to the Court's February 1, 2011 Order approving distribution of the settlement, dkt. 344, the $29 million Class Fund was divided among the claimants who submitted timely and eligible claim forms. The resulting standard payment amount was $1,130.69, subject to deductions due to New York child support liens, backup tax withholding for those who did not provide valid social security numbers, and payments received in the 2005 Settlement.

   Pursuant to the Court's October 22, 2010 Order approving the March 16, 2010 stipulation, dkt. 294, claims postmarked between September 11, 2010 and December 15, 2010 were to be considered for payment, if otherwise eligible, if the claimant provided good cause for filing late. The $200,000 previously agreed to be paid towards attorneys' fees was withheld in order to ensure there would be enough funds to pay these late claims. Pursuant to the Court's August 29, 2011 Order, dkt. 394, this money, as well as a portion of the funds remaining in the distribution account due to timely and eligible checks that had not been cashed, was used to pay

the late claimants the standard payment amount for timely claimants: $1,130.69, subject to the same deductions noted above. All of the initial distribution of timely and eligible checks were void by June 18, 2011. Rust reissued checks to all claimants who requested a reissue before this date, giving the checks a void date of July 18, 2011. During the first distribution, claimants cashed checks totaling approximately $24.8 million.

Pursuant to the Court's August 27, 2012 Order, dkt. 450 , on November 2, 2012, a second distribution of $41.40 per person was sent to 25,243 eligible claimants who cashed their first distribution settlement checks. In accordance with that Order, checks were also re-issued to those who submitted a written request by April 30, 2013. The Court's Order no longer permits Rust or ECBA to issue any additional checks. During the second distribution, claimants cashed checks that equaled approximately $595,000.[1] Because class members move frequently, over $430,000 remains in the account.

After both distributions, Rust reported that the $29.2 million total settlement fund was distributed as follows:

- $25,381,422.01 was paid directly to class members ($25,378,802.64 in regular unique checks and $2,619.37 in non-fraud cashier's checks paid to those in federal custody);[2]

- $3,132,396.59 was paid to the New York City Human Resources Administration ("HRA") for child support liens ($3,044,114.65 was initially withheld and an additional net $88,281.94 was subsequently paid to HRA);

- $4,206.17 net was credited to the account for checks fraudulently cashed;[3]

- $239,388.76 was paid to the Internal Revenue Service ("IRS") in backup tax withholding for those who did not provide a valid social security number ($272,633.10 was initially paid but $33,244.34 was returned due to due to uncashed checks)

- $2.24 was deposited due to the bank's adjustment for processing errors;

---

[1] A more detailed accounting is set forth in Exhibits 1 and 2.

[2] This number does not include the amount paid out to 33 eligible claimants who cashed two settlement checks. Each of these claimants sent a request to have Rust reissue their check, and at the time a second check was mailed to the claimants, Rust believed the original check was uncashed and voided with the bank. At a later date, it came to Rust's attention that the original check had, in fact, been cashed and the eligible claimant proceeded to cash the second, "reissued" check. Rust requested that the claimants return the funds that they obtained as a result of cashing both checks. One claimant returned his funds. As such, 32 checks remain "double-cashed" for a total of $32,878.33 in overpayments to eligible claimants. Because this error was a result of miscommunication between Rust and the bank, Rust has returned this amount to the Settlement Fund. Ex. 1. After Rust transferred the account to ECBA, it was discovered that Rust still owed the account $41.40 due to double-cashed checks. Rust subsequently paid this amount to ECBA, and it was added back into the account. Ex. 1.

[3] Rust was credited $15,196.48 by the bank for fraud claims. Ex. 1. $4,206.17 remained in the account at the time it was transferred to ECBA to distribute to four individuals. ECBA sent settlement checks in the amount of $1,130.69 to three of the four class members, totaling $3,392.07. Exs. 2, 3. The fund now has a net credit of $814.10 for the remaining class member who could not be located.

- $443.04 net was paid out in bank fees (later reimbursed, see below and *supra* n.2, 5); and[4]

- $41.40, was paid out of the account for doubled-cashed checks (later reimbursed, see below and *supra* n.2, 5).

After the above-referenced additions and subtractions from the initial $29.2 million, $450,516.62 remained in the Rust account. Ex. 1.

On May 7, 2013, $450,516.62 was transferred from Rust to our firm to distribute the remaining settlement checks.[5] Ex. 3 (ECBA account transactions from May 7, 2013 – May 1, 2014). Our firm has distributed the money as follows:

- $14,453.30 was paid directly to claimants;

- $3,392.07 was paid to claimants whose checks were previously fraudulently cashed (*supra* n.3);

- $209.07 was paid to Rust to refund an overpayment of bank fees (*supra* n.5);

- $693.51 was deposited into the account by Rust to pay bank fees and double cashed checks previously owed (*supra* n.2, 5);

- $45.00 was deposited into the account by ECBA to pay bank fees.

Accordingly, the current balance of the fund is $433,200.69. Exs. 1-4. If Mr. Spencer and Mr. Winfield are paid $1,172.09 each as discussed below, the final balance will be **$430,856.51**. Exs. 1, 2.[6]

## II. Reissuance

Due to errors by Rust and DOCS, we respectfully request the Court's permission to reissue settlement checks from the first and second distributions for two claimants: Darron Spencer and Vincent Winfield. The City consents to this request.

Pursuant to the Court's August 27, 2012 Order, dkt. 450, the deadline to submit a reissue request was April 30, 2013. The Court's Order Section (a)(i) states: "Written requests for re-issued checks from the initial distribution or from the second distribution shall be honored if

---

[4] Payments toward bank fees were initially withheld prior to the transfer of funds on May 7, 2013. Ex. 2.

[5] The March 31, 2013 balance for the fund was $450,725.70. Ex 4. At the time, Rust owed $443.04 in bank fees and $41.40 in double cashed checks. Ex. 3. This is a difference of $484.44. Accordingly, Rust paid **$484.43** to the fund in two increments: on September 28, 2013 for the amount of $275.35 and on October 2, 2013 for the amount of $209.08. *Id*. Exs. 1, 3. Rust sent an additional check for $209.08 in March 2014. This was an overpayment of $209.08 in bank fees. Because Rust reimbursed an extra $209.08 for bank fees, but owed the fund $0.01, it was repaid $209.07. Exs. 2, 3

[6] Because ECBA switched banks, the funds' TD Bank account was closed, and the $433,200.69 was transferred to a new bank, Sterling National Bank, on May 1, 2014. Exs. 3, 4.

received by Class Counsel, or post-marked, no later than April 30, 2013, so long as funds remain in either the reserve funds or the Class Fund." *Id*. In addition, Section (a)(m) prevents our office from reissuing any checks "one-year from . . . this order," that is after August 27, 2013. *Id*. Due to errors by Rust and DOCS, Darron Spencer and Vincent Winfield did not request in writing a re-issuance until after the Court deadline.

Darron Spencer, Claim No. 21168, was issued a check for the amount of $1,130.69 on February 10, 2011. According to Rust's documentation, Mr. Spencer called Rust's office seeking a reissue of this check in August and November 2011, and then again on September 17, 2013. Rust, in error, did not respond to either of his 2011 reissue inquiries. His 2013 request was forwarded to our office, but we were unable to re-issue his check because the Court-ordered deadline had passed. Because Mr. Spencer made two documented attempts to request a reissue of his settlement check well before the Court-ordered deadlines, we believe it would be equitable to re-issue his check now.

Vincent Winfield, Claim No. 10342, was issued a check for the amount of $1,130.69 on June 22, 2011. On August 7, 2013, after the Court-ordered deadline, Mr. Winfield wrote to Rust, enclosing his original settlement check, explaining that he did not have access to his property while in a state facility but under federal custody. Mr. Winfield was not provided with his property until August 2013, when he was transferred to state custody. Mr. Winfield provided us with an email from Valerie Phillips, employee of Southport Correctional Facility, supporting this claim. Our office followed up with Ms. Phillips who provided written documentation that he did not have access to his settlement check in June 2011 because "he did not have access to his property from the time he physically left here in 2010 until his 'release' from [federal] custody in August 2013." Mr. Winfield therefore was never informed that he had a settlement check in his possession until four months after the April 30, 2013 Court-ordered deadline. We therefore also think it is equitable to re-issue his check now.

Because we also think these two claimants should receive the second distribution award amount of $41.40, we respectfully request the Court's permission to issue them both checks for $1172.09.

### III. Cy Pres

As set forth above, if the two claimants discussed above are paid $1,172.09 each, the final remaining balance will be $430,856.51. The Stipulation of Settlement states that "Class Counsel, on written notice to the City and the Court, shall have the discretion to … seek an award by the Court consistent with cy pres principles." Stipulation of Settlement ¶ 45 (dkt. 233, Ex. A).[7] Consistent with that agreement, the parties have been discussing the best use of the

---

[7] The full text of the relevant provisions follow. Pursuant to paragraph 45 of the Stipulation of Settlement, the parties agreed that:

> Class Counsel has the discretion to void checks mailed to SCMs [Settlement Class Members] and not cashed within 120 days of issuance. Notice of this procedure will be provided at the time the checks are issued. Class Counsel, on written notice to the City and the Court, shall have the discretion to (a) reissue the checks, or (b) add the amount of the

EMERY CELLI BRINCKERHOFF & ABADY LLP
Page 5

approximately $430,000. The City has proposed that the money remaining in the fund be used for the installation of cameras at Rikers Island, and requested the consent of Class Counsel for this use of the remaining funds. We are considering the City's proposal, but will not agree to such use unless we first receive assurances that the cameras will be properly monitored and maintained. If properly monitored and maintained, cameras help deter violence and the violation of detainees' rights. Cameras also can assist in the prosecution of those who violate inmates' rights. If the cameras are not properly monitored and maintained, however, they will not benefit the class.

    As part of another class action currently pending before Judge Swain and Magistrate Judge Francis – *Nunez, et al. v. City of New York, et al.*, 11-CV-5845 (S.D.N.Y.), which involves the alleged systemic abuse of detainees by guards on Rikers Island – this office along with co-counsel has proposed to the City that it install additional cameras on Rikers Island and put in place policies and procedures that ensure that cameras are properly monitored and maintained. If we are able to reach a final settlement in *Nunez* that includes the installation, monitoring, and maintenance of additional cameras, then we would recommend to the Court that the money remaining in the fund be used to purchase additional cameras on Rikers Island. Settlement discussions in *Nunez* are ongoing, and three lengthy settlement conferences were held last month. If a satisfactory resolution of *Nunez* is not possible, we will confer with the City and write the Court concerning the distribution of the remaining funds. We therefore respectfully request the Court's continued patience as we work with the City to determine the best use of the remaining funds. The City consents to the request for additional time.

---

    voided checks back to the Class Fund to be divided equally amongst eligible SCMs, or (c) issue checks to persons who make late claims for good cause shown, or (d) seek an award by the Court consistent with cy pres principles.

Moreover, the Court Order finally approving the settlement provided:

    If money remains in the Class Fund or in the $200,000 reserve after the payment late claims filed on or before December 15, 2010 for "good cause," the parties shall confer and seek an order from the Court as to how to distribute same.

10/21/2010 Order (Dkt. 294) ¶ (z). And the August 27, 2012 Court Order states that "At the conclusion of one year, the parties shall confer and seek and order from the Court as to how to distribute any remaining money." 8/27/12 Order (Dkt. 450) ¶ (o).

Emery Celli Brinckerhoff & Abady LLP
Page 6

### IV. Conclusion

We respectfully request permission to issue checks in the amount $1172.09 to Darron Spencer and Vincent Winfield and for additional time to determine how to distribute the remaining funds. Please contact us with any questions. Thank you.

Respectfully Yours,

/s/

Elizabeth Saylor

Encl.

c. Counsel of Record (via ECF)